

No. **09-11039**

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States of America,

Plaintiff/Respondent,

v.

Bruce Carneil Webster,

Defendant/Petitioner.

## MOTION FOR AUTHORIZATION TO FILE SUCCESSIVE MOTION TO VACATE SENTENCE

**THIS IS A DEATH PENALTY CASE.**

*Oral Argument Requested*

U.S. COURT OF APPEALS
**FILED**

OCT 2 2 2009

CHARLES R. FULBRUGE III
CLERK

Dorsey & Whitney LLP
Steven J. Wells
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600

Counsel for Petitioner
Bruce Carneil Webster

## INTRODUCTION

Bruce Carneil Webster moves this Court for authorization to file in the United States District Court for the Northern District of Texas a successive motion to vacate his death sentence under 28 U.S.C. § 2255.[1] The Proposed Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255 is submitted with the filing of this motion as Exhibit 1. Oral argument is requested.

Although Petitioner does not seek to challenge his conviction in the successive motion, he does seek to challenge his sentence of death based on newly discovered evidence that establishes that he is mentally retarded and therefore ineligible for the death penalty. *See Atkins v. Virginia*, 536 U.S. 304 (2002). This Court should grant Petitioner's motion because, consistent with this Court's limited gate-keeping role, the Court need only find that Petitioner has made "a sufficient showing of possible merit [to the application] to warrant a fuller exploration by the district court." *Reyes-Requena v. United States*, 243 F.3d 893, 899 (5th Cir. 2001).

At a trial more than six years before *Atkins* was decided, Mr. Webster presented substantial evidence— he had scored below 72 on six separate IQ tests taken since the age of eighteen and had significant adaptive deficits— that he was mentally retarded; four jurors, in fact, decided that Mr. Webster is or may be

---

[1] Mr. Webster's sentence has been stayed in collateral litigation challenging the constitutionality of the lethal injection procedure in federal prison. *See* Order, *Roane, et. al. v. Gonzales, et. al.*, Case No. 1:05-cv-2337 (D.D.C. Feb. 16, 2007) (Docket No. 27) (Wells Decl. Ex. A).

1

mentally retarded. The trial court, however, in a two-sentence decision, decided that Mr. Webster "was not mentally retarded as a matter of law" and sentenced Petitioner to death. The trial court's decision contained no explanation for its "finding" on the issue of mental retardation; no indication of the standard for mental retardation being applied; and, in fact, no indication whether *any* standard at all was being applied. Indeed, neither this Court nor the courts of Texas had, at the time of the trial, enunciated either a standard for mental retardation in the context of the death penalty or a process for its determination. Further, Petitioner was not permitted an evidentiary hearing on the issue of his mental retardation at trial or in connection with his previous 2255 Motion, an amended version of which was filed just weeks after *Atkins* was decided.

While substantial evidence of Petitioner's mental retardation was presented at trial, newly discovered evidence, gathered by the undersigned pro bono counsel and its investigators, establishes that Petitioner is mentally retarded – under the definition of mental retardation widely accepted by the courts today and widely accepted by the medical field at the time of trial. Newly discovered and released government and school records – from a time prior to the commission of the crime of which Petitioner was convicted – demonstrate IQ scores and adaptive functioning well within the range of mental retardation, as well as explicit diagnoses of "mental retardation" by three independent physicians. Importantly,

2

one doctor specifically noted that there was no evidence that Mr. Webster was faking his condition. Testimony from Petitioner's family and community provide additional compelling evidence of adaptive deficits. No reasonable factfinder, weighing this newly discovered evidence together with the evidence as a whole at trial, could conclude that Petitioner is not mentally retarded.

Accordingly, Petitioner wishes to present to the district court in connection with – for the very first time – an evidentiary hearing, the following claim:

> Newly discovered contemporaneous Social Security records along with declarations of childhood friends, relatives, and acquaintances of Mr. Webster, viewed in light of the evidence as a whole, establish by clear and convincing evidence that Mr. Webster is not eligible for the death penalty.

## STATEMENT OF THE CASE

### I. PROCEDURAL HISTORY

#### A. MR. WEBSTER WAS TRIED, CONVICTED, AND SENTENCED TO DEATH IN 1996

On November 4, 1994, Mr. Webster was indicted on six counts in the Northern District of Texas, including kidnapping in which a death occurred in violation of 18 U.S.C. §§ 1201(a)(1) and (2), along with various noncapital offenses. Mr. Webster was tried, convicted, and sentenced to death on the capital charge on June 20, 1996.

3

### B.    EVIDENCE OF MENTAL RETARDATION

#### 1.    LEGAL FRAMEWORK AT THE TIME OF TRIAL

Under the then-existing legal framework, Mr. Webster was allowed to present evidence of mental retardation during the sentencing phase of his trial. This evidence was provided as "mitigating evidence" under the U.S. Supreme Court's decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989), and under a federal statute, 18 U.S.C. § 3596(c), which statutorily barred the execution of mentally retarded individuals. At the time of Mr. Webster's trial, a defendant's mental retardation did not serve as a constitutional bar to execution as it does now; indeed, the U.S. Supreme Court expressly stated in *Penry* that there was not a national consensus against the execution of the mentally retarded such that the punishment could be considered "cruel and unusual." *Penry*, 492 U.S. at 305. Further, neither *Penry* nor 18 U.S.C. § 3596(c) defined "mental retardation" or required any procedural process for making a mental retardation determination.

#### 2.    EVIDENCE OF MENTAL RETARDATION PRESENTED AT TRIAL

Consistent with the limited existing legal framework under *Penry* and Section 3596(c), Mr. Webster attempted to prove during the sentencing phase that he was mentally retarded. The evidence presented consisted primarily of testimony from various doctors who had administered IQ tests after Mr. Webster's incarceration, as well as testimony from Mr. Webster's family members and

4

childhood friends. Notably, of the six individually administered IQ tests admitted into evidence at trial, only one had been administered before commission of the crime. In particular, the evidence presented to the trial court includes:

\* Testimony from Dr. Finn, who had administered the WAIS-R and Rorshach tests and determined Mr. Webster has an IQ of 59. *See* Trial Tr. Vol. 23 at 187:6-9 (Wells Decl. Ex. B).

\* Testimony from Dr. Keyes, a psychologist specializing in mental retardation, who had administered the Bender-Gestalt, Stanford Binet, and Woodcock-Johnson Psycho-Educational Battery tests and concluded that Mr. Webster has an IQ of 51 and has the adaptive functioning of a seven-year-old. *See* Trial Tr. Vol. 24 at 20:2-6, 43:16-25 (Wells Decl. Ex. C).

\* Testimony from Dr. Fulbright, a neuro-psychologist, who had performed a series of tests on Mr. Webster and concluded that Mr. Webster has significant impairment in his attention capacity. *See* Trial Tr. Vol. 24 at 131:18-19 (Wells Decl. Ex. C).

\* Testimony from Dr. Cunningham, who had examined Mr. Webster and interviewed Mr. Webster's family and concluded that Mr. Webster suffers from mental retardation of a mild variety. *See* Trial Tr. Vol. 24 at 189:7-8 (Wells Decl. Ex. C).

\* Testimony from several witnesses regarding Mr. Webster's adaptive deficit in functional academics. *See, e.g.*, Testimony of Luketha Frazier, Trial Tr. Vol. 23 at 75:18 – 76:4 (stating that she and other classmates helped Mr. Webster with his homework and on exams) (Wells Decl. Ex. B); Testimony of Beatrice Webster, Trial Tr. Vol. 23 at 138:2-5 (stating that Mr. Webster repeated grades twice, once in elementary school and once in middle school) (Wells Decl. Ex. B).

\* Testimony from several witnesses regarding Mr. Webster's adaptive deficit in home living. *See, e.g.*, Testimony of Dr. Denis Keyes, Trial Tr. Vol. 24 at 44:4-12 (stating that Mr. Webster is not able to live on his own and function in the real world) (Wells Decl.

Ex. C); Testimony of Mark Webster, Trial Tr. Vol. 23 at 33:5-14 (stating that Mr. Webster relied on the care of his mother and his girlfriends) (Wells Decl. Ex. B); Testimony of Future Mae Webster, Trial Tr. Vol. 23 at 67:4-17 (stating that she and her mother gave Mr. Webster the money he needed) (Wells Decl. Ex. B); Testimony of Beatrice Webster, Trial Tr. Vol. 23 at 145:13-24 (stating that Mr. Webster was never able to live away from her home and that he only received income from welfare, food stamps, and family members and girlfriends) (Wells Decl. Ex. B).

\*      Testimony from several witnesses regarding Mr. Webster's adaptive deficit in communication and conceptual skills. *See, e.g.*, Testimony of Dr. Raymond Finn, Trial Tr. Vol. 23 at 194:10-13 (stating that Mr. Webster is better at speaking than understanding and that concepts had to be simplified in order for Mr. Webster to understand them) (Wells Decl. Ex. B); Testimony of Dr. Denis Keyes, Trial Tr. Vol. 24 at 107:10-14 (stating that Mr. Webster was not able to communicate regarding abstract thoughts) (Wells Decl. Ex. C); Testimony of Leonda Daniels, Trial Tr. Vol. 23 at 102:22 – 103:3 (stating that Mr. Webster may have been able to write letters, but that his handwriting was illegible) (Wells Decl. Ex. B).

Immediately after this evidence was presented, Mr. Webster's lawyers acknowledged that 18 U.S.C. § 3596(c) did not require a finding on mental retardation, but requested that the court make a finding whether Mr. Webster was mentally retarded. Trial Tr. Vol. 26 at 227:7-20 (Wells Decl. Ex. E). Without stated analysis or explanation, the trial court declared: "I do not find, as a matter of law, that the defendant is mentally retarded. I do not believe that the evidence shows that he is, as a matter of law, mentally retarded." *Id.* at 227:21-25.

The next day, on June 19, 1996, the jury was instructed that if the government proved aggravating factors beyond a reasonable doubt, the jury must

6

consider whether the defendant had proved any mitigating factor by a preponderance of the evidence, including "[t]he defendant is or may be mentally retarded." Trial Tr. Vol. 27 at 19:19 – 21:2 (Wells Decl. Ex. F). The jury was given no instruction as to the standard to be used in determining mental retardation. On June 20, 1996, the jury found that the government had proven aggravating factors beyond a reasonable doubt. *Id.* at 101:10 – 102:11. Four jurors found that the defendant had proven by a preponderance of the evidence that Mr. Webster "is or may be mentally retarded." *Id.* at 102:17.

On June 21, 1996, the trial court issued a finding that Mr. Webster was not mentally retarded and therefore not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty. *See* Factual Finding Regarding Mental Retardation, Docket No. 751[2] (finding that Mr. Webster "is not mentally retarded and that he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him"). On September 30, 1996, the Court issued its judgment, sentencing Mr. Webster to death. Judgment in a Criminal Case, Docket No. 824.

---

[2] "Docket No." refers to the criminal docket entry in *U.S. v. Webster*, Case No. 4:94-cr-00121-Y (N.D. Tex.).

## C.    ON DIRECT APPEAL, THIS COURT AFFIRMS MR. WEBSTER'S CONVICTION AND SENTENCE

Mr. Webster appealed his sentence and conviction on December 3, 1998. This Court affirmed, rejecting Mr. Webster's arguments that the trial court erred in making its mental retardation finding. *See U.S. v. Webster*, 162 F.3d 308 (5th Cir. 1998). Importantly, this Court noted that "a finding that a defendant is not mentally retarded under § 3596 presents an issue of first impression," *id.* at 352, and that the statute "fails to provide guidance, and no case has addressed this issue," *id.* at 351. Because the Federal Death Penalty Act failed to provide guidance as to how to ensure that the mandate of Section 3596(c) is carried out, this Court concluded that the trial court did not plainly err in its unexplained finding that Mr. Webster is not mentally retarded. *Id.* at 351. In essence, this Court decided that because there *was* no standard for mental retardation, the trial court could not have applied the *wrong* standard. *Id.* at 352.

## D.    MR. WEBSTER CHALLENGES HIS SENTENCE UNDER 28 U.S.C. § 2255

Mr. Webster then filed his initial Motion to Vacate Conviction and Sentence under 28 U.S.C. § 2255 ("2255 Motion") on September 29, 2000. *See* 2255 Motion, Docket No. 998 (Wells Decl. Ex. U). Among other claims, Mr. Webster argued that he was ineligible for execution under 18 U.S.C. § 3596(c) because he is mentally retarded, *id.* at 50-51; that there was insufficient evidence to support the

trial court's finding that he was not mentally retarded, *id.* at 52-58; and that Section 3596(c) was unconstitutionally vague because it provided no guidance concerning who is to be the factfinder on an issue of mental retardation, the burden of proof for a finding of mental retardation, and what standards are to be used in defining mental retardation, *id.* at 62-63. In addition to the evidence supporting mental retardation presented at trial, Mr. Webster presented evidence of adaptive deficits and poor academic performance from two members of the Watson Chapel Schools faculty.[3]

### E. THE DISTRICT COURT DENIES MR. WEBSTER'S REQUEST FOR ADDITIONAL DISCOVERY ON JUNE 18, 2002

While his 2255 Motion was pending, Mr. Webster filed a Motion for Leave to Conduct Discovery on April 30, 2001. This motion requested discovery on several issues related to Mr. Webster's mental retardation claim. *See* Motion for Leave to Conduct Discovery, Docket No. 1028. Request for Discovery No. 8 specifically requested that the government "be required to produce . . . any reports prepared by a mental health professional in the government's possession which, in

---

[3] The petition showed that E.C. Turner, a counselor in the Watson Chapel Schools, would testify that Mr. Webster was a "follower" in situations where he was intellectually equal or inferior to other students. The petition also showed that Mr. Webster's former teacher, Loula Gray, would testify that Mr. Webster was a "slow" student, and that he was assigned to "basic" classes at Watson Chapel Jr. High School, where he received more individualized attention. *See* 2255 Motion at 26-29 (Wells Decl. Ex. U).

any manner, questions or rebuts the testimony by the government's witnesses at trial (i.e. Dr. Coons and Dr. Parker) on the issue of petitioner's mental retardation." *Id.* at 10. On June 18, 2002, the Northern District of Texas entered an order denying all requests for discovery and requiring Mr. Webster to file an amended motion to vacate under 28 U.S.C. § 2255 within 60 days. *See* Memorandum Opinion and Order Denying Petitioner's Motion for Discovery, Docket No. 1063. The court concluded that because two of Mr. Webster's claims of mental retardation had been affirmed on direct appeal, additional discovery would not be permitted on those claims. The court further concluded that on the other two claims, Mr. Webster failed to show how additional discovery would contribute to his claims. Had the court granted the Request for Discovery No. 8 (among others), the government would have been required to turn over the Social Security records which are a significant part of the new evidence presented in the instant motion.

**F.    THE UNITED STATES SUPREME COURT DECIDES *ATKINS V. VIRGINIA* ON JUNE 20, 2002**

Two days after the district court entered its order denying Mr. Webster's request for additional discovery on the question of his mental retardation, the Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002). *Atkins*, which abrogated *Penry* by declaring the execution of mentally retarded individuals "cruel and unusual punishment" in violation of the Eighth Amendment, transformed the analysis of mental retardation claims in capital cases.

The foundation for the Court's decision in *Atkins* was that mentally retarded individuals act with a decreased level of moral culpability than that which categorizes the most serious adult criminal actors. *Id.* at 318. Mentally retarded individuals operate with disabilities in areas of "reasoning, judgment, and control of their impulses." *Id.* at 306. It is because of their impairment that they have a "diminished capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318. While the Court found that their deficiencies "do not warrant an exemption from criminal sanctions," they do diminish their personal culpability. *Id.*

The Court recognized that the more difficult issue was determining which offenders would qualify as mentally retarded. "Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* at 317. The Court opted to follow the approach it took in *Ford v. Wainwright* with regard to insanity, and left to the states "'the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences.'" *Id.* (citing *Ford*, 477 U.S. 399, 405, 416-417 (1986)).[4]

---

4   The *Atkins* court, however, did advocate the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association ("APA") definitions of mental retardation. *See Atkins*, 536 U.S. at 308 n.3, 318.

## G.    MR. WEBSTER IS FORCED TO FILE HIS AMENDED MOTION TO VACATE SENTENCE UNDER 28 U.S.C. § 2255 ON AUGUST 22, 2002

Due to the district court's scheduling order and order denying discovery, Mr. Webster was forced to file his Amended Motion to Vacate Conviction and Sentence ("Amended 2255 Motion") on August 22, 2002, just 56 days after the *Atkins* decision was announced, without discovery.[5] *See* Amended 2255 Motion, Docket No. 1064 (Wells Decl. Ex. V). In that motion, Mr. Webster continued to argue that he was ineligible for the death penalty because he was mentally retarded, but after *Atkins*, this argument transformed from a statutory claim to a constitutional one.[6] *Id.* at 50-53. Proving mental retardation was still uncertain, however, because the *Atkins* Court left the development and implementation of the definitions, standards, and safeguards supporting the determination of mental retardation to the states. *See Atkins*, 536 U.S. at 317.

---

[5]    Four days after *Atkins* was decided, the U.S. Supreme Court also decided *Ring v. Arizona*, 536 U.S. 584 (2002). *Ring* addressed the constitutional right to have a jury decide certain questions relating to sentencing. Mr. Webster argued that his sentence should be vacated under *Ring* in Grounds for Review Two and Five because the judge, rather than the jury, decided the question of mental retardation at his trial. *See* Amended 2255 Motion at 17-25, 34-36 (Wells Decl. Ex. V).

[6]    Mr. Webster also referenced *Atkins* in arguing that that there was insufficient evidence to support the trial court's finding that he was not mentally retarded, Amended 2255 Motion at 53-60 (Wells Decl. Ex. V), and that Section 3596(c) was unconstitutionally vague, *id.* a 62-64.

The district court ultimately denied Mr. Webster's Amended 2255 Motion on September 20, 2003, affirming its previous finding that Mr. Webster is not mentally retarded. *See* Memorandum Opinion and Order, Docket No. 1110. While the district court listed the evidence presented in support and in opposition to a finding of mental retardation, it simply adopted its previous determination that Mr. Webster did not suffer from mental retardation, without substantive analysis of the new *Atkins* claim. *Id.* at 21-33. In rejecting Mr. Webster's claim, the district court recognized that trial experts for the government and defense agreed that Mr. Webster's IQ scores fell consistently in the range of subaverage intellectual functioning associated with mental retardation, but that the experts "converged" on the issue of Mr. Webster's adaptive skills. *Id.* at 31-32. The district court further found that there was evidence Mr. Webster exhibited adaptive deficits,[7] but that evidence also existed to support its finding at trial that Mr. Webster "does not have a deficit in adaptive skills."[8] *Id.* at 32. The court denied all of Mr. Webster's claims as well as his request for an evidentiary hearing. *Id.* at 32-33.

---

[7] This evidence includes a Vineland test given by Dr. Keyes and testimony by Mr. Webster's family members, acquaintances, and teachers who knew him before age 18. Memorandum Opinion and Order, Docket No. 1110, at 32.

[8] This evidence is almost solely related to Mr. Webster's ability to function in prison. "Webster has adapted to the criminal life that he chose and has illustrated the ability to . . . live within the confines of the 'home' he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math." Memorandum Opinion and Order, Docket No. 1110, at 32.

13

## H.    MR. WEBSTER APPLIED FOR CERTIFICATES OF APPEALABILITY ON ISSUES RELATED TO MENTAL RETARDATION

Mr. Webster applied for certificates of appealability from the district court on each of the 16 grounds raised in his Amended 2255 Motion. *See* Order, Docket No. 1119. The district court granted certificates of appealability on (1) whether sufficient evidence supported the district court's finding that Mr. Webster was not mentally retarded, and (2) whether the government is required to prove a capital defendant is not mentally retarded. *Id.* On appeal, this Court again affirmed the trial court's finding on mental retardation, stating, "The question whether he is mentally retarded was, as the district court observed, 'a highly contested one at trial,' and Mr. Webster failed to convince *either* the district court that he is retarded or, moreover, a majority of the jurors that he is or even *may* be retarded. And the record supports those findings." *U.S. v. Webster*, 421 F.3d 308, 314 (5th Cir. 2005). Like the district court, this Court did not perform a legal analysis of the evidence in light of the new constitutional prohibition on the execution of the mentally retarded and failed to apply the developing standards prescribed therein. *Id.* at 312-314. This Court considered only whether the evidence was sufficient to support the trial court's finding that Mr. Webster is not mentally retarded under an abandoned legal scheme, and did not consider whether Mr. Webster presented sufficient evidence or should be given an opportunity to present evidence to prove

that he is mentally retarded under *Atkins*. *Id.* This Court also noted that the district court's order should be affirmed because Mr. Webster presented no "new evidence," in support of his claim: "Indeed, Webster's brief does not point to any new evidence bearing directly on his mental capacity; instead it summarizes the evidence presented at his trial concerning his cognitive abilities and childhood experiences." *Id.* at 314. Thus, Mr. Webster was denied an opportunity for collateral review of the evidence of his mental retardation under *Atkins* or to develop new evidence under the *Atkins* framework.

## SUMMARY OF THE ARGUMENT

This Court should grant Mr. Webster's motion to file a successive petition because he has made a prima facie showing that "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense." 28 U.S.C. § 2255(h)(1).

Mr. Webster comes before this Court with compelling new evidence of mental retardation which was previously unavailable to him. This evidence includes: (i) Social Security records containing three separate contemporaneous diagnoses of mental retardation (none of which could be subject to a claim of "manipulation" as they were all prepared prior to Petitioner's arrest in this matter); (ii) information concerning Mr. Webster's participation in special education

15

classes in the Watson Chapel Schools; (iii) forms completed by Mr. Webster for government benefits; and (iv) declarations from childhood friends, relatives, and acquaintances of Mr. Webster discussing the manifestation of Mr. Webster's mental retardation prior to age 18.

## ARGUMENT

### I.    STANDARD OF REVIEW

#### A.    IN EVALUATING AN APPLICATION TO FILE A SUCCESSIVE MOTION UNDER 28 U.S.C. § 2255, THIS COURT PERFORMS A LIMITED GATE-KEEPING ROLE

Because Mr. Webster was tried and convicted in federal court, this Court must evaluate his application to file a successive motion under 28 U.S.C. § 2255. In considering whether to grant the application, this Court "should . . . insist only on a *prima facie showing* of the motion's adequacy." *Reyes-Requena*, 243 F.3d at 898 (quoting *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997) (emphasis in original)). A prima facie showing means "simply a sufficient showing of possible merit to warrant a further exploration by the district court." *Id.* at 899 (quoting *Bennett*, 119 F.3d at 469). Thus, the motion should be granted if "it appears reasonably likely" that the application satisfies the requirements for filing a successive motion. *Id.* This Court's decision to grant the motion is tentative in that the district court independently decides whether the applicant satisfies the

16

requirements for filing a successive motion before hearing the merits of the motion. *Id.*

## B.    THE SAME CLAIM SUCCESSOR BAR DOES NOT APPLY TO APPLICATIONS BROUGHT BY FEDERAL PRISONERS UNDER 28 U.S.C. § 2255

As an initial matter, this Court should not dismiss this motion even though Mr. Webster seeks to raise an *Atkins* claim like the one raised in his first 2255 Motion because the same claim successor bar found in 28 U.S.C. § 2244(b)(1) does not apply to him as a federal prisoner. By the plain language of 28 U.S.C. § 2244, it is clear that Congress intended for the same claim successor bar to apply only to claims brought by state prisoners under 28 U.S.C. § 2254, not to claims brought by federal prisoners, like Mr. Webster, under 28 U.S.C. § 2255. Congress expressly provided that "[a] claim presented in a second or successive habeas corpus application *under section 2254* that was presented in a prior application shall be dismissed." 28 U.S.C. § 2244(b)(1) (emphasis added). There is no such bar under 28 U.S.C. § 2255 or in any other statute. Under the well-known interpretative cannon, *expressio unius est exclusio alterius* ("the expression of one thing implies the exclusion of the other"), Congress's explicit decision to bar repetitive petitions brought by state prisoners under 28 U.S.C. § 2254 demonstrates that it did not intend to include similar claims brought by federal prisoners under 28 U.S.C. § 2255. *See Leatherman v. Tarrant County Narcotics Intelligence &*

*Coordination Unit*, 507 U.S. 163, 168 (1993) (applying *expressio unius est exclusio alterius* to conclude that because Fed. R. Civ. P. 9(b) does not specifically enumerate among the actions that must be pled with greater particularity complaints alleging municipal liability under 42 U.S.C. § 1983, such complaints need not be pled with particularity); *Thompson v. Goetzman*, 337 F.3d 489, 499 (5th Cir. 2003) (applying *expressio unius est exclusio alterius* to conclude that Congress's failure to include a right of action against tortfeasors indicates that the statute allows recovery solely from the party named in the statute, *i.e.*, an insurer).

### C.    THERE IS NO DUE DILIGENCE REQUIREMENT FOR SUCCESSIVE MOTIONS BROUGHT BY FEDERAL PRISONERS UNDER 28 U.S.C. § 2255

Under 28 U.S.C. § 2255, a successive motion must demonstrate, *inter alia*, "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense." 28 U.S.C. § 2255(h)(1). While Congress required state prisoners presenting a second or successive claim under 28 U.S.C. § 2254 to demonstrate that the newly discovered evidence was "previously [unavailable] through the exercise of due diligence," 28 U.S.C. § 2244(b)(2)(B)(i), federal prisoners presenting a successive claim need not make a showing of due diligence under 28 U.S.C. § 2255. Congress explicitly made the due diligence requirement apply solely to "[a] claim

presented in a second or successive habeas corpus application *under section 2254* that was not presented in a prior application." 28 U.S.C. § 2244(b)(2)(B) (emphasis added).  There is no such requirement in 28 U.S.C. § 2255(h)(1).  As with the same claim successor bar, the well-known cannon of statutory construction, *expressio unius est exclusio alterius*, applies and demonstrates that Congress did not intend to include a due diligence requirement for petitions brought by federal prisoners under 28 U.S.C. § 2255.  *See Leatherman*, 507 U.S. at 168; *Thompson*, 337 F.3d at 499.

### D.    UNDER 28 U.S.C. § 2255, FEDERAL PRISONERS CAN CHALLENGE THEIR SENTENCES

Congress provided that federal prisoners "may move the court which imposed the sentence to vacate, set aside *or correct the sentence.*" 28 U.S.C. § 2255(a) (emphasis added).  While the petitioner must make a prima facie showing on a successive motion that "no reasonable factfinder would have found the movant guilty of the offense," 28 U.S.C. § 2255(h)(1), courts have left open the question "whether, under the AEDPA, an individual subject to a sentence of death may assert . . . that he is 'innocent' of the death penalty." *In re Vial*, 115 F.3d 1192, 1198 n.12 (4th Cir. 1997); *cf. LaFevers v. Gibson*, 238 F.3d 1263, 1267 (10th Cir. 2001) (noting that the court need not decide whether § 2244(b)(2)(B)(ii) applies to challenges to a death sentence made by a state prisoner under 28 U.S.C. § 2254); *but see Babbitt v. Woodford*, 177 F.3d 744, 746 (9th Cir. 1999) (noting

19

that § 2244(b)(2)(B)(ii) encompasses challenges brought by state prisoners to a death sentence). The Fifth Circuit has not decided the issue, but should conclude that 28 U.S.C. § 2255(h)(1) encompasses a claim that the petitioner is "innocent of the death penalty."

### E.   PETITIONER MUST MAKE A PRIMA FACIE SHOWING THAT HE IS MENTALLY RETARDED

This Court has also required that petitioners bringing claims based on *Atkins* also make a prima facie showing that the petitioner is mentally retarded. *Cf. In re Thomas*, 225 Fed. Appx. 222, 223-24 (5th Cir. 2007) (application made by state prisoner under 28 U.S.C. § 2254); *In re Morris*, 328 F.3d 739, 741 (5th Cir. 2003) (same). The Fifth Circuit has defined mental retardation as "a disability characterized by three criteria: (1) significantly subaverage general intellectual functioning, usually defined as an IQ of about 70 or below; (2) accompanied by related limitations in adaptive functioning;[9] (3) the onset of which occurs prior to the age of 18." *Thomas*, 225 Fed. Appx. at 224.

---

[9] "Adaptive behavior is the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives." American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 41 (10th ed. 2002) (hereinafter "AAMR Manual"). For a diagnosis of mental retardation, an individual is required to have deficits in one of the following three adaptive behaviors: conceptual (including functional academics and communication), social (including social skills), or practical (including home living). *Id.* at 82, 91.

Newly discovered evidence combined with evidence already in the record proves that Mr. Webster meets these definitions of mentally retarded and is therefore innocent of the death penalty.

**II.    NEWLY DISCOVERED EVIDENCE, IN LIGHT OF EVIDENCE IN THE RECORD AS A WHOLE, ESTABLISHES BY CLEAR AND CONVINCING EVIDENCE THAT NO REASONABLE FACTFINDER WOULD HAVE FOUND PETITIONER ELIGIBLE FOR THE DEATH PENALTY**

**A.    PETITIONER'S NEWLY DISCOVERED SOCIAL SECURITY RECORDS**

**1.    Medical Diagnoses of Mental Retardation**

On September 9, 1993, Mr. Webster applied for Social Security benefits, claiming a disabling condition of sinus problems and headaches. In order to determine whether Mr. Webster was eligible for Social Security benefits based on this claim, the Social Security Administration had Mr. Webster evaluated by three separate medical professionals. Each doctor independently diagnosed Mr. Webster with extremely low IQ and/or mental retardation. Although these records had been requested from the Social Security Administration prior to trial, they first became available to Mr. Webster's legal team on February 9, 2009. *See* Moore Declaration at ¶ 4; LeRoux Declaration at ¶ 12.

**a.    *Dr. Rittelmeyer's Diagnosis of Mental Retardation***

In the first report, dated October 25, 1993 and entitled "General Physical Examination," Dr. C.M. Rittelmeyer evaluated Mr. Webster's mental and physical

21

condition. *See* General Physical Examination (Wells Decl. Ex. G at G.18).

Although Dr. Rittelmeyer's descriptions of Mr. Webster's physical health is

unremarkable, his diagnosis of Mr. Webster is significant: "Mental retardation.

Flat Feet. Chronic sinus problems and Allergies by history." *Id.* at G.21. In other

words, an unbiased government employee independently diagnosed Mr. Webster

as mentally retarded at the age of 20. Importantly, this report was written well

before the crime at issue in this case. Dr. Rittelmeyer's report is new evidence that

supports the mental retardation evidence Mr. Webster offered at trial.

### b.    *Dr. Spellman's Diagnosis of Mental Retardation and Scoring of 69 or lower*

A psychological evaluation dated December 22, 1993, completed by Dr.

Charles Spellman for the diagnosis of mental disorders to "better ascertain

eligibility for Social Security benefits," further supports a contemporaneous

diagnosis of mental retardation. *See* Palaver, Inc. Evaluation for Mental Disorders

(Wells Decl. Ex. G at G.11). Dr. Spellman notes that "[i]deation was sparse and

this appeared to be more of a function of his lower cognitive ability than of any

mental illness. He came across as a slow fellow who did not know much and did

not know how to communicate well." *Id.* at G.12. Regarding intellectual function,

Dr. Spellman stated that "[Mr. Webster] was not able to register three objects. . . .

He was not able to do simple calculations. He did not know what the sayings

meant." *Id.* Dr. Spellman estimated Mr. Webster's IQ to be 69 or lower. *Id.* at

G.13. In regard to Mr. Webster's level of adaptive functioning, Dr. Spellman stated: "[Mr. Webster] lives with his mother. He watches television, listens to the radio and goes walking. . . . He does no chores around the house. Mostly he seems to be idle around the house and on the streets." *Id.* at G.13. Dr. Spellman's only diagnoses of Mr. Webster were "1. Mental Retardation" and "2. Antisocial Personality by History." *Id.* Dr. Spellman also noted that "[t]here was no evidence of exaggeration or malingering" and that "[Mr. Webster] will not get any better." *Id.*

Dr. Spellman's report, which includes one of the earliest IQ tests administered to Mr. Webster, further supports the evidence in the trial record that Mr. Webster's IQ is below 70 and accordingly has significant limitations in intellectual functioning. Dr. Spellman's evaluation, along with Dr. Hackett's evaluation below, are also the first known professional diagnoses of Mr. Webster's adaptive deficits. Dr. Spellman's evaluation of Mr. Webster demonstrates that Mr. Webster has significant limitations in conceptual skills (such as self direction, communication, and functional academics), social skills (such as taking responsibility), and practical skills (such as personal activities of daily life). Most importantly, Dr. Spellman evaluated Mr. Webster at age 20 and concluded that there was no evidence that Mr. Webster was faking his limitations. Dr. Spellman's

23

report is new evidence that supports the mental retardation evidence Mr. Webster offered at trial.

### c.   *Dr. Hackett's Diagnosis of Mild Mental Retardation and IQ Scoring of 59*

Dr. Edward Hackett also performed a medical examination and another psychological examination of Mr. Webster in conjunction with his application for Social Security benefits. In Dr. Hackett's Medical Report, dated November 10, 1993, he stated that "[Mr. Webster] was viewed as a somewhat mild retarded con man, but very street wise. . . . He would also not function well in the work place." *See* Medical Report (Wells Decl. Ex. G at G.14). Dr. Hackett "did not feel that [Mr. Webster] could manage his own benefits. His behavior was somewhat bazaar [sic]. On the IQ scores performance was estimated lower than verbal." *See id.* In Dr. Hackett's Psychometric Evaluation report, dated October 22, 1993, Mr. Webster's Full Scale WAIS-R IQ score is 59. *See* Psychometric Evaluation (Wells Decl. Ex. G at G.15). Dr. Hackett's evaluation states "[Mr. Webster] is mildly retarded, but is also antisocial." *Id.* at G.16. His diagnoses are as follows: "Mild Mental Retardation. . . . Mr. Webster manifests no signs of wanting to improve or to seek employment. He appears to be a user of others." *Id.*

Like Dr. Spellman's report, Dr. Hackett's report, which also includes one of the earliest IQ tests administered to Mr. Webster, further supports the evidence in the trial record that Mr. Webster's IQ is below 70 and accordingly has significant

24

limitations in intellectual functioning. Dr. Hackett's evaluation of Mr. Webster, one of the first known professional diagnoses of Mr. Webster's adaptive deficits, also demonstrates that Mr. Webster has significant limitations in conceptual skills (such as managing daily life) and practical skills (such as seeking or keeping a job). Dr. Hackett's report is new evidence that supports the mental retardation evidence Mr. Webster offered at trial.

**d.    *The Diagnoses Contained in the Social Security Records Undermine Evidence Offered by the Government at Trial***

Unlike the diagnoses made by the government's experts at trial, the diagnoses in the Social Security records are based on complete administration of applicable examinations, and all three were made when Mr. Webster was 20 years old, well before he committed the crime at issue in this case. The two diagnoses relating to mental retardation offered at trial by the government's experts were made while Mr. Webster was incarcerated, which was years after the newly discovered evaluations were completed. *See* Trial Tr. Vol. 26 at 59:12-19, 120:17 – 121:6 (Wells Decl. Ex. E). In addition, one was based on incomplete administration of the applicable examination, *id.* at 86:8-13, while the other was made by an individual not licensed by the Texas Department of Mental Health and Mental Retardation to diagnose mental retardation, *id.* at 177:9-14. Because the newly discovered diagnoses were made before Mr. Webster was incarcerated, and

25

expressly conclude that there is no evidence of malingering, they also refute the government's suggestion that Mr. Webster was faking later IQ tests in order to secure a mental retardation defense. *See id.* at 224:21 – 225:4.

**2.    New Evidence that Mr. Webster Was Enrolled in Special Education Classes**

Additionally, the Social Security records contain previously unavailable evidence that Mr. Webster received special education. *See* November 8, 1993 Lou Jackson Letter from Watson Chapel Schools (Wells Decl. Ex. G at G.17). In a letter from the Special Education Supervisor for the Watson Chapel Schools, Lou Jackson explains that Mr. Webster's Special Education records had been destroyed in 1988. *Id.* This new evidence directly contradicts testimony of two Watson Chapel Schools representatives offered by the government at trial, each of whom suggested that Mr. Webster was not placed in special education classes and therefore did not meet the definition of mentally retarded. Trial Tr. Vol. 24 at 238:16 – 239:8; 247:21 – 248:8 (Wells Decl. Ex. C). This letter establishes that Mr. Webster was in fact enrolled in special education classes in the Watson Chapel Schools and demonstrates that Mr. Webster has significant limitations in intellectual functioning and adaptive behavior, including impairments in functional academics. The letter constitutes new evidence that supports the mental retardation evidence Mr. Webster presented at trial.

### 3.    The Application Completed by Mr. Webster Demonstrates Mr. Webster's Limitations

Finally, the form completed by Mr. Webster to apply for Social Security disability benefits provides a clear example of Mr. Webster's deficits in syntax, spelling, punctuation, grammar, ability to answer a question, ability to write a complete sentence, and penmanship. *See* Statement of Claimant or Other Person (Wells Decl. Ex. G at G.28-29); Disability Supplemental Interview Outline (Wells Decl. Ex. G at G.30-35). In response to the application's prompt to describe the pain or other symptoms, Mr. Webster wrote: "it causes me to bet up set Easily headhurtsdiffiernt of bredth." Statement of Claimant or Other Person (Wells Decl. Ex. G at G.28). In response to the question what does it feel like, Mr. Webster responded, "it feels real bad." *Id.* When asked what side effects his medication caused, Mr. Webster responded "Is leep bettEr." *Id.* When asked what he does on a normal day, Mr. Webster answered "I sleeps look at. cartoon." Disability Supplemental Interview Outline (Wells Decl. Ex. G at G.30). When asked to describe changes in his condition since onset, Mr. Webster replied "ain't got no chang." *Id.* When asked whether he was involved in any clubs or other groups, Mr. Webster answered "Iwalk around in the club." *Id.* at G.34. These incomprehensible answers, along with the illegible penmanship, lack of syntax, capitalization, and punctuation, demonstrate Mr. Webster's significant limitations in intellectual functioning as well as his significant limitations in conceptual skills

27

(such as language, writing, and communication). This evidence bolsters the mental retardation evaluations Mr. Webster offered at trial.[10]

### B.   NEWLY DISCOVERED EVIDENCE REGARDING PETITIONER'S ADAPTIVE DEFICITS

In evaluating a defendant's adaptive deficits, courts have accorded great weight to testimony from family members and others who have had regular contact with the defendant (including parents, teachers, employers, and childhood friends). *See, e.g., Holladay v. Allen*, 555 F.3d 1346, 1349-50 (11th Cir. 2009) (affirming district court's finding that state prisoner was mentally retarded and therefore entitled to relief on a successive habeas corpus petition). Declarations recently obtained from childhood friends, relatives, and acquaintances of Mr. Webster over the course of multiple interviews with experts provide further evidence of Mr. Webster's mental retardation, and in particular, his limitations in adaptive behavior in functional academics, home living, communication, and social and interpersonal

---

[10] Mr. Webster's legal team also discovered records showing a pattern of abuse and violence in Mr. Webster's family. Child abuse and domestic violence are risk factors for mental retardation. *See* AAMR Manual at 127. Records obtained from the Arkansas Department of Human Services Child Maltreatment Central Registry on October 31, 2008 indicate that Mr. Webster was a victim of physical and sexual abuse at the age of 10. *See* Maltreatment Summary Report (Wells Decl. Ex. I at I.3-4); LeRoux Declaration at ¶ 5. In addition, Social Security records for Mr. Webster's father, Willie Webster, obtained on February 9, 2009, indicate that Willie Webster was "functioning on a psychotic level" and that he "tends to lose his temper easily and is rough on both [his wife] and their children." *See* Report of Richard E. Walters, M.D. (Wells Decl. Ex. H at H.6 ); Dr. Padberg Neurological Examination of Willie Webster Report (*id.* at H.11); LeRoux Declaration at ¶ 12.

skills. While some of the information learned in the interviews supplements that previously presented at trial and on Mr. Webster's first 2255 Motion, much of the information constitutes new evidence which goes directly to the adaptive deficits prong of the currently accepted definition of mental retardation.[11] As a whole, the declarations demonstrate that Mr. Webster meets the accepted definition of mentally retarded and is therefore ineligible for the death penalty.

1.    **Mr. Webster Was Dependent on the Care of Others**

Interviews with Mr. Webster's childhood friends, relatives, and acquaintances revealed evidence that Mr. Webster was unable to care for himself, which demonstrates his adaptive deficit in home living. Dorothy Harris Wallace, Mr. Webster's sister, said that he needed his mother to take care of him, doing everything, including "tying his shoes, dressing him, [and] feeding him." Wallace Declaration at ¶ 10 (Wells Decl. Ex. R). Sharon Webster, Mr. Webster's sister-in-law, said Mr. Webster could not get his clothes ready and prepare himself

---

[11] Angela Madison, Lanetra Evans, Sharon Webster, Michael Parks, and Theressia Marten Moten did not testify at trial and were not interviewed prior to trial; their declarations constitute new evidence. Jodin Smith did not testify at trial, but was interviewed prior to trial; her declaration constitutes new evidence because she had never communicated these statements prior to November 2008. Dorothy Harris Wallace, Leonda Daniels, Luketha Frazier, Marvin Holloway, and Tony Webster testified at trial, but their declarations constitute new evidence because their statements were never communicated until November 2008.

physically for the day; instead, he relied on his mother to dress and prepare him. Sharon Webster Declaration at ¶ 8 (Wells Decl. Ex. S).

As Mr. Webster grew older, he acted too cool to do things like shop or find his way around town. *Id.* at ¶ 10. Lanetra Evans said that he relied on girlfriends to pick out his clothes for him and even to tie his shoes for him. Evans Declaration at ¶ 7 (Wells Decl. Ex. K). According to Leonda Daniels, Mr. Webster's former girlfriend, Mr. Webster could not even perform the simplest of life skills necessary to take care of himself, including filling out a job application and buying groceries: "Bruce could not do any kind of paper work. I had to fill out a job application for him. . . . Bruce would go along with anything. He could not think for himself. Whatever anybody wanted to do, that was alright with Bruce. Bruce could not be counted on to do anything where he had to exercise judgment or common sense. If you sent him to the store for, say, a coke, a pack of cigarettes and a bag of chips, when he came back there would always be something wrong. I would say, 'You can't remember three things?' Even if you wrote him out a list, like 'milk, Fruit Loops, etc.' he could not follow directions." Daniels Declaration at ¶¶ 7-9 (Wells Decl. Ex. J).[12]

---

[12] Ms. Daniels also clarified her trial testimony: "When I testified at his trial in 1996, the government lawyer got me all confused about this and got me to say that Bruce could fill out an application but that he just did not want to. The reality is that Bruce really could not do it himself." Daniels Declaration at ¶ 7 (Wells Decl. Ex. J).

30

The declarations also prove that Mr. Webster was never able to overcome his home living deficits, unlike his siblings. Sharon Webster, Mr. Webster's sister-in-law, said that Mr. Webster could not complete the simplest of tasks, such as running a small errand, mainly because he had such a short attention span, similar to that of a three-year-old. Sharon Webster Declaration at ¶ 9 (Wells Decl. Ex. S). Ms. Daniels, who dated Mr. Webster when they were teenagers and lived with the Webster family, reiterated this statement: "it was impossible for Bruce to focus on anything for long. He had the attention span of a small child." Daniels Declaration at ¶ 4 (Wells Decl. Ex. J). Michael Parks, a neighbor of the Websters, says that unlike the other Webster children who ultimately overcame their disabilities, Mr. Webster failed to adapt and find a job at which he could succeed: "Bruce never developed any of these skills due, I am quite sure, to his mental limitations. He never seemed to be able to develop skills like his brothers did despite their own limitations." Parks Declaration at ¶ 4 (Wells Decl. Ex. P).

These declarations provide new evidence that Mr. Webster has significant limitations in home living, a deficit he was never able to overcome.

### 2. Mr. Webster Did Not Have Basic Communication Skills and Could Not Understand Basic Tasks

Additional new evidence also demonstrates Mr. Webster's inability to understand simple language concepts and basic tasks. Jodin Smith, Mr. Webster's former sister-in-law, explained that Mr. Webster did not understand that the word

quarter referred to the numerical fraction, so he didn't understand that a quarter was twenty-five cents or that a quarter of an hour was fifteen minutes. Smith Declaration at ¶ 13 (Wells Decl. Ex. Q). Angela Madison, a neighbor of the Webster family said it was impossible to have a conversation with Mr. Webster because he would talk in slang and ramble from one subject to another. Madison Declaration at ¶ 4 (Wells Decl. Ex. N). Ms. Daniels, Mr. Webster's former girlfriend, said that Mr. Webster had difficulty understanding and using compound words, such as double date, which Mr. Webster believed was having two separate dates. Daniels Declaration at ¶ 11 (Wells Decl. Ex. J).

Mr. Webster also had a difficult time with simple tasks, like telling time. Wallace Declaration at ¶ 9 (Wells Decl. Ex. R). According to Ms. Daniels, Mr. Webster could not play cards or dominoes; he was unable to understand basics like following suit or adding the dots on the dominoes. Daniels Declaration at ¶ 5 (Wells Decl. Ex. J). Marvin Holloway, one of Mr. Webster's co-defendants, also recognized Mr. Webster's lack of intelligence and stated that he "could tell that Bruce was not right mentally and that he was lacking in intelligence." Holloway Declaration at ¶ 4 (Wells Decl. Ex. M). These declarations provide new evidence that Mr. Webster has significant limitations in adaptive behavior, such as communication.

### 3.    Mr. Webster Cheated His Way Through School

There is also new evidence regarding Mr. Webster's performance in school, which goes to his adaptive deficit in functional academics. A cousin of Mr. Webster, Luketha Frazer, said that even though she was not a very good student, she was better than Mr. Webster and not only helped him with his work, but often did his work for him. Frazier Declaration at ¶ 5 (Wells Decl. Ex. L). She also said that other students helped Mr. Webster in school, either doing his work for him, showing him how to do it, or letting him copy their answers. *Id.* at ¶ 6. These statements constitute new evidence that Mr. Webster suffered from low intellectual functioning and had significant limitations in adaptive behavior well before the age of 18.

### 4.    Mr. Webster Is Not Capable of a Leadership Role

Contrary to the government's evidence at trial, there is new evidence that Mr. Webster was incapable of organizing the crime at issue in this case. For the first time, Mr. Webster's co-defendant, Marvin Holloway, has stated that Mr. Webster was not able to organize any group of people, certainly not a criminal drug enterprise: "In the first paragraph of its opinion affirming Bruce's death sentence, the U.S. Court of Appeals for the Fifth Circuit stated: 'Webster, Hall and Marvin Holloway ran a marihuana trafficking enterprise in Pine Bluff, Arkansas.' The Court was totally incorrect about this. Bruce was definitely not a partner in

the marihuana enterprise. As far as I know, Bruce did not run anything."
Holloway Declaration at ¶ 5 (Wells Decl. Ex. M).

### 5. History of Mental Retardation in Mr. Webster's Family

Finally, the declarations from Mr. Webster's family members contain previously unexplored details regarding a history of mental retardation and/or low intellectual functioning in Mr. Webster's family. Sharon Webster, Bruce's sister-in-law, said that Bruce's mother has difficulty reading, that Bruce's father cannot read, and that both of Mr. Webster's parents are mentally retarded. Sharon Webster Declaration at ¶ 5 (Wells Decl. Ex. S). Dorothy Harris Wallace, Mr. Webster's half sister, agreed that low intellectual functioning was a family-wide problem and says that Mr. Webster and his brother Tony were the slowest of all the children. Wallace Declaration at ¶ 11 (Wells Decl. Ex. R). Mr. Webster's brother Tony says that he received disability benefits for being mentally retarded and that Mr. Webster's impairments were even more severe. Tony Webster Declaration at ¶¶ 2-3 (Wells Decl. Ex. T). Tony explained that the simplest of tasks perplexed Mr. Webster, even playing checkers was difficult and Mr. Webster would take five to ten minutes between turns. *Id.* Theressia Marten Moten, Mr. Webster's maternal cousin, explained that mental retardation ran in Mr. Webster's mother's family, but that Mr. Webster was as severely mentally retarded as any of the family members. Moten Declaration at ¶¶ 3, 6 (Wells Decl. Ex. O).

34

### 6.     The Declarations Refute Evidence Offered at Trial by the Government of Mr. Webster's Adaptive Functioning

Importantly, the new declarations illustrate Mr. Webster's adaptive deficits before incarceration, in contrast to the government's evidence on adaptive deficits which discussed Mr. Webster's ability to function in prison, and demonstrated only that Mr. Webster was able to clean and maintain his cell, *see* Trial Tr. Vol. 26 at 59:12-24, 136:1-11 (Wells Decl. Ex. E); order and read materials from the prison library, *see* Trial Tr. Vol. 25 at 128-29, 138, 143 (Wells Decl. Ex. D), Vol. 26 at 25, 136-37, 139 (Wells Decl. Ex. E); understand and use commissary in prison, *see* Trial Tr. Vol. 25 at 125-26 (Wells Decl. Ex. D); and move about the prison to make social connections, *see* Trial Tr. Vol. 25 at 89 (Wells Decl. Ex. D), Vol. 26 at 140-41 (Wells Decl. Ex. E).  Indeed, experts in the field have discredited statements about an individual's ability to function in prison because the structured nature of the environment does not provide a true test of an individual's abilities. *See, e.g.*, J. Gregory Olley and Ann W. Cox, *Assessment of Adaptive Behavior in Adult Forensic Cases: The Use of the Adaptive Behavior Assessment System-II*, 20 (2d ed. 2008) ("Performance in the highly structured and limited environment of prison is a poor indicator of one's functioning.  Many people with mental retardation perform better in the structured prison setting than in less structured settings.  Therefore, observing the defendant's completion of prison chores or any other activities does not give a valid sample of adaptive behavior.").

\*     \*     \*

The newly discovered evidence, viewed in light of the substantial evidence already presented at trial, demonstrates by clear and convincing evidence that Mr. Webster is mentally retarded and therefore ineligible for the death penalty. The numerous intelligence tests given to Mr. Webster over the past two decades provide uncontroverted evidence of Mr. Webster's intellectual limitations. Mr. Webster has taken 8 individually administered intelligence tests (including the newly discovered tests from before the commission of the crime), and has scored in the mentally retarded range on all 8 exams. In addition, Mr. Webster has shown that he has significant limitations in adaptive behavior, including an inability to care for himself, relate to others, and meet the demands of living in a community. While Mr. Webster presented testimony at trial from individuals who knew him before age 18, for the first time, Mr. Webster has evidence of independent, professional diagnoses of his limitations in adaptive behavior from a time well before the commission of the crime at issue. Finally, there is ample evidence that Mr. Webster's mental retardation manifested itself prior to age 18.

Any reasonable factfinder considering the newly discovered Social Security records, the new Declarations of Mr. Webster's childhood friends, relatives, and acquaintances, and the substantial evidence already admitted at trial of Mr.

Webster's limitations would have found Mr. Webster to be mentally retarded and therefore not eligible for the death penalty.

### III.    MR. WEBSTER HAS BEEN DENIED THE OPPORTUNITY TO PRESENT EVIDENCE OF MENTAL RETARDATION UNDER *ATKINS*

In the years following *Atkins*, this Court and other courts around the country have held that *Atkins* requires an evidentiary hearing if the motion presents even a "slight" showing that petitioner is mentally retarded. *See In re Hearn*, 418 F.3d 444, 447-48 (5th Cir. 2005).[13]

As detailed above, Mr. Webster's mental retardation claim has never been evaluated in an evidentiary hearing pursuant to an *Atkins* claim and has not been considered by the factfinder pursuant to an *Atkins* claim. Mr. Webster has now discovered new evidence that further supports the evidence entered at trial that proves he is mentally retarded and therefore ineligible for the death penalty. At a minimum, Mr. Webster should be given an evidentiary hearing to present this newly discovered evidence.

---

[13] Both the Fourth and Eighth Circuits have expressly held that a petitioner who alleges facts that would entitle him to relief under *Atkins* is entitled to an *Atkins* evidentiary hearing. *See Walker v. True*, 399 F.3d 315, 327 (4th Cir. 2005) (concluding that a petitioner who never presented his *Atkins* claim in the trial court had not received a "full and fair evidentiary hearing" under *Townsend v. Sain*, 372 U.S. 293, 312-313 (1963)); *Simpson v. Norris*, 490 F.3d 1029, 1035 (8th Cir. 2007) (concluding that a petitioner must simply allege "that he is mentally retarded as *Atkins* defines that condition" in order to receive an evidentiary hearing on the issue); *Sasser v. Norris*, 553 F.3d 1121, 1126 (8th Cir. 2008) (same).

## CONCLUSION

THEREFORE, for all the foregoing reasons, Mr. Webster asks this Court to:

1.    Authorize Bruce Carneil Webster to file a successive motion to vacate his

sentence under 28 U.S.C. § 2255.

Dated:  October 21, 2009

<div style="margin-left: 40%;">

Respectfully submitted,

Dorsey & Whitney LLP

By _____
    Steven J. Wells (MN Atty# 163508)
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile:  (612) 340-2868
E-mail:  wells.steve@dorsey.com

Counsel for Petitioner
Bruce Carneil Webster

</div>

## **CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

1.    This motion complies with the type-volume limitation of FED. R. APP. P.32(a)(7)(B) because it contains 9,238 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.    This motion complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2003, Version 11 (SP2) in 14-point Times New Roman.

Dated:  October 21, 2009          Dorsey & Whitney LLP

By _____
    Oliver J. McKinstry (MN # 388109)
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868
E-mail:  mckinstry.oliver@dorsey.com

Counsel for Petitioner
Bruce Carneil Webster

# Ex. 1 Proposed Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
Fort Worth Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff/Respondent, | § | |
| | § | |
| v. | § | Criminal No. 4:94-cr-00121-Y |
| | § | |
| BRUCE CARNEIL WEBSTER, | § | |
| | § | |
| Defendant/Petitioner. | § | |
| | § | |
| | § | |

**PROPOSED MOTION TO VACATE SENTENCE
PURSUANT TO 28 U.S.C. § 2255**

**INTRODUCTION**

Petitioner Bruce Carneil Webster moves this Court to vacate his death sentence under 28 U.S.C. § 2255.[1] Although Petitioner does not seek to challenge his conviction, he does seek to challenge his sentence of death based on newly discovered evidence that establishes that he is mentally retarded and therefore ineligible for the death penalty. *See Atkins v. Virginia*, 536 U.S. 304 (2002). The requirements for filing a successive motion under 28 U.S.C. § 2255 have been satisfied.

---

[1]  Mr. Webster's sentence has been stayed in collateral litigation challenging the constitutionality of the lethal injection procedure in federal prison. *See* Order, *Roane, et. al. v. Gonzales, et. al.*, Case No. 1:05-cv-2337 (D.D.C. Feb. 16, 2007) (Docket No. 27) (Wells Decl. Ex. A).

At a trial before this Court more than six years before *Atkins* was decided, Mr. Webster presented substantial evidence— he had scored below 72 on six separate IQ tests taken since the age of eighteen and had significant adaptive deficits— that he was mentally retarded; four jurors, in fact, decided that Mr. Webster is or may be mentally retarded. This Court, however, decided without explanation that Mr. Webster "was not mentally retarded as a matter of law" and sentenced Petitioner to death. Neither this Court, nor the Fifth Circuit, nor the courts of Texas had, at the time of the trial, enunciated either a standard for mental retardation in the context of the death penalty or a process for its determination. Petitioner was not permitted an evidentiary hearing on the issue of his mental retardation at trial or in connection with his previous 2255 Motion, an amended version of which was filed just weeks after *Atkins* was decided.

While substantial evidence of Petitioner's mental retardation was presented at trial, newly discovered evidence, gathered by the undersigned pro bono counsel and its investigators, establishes that Petitioner is mentally retarded – under the definition of mental retardation widely accepted by the courts today and widely accepted by the medical field at the time of trial. Newly discovered and released government and school records – from a time prior to the commission of the crime of which Petitioner was convicted – demonstrate IQ scores and adaptive functioning well within the range of mental retardation, as well as explicit

2

diagnoses of "mental retardation" by three independent physicians. Importantly, one doctor specifically noted that there was no evidence that Mr. Webster was faking his condition. Testimony from Petitioner's family and community provide additional compelling evidence of adaptive deficits. No reasonable factfinder, weighing this newly discovered evidence together with the evidence as a whole at trial, could conclude that Petitioner is not mentally retarded.

Accordingly, Petitioner presents to this Court in connection with – for the very first time – an evidentiary hearing, the following claim:

> Newly discovered contemporaneous Social Security records along with declarations of childhood friends, relatives, and acquaintances of Mr. Webster, viewed in light of the evidence as a whole, establish by clear and convincing evidence that Mr. Webster is not eligible for the death penalty.

## STATEMENT OF THE CASE

### I.    PROCEDURAL HISTORY

#### A.    MR. WEBSTER WAS TRIED, CONVICTED, AND SENTENCED TO DEATH IN 1996

On November 4, 1994, Mr. Webster was indicted on six counts in the Northern District of Texas, including kidnapping in which a death occurred in violation of 18 U.S.C. §§ 1201(a)(1) and (2), along with various noncapital offenses. Mr. Webster was tried, convicted, and sentenced to death on the capital charge on June 20, 1996.

3

## B.    EVIDENCE OF MENTAL RETARDATION

### 1.    LEGAL FRAMEWORK AT THE TIME OF TRIAL

Under the then-existing legal framework, Mr. Webster was allowed to present evidence of mental retardation during the sentencing phase of his trial. This evidence was provided as "mitigating evidence" under the U.S. Supreme Court's decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989) and under a federal statute, 18 U.S.C. § 3596(c), which statutorily barred the execution of mentally retarded individuals. At the time of Mr. Webster's trial, a defendant's mental retardation did not serve as a constitutional bar to execution as it does now; indeed, the U.S. Supreme Court expressly stated in *Penry* that there was not a national consensus against the execution of the mentally retarded such that the punishment could be considered "cruel and unusual." *Penry*, 492 U.S. at 305. Further, neither *Penry* nor 18 U.S.C. § 3596(c) defined "mental retardation" or required any procedural process for making a mental retardation determination.

### 2.    EVIDENCE OF MENTAL RETARDATION PRESENTED AT TRIAL

Consistent with the limited existing legal framework under *Penry* and Section 3596(c), Mr. Webster attempted to prove during the sentencing phase that he was mentally retarded. The evidence presented consisted primarily of testimony from various doctors who had administered IQ tests after Mr. Webster's incarceration, as well as testimony from Mr. Webster's family members and

4

childhood friends. Notably, of the six individually administered IQ tests admitted into evidence at trial, only one had been administered before commission of the crime. In particular, the evidence presented to this Court includes:

> * Testimony from Dr. Finn, who had administered the WAIS-R and Rorshach tests and determined Mr. Webster has an IQ of 59. *See* Trial Tr. Vol. 23 at 187:6-9 (Wells Decl. Ex. B).

> * Testimony from Dr. Keyes, a psychologist specializing in mental retardation, who had administered the Bender-Gestalt, Stanford Binet, and Woodcock-Johnson Psycho-Educational Battery tests and concluded that Mr. Webster has an IQ of 51 and has the adaptive functioning of a seven-year-old. *See* Trial Tr. Vol. 24 at 20:2-6, 43:16-25 (Wells Decl. Ex. C).

> * Testimony from Dr. Fulbright, a neuro-psychologist, who had performed a series of tests on Mr. Webster and concluded that Mr. Webster has significant impairment in his attention capacity. *See* Trial Tr. Vol. 24 at 131:18-19 (Wells Decl. Ex. C).

> * Testimony from Dr. Cunningham, who had examined Mr. Webster and interviewed Mr. Webster's family and concluded that Mr. Webster suffers from mental retardation of a mild variety. *See* Trial Tr. Vol. 24 at 189:7-8 (Wells Decl. Ex. C).

> * Testimony from several witnesses regarding Mr. Webster's adaptive deficit in functional academics. *See, e.g.,* Testimony of Luketha Frazier, Trial Tr. Vol. 23 at 75:18 – 76:4 (stating that she and other classmates helped Mr. Webster with his homework and on exams) (Wells Decl. Ex. B); Testimony of Beatrice Webster, Trial Tr. Vol. 23 at 138:2-5 (stating that Mr. Webster repeated grades twice, once in elementary school and once in middle school) (Wells Decl. Ex. B).

> * Testimony from several witnesses regarding Mr. Webster's adaptive deficit in home living. *See, e.g.,* Testimony of Dr. Denis Keyes, Trial Tr. Vol. 24, at 44:4-12 (stating that Mr. Webster is not

able to live on his own and function in the real world) (Wells Decl. Ex. C); Testimony of Mark Webster, Trial Tr. Vol. 23 at 33:5-14 (stating that Mr. Webster relied on the care of his mother and his girlfriends) (Wells Decl. Ex. B); Testimony of Future Mae Webster, Trial Tr. Vol. 23 at 67:4-17 (stating that she and her mother gave Mr. Webster the money he needed) (Wells Decl. Ex. B); Testimony of Beatrice Webster, Trial Tr. Vol. 23 at 145:13-24 (stating that Mr. Webster was never able to live away from her home and that he only received income from welfare, food stamps, and family members and girlfriends) (Wells Decl. Ex. B).

*       Testimony from several witnesses regarding Mr. Webster's adaptive deficit in communication and conceptual skills. *See, e.g.*, Testimony of Dr. Raymond Finn, Trial Tr. Vol. 23 at 194:10-13 (stating that Mr. Webster is better at speaking than understanding and that concepts had to be simplified in order for Mr. Webster to understand them) (Wells Decl. Ex. B); Testimony of Dr. Denis Keyes, Trial Tr. Vol. 24 at 107:10-14 (stating that Mr. Webster was not able to communicate regarding abstract thoughts) (Wells Decl. Ex. C); Testimony of Leonda Daniels, Trial Tr. Vol. 23 at 102:22 – 103:3 (stating that Mr. Webster may have been able to write letters, but that his handwriting was illegible) (Wells Decl. Ex. B).

Immediately after this evidence was presented, Mr. Webster's lawyers acknowledged that 18 U.S.C. § 3596(c) did not require a finding on mental retardation, but requested that this Court make a finding whether Mr. Webster was mentally retarded. Trial Tr. Vol. 26 at 227:7-20 (Wells Decl. Ex. E). Without stated analysis or explanation, this Court declared: "I do not find, as a matter of law, that the defendant is mentally retarded. I do not believe that the evidence shows that he is, as a matter of law, mentally retarded." *Id.* at 227:21-25.

The next day, on June 19, 1996, the jury was instructed that if the government proved aggravating factors beyond a reasonable doubt, the jury must

6

consider whether the defendant had proved any mitigating factor by a preponderance of the evidence, including "[t]he defendant is or may be mentally retarded." Trial Tr. Vol. 27 at 19:19 – 21:2 (Wells Decl. Ex. F). The jury was given no instruction as to the standard to be used in determining mental retardation. On June 20, 1996, the jury found that the government had proven aggravating factors beyond a reasonable doubt. *Id.* at 101:10 – 102:11. Four jurors found that the defendant had proven by a preponderance of the evidence that Mr. Webster "is or may be mentally retarded." *Id.* at 102:17.

On June 21, 1996, this Court issued a finding that Mr. Webster was not mentally retarded and therefore not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty. *See* Factual Finding Regarding Mental Retardation, Docket No. 751[2] (finding that Mr. Webster "is not mentally retarded and that he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him"). On September 30, 1996, the Court issued its judgment, sentencing Mr. Webster to death. Judgment in a Criminal Case, Docket No. 824.

---

[2]   "Docket No." refers to the criminal docket entry in *U.S. v. Webster*, Case No. 4:94-cr-00121-Y (N.D. Tex.).

7

### C.    ON DIRECT APPEAL, THE FIFTH CIRCUIT AFFIRMS MR. WEBSTER'S CONVICTION AND SENTENCE

Mr. Webster appealed his sentence and conviction on December 3, 1998. The Fifth Circuit affirmed, rejecting Mr. Webster's arguments that this Court erred in making its mental retardation finding. *See U.S. v. Webster*, 162 F.3d 308 (5th Cir. 1998). Importantly, the Fifth Circuit noted that "a finding that a defendant is not mentally retarded under § 3596 presents an issue of first impression," *id.* at 352, and that the statute "fails to provide guidance, and no case has addressed this issue," *id.* at 351. Because the Federal Death Penalty Act failed to provide guidance as to how to ensure that the mandate of Section 3596(c) is carried out, the Fifth Circuit concluded that this Court did not plainly err in its unexplained finding that Mr. Webster is not mentally retarded. *Id.* at 351. In essence, the Fifth Circuit decided that because there *was* no standard for mental retardation, this Court could not have applied the *wrong* standard. *Id.* at 352.

### D.    MR. WEBSTER CHALLENGES HIS SENTENCE UNDER 28 U.S.C. § 2255

Mr. Webster then filed his initial Motion to Vacate Conviction and Sentence under 28 U.S.C. § 2255 ("2255 Motion") on September 29, 2000. *See* 2255 Motion, Docket No. 998 (Wells Decl. Ex. U). Among other claims, Mr. Webster argued that he was ineligible for execution under 18 U.S.C. § 3596(c) because he is mentally retarded, *id.* at 50-51; that there was insufficient evidence to support this

8

Court's finding that he was not mentally retarded, *id.* at 52-58; and that Section 3596(c) was unconstitutionally vague because it provided no guidance concerning who is to be the factfinder on an issue of mental retardation, the burden of proof for a finding of mental retardation, and what standards are to be used in defining mental retardation, *id.* at 62-63. In addition to the evidence supporting mental retardation presented at trial, Mr. Webster presented evidence of adaptive deficits and poor academic performance from two members of the Watson Chapel Schools faculty.[3]

### E.    THIS COURT DENIES MR. WEBSTER'S REQUEST FOR ADDITIONAL DISCOVERY ON JUNE 18, 2002

While his 2255 Motion was pending, Mr. Webster filed a Motion for Leave to Conduct Discovery on April 30, 2001. This motion requested discovery on several issues related to Mr. Webster's mental retardation claim. *See* Motion for Leave to Conduct Discovery, Docket No. 1028. Request for Discovery No. 8 specifically requested that the government "be required to produce . . . any reports prepared by a mental health professional in the government's possession which, in any manner, questions or rebuts the testimony by the government's witnesses at

---

[3]   The petition showed that E.C. Turner, a counselor in the Watson Chapel Schools, would testify that Mr. Webster was a "follower" in situations where he was intellectually equal or inferior to other students. The petition also showed that Mr. Webster's former teacher, Loula Gray, would testify that Mr. Webster was a "slow" student, and that he was assigned to "basic" classes at Watson Chapel Jr. High School, where he received more individualized attention. *See* 2255 Motion at 26-29 (Wells Decl. Ex. U).

9

trial (i.e. Dr. Coons and Dr. Parker) on the issue of petitioner's mental retardation." *Id.* at 10. On June 18, 2002, this Court entered an order denying all requests for discovery and requiring Mr. Webster to file an amended motion to vacate under 28 U.S.C. § 2255 within 60 days. *See* Memorandum Opinion and Order Denying Petitioner's Motion for Discovery, Docket No. 1063. This Court concluded that because two of Mr. Webster's claims of mental retardation had been affirmed on direct appeal, additional discovery would not be permitted on those claims. This Court further concluded that on the other two claims, Mr. Webster failed to show how additional discovery would contribute to his claims. Had the court granted the Request for Discovery No. 8 (among others), the government would have been required to turn over the Social Security records which are a significant part of the new evidence presented in the instant motion.

### F.   THE UNITED STATES SUPREME COURT DECIDES *ATKINS V. VIRGINIA* ON JUNE 20, 2002

Two days after this Court entered its order denying Mr. Webster's request for additional discovery on the question of his mental retardation, the Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002). *Atkins*, which abrogated *Penry* by declaring the execution of mentally retarded individuals "cruel and unusual punishment" in violation of the Eighth Amendment, transformed the analysis of mental retardation claims in capital cases.

The foundation for the Court's decision in *Atkins* was that mentally retarded individuals act with a decreased level of moral culpability than that which categorizes the most serious adult criminal actors. *Id.* at 318. Mentally retarded individuals operate with disabilities in areas of "reasoning, judgment, and control of their impulses." *Id.* at 306. It is because of their impairment that they have a "diminished capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318. While the Court found that their deficiencies "do not warrant an exemption from criminal sanctions," they do diminish their personal culpability. *Id.*

The Court recognized that the more difficult issue was determining which offenders would qualify as mentally retarded. "Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* at 317. The Court opted to follow the approach it took in *Ford v. Wainwright* with regard to insanity, and left to the states "'the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences.'" *Id.* (citing *Ford*, 477 U.S. 399, 405, 416-417 (1986)).[4]

---

[4] The *Atkins* court, however, did advocate the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association ("APA") definitions of mental retardation. *See Atkins*, 536 U.S. at 308 n.3, 318.

## G.    MR. WEBSTER IS FORCED TO FILE HIS AMENDED MOTION TO VACATE SENTENCE UNDER 28 U.S.C. § 2255 ON AUGUST 22, 2002

Due to this Court's scheduling order and order denying discovery, Mr. Webster was forced to file his Amended Motion to Vacate Conviction and Sentence ("Amended 2255 Motion") on August 22, 2002, just 56 days after the *Atkins* decision was announced, without discovery.[5] *See* Amended 2255 Motion, Docket No. 1064 (Wells Decl. Ex. V). In that motion, Mr. Webster continued to argue that he was ineligible for the death penalty because he was mentally retarded, but after *Atkins*, this argument transformed from a statutory claim to a constitutional one.[6] *Id.* at 50-53. Proving mental retardation was still uncertain, however, because the *Atkins* Court left the development and implementation of the definitions, standards, and safeguards supporting the determination of mental retardation to the states. *See Atkins*, 536 U.S. at 317.

---

[5]  Four days after *Atkins* was decided, the U.S. Supreme Court also decided *Ring v. Arizona*, 536 U.S. 584 (2002). *Ring* addressed the constitutional right to have a jury decide certain questions relating to sentencing. Mr. Webster argued that his sentence should be vacated under *Ring* in Grounds for Review Two and Five because the judge, rather than the jury, decided the question of mental retardation at his trial. *See* Amended 2255 Motion at 17-25, 34-36 (Wells Decl. Ex. V).

[6]  Mr. Webster also referenced *Atkins* in arguing that that there was insufficient evidence to support this Court's finding that he was not mentally retarded, Amended 2255 Motion at 53-60, and that Section 3596(c) was unconstitutionally vague, *id.* a 62-64 (Wells Decl. Ex. V).

12

This Court ultimately denied Mr. Webster's Amended 2255 Motion on September 20, 2003, affirming its previous finding that Mr. Webster is not mentally retarded. *See* Memorandum Opinion and Order, Docket No. 1110. While this Court listed the evidence presented in support and in opposition to a finding of mental retardation, it simply adopted its previous determination that Mr. Webster did not suffer from mental retardation, without substantive analysis of the new *Atkins* claim. *Id.* at 21-33. In rejecting Mr. Webster's claim, this Court recognized that trial experts for the government and defense agreed that Mr. Webster's IQ scores fell consistently in the range of subaverage intellectual functioning associated with mental retardation, but that the experts "converged" on the issue of Mr. Webster's adaptive skills. *Id.* at 31-32. This Court further found that there was evidence Mr. Webster exhibited adaptive deficits,[7] but that evidence also existed to support its finding at trial that Mr. Webster "does not have a deficit in adaptive skills."[8] *Id.* at 32. This Court denied all of Mr. Webster's claims as well as his request for an evidentiary hearing. *Id.* at 32-33.

---

7  This evidence includes a Vineland test given by Dr. Keyes, and testimony by Mr. Webster's family members, acquaintances, and teachers who knew him before age 18. Memorandum Opinion and Order, Docket No. 1110, at 32.

8  This evidence is almost solely related to Mr. Webster's ability to function in prison. "Webster has adapted to the criminal life that he chose and has illustrated the ability to . . . live within the confines of the 'home' he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math." Memorandum Opinion and Order, Docket No. 1110, at 32.

## H.    MR. WEBSTER APPLIED FOR CERTIFICATES OF APPEALABILITY ON ISSUES RELATED TO MENTAL RETARDATION

Mr. Webster applied for certificates of appealability on each of the 16 grounds raised in his Amended 2255 Motion. *See* Order, Docket No. 1119. This Court granted certificates of appealability on (1) whether sufficient evidence supported its finding that Mr. Webster was not mentally retarded, and (2) whether the government is required to prove a capital defendant is not mentally retarded. *Id.* On appeal, the Fifth Circuit again affirmed this Court's finding on mental retardation, stating, "The question whether he is mentally retarded was, as the district court observed, 'a highly contested one at trial,' and Mr. Webster failed to convince *either* the district court that he is retarded or, moreover, a majority of the jurors that he is or even *may* be retarded. And the record supports those findings." *U.S. v. Webster*, 421 F.3d 308, 314 (5th Cir. 2005). The Fifth Circuit did not perform a legal analysis of the evidence in light of the new constitutional prohibition on the execution of the mentally retarded and failed to apply the developing standards prescribed therein. *Id.* at 312-314. The Fifth Circuit considered only whether the evidence was sufficient to support the trial court's finding that Mr. Webster is not mentally retarded under an abandoned legal scheme, and did not consider whether Mr. Webster presented sufficient evidence or should be given an opportunity to present evidence to prove that he is mentally

14

retarded under *Atkins*. *Id.* The Fifth Circuit also noted that this Court's order should be affirmed because Mr. Webster presented no "new evidence," in support of his claim: "Indeed, Webster's brief does not point to any new evidence bearing directly on his mental capacity; instead it summarizes the evidence presented at his trial concerning his cognitive abilities and childhood experiences." *Id.* at 314. Thus, Mr. Webster was denied an opportunity for collateral review of the evidence of his mental retardation under *Atkins* or to develop new evidence under the *Atkins* framework.

## SUMMARY OF THE ARGUMENT

Mr. Webster comes before this Court with compelling new evidence of mental retardation which was previously unavailable to him. This evidence includes: (i) Social Security records containing three separate contemporaneous diagnoses of mental retardation (none of which could be subject to a claim of "manipulation" as they were all prepared prior to Petitioner's arrest in this matter); (ii) information concerning Mr. Webster's participation in special education classes in the Watson Chapel Schools; (iii) forms completed by Mr. Webster for government benefits; and (iv) declarations from childhood friends, relatives, and acquaintances of Mr. Webster discussing the manifestation of Mr. Webster's mental retardation prior to age 18. This newly discovered evidence, when viewed in light of the evidence as a whole, is sufficient to establish by clear and

convincing evidence that no reasonable factfinder would have found Mr. Webster eligible for the death penalty. *See* 28 U.S.C. § 2255(h)(1).

## ARGUMENT

### I.   STANDARD OF REVIEW

Because Mr. Webster was tried and convicted in federal court, this Court must evaluate his application to file a successive motion under 28 U.S.C. § 2255. Mr. Webster meets the requirements for filing a successive petition under 28 U.S.C. § 2255(h)(1).

#### A.   THE SAME CLAIM SUCCESSOR BAR DOES NOT APPLY TO APPLICATIONS BROUGHT BY FEDERAL PRISONERS UNDER 28 U.S.C. § 2255

As an initial matter, this Court should not dismiss this petition even though Mr. Webster seeks to raise an *Atkins* claim like the one raised in his first 2255 Motion because the same claim successor bar found in 28 U.S.C. § 2244(b)(1) does not apply to him as a federal prisoner. By the plain language of 28 U.S.C. § 2244, it is clear that Congress intended for the same claim successor bar to apply only to claims brought by state prisoners under 28 U.S.C. § 2254, not to claims brought by federal prisoners, like Mr. Webster, under 28 U.S.C. § 2255. Congress expressly provided that "[a] claim presented in a second or successive habeas corpus application *under section 2254* that was presented in a prior application shall be dismissed." 28 U.S.C. § 2244(b)(1) (emphasis added). There is no such

16

bar under 28 U.S.C. § 2255 or in any other statute. Under the well-known interpretative cannon, *expressio unius est exclusio alterius* ("the expression of one thing implies the exclusion of the other"), Congress's explicit decision to bar repetitive petitions brought by state prisoners under 28 U.S.C. § 2254 demonstrates that it did not intend to include similar claims brought by federal prisoners under 28 U.S.C. § 2255. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) (applying *expressio unius est exclusio alterius* to conclude that because Fed. R. Civ. P. 9(b) does not specifically enumerate among the actions that must be pled with greater particularity complaints alleging municipal liability under 42 U.S.C. § 1983, such complaints need not be pled with particularity); *Thompson v. Goetzman*, 337 F.3d 489, 499 (5th Cir. 2003) (applying *expressio unius est exclusio alterius* to conclude that Congress's failure to include a right of action against tortfeasors indicates that the statute allows recovery solely from the party named in the statute, *i.e.*, an insurer).

## B. THERE IS NO DUE DILIGENCE REQUIREMENT FOR SUCCESSIVE MOTIONS BROUGHT BY FEDERAL PRISONERS UNDER 28 U.S.C. § 2255

Under 28 U.S.C. § 2255, a successive motion must demonstrate, *inter alia,* "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense." 28

U.S.C. § 2255(h)(1). While Congress required state prisoners presenting a second or successive claim under 28 U.S.C. § 2254 to demonstrate that the newly discovered evidence was "previously [unavailable] through the exercise of due diligence," 28 U.S.C. § 2244(b)(2)(B)(i), federal prisoners presenting a successive claim need not make a showing of due diligence under 28 U.S.C. § 2255. Congress explicitly made the due diligence requirement apply solely to "[a] claim presented in a second or successive habeas corpus application *under section 2254* that was not presented in a prior application." 28 U.S.C. § 2244(b)(2)(B) (emphasis added). There is no such requirement in 28 U.S.C. § 2255(h)(1). As with the same claim successor bar, the well-known cannon of statutory construction, *expressio unius est exclusio alterius*, applies and demonstrates that Congress did not intend to include a due diligence requirement for petitions brought by federal prisoners under 28 U.S.C. § 2255. *See Leatherman*, 507 U.S. at 168; *Thompson*, 337 F.3d at 499.

### C.   UNDER 28 U.S.C. § 2255, FEDERAL PRISONERS CAN CHALLENGE THEIR SENTENCES

Congress provided that federal prisoners "may move the court which imposed the sentence to vacate, set aside *or correct the sentence*." 28 U.S.C. § 2255(a) (emphasis added). While the petitioner must make a prima facie showing on a successive motion that "no reasonable factfinder would have found the movant guilty of the offense," 28 U.S.C. § 2255(h)(1), courts have left open the

18

question "whether, under the AEDPA, an individual subject to a sentence of death may assert . . . that he is 'innocent' of the death penalty." *In re Vial*, 115 F.3d 1192, 1198 n.12 (4th Cir. 1997); *cf. LaFevers v. Gibson*, 238 F.3d 1263, 1267 (10th Cir. 2001) (noting that the court need not decide whether § 2244(b)(2)(B)(ii) applies to challenges to a death sentence made by a state prisoner under 28 U.S.C. § 2254); *but see Babbitt v. Woodford*, 177 F.3d 744, 746 (9th Cir. 1999) (noting that § 2244(b)(2)(B)(ii) encompasses challenges brought by state prisoners to a death sentence). The Fifth Circuit has not decided the issue, but should conclude that 28 U.S.C. § 2255(h)(1) encompasses a claim that the petitioner is "innocent of the death penalty."

## D.    STANDARD FOR ESTABLISHING MENTAL RETARDATION

The Fifth Circuit has defined mental retardation as "a disability characterized by three criteria: (1) significantly subaverage general intellectual functioning, usually defined as an IQ of about 70 or below; (2) accompanied by related limitations in adaptive functioning;[9] (3) the onset of which occurs prior to the age of 18." *Cf. In re Thomas*, 225 Fed. Appx. 222, 224 (5th Cir. 2007)

---

[9] "Adaptive behavior is the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives." American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 41 (10th ed. 2002) (hereinafter "AAMR Manual"). For a diagnosis of mental retardation, an individual is required to have deficits in one of the following three adaptive behaviors: conceptual (including functional academics and communication), social (including social skills), or practical (including home living). *Id.* at 82, 91.

(application made by state prisoner under 28 U.S.C. § 2254). Newly discovered

evidence combined with evidence already in the record proves by clear and

convincing evidence that Mr. Webster meets these definitions of mentally retarded

and is therefore innocent of the death penalty.[10]

**II.  GROUND FOR RELIEF:  NEWLY DISCOVERED EVIDENCE, IN LIGHT OF EVIDENCE IN THE RECORD AS A WHOLE, ESTABLISHES BY CLEAR AND CONVINCING EVIDENCE THAT NO REASONABLE FACTFINDER WOULD HAVE FOUND PETITIONER ELIGIBLE FOR THE DEATH PENALTY**

**A.  PETITIONER'S NEWLY DISCOVERED SOCIAL SECURITY RECORDS**

**1.  Medical Diagnoses of Mental Retardation**

On September 9, 1993, Mr. Webster applied for Social Security benefits,

claiming a disabling condition of sinus problems and headaches. In order to

determine whether Mr. Webster was eligible for Social Security benefits based on

this claim, the Social Security Administration had Mr. Webster evaluated by three

separate medical professionals. Each doctor independently diagnosed Mr. Webster

with extremely low IQ and/or mental retardation. Although these records had been

requested from the Social Security Administration prior to trial, they first became

---

[10] While Mr. Webster can show by clear and convincing evidence that he is mentally retarded, the appropriate standard for the district court to apply to the question of Mr. Webster's mental retardation should be proof by a preponderance of the evidence. *See United States v. Davis*, No. RWT-07-0199, 2009 WL 1117401, at *33 (D. Md. April 24, 2008) (finding defendant ineligible for the death penalty upon proof of mental retardation by preponderance of the evidence).

20

available to Mr. Webster's legal team on February 9, 2009. *See* Moore Declaration at ¶ 4; LeRoux Declaration at ¶ 12.

### a.   *Dr. Rittelmeyer's Diagnosis of Mental Retardation*

In the first report, dated October 25, 1993 and entitled "General Physical Examination," Dr. C.M. Rittelmeyer evaluated Mr. Webster's mental and physical condition. *See* General Physical Examination (Wells Decl. Ex. G at G.18). Although Dr. Rittelmeyer's descriptions of Mr. Webster's physical health is unremarkable, his diagnosis of Mr. Webster is significant: "Mental retardation. Flat Feet. Chronic sinus problems and Allergies by history." *Id.* at G.21. In other words, an unbiased government employee independently diagnosed Mr. Webster as mentally retarded at the age of 20. Importantly, this report was written well before the crime at issue in this case. Dr. Rittelmeyer's report is new evidence that supports the mental retardation evidence Mr. Webster offered at trial.

### b.   *Dr. Spellman's Diagnosis of Mental Retardation and Scoring of 69 or lower*

A psychological evaluation dated December 22, 1993, completed by Dr. Charles Spellman for the diagnosis of mental disorders to "better ascertain eligibility for Social Security benefits," further supports a contemporaneous diagnosis of mental retardation. *See* Palaver, Inc. Evaluation for Mental Disorders (Wells Decl. Ex. G at G.11). Dr. Spellman notes that "[i]deation was sparse and this appeared to be more of a function of his lower cognitive ability than of any

mental illness. He came across as a slow fellow who did not know much and did not know how to communicate well." *Id.* at G.12. Regarding intellectual function, Dr. Spellman stated that "[Mr. Webster] was not able to register three objects. . . . He was not able to do simple calculations. He did not know what the sayings meant." *Id.* Dr. Spellman estimated Mr. Webster's IQ to be 69 or lower. *Id.* at G.13. In regard to Mr. Webster's level of adaptive functioning, Dr. Spellman stated: "[Mr. Webster] lives with his mother. He watches television, listens to the radio and goes walking. . . . He does no chores around the house. Mostly he seems to be idle around the house and on the streets." *Id.* at G.13. Dr. Spellman's only diagnoses of Mr. Webster were "1. Mental Retardation" and "2. Antisocial Personality by History." *Id.* Dr. Spellman also noted that "[t]here was no evidence of exaggeration or malingering" and that "[Mr. Webster] will not get any better." *Id.*

Dr. Spellman's report, which includes one of the earliest IQ tests administered to Mr. Webster, further supports the evidence in the trial record that Mr. Webster's IQ is below 70 and accordingly has significant limitations in intellectual functioning. Dr. Spellman's evaluation, along with Dr. Hackett's evaluation below, are also the first known professional diagnoses of Mr. Webster's adaptive deficits. Dr. Spellman's evaluation of Mr. Webster demonstrates that Mr. Webster has significant limitations in conceptual skills (such as self direction,

22

communication, and functional academics), social skills (such as taking responsibility), and practical skills (such as personal activities of daily life). Most importantly, Dr. Spellman evaluated Mr. Webster at age 20 and concluded that there was no evidence that Mr. Webster was faking his limitations. Dr. Spellman's report is new evidence that supports the mental retardation evidence Mr. Webster offered at trial.

c.    *Dr. Hackett's Diagnosis of Mild Mental Retardation and IQ Scoring of 59*

Dr. Edward Hackett also performed a medical examination and another psychological examination of Mr. Webster in conjunction with his application for Social Security benefits. In Dr. Hackett's Medical Report, dated November 10, 1993, he stated that "[Mr. Webster] was viewed as a somewhat mild retarded con man, but very street wise. . . . He would also not function well in the work place." *See* Medical Report (Wells Decl. Ex. G at G.14). Dr. Hackett "did not feel that [Mr. Webster] could manage his own benefits. His behavior was somewhat bazaar [sic]. On the IQ scores performance was estimated lower than verbal." *See id.* In Dr. Hackett's Psychometric Evaluation report, dated October 22, 1993, Mr. Webster's Full Scale WAIS-R IQ score is 59. *See* Psychometric Evaluation (Wells Decl. Ex. G at G.15). Dr. Hackett's evaluation states "[Mr. Webster] is mildly retarded, but is also antisocial." *Id.* at G.16. His diagnoses are as follows: "Mild

Mental Retardation. . . . Mr. Webster manifests no signs of wanting to improve or to seek employment. He appears to be a user of others." *Id.*

Like Dr. Spellman's report, Dr. Hackett's report, which also includes one of the earliest IQ tests administered to Mr. Webster, further supports the evidence in the trial record that Mr. Webster's IQ is below 70 and accordingly has significant limitations in intellectual functioning. Dr. Hackett's evaluation of Mr. Webster, one of the first known professional diagnoses of Mr. Webster's adaptive deficits, also demonstrates that Mr. Webster has significant limitations in conceptual skills (such as managing daily life) and practical skills (such as seeking or keeping a job). Dr. Hackett's report is new evidence that supports the mental retardation evidence Mr. Webster offered at trial.

> **d.** ***The Diagnoses Contained in the Social Security Records Undermine Evidence Offered by the Government at Trial***

Unlike the diagnoses made by the government's experts at trial, the diagnoses in the Social Security records are based on complete administration of applicable examinations, and all three were made when Mr. Webster was 20 years old, well before he committed the crime at issue in this case. The two diagnoses relating to mental retardation offered at trial by the government's experts were made while Mr. Webster was incarcerated, which was years after the newly discovered evaluations were completed. *See* Trial Tr. Vol. 26 at 59:12-19, 120:17

– 121:6 (Wells Decl. Ex. E). In addition, one was based on incomplete administration of the applicable examination, *id.* at 86:8-13, while the other was made by an individual not licensed by the Texas Department of Mental Health and Mental Retardation to diagnose mental retardation, *id.* at 177:9-14. Because the newly discovered diagnoses were made before Mr. Webster was incarcerated, and expressly conclude that there is no evidence of malingering, they also refute the government's suggestion that Mr. Webster was faking later IQ tests in order to secure a mental retardation defense. *See id.* at 224:21 – 225:4.

### 2. New Evidence that Mr. Webster Was Enrolled in Special Education Classes

Additionally, the Social Security records contain previously unavailable evidence that Mr. Webster received special education. *See* November 8, 1993 Lou Jackson Letter from Watson Chapel Schools (Wells Decl. Ex. G at G.17). In a letter from the Special Education Supervisor for the Watson Chapel Schools, Lou Jackson explains that Mr. Webster's Special Education records had been destroyed in 1988. *Id.* This new evidence directly contradicts testimony of two Watson Chapel Schools representatives offered by the government at trial, each of whom suggested that Mr. Webster was not placed in special education classes and therefore did not meet the definition of mentally retarded. Trial Tr. Vol. 24 at 238:16 – 239:8; 247:21 – 248:8 (Wells Decl. Ex. C). This letter establishes that Mr. Webster was in fact enrolled in special education classes in the Watson Chapel

Schools and demonstrates that Mr. Webster has significant limitations in intellectual functioning and adaptive behavior, including impairments in functional academics. The letter constitutes new evidence that supports the mental retardation evidence Mr. Webster presented at trial.

3.    **The Application Completed by Mr. Webster Demonstrates Mr. Webster's Limitations**

Finally, the form completed by Mr. Webster to apply for Social Security disability benefits provides a clear example of Mr. Webster's deficits in syntax, spelling, punctuation, grammar, ability to answer a question, ability to write a complete sentence, and penmanship. *See* Statement of Claimant or Other Person (Wells Decl. Ex. G at G.28-29); Disability Supplemental Interview Outline (Wells Decl. Ex. G at G.30-35). In response to the application's prompt to describe the pain or other symptoms, Mr. Webster wrote: "it causes me to bet up set Easily headhurtsdiffiemt of bredth." Statement of Claimant or Other Person (Wells Decl. Ex. G at G.28). In response to the question what does it feel like, Mr. Webster responded, "it feels real bad." *Id.* When asked what side effects his medication caused, Mr. Webster responded "Is leep bettEr." *Id.* When asked what he does on a normal day, Mr. Webster answered "I sleeps look at. cartoon." Disability Supplemental Interview Outline (Wells Decl. Ex. G at G.30). When asked to describe changes in his condition since onset, Mr. Webster replied "ain't got no chang." *Id.* When asked whether he was involved in any clubs or other groups,

Mr. Webster answered "Iwalk around in the club." *Id.* at G.34. These incomprehensible answers, along with the illegible penmanship, lack of syntax, capitalization, and punctuation, demonstrate Mr. Webster's significant limitations in intellectual functioning as well as his significant limitations in conceptual skills (such as language, writing, and communication). This evidence bolsters the mental retardation evaluations Mr. Webster offered at trial.[11]

**B.   NEWLY DISCOVERED EVIDENCE REGARDING PETITIONER'S ADAPTIVE DEFICITS**

In evaluating a defendant's adaptive deficits, courts have accorded great weight to testimony from family members and others who have had regular contact with the defendant (including parents, teachers, employers, and childhood friends). *See, e.g., Holladay v. Allen*, 555 F.3d 1346, 1349-50 (11th Cir. 2009) (affirming district court's finding that state prisoner was mentally retarded and therefore entitled to relief on a successive habeas corpus petition). Declarations recently

---

[11] Mr. Webster's legal team also discovered records showing a pattern of abuse and violence in Mr. Webster's family. Child abuse and domestic violence are risk factors for mental retardation. *See* AAMR Manual at 127. Records obtained from the Arkansas Department of Human Services Child Maltreatment Central Registry on October 31, 2008 indicate that Mr. Webster was a victim of physical and sexual abuse at the age of 10. *See* Maltreatment Summary Report (Wells Decl. Ex. I at I.3-4); LeRoux Declaration at ¶ 5. In addition, Social Security records for Mr. Webster's father, Willie Webster, obtained on February 9, 2009, indicate that Willie Webster was "functioning on a psychotic level" and that he "tends to lose his temper easily and is rough on both [his wife] and their children." *See* Report of Richard E. Walters, M.D. (Wells Decl. Ex. H at H.6); Dr. Padberg Neurological Examination of Willie Webster Report (*id.* at H.11); LeRoux Declaration at ¶ 12.

obtained from childhood friends, relatives, and acquaintances of Mr. Webster over the course of multiple interviews with experts provide further evidence of Mr. Webster's mental retardation, and in particular, his limitations in adaptive behavior in functional academics, home living, communication, and social and interpersonal skills. While some of the information learned in the interviews supplements that previously presented at trial and on Mr. Webster's first 2255 Motion, much of the information constitutes new evidence which goes directly to the adaptive deficits prong of the currently accepted definition of mental retardation.[12] As a whole, the declarations demonstrate that Mr. Webster meets the accepted definition of mentally retarded and is therefore ineligible for the death penalty.

### 1.    Mr. Webster Was Dependent on the Care of Others

Interviews with Mr. Webster's childhood friends, relatives, and acquaintances revealed evidence that Mr. Webster was unable to care for himself, which demonstrates his adaptive deficit in home living. Dorothy Harris Wallace, Mr. Webster's sister, said that he needed his mother to take care of him, doing

---

[12] Angela Madison, Lanetra Evans, Sharon Webster, Michael Parks, and Theressia Marten Moten did not testify at trial and were not interviewed prior to trial; their declarations constitute new evidence. Jodin Smith did not testify at trial, but was interviewed prior to trial; her declaration constitutes new evidence because she had never communicated these statements prior to November 2008. Dorothy Harris Wallace, Leonda Daniels, Luketha Frazier, Marvin Holloway, and Tony Webster testified at trial, but their declarations constitute new evidence because their statements were never communicated until November 2008.

everything, including "tying his shoes, dressing him, [and] feeding him." Wallace Declaration at ¶ 10 (Wells Decl. Ex. R). Sharon Webster, Mr. Webster's sister-in-law, said Mr. Webster could not get his clothes ready and prepare himself physically for the day; instead, he relied on his mother to dress and prepare him. Sharon Webster Declaration at ¶ 8 (Wells Decl. Ex. S).

As Mr. Webster grew older, he acted too cool to do things like shop or find his way around town. *Id.* at ¶ 10. Lanetra Evans said that he relied on girlfriends to pick out his clothes for him and even to tie his shoes for him. Evans Declaration at ¶ 7 (Wells Decl. Ex. K). According to Leonda Daniels, Mr. Webster's former girlfriend, Mr. Webster could not even perform the simplest of life skills necessary to take care of himself, including filling out a job application and buying groceries: "Bruce could not do any kind of paper work. I had to fill out a job application for him. . . . Bruce would go along with anything. He could not think for himself. Whatever anybody wanted to do, that was alright with Bruce. Bruce could not be counted on to do anything where he had to exercise judgment or common sense. If you sent him to the store for, say, a coke, a pack of cigarettes and a bag of chips, when he came back there would always be something wrong. I would say, 'You can't remember three things?' Even if you wrote him out a list, like 'milk, Fruit

Loops, etc.' he could not follow directions." Daniels Declaration at ¶¶ 7-9 (Wells Decl. Ex. J).[13]

The declarations also prove that Mr. Webster was never able to overcome his home living deficits, unlike his siblings. Sharon Webster, Mr. Webster's sister-in-law, said that Mr. Webster could not complete the simplest of tasks, such as running a small errand, mainly because he had such a short attention span, similar to that of a three-year-old. Sharon Webster Declaration at ¶ 9 (Wells Decl. Ex. S). Ms. Daniels, who dated Mr. Webster when they were teenagers and lived with the Webster family, reiterated this statement: "it was impossible for Bruce to focus on anything for long. He had the attention span of a small child." Daniels Declaration at ¶ 4 (Wells Decl. Ex. J). Michael Parks, a neighbor of the Websters, says that unlike the other Webster children who ultimately overcame their disabilities, Mr. Webster failed to adapt and find a job at which he could succeed: "Bruce never developed any of these skills due, I am quite sure, to his mental limitations. He never seemed to be able to develop skills like his brothers did despite their own limitations." Parks Declaration at ¶ 4 (Wells Decl. Ex. P).

---

[13] Ms. Daniels also clarified her trial testimony: "When I testified at his trial in 1996, the government lawyer got me all confused about this and got me to say that Bruce could fill out an application but that he just did not want to. The reality is that Bruce really could not do it himself." Daniels Declaration at ¶ 7 (Wells Decl. Ex. J).

These declarations provide new evidence that Mr. Webster has significant limitations in home living, a deficit he was never able to overcome.

### 2. Mr. Webster Did Not Have Basic Communication Skills and Could Not Understand Basic Tasks

Additional new evidence also demonstrates Mr. Webster's inability to understand simple language concepts and basic tasks. Jodin Smith, Mr. Webster's former sister-in-law, explained that Mr. Webster did not understand that the word quarter referred to the numerical fraction, so he didn't understand that a quarter was twenty-five cents or that a quarter of an hour was fifteen minutes. Smith Declaration at ¶ 13 (Wells Decl. Ex. Q). Angela Madison, a neighbor of the Webster family said it was impossible to have a conversation with Mr. Webster because he would talk in slang and ramble from one subject to another. Madison Declaration at ¶ 4 (Wells Decl. Ex. N). Ms. Daniels, Mr. Webster's former girlfriend, said that Mr. Webster had difficulty understanding and using compound words, such as double date, which Mr. Webster believed was having two separate dates. Daniels Declaration at ¶ 11 (Wells Decl. Ex. J).

Mr. Webster also had a difficult time with simple tasks, like telling time. Wallace Declaration at ¶ 9 (Wells Decl. Ex. R). According to Ms. Daniels, Mr. Webster could not play cards or dominoes; he was unable to understand basics like following suit or adding the dots on the dominoes. Daniels Declaration at ¶ 5 (Wells Decl. Ex. J). Marvin Holloway, one of Mr. Webster's co-defendants, also

31

recognized Mr. Webster's lack of intelligence and stated that he "could tell that Bruce was not right mentally and that he was lacking in intelligence." Holloway Declaration at ¶ 4 (Wells Decl. Ex. M). These declarations provide new evidence that Mr. Webster has significant limitations in adaptive behavior, such as communication.

### 3. Mr. Webster Cheated His Way Through School

There is also new evidence regarding Mr. Webster's performance in school, which goes to his adaptive deficit in functional academics. A cousin of Mr. Webster, Luketha Frazer, said that even though she was not a very good student, she was better than Mr. Webster and not only helped him with his work, but often did his work for him. Frazier Declaration at ¶ 5 (Wells Decl. Ex. L). She also said that other students helped Mr. Webster in school, either doing his work for him, showing him how to do it, or letting him copy their answers. *Id.* at ¶ 6. These statements constitute new evidence that Mr. Webster suffered from low intellectual functioning and had significant limitations in adaptive behavior well before the age of 18.

### 4. Mr. Webster Is Not Capable of a Leadership Role

Contrary to the government's evidence at trial, there is new evidence that Mr. Webster was incapable of organizing the crime at issue in this case. For the first time, Mr. Webster's co-defendant, Marvin Holloway, has stated that Mr.

32

Webster was not able to organize any group of people, certainly not a criminal drug enterprise: "In the first paragraph of its opinion affirming Bruce's death sentence, the U.S. Court of Appeals for the Fifth Circuit stated: 'Webster, Hall and Marvin Holloway ran a marihuana trafficking enterprise in Pine Bluff, Arkansas.' The Court was totally incorrect about this. Bruce was definitely not a partner in the marihuana enterprise. As far as I know, Bruce did not run anything." Holloway Declaration at ¶ 5 (Wells Decl. Ex. M).

### 5.    History of Mental Retardation in Mr. Webster's Family

Finally, the declarations from Mr. Webster's family members contain previously unexplored details regarding a history of mental retardation and/or low intellectual functioning in Mr. Webster's family. Sharon Webster, Bruce's sister-in-law, said that Bruce's mother has difficulty reading, that Bruce's father cannot read, and that both of Mr. Webster's parents are mentally retarded. Sharon Webster Declaration at ¶ 5 (Wells Decl. Ex. S). Dorothy Harris Wallace, Mr. Webster's half sister, agreed that low intellectual functioning was a family-wide problem and says that Mr. Webster and his brother Tony were the slowest of all the children. Wallace Declaration at ¶ 11 (Wells Decl. Ex. R). Mr. Webster's brother Tony says that he received disability benefits for being mentally retarded and that Mr. Webster's impairments were even more severe. Tony Webster Declaration at ¶¶ 2-3 (Wells Decl. Ex. T). Tony explained that the simplest of tasks perplexed

Mr. Webster, even playing checkers was difficult and Mr. Webster would take five to ten minutes between turns. *Id.* Theressia Marten Moten, Mr. Webster's maternal cousin, explained that mental retardation ran in Mr. Webster's mother's family, but that Mr. Webster was as severely mentally retarded as any of the family members. Moten Declaration at ¶¶ 3, 6 (Wells Decl. Ex. O).

6.    **The Declarations Refute Evidence Offered at Trial by the Government of Mr. Webster's Adaptive Functioning**

Importantly, the new declarations illustrate Mr. Webster's adaptive deficits before incarceration, in contrast to the government's evidence on adaptive deficits which discussed Mr. Webster's ability to function in prison, and demonstrated only that Mr. Webster was able to clean and maintain his cell, *see* Trial Tr. Vol. 26 at 59:12-24, 136:1-11 (Wells Decl. Ex. E); order and read materials from the prison library, *see* Trial Tr. Vol. 25 at 128-29, 138, 143 (Wells Decl. Ex. D), Vol. 26 at 25, 136-37, 139 (Wells Decl. Ex. E); understand and use commissary in prison, *see* Trial Tr. Vol. 25 at 125-26 (Wells Decl. Ex. D); and move about the prison to make social connections, *see* Trial Tr. Vol. 25 at 89 (Wells Decl. Ex. D), Vol. 26 at 140-41 (Wells Decl. Ex. E). Indeed, experts in the field have discredited statements about an individual's ability to function in prison because the structured nature of the environment does not provide a true test of an individual's abilities. *See, e.g.*, J. Gregory Olley and Ann W. Cox, *Assessment of Adaptive Behavior in Adult Forensic Cases: The Use of the Adaptive Behavior Assessment System-II*, 20

34

(2d ed. 2008) ("Performance in the highly structured and limited environment of prison is a poor indicator of one's functioning. Many people with mental retardation perform better in the structured prison setting than in less structured settings. Therefore, observing the defendant's completion of prison chores or any other activities does not give a valid sample of adaptive behavior.").

\*    \*    \*

The newly discovered evidence, viewed in light of the substantial evidence already presented at trial, demonstrates by clear and convincing evidence that Mr. Webster is mentally retarded and therefore ineligible for the death penalty. The numerous intelligence tests given to Mr. Webster over the past two decades provide uncontroverted evidence of Mr. Webster's intellectual limitations. Mr. Webster has taken 8 individually administered intelligence tests (including the newly discovered tests from before the commission of the crime), and has scored in the mentally retarded range on all 8 exams. In addition, Mr. Webster has shown that he has significant limitations in adaptive behavior, including an inability to care for himself, relate to others, and meet the demands of living in a community. While Mr. Webster presented testimony at trial from individuals who knew him before age 18, for the first time, Mr. Webster has evidence of independent, professional diagnoses of his limitations in adaptive behavior from a time well

35

before the commission of the crime at issue. Finally, there is ample evidence that Mr. Webster's mental retardation manifested itself prior to age 18.

Any reasonable factfinder considering the newly discovered Social Security records, the new Declarations of Mr. Webster's childhood friends, relatives, and acquaintances, and the substantial evidence already admitted at trial of Mr. Webster's limitations would have found Mr. Webster to be mentally retarded and therefore not eligible for the death penalty.

### III.   MR. WEBSTER HAS BEEN DENIED THE OPPORTUNITY TO PRESENT EVIDENCE OF MENTAL RETARDATION UNDER *ATKINS*

In the years following *Atkins*, the Fifth Circuit and other courts around the country have held that *Atkins* requires an evidentiary hearing if the motion presents even a "slight" showing that petitioner is mentally retarded. *See In re Hearn*, 418 F.3d 444, 447-48 (5th Cir. 2005).[14]

As detailed above, Mr. Webster's mental retardation claim has never been evaluated in an evidentiary hearing pursuant to an *Atkins* claim and has not been

---

[14] Both the Fourth and Eighth Circuits have expressly held that a petitioner who alleges facts that would entitle him to relief under *Atkins* is entitled to an *Atkins* evidentiary hearing. *See Walker v. True*, 399 F.3d 315, 327 (4th Cir. 2005) (concluding that a petitioner who never presented his *Atkins* claim in the trial court had not received a "full and fair evidentiary hearing" under *Townsend v. Sain*, 372 U.S. 293, 312-313 (1963)); *Simpson v. Norris*, 490 F.3d 1029, 1035 (8th Cir. 2007) (concluding that a petitioner must simply allege "that he is mentally retarded as *Atkins* defines that condition" in order to receive an evidentiary hearing on the issue); *Sasser v. Norris*, 553 F.3d 1121, 1126 (8th Cir. 2008) (same).

considered by the factfinder pursuant to an *Atkins* claim. Mr. Webster has now discovered new evidence that further supports the evidence entered at trial that proves he is mentally retarded and therefore ineligible for the death penalty. At a minimum, Mr. Webster should be given an evidentiary hearing to present this newly discovered evidence.

## **CONCLUSION**

THEREFORE, for all the foregoing reasons, Mr. Webster asks this Court to:

1. Relieve Bruce Carneil Webster's sentence under 28 U.S.C. § 2255 because he is mentally retarded and therefore ineligible for the death penalty.

2. In the alternative, grant Bruce Carneil Webster an evidentiary hearing allowing Petitioner the opportunity to present evidence of his *Atkins* claim.

Dated:  October 21, 2009

Respectfully submitted,

Dorsey & Whitney LLP

By _____
        Steven J. Wells (MN Atty# 163508)
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile:  (612) 340-2868
E-mail:  wells.steve@dorsey.com

Counsel for Petitioner
Bruce Carneil Webster

37

# Wells Declaration

No. _____

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

Bruce Carneil Webster

v.

United States of America

---

## DECLARATION OF STEVEN J. WELLS IN SUPPORT OF MOTION FOR AUTHORIZATION TO FILE SUCCESSIVE MOTION TO VACATE SENTENCE

I, STEVEN J. WELLS, declare as follows:

I am a partner at the law firm of Dorsey & Whitney LLP ("Dorsey"),

attorneys for Petitioner Bruce Carneil Webster. I submit this Declaration in

support of Petitioner's Motion for Authorization to File Successive Motion to

Vacate Sentence.

1.　　Attached hereto as **Exhibit A** is a true and correct copy of the Order entered in *Roane, et. al. v. Gonzales, et. al.*, Case No. 1:05-cv-2337 (D.D.C. Feb. 16, 2007) (Docket No. 27).

2.　　Attached hereto as **Exhibit B** is a true and correct copy of excerpts from Volume 23 of the transcript of proceedings held in the criminal trial of Bruce Carniel Webster in the Northern District of Texas, *U.S. v. Webster*, Case No. 4:94-cr-00121-Y (N.D. Tex.) (hereinafter "trial transcript") on June 12, 1996.

3.　　Attached hereto as **Exhibit C** is a true and correct copy of excerpts from Volume 24 of the trial transcript for proceedings held on June 13, 1996.

4.　　Attached hereto as **Exhibit D** is a true and correct copy of excerpts from Volume 25 of the trial transcript for proceedings held on June 14, 1996.

5.　　Attached hereto as **Exhibit E** is a true and correct copy of excerpts from Volume 26 of the trial transcript for proceedings held on June 18, 1996.

6.　　Attached hereto as **Exhibit F** is a true and correct copy of excerpts from Volume 27 of the trial transcript for proceedings held on June 19, 1996.

7.　　Attached hereto as **Exhibit G** is a true and correct copy of the Social Security Administration records of Bruce Webster received by Dorsey on February 9, 2009. Dorsey has paginated this exhibit for ease of reading. Dorsey has redacted pursuant to Fed. R. Crim. P. 49 for privacy protection.

8.     Attached hereto as **Exhibit H** is a true and correct copy of the Social Security Administration records of Willie Webster received on February 9, 2009. Dorsey has paginated this exhibit for ease of reading. Dorsey has redacted pursuant to Fed. R. Crim. P. 49 for privacy protection.

9.     Attached hereto as **Exhibit I** is a true and correct copy of the Department of Human Services Child Maltreatment Division Records received on October 31, 2008. Dorsey has paginated this exhibit for ease of reading. Dorsey has redacted pursuant to Fed. R. Crim. P. 49 for privacy protection.

10.     Attached hereto as **Exhibit J** is a true and correct copy of the December 9, 2008 Declaration of Leonda Daniels.

11.     Attached hereto as **Exhibit K** is a true and correct copy of the November 12, 2008 Declaration of Lanetra Evans.

12.     Attached hereto as **Exhibit L** is a true and correct copy of the November 11, 2008 Declaration of Luketha Frazier.

13.     Attached hereto as **Exhibit M** is a true and correct copy of the December 7, 2008 Declaration of Marvin Holloway.

14.     Attached hereto as **Exhibit N** is a true and correct copy of the December 9, 2008 Declaration of Angela Madison.

15.     Attached hereto as **Exhibit O** is a true and correct copy of the December 9, 2008 Declaration of Theressia Marten Moten.

16.    Attached hereto as **Exhibit P** is a true and correct copy of the December 8, 2008 Declaration of Michael Parks.

17.    Attached hereto as **Exhibit Q** is a true and correct copy of the November 11, 2008 Declaration of Jodin Smith.

18.    Attached hereto as **Exhibit R** is a true and correct copy of the November 11, 2008 Declaration of Dorothy Harris Wallace.

19.    Attached hereto as **Exhibit S** is a true and correct copy of the November 11, 2008 Declaration of Sharon Webster.

20.    Attached hereto as **Exhibit T** is a true and correct copy of the November 11, 2008 Declaration of Tony Webster.

21.    Attached hereto as **Exhibit U** is a true and correct copy of the Motion of Bruce Carneil Webster to Vacate Conviction and Sentence and for New Trial Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure, filed on September 29, 2000.

22.    Attached hereto as **Exhibit V** is a true and correct copy of the Amended Motion of Bruce Carneil Webster to Vacate Conviction and Sentence and for New Trial Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure, filed on August 22, 2002.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

-5-

Dated: 10/20/09

Steven J. Wells

# Wells Decl. Ex. A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAMES H. ROANE, JR., et al.,           )
                                        )
        Plaintiffs,              )
                                        )
v.                                      )        Case No. 1:05-CV-2337 (RWR)
                                        )
ALBERTO GONZALES, et al.,               )
        Defendants.              )
                                        )

## ORDER

IT IS ORDERED that Plaintiff Bruce Webster's Unopposed Motion for a Preliminary Injunction Barring His Execution it is hereby GRANTED. The Defendants herein are enjoined from executing Plaintiff Bruce Webster, pending further order of this Court.

Dated: 2/16/07

_____
Richard W. Roberts
United States District Judge

EXHIBIT A

# Wells Decl. Ex. B

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA     . CRIMINAL ACTION NO.
. 4:94-CR-121-Y
V.
. Fort Worth, Texas
BRUCE CARNEIL WEBSTER        . June 12, 1996
. . . . . . . . . . . . . . .


VOLUME 23
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:       MR. RICHARD B. ROPER
                MR. PAUL D. MACALUSO
                 MR. CHRISTOPHER CURTIS
                Assistant United States Attorney
                 801 Cherry Street, Suite 1700
                Fort Worth, Texas  76102-6897
                 (817) 978-3291

For the Defendant:       MR. LARRY M. MOORE
                Attorney at Law
                 1112-A East First Street
                Fort Worth, Texas  76102
                 (817) 338-4800

                 MR. ALLAN K. BUTCHER
                Hill, Beatty, Butcher
                 & Gallagher
                201 Main Street, Suite 1300
                 Fort Worth, Texas  76102
                (817) 336-3600

Court Reporter:        Ana P. Warren
                U.S. District Court Reporter
                501 W. 10th Street, Room 204B
                 Fort Worth, Texas  76102-3637
                (817) 335-3050

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.


U.S. DISTRICT COURT

Q. He has not or you don't know?

A. No, because he was working on the C.E.T.A. program, and that was during school, and school was back in.

Q. Do you have any earthly idea how he would get all that money he was spending on himself and other people?

A. Bruce don't have no money because there have been times when Bruce sees me, Bruce asks me for money, and I give it to him.

Q. Okay. You wouldn't see him wearing jewelry?

A. Jewelry that my mother bought.

Q. Your mother bought him expensive jewelry?

A. Yes. She charged it on her card. She would do it for me, too.

Q. But if your mother didn't give him the money and he wasn't working, then you don't really know where he would have gotten his money, do you?

A. From me and his mother, $35 here, $2 here.

Q. Okay. Do you know why Bruce couldn't hold an honest job like your brother Tony and your brother Mark?

A. What did you say?

Q. Is there any reason that you know of why Bruce couldn't have gone out and gotten an honest job?

A. If somebody had hired him. Just like I used to put in for jobs and never could get hired because of education. I didn't get an education.

U.S. DISTRICT COURT

Direct - Butcher/Frazier          75

A. About seven or eight.

Q. So it was in your early years?

A. Yes.

Q. And how often would you see him?

A. I would see him every day.

Q. Were the two of you in the same grade?

A. Yes.

Q. Did you go to the same school?

A. Yes.

Q. Did you have classes together?

A. We had one class together.

Q. How did Bruce get along with the other children in school while you were there?

A. He got along with them well.

Q. Was he liked or not liked?

A. Very disliked -- excuse me. Sorry. He was very liked by the students.

Q. How well did he perform? Was he able to do all of the assignments and do well in school?

A. With the help of other students.

Q. In what way would other students help him?

A. They would do his homework or try to show him how to do it.

Q. Did he ever get help on exams or tests?

A. On one particular test, I helped him.

Q. Do you know whether or not other students helped him on

U.S. DISTRICT COURT

Direct - Butcher/Frazier        76

other tests?

A. Not to my knowledge.

Q. Did you ever help him with assignments?

A. Yes.

Q. With regard to a driver's license, did you have memory -- do you remember an incident involving Bruce and the driver's license?

A. Yes.

Q. What was that?

A. Well, I had the answers to the test, and I gave them to him.

Q. So you provided the answers to the written portion of the test to Bruce?

A. Yes.

Q. And this was for the driver's license?

A. Yes.

Q. Living across the street or down the street from the Webster family, are you aware of the punishment that Willie Webster, Bruce's father, would give out?

A. Yes.

Q. Have you seen that yourself?

A. I didn't see it, but I heard of it.

Q. Well, not with regard to any particular person, but have you seen it in general?

A. Well, it happened to myself.

U.S. DISTRICT COURT

Recross - Macaluso/Daniels        102

A. Yes, sir.

MR. MOORE: I don't think I have anything further, Your Honor.

MR. MACALUSO: Just a question or two.

THE COURT: All right.

RECROSS EXAMINATION

BY MR. MACALUSO:

Q. Ms. Daniels, did I understand you to say that you didn't think Mr. Webster, Bruce over here, could fill out a job application?

A. He could fill out one, but at the time I guess he wanted me to fill out the application form.

Q. Then the question is, ma'am, so we're clear on this. Are you saying that he could but didn't?

A. He can fill out an application, yeah, but I filled it out that particular day.

Q. We don't want to confuse the jury by suggesting that he couldn't fill out a job application, would we?

A. Yeah. He can fill out one.

Q. You've read letters from him, haven't you?

A. Huh? Sir?

Q. Has he written letters to you?

A. Yes, sir.

Q. Does he have any difficulty writing you a letter?

A. I can hardly understand his handwriting. I don't know.

U.S. DISTRICT COURT

Direct - Moore/McKelvy          103

Q. Well, putting aside the handwriting, did you have any difficulty understanding what he had to say at all?

A. Huh-uh.

MR. MACALUSO: Thank you, ma'am.

MR. MOORE: No further questions.

THE COURT: You may step down. Thank you. And you're free to go as well.

MR. MOORE: Dorothy Harris McKelvy.

THE COURT: What was the last name again?

MR. MOORE: McKelvy, M-C-K-E-L-V-Y. I think she's on the witness list as Dorothy Harris, Your Honor, Number 64.

THE COURT: 64. Thank you.

Ms. McKelvy, would you please raise your hand and be sworn?

(Witness sworn by the Court)

DOROTHY HARRIS MCKELVY, testified under oath as follows:

DIRECT EXAMINATION

BY MR. MOORE:

Q. State your full name for the jury, please? State your full name for the jury, Dorothy?

A. I can't hear you too well.

Q. Okay. Let me try this again. State your full name for the jury?

A. Dorothy Harris McKelvy.

Q. And how old are you?

A. Thirty-six.

U.S. DISTRICT COURT

Direct - Moore/Webster, Beatrice        138

A. Yes, sir.

Q. What grade did he have to repeat?

A. I believe he had to repeat the second grade twice and another grade when he got on up -- what you would call -- not high school but between that.

Q. During the time that Bruce was growing up in the house, were there things that occurred -- were there things that your husband did to Bruce that you knew he ought not be doing?

A. Yes, sir.

Q. Did those type things occur to the other children in the house as well?

A. Yes, sir.

Q. Did those type things happen to you?

A. Yes, sir.

Q. Did you ever make any efforts to try to stop your husband from doing those type things to your children?

A. No, sir.

Q. Why didn't you do that, Ms. Webster?

A. I was afraid.

Q. What were you afraid of?

A. The things that he told me.

Q. The things that your husband told you?

A. Yes, sir.

Q. What type things would he tell you that he would do?

A. He just told me that I don't go to no white folk, only him,

U.S. DISTRICT COURT

Direct - Moore/Webster, Beatrice        145

about him, what was he talking about?

A. Well, I assume if I say the wrong thing, testify to the truth or something, and he knows that it's the truth, that if he hear about it, you know, I don't know what he would do. But I assume that's what he's saying.

Q. Are you still scared of your husband?

A. Yes, sir.

Q. Are you scared about him finding out what you testified to here in court?

A. Yes, sir.

Q. Can your husband read and write?

A. No, sir.

Q. When you -- when did Bruce leave home for good? Has there ever been a time in Bruce's life when he left and moved out and never came back to live?

A. No, sir.

Q. How has Bruce, since he, you know, became a teenager and thereafter, how has Bruce lived? How has he supported himself?

A. Through the welfare office, F.D.C., and get food stamps and with a little money I give him. He would just live at home with me.

Q. Has he lived at home continuously pretty much all of his life?

A. Yes, sir.

Q. Has there been occasions when he has lived with somebody

U.S. DISTRICT COURT

Direct - Moore/Finn                187

mental health community as being reliable?

A. Yes. It's one of the two or three most widely used individual intelligence tests for adults.

Q. What was the result of the tests that you administered to Mr. Webster?

A. In January 30 of 1995, he obtained a verbal score, which is kind of a sub-score, an I.Q. of 59, a performance I.Q. which is based on some other -- it's another sub-score of 60, and a full scale or an overall I.Q. of 59.

Q. What does that, as a professional experienced and trained in the area of mental health and mental retardation, what does that tell you?

A. Well, it tells me, first of all, that in numerical terms this is an individual who is actually less -- who is at the 0.3 percentile. That is, if you take these same hundred people that I was talking about earlier, and line them up against the wall, you would have to cut one of them in two and fit him in the middle somewhere. He is actually below the first percentile in terms of intelligence compared to the rest of the population.

I might also add that this score of 59 is below both the score of 62 and the score of 70 that are used to define retardation in terms of test scores. So he is clearly mentally retarded by both definitions.

Q. Is the score that you obtained at the time you administered

U.S. DISTRICT COURT

Direct - Moore/Finn          194

3, 4, but really can't pull those together very well into a conclusion or a general statement. You have to sit and listen to all the details and kind of draw the conclusions yourself. So there is a certain concreteness, to use that term, in his thinking that, again, is typical of mildly retarded individuals.

Q. Does he have a large fund of knowledge? Were there words that you used that he didn't understand, things like that?

A. His word knowledge is one of his stronger points. Although he is better at speaking than he is at understanding. There were times that I had to rephrase and simplify things that I said to him in order for him to understand them.

Q. A person that has an I.Q. in the range of what you tested Mr. Webster to have, would it be possible for an individual like that to communicate, speak, read, write, things like that?

A. Yes. In fact, for mildly retarded individuals, the kind of rough rule of thumb is that they can often master academic skills up to about maybe a second or possibly low third grade level. The term educable mentally retarded is sometimes used, and it refers to the fact that these individuals can absorb at least the rudiments of what is taught in school. They can learn to read and write at a very low level, but they can do it. They can learn to dial a telephone, to communicate with people, in a minimally adequate way and so on.

U.S. DISTRICT COURT

246

INDEX

| Witnesses: | Direct | Cross | Redirect | Recross | VoirDire |
|---|---|---|---|---|---|
| Mark Webster | 2 | 22 | 32 | | |
| Tony Webster | 34 | 43 | 51 | | |
| Future Rayford | 52 | 63 | 70 | | |
| Luketha Frazier | 73 | 79 | 89 | | |
| Leonda Daniels | 90 | 94 | 100 | 102 | |
| Dorothy McKelvy | 103 | 114 | 118 | | |
| Ruby Binns | 119 | 127 | 130 | | |
| Beatrice Webster | 131 | 156 | 170 | | |
| Raymond Finn | 172 | 197 | 231 | 241 | |

-oOo-

EXHIBITS

| Exhibit Number | Offered | Admitted |
|---|---|---|
| Defendant's 12 | 136 | 137 |
| Defendant's 10 | 150 | 150 |
| Defendant's 23 | 153 | 153 |

-oOo-

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter, and that the transcript was prepared by me and under my supervision.

Ana P. Warren, CSR #2302                Date
U.S. District Court Reporter

-oOo-

U.S. DISTRICT COURT

# Wells Decl. Ex. C

Vol. 24: 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA         .  CRIMINAL ACTION NO.
                                 .     4:94-CR-121-Y
V.                               .
                                 .  Fort Worth, Texas
BRUCE CARNEIL WEBSTER            .  June 13, 1996

. . . . . . . . . . . . . . . .


VOLUME 24
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, and a jury.


APPEARANCES:

For the Government:              MR. RICHARD B. ROPER
                                 MR. PAUL D. MACALUSO
                                 MR. CHRISTOPHER CURTIS
                                 Assistant United States Attorney
                                 801 Cherry Street, Suite 1700
                                 Fort Worth, Texas   76102-6897
                                 (817) 978-3291

For the Defendant:               MR. LARRY M. MOORE
                                 Attorney at Law
                                 1112-A East First Street
                                 Fort Worth, Texas   76102
                                 (817) 338-4800

                                 MR. ALLAN K. BUTCHER
                                 Hill, Beatty, Butcher
                                   & Gallagher
                                 201 Main Street, Suite 1300
                                 Fort Worth, Texas   76102
                                 (817) 336-3600

Court Reporter:                  Ana P. Warren
                                 U.S. District Court Reporter
                                 501 W. 10th Street, Room 204B
                                 Fort Worth, Texas   76102-3637
                                 (817) 335-3050

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

EXHIBIT C
U.S. DISTRICT COURT

COPY

Direct - Moore/Keyes                    Vol. 24: 20

first test I gave him was the Stanford Binet, Fourth Edition.

In the Stanford Binet he performed in the lowest .2 percent of

the population.

Q.   I'm sorry.   The lowest what?

A.   Point two percent of the population, a composite score of

51.

Q.   Earlier, when we were discussing the definition of I.Q.,

the definition of mental retardation and so forth, there was

some discussion of scores of 75 and below and so forth.  Is the

composite score of 51 that you achieved on the Stanford

Binet, are we talking the same numbers as they use in the

statistical definitions of mental retardation?

A.   Essentially, yes, we are.   There is a small difference

between the Stanford Binet and the W.A.I.S., Wechsler Adult

Intelligence Scale Revised, and the reason for that is because

of the distance between the standard deviation.   The standard

deviation on the W.A.I.S. is 15.   It's 16 on the Binet.

Q.   Was there a particular reason why you chose to administer

the Stanford Binet to Mr. Webster as opposed to the W.A.I.S.?

A.   Yes.   I chose to use the Stanford Binet because -- first of

all, Bruce, his age is within the limits of the Stanford Binet,

up to 23, 11.   And, also, I chose the Stanford Binet because he

had been given the W.A.I.S. on several other occasions, and I

felt that there was a very distinct possibility of a practice

effect.

inflated view of what he's capable of doing compared to what his teachers thought. Therefore, I dropped several members of the family and used the teacher's evaluations as better indicators. But the overall composite -- there were two composite scores that I used, and those areas considerably differed from his intellectual skills, which didn't surprise me terribly much.

Q. What does that mean? Explain that to me?

A. The people who knew him knew him when he was in a very unstructured environment. He was very free. He did not consider school to be a very good indicator of what he needed in the future, and as such, he was unstructured and misbehaved considerably while he was in school. Therefore, his school administrators found him to be probably functioning at a medium to lower level than he really does.

His family members, the ones who knew him best, I could tell were giving me honest responses. The ones who didn't know him quite as well gave inflated views, and the overall numbers that I came up with were significantly lower than his intellectual skills, which states that during his period of being in an unstructured lifestyle and living in an unstructured life, non-institutionalized, living in a home where there was abuse going on, and where he would come and go as he pleased, in those situations, adaptively, he functions somewhere in the range of a seven year old.

Q.   He functions in the range of what?

A.   Somewhere in the range of a seven year old, six to seven year old.

Q.   The information that you received in regard to the taking -- doing the Vineland scale, doing the history and so forth, was it consistent with an individual that essentially has never lived on his own, had never had a bank account, never had a charge card, never been able to function in the real world, essentially, on his own?

A.   Essentially, it was that of a six year old, six to seven year old.  Yes, that's exactly what it was.  He was never on his own.

Q.   You indicated something about abuse.  During the interviews that you were doing with the members of the family, as kind of a byproduct of the Vineland interviews, did you learn that there was, in fact, a history of abuse in that home?

A.   Yes, I did.

Q.   Is that something that you had had indications of prior to the time that you had been doing those interviews?

A.   There was some indication in the record, but the record, I don't think, really portrayed it very accurately.  It certainly didn't portray the heinous level.

Q.   Did Bruce -- is this something that you had learned from Bruce, or is it something that you had learned from other sources?

A.   Yes.

Q.   What are some of the things that you would expect a person of Bruce Webster's intelligence level not to be able to do on a day-to-day basis?

A.   Not to be able to do?

Q.   Yes.

A.   I would expect that he was not capable of carrying on a high level conversation to the point where an individual would think that he was talking with a normal person for very long. For awhile he can make you believe that he's just as normal as apple pie, and it's after awhile you can realize that he's really not able to carry on that level of conversation for a long period of time, particularly when you get into some abstract thoughts.

I would expect that he would not be able to sit down and read a text and understand everything that he reads.  I would expect him to understand things around the third grade level of comprehension, third or fourth grade level of comprehension.

I would expect that he would be unable to do a job for extended periods of time without goofing off because his ability to concentrate would sway.  I would expect that he would not be able to control certain impulses, various impulses, not the least of which among them is sexual.

Q.   I take it he could go to the movies and enjoy the movies?

A.   Yes.

judge, and it's been measured as a test of attention.

Q. Were there other tests that you gave in this particular area?

A. I would have given him the Pace (phonetic) Auditory Serial Addition Test, which is a measure of a person's information processing speed and their thinking speed, basically, and their ability to divide their attention between two things at once. He was not able to learn the basics of that test. He couldn't perform -- when I was showing him what I wanted him to do, he couldn't demonstrate a capacity to do that, which is to add single digit numbers -- a single digit number to the previous number that was satisfied said in serial order, not in cumulative order. It's a tough test. A lot of people have difficulty with it, but he couldn't even master the basics with repeated instruction. So I didn't give him that.

Q. As a result of the testing that you did in this particular area, what did the results of those tests indicate to you?

A. First of all, those results indicated significant impairment in his attention capacity. His ability to pay attention to what he hears for a short periods of time does not appear to be too bad. His ability to pay attention to more than one thing at a time and, at the same time on the flip side of the coin, filter out a distraction appears to be quite poor, and that would certainly not be unexpected in light of his intellectual functioning as measured on the previous tests.

the offense, and that's what I was focusing on, in terms of diagnoses, was what was occurring at that time.  He didn't spontaneously report any hallucinations at that time period, but there is, again, history of that occurring in his record before the offense, and he described it when I was interviewing him as something that happened to him periodically.

I made some other diagnoses as well.  I diagnosed him as suffering from mental retardation of a mild variety.  As you have perhaps heard testimony, mental retardation is staged as mild or moderate or severe profound, and this was of a mild sort, in terms of the I.Q. range that it falls within, by my best estimate.

I also diagnosed an antisocial personality disorder and, also, a personality disorder not otherwise specified, a combination, a mixture of personality disorders, involving features that I identified, both narcissistic and dependent.

Q.   Do you find that there are psychological disorders that are associated with chronic violence?

A.   Yes, there are.

Q.   And are the ones that you found so associated?

A.   That's a complicated -- yes, because I have made several diagnoses, it would relate in different ways to those, and, perhaps, I can take them in order in terms of the relationship they have.

Q.   Okay.  With regard to the antisocial personality.  Is there

Direct - Curtis/Stewart              Vol. 24: 238

have you had the opportunity on several occasions to have contact with either mentally retarded or mildly mentally retarded individuals?

A.  I have.

Q.  Now, did you have -- could you describe for the jury what sort of contact you had with Bruce Webster when you were a principal at Watson Chapel Junior High?

A.  My primary function in relation to Bruce was supervision, his grade placement, his scheduling of classes.

Q.  Did you have enough contact with him to form any opinion as to his intellectual ability?

A.  I did.

Q.  Do you have an opinion as to whether or not he was mentally retarded?

A.  In my opinion, I do not believe Bruce is mentally retarded.

Q.  Now, during your time of 25 years as a counselor and a principal, have you participated in making determinations whether someone was going to be assigned to special education classes, in fact, whether they were mentally retarded?

A.  In a number of instances, yes.

Q.  Was Bruce Webster ever, as far as you know, assigned to special education classes while you were a principal in the school which he attended?

A.  He was not.

Q.  Was there any reason to put him in special education

classes?

A.   In my opinion, he was not -- or should not have been assigned to any special education classes.

Q.   As far as you know, in anybody's opinion at Watson Chapel Junior High, should he have been assigned to special education classes?

A.   I do not think he met the qualifications for special education placement.

Q.   Now, Mr. Stewart, before coming to court today, several months ago did a Dr. Keyes come to talk to you?

A.   Yes, sir, he did.

Q.   How long did he talk with you?

A.   Just a few minutes.

Q.   At the conclusion of your conversation, what did he say to you?

A.   The final statement before his farewell -- and he was quite cordial with that -- but after we had visited for a few minutes, he closed his book and said that I hadn't given any information which would have been beneficial or would have helped him.

Q.   And did he leave after that?

A.   We may have visited for a few moments thereafter, but, yes, sir, he did leave after that.

Q.   Are you aware whether Bruce Webster, while you were principal of the school he was attending, was ever tested for

Direct - Macaluso/McLaughlin        Vol. 24: 247

Q.  Did he give you the lingo and the language and the signs and things like that?

A.  Yes, sir, rankings, et cetera.

Q.  And on the occasions, including those times when you spoke to Bruce, did you have difficulty understanding him?

A.  No, sir.

Q.  Did he speak in a coherent fashion?

A.  Always.

Q.  I mean, did you ever, like, scratch your head when you got through talking to Bruce and try to figure out what he's trying to say or what he was trying to get across to you?

A.  No, sir.

Q.  Now, you have been in the school business for about how long?

A.  Twenty years.

Q.  Have you seen people that you believed, or have been diagnosed as being mentally retarded?

A.  Yes, sir.

Q.  On few or on many occasions?

A.  Well, we have our share in our schools.

Q.  Okay.  And people who have been placed in special education programs?

A.  After testing, yes.

Q.  With Bruce, was there any reason at any time during your tenure, your involvement with Bruce Webster, on the basis of

anybody that you spoke to, like a teacher, that suggested that he was in any way mentally retarded?

A. No, sir.

Q. Did anything like that come from a teacher that he should be put in a special education class or something like that?

A. No, sir, not to me.

Q. Did he appear to be impaired mentally in any other way?

A. No, sir.

Q. Did you ever have occasion to go by his house?

A. Yes, sir. There was an occasion that the principal and I took him home one time.

Q. Did you go in the house or just drop him off?

A. No, sir. We didn't go in the house.

Q. Did anything ever come to your attention about any sort of physical abuse to Bruce?

A. No, sir.

Q. Did you ever notice anything about him, bruises on him, or he complained about being beat up or mistreated by his family in any way?

A. Never.

Q. Now, let me ask you. Did you have occasion, within the last few months, at least, to talk to or be visited by a doctor by the name of Denis Keyes?

A. Yes, sir. I have visited with him.

Q. Did he come to your office, to your home, or where do you

Vol. 24:  260

I N D E X

| Witnesses: | Direct | Cross | Redirect | Recross | Court |
|---|---|---|---|---|---|
| Denis Keyes | 2 | 52 | 85 | 97 | |
| | | | 99 | | 99 |
| | | | 109 | | |
| | | | | 113 | |
| | | | 119 | | |
| Robert Fulbright | 120 | 151 | 164 | 171 | |
| Levi Thomas | 172 | 178 | 181 | | |
| Mark Cunningham | 182 | 203 | 222 | | |
| Charles McLemore | 225 | 232 | | | |
| Gene Stewart | 236 | 240 | | | |
| Richard McLaughlin | 243 | 251 | | | |

-oOo-

E X H I B I T S

| Exhibit Number | Offered | Admitted |
|---|---|---|
| Defendant's 27 | 89 | 91 |
| Government's 95 | 226 | 226 |

-oOo-

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter, and that the transcript was prepared by me and under my supervision.

*Ana P. Warren*                              4-8-97

Ana P. Warren, CSR #2302                     Date
U.S. District Court Reporter

-oOo-

U.S. DISTRICT COURT

# Wells Decl. Ex. D

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA    . CRIMINAL ACTION NO.
                  .   4:94-CR-121-Y
V.                .
                  . Fort Worth, Texas
BRUCE CARNEIL WEBSTER        . June 14, 1996
. . . . . . . . . . . . . . .


VOLUME 25
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, and a jury.


APPEARANCES:

For the Government:      MR. RICHARD B. ROPER
                  MR. PAUL D. MACALUSO
                  MR. CHRISTOPHER CURTIS
                  Assistant United States Attorney
                  801 Cherry Street, Suite 1700
                  Fort Worth, Texas  76102-6897
                  (817) 978-3291

For the Defendant:      MR. LARRY M. MOORE
                  Attorney at Law
                  1112-A East First Street
                  Fort Worth, Texas  76102
                  (817) 338-4800

                  MR. ALLAN K. BUTCHER
                  Hill, Beatty, Butcher
                    & Gallagher
                  201 Main Street, Suite 1300
                  Fort Worth, Texas  76102
                  (817) 336-3600

Court Reporter:      Ana P. Warren
                  U.S. District Court Reporter
                  501 W. 10th Street, Room 204B
                  Fort Worth, Texas  76102-3637
                  (817) 335-3050

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.


U.S. DISTRICT COURT

Direct - Roper/Clay, John          89

A. Well, he was telling me about some incidents that happened over at the facilities where I'm at.

Q. And did there come a time when he told you about a plan he had regarding the visiting area of the jail?

A. Yes, he did.

Q. And what did he say?

A. He was telling me about how he had a master mind plan that he could put together, but he needed me to help him because he was confined to solitary confinement at that time, and he needed me to help him do that.

Q. Well, what did he tell you in that regard?

A. He wanted me to -- he knew I had a lot of lady friends that was next door, and he wanted me to get a lady friend of mine to put him on his visiting list, and when someone came to saw me, they could put him out and me out, and pull the other ladies out as well. We would all be in the visiting room at the same time. I could look out for him while he got with the lady, and then he could look out for me when I got with my lady.

Q. Now, did you know whether or not Mr. Webster had anybody in this part of the area readily available to be put on his visitor list?

A. He said -- that's the reason why he needed me because his family wasn't from around here, and he didn't have anybody to put on there, and he wanted me to put someone on his visiting list that was around here that could come kind of regular.

U.S. DISTRICT COURT

Direct - Roper/Valdez          125

newspaper articles?

A. Yes, sir. He would read from the scriptures, and we would talk about that.

Q. Did he ever talk in a face-to-face manner about the bible?

A. No, sir.

Q. Did you ever have any difficulty in understanding Bruce?

A. No, sir.

Q. Now, is there a commissary in that building?

A. Yes, sir.

Q. Briefly explain to the jury what that is?

A. Commissary is their -- in order for him to receive, or any inmate to receive commissary privileges, he would have to check out the items that he needed. It's like a canteen where you can order sodas, chips, candy, cigarettes, and he would have to check the items that he needed and turn it into the officers so they can deduct it from his account and fill the order and give it back to him, and he would have to describe the orders that he would check off and sign for.

Q. Was he able to do that?

A. Yes, sir.

Q. Did you ever have a conversation with him about a commissary problem?

A. Yes, sir. There was one incident that a commissary officer made a mistake, that he was overcharged for the item and never received the item.

U.S. DISTRICT COURT

Cross - Butcher/Valdez          126

Q. How did you know?

A. Because he stopped me -- when I was coming in the office one day, and he stopped me that there was a problem with his commissary, and he requested me for me to talk to the commissary officer, and he brought it to my attention.

Q. You said reading material from newspapers he received. Was there any other reading material he ever received?

A. Post cards. He would question me about post cards.

Q. And what did he say about that?

A. He would like to see them and read them even through they weren't entitled to have them in their cell.

Q. How long have you been working in the jail unit, in law enforcement?

A. Fourteen years, sir.

Q. During that course, have you ever come across folks that were mentally retarded, prisoners that were mentally retarded?

A. Yes, sir, several.

Q. Is there any indication from talking to Mr. Webster that he appeared to fit in that category?

A. No, sir.

          MR. ROPER: Pass the witness.

          THE COURT: Is there cross?

          MR. BUTCHER: Yes, Your Honor.

                    CROSS EXAMINATION

BY MR. BUTCHER:

U.S. DISTRICT COURT

Direct - Roper/Alexander            128

MR. ROPER: No further questions.

THE COURT: You may step down, sir.

MR. ROPER: We call Luther Alexander.

THE COURT: Please have a seat over here, sir?

THE WITNESS: Yes, sir.

THE COURT: You'll recall you're still under oath?

THE WITNESS: Yes, sir.

LUTHER ALEXANDER, testified under oath as follows:

DIRECT EXAMINATION

BY MR. ROPER:

Q. For the record, are you the same Luther Alexander who testified earlier in this cause?

A. Yes, sir, I am.

Q. During the course of being a jailer there at the Mansfield Law Enforcement Detention, did you come in contact with the defendant in this case, Bruce Webster?

A. Yes, sir.

Q. Is there, at that center, a law library for inmates to use?

A. Yes, sir, there is.

Q. And have you ever had occasion to be in that law library with Defendant Webster?

A. Yes, sir, on many occasions.

Q. Tell the members of the jury why that would happen?

A. Okay. First, when he was in general population, he attended law library almost each and every day that we had it.

U.S. DISTRICT COURT

Most inmates attend law library just to get out of their zones, have a little freedom. During that time, after he had his escape attempt, he was escorted to the law library to do his studying by himself with leg irons and handcuffs off. I observed him during that period of time.

Q. Tell the members of the jury what you observed when you were there in the law library with him?

A. When he was escorted to the law library, he got down law library books. He looked at them. He took notes from them.

Q. Now, during the time when you were with him, did you appear to -- did you understand what he was saying when he was talking to you?

A. Yes, sir, at all times.

Q. Did you ever give him directions?

A. Yes, sir, I did.

Q. Was he able to understand those directions?

A. Yes, sir, he was.

Q. Did you ever have occasion to see him -- about how he kept himself, his hygiene?

A. At all times he was very neat. When he had attorney visits, regular visits, he always took his time to groom himself properly before he left the cell. In many cases, the officer will call and complain about him not getting ready fast enough to go to his visits.

Q. Now, did there come a time that you talked to him about --

U.S. DISTRICT COURT

Direct - Roper/Harrison          138

A. No.

Q. Did you ever see Webster with any reading materials?

A. Yes.

Q. Tell the members of the jury what you have seen?

A. One day I was working the zone where he was, and he asked for a book, and I gave him a book. He asked for a request for service form, and I gave it to him, and he filled it out.

Q. Now, during the course of being there, did you have occasion to talk with him in regards to the commissary?

A. Yes.

Q. Would that be once or more than once?

A. Once.

Q. What did he say in regards to the commissary?

A. That his commissary was messed up, that she had given his money out wrong.

Q. Did you check into that?

A. Yes.

Q. And what did you find out?

A. That it was wrong, and he refigured it, and I took it to the commissary lady.

Q. Did you ever hear him talking to other inmates?

A. Yes.

Q. In particular, is there an inmate there by the name of Bobby Collins?

A. Yes.

U.S. DISTRICT COURT

Direct - Roper/Saenz          143

Q. Did you ever have occasion to go to the law library with him?

A. Yes, sir. There were several times that he had filled out requests and was allowed, when he was in general population.

Q. And were you ever present there? I mean, when you go to the law library?

A. Yes, sir. I was the officer in charge of that several times.

Q. What would you observe Webster do there in the law library?

A. He would be reading books, law library materials, copying stuff, helping other inmates, read --

Q. Do you ever remember -- I'm sorry. I cut you off.

A. -- reading a document, stuff like that.

Q. Did you ever have occasion, or recall him ever helping a particular inmate?

A. One time there was an inmate whose last name was Crump, first name Warren. I do not recollect the time, but it was last year.

Q. And what was he doing with regard to that inmate, Webster?

A. I believe he was helping him on his trial or his case.

Q. Now, of course -- I guess you can't look into his mind and see if he was reading, but what did you observe him do with those books?

A. Reading the book, flipping the pages, slowly.

Q. Did you ever have -- I want to go back, if I could, to

U.S. DISTRICT COURT

151

EXHIBITS

| Exhibit Number | Offered | Admitted |
|---|---|---|
| Government's 102-A | 18 | 19 |
| Government's 102-B thru 102-D | 21 | 21 |
| Government's 98-A | 57 | 57 |
| Defendant's 9 | 61 | 61 |
| Government's 99 | 71 | 71 |
| Government's 121-A | 91 | 91 |
| Government's 121-B | 92 | denied |
| Government's 132-A | 112 | 112 |

-oOo-

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter, and that the transcript was prepared by me and under my supervision.

Ana P. Warren, CSR #2302          Date
U.S. District Court Reporter

-oOo-

U.S. DISTRICT COURT

# Wells Decl. Ex. E

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA    . CRIMINAL ACTION NO.
                            .   4:94-CR-121-Y
V.                          .
                            . Fort Worth, Texas
BRUCE CARNEIL WEBSTER       . June 18, 1996
. . . . . . . . . . . . . . . .

VOLUME 26
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        MR. RICHARD B. ROPER
                           MR. PAUL D. MACALUSO
                           MR. CHRISTOPHER CURTIS
                           Assistant United States Attorney
                           801 Cherry Street, Suite 1700
                           Fort Worth, Texas 76102-6897
                           (817) 978-3291

For the Defendant:         MR. LARRY M. MOORE
                           Attorney at Law
                           1112-A East First Street
                           Fort Worth, Texas 76102
                           (817) 338-4800

                           MR. ALLAN K. BUTCHER
                           Hill, Beatty, Butcher
                             & Gallagher
                           201 Main Street, Suite 1300
                           Fort Worth, Texas 76102
                           (817) 336-3600

Court Reporter:            Ana P. Warren
                           U.S. District Court Reporter
                           501 W. 10th Street, Room 204B
                           Fort Worth, Texas 76102-3637
                           (817) 335-3050

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

U.S. DISTRICT COURT

EXHIBIT E

Direct - Roper/Cardinale          25

now, we're not going into all of these. Are these all relating to requests by the defendant, Webster, for law library visits?

A. They appear to be. We use these also for medical services and recreation and a variety of things.

Q. There could be other requests in there, but --

A. Right. These all appear to relate to attending the law library.

Q. Let me show you Government's Exhibit Number 17-C (sic), D -- well, let's just start with 17 (sic) first. Can you look at that?

A. Yes.

Q. Do you recognize those records?

A. Yes.

Q. Is Government's Exhibit Number 17-C (sic) a part of the records relating to the defendant, Bruce Carneil Webster?

A. Yes.

    MR. ROPER: The government would move to introduce Government's Exhibit 17-C (sic).

    MR. BUTCHER: No objection.

    THE COURT: 17-C (sic) admitted.

Q. (By Mr. Roper) What is Government's Exhibit Number 17-C (sic).

A. These are requests for service forms or a form specifically filled out by an inmate requesting to make a call, a request for service that's typically used, and there are several of

U.S. DISTRICT COURT

Direct - Roper/Parker          59

officers at Mansfield.

Q. Fifty-one, addresses envelopes completely, and there is a "don't know" there. Have you ever dealt with information consistent with that finding?

A. I know that he can address an envelope. I have a copy of one that he has addressed.

Q. All right. Let's turn over, just quickly, if we can go through this, the daily living skills domain?

A. I'm sorry. Where are you?

Q. Daily living skills domain, several pages over?

A. Okay.

Q. Specifically, Question Number 36, puts clean clothes away without assistance when asked. Do you see that?

A. Yes, sir.

Q. There is a zero there. He didn't get any points for that?

A. That's right. That would mean, no, he never puts his clothes away. Well, I was in his cell. I saw his cell. I mean, it was squared away. He puts clothes where they are supposed to be, and other things, too.

Q. If you could turn a couple pages over to Question Number 77, makes own bed and changes bedding routinely, and that was a zero. No points for that?

A. Whoever answered this indicated that, no, he never makes his own bed. He makes his own bed. I saw it.

Q. All right. If we could move forward then, based on your

Cross - Moore/Parker          86

of those scales in evaluating somebody's adaptive functioning is because it tends to make it more objective, or take it out of the range of just being a subjective opinion; is that correct?

A. That would be the general purpose, yes.

Q. But you chose not to use one of those scales?

A. For reasons I have explained to you.

Q. Now, when you indicated that your testing result of a 72 full scale I.Q. was the result of the test, that was the result of the seven sub-tests that you gave, plus, your estimates of the four -- as to what the results of the four sub-tests that you didn't give him would have been; is that correct?

A. That's correct.

Q. And 72 puts him squarely in the range of that area that we discussed where a diagnosis of mental retardation is proper if there are deficits in that adaptive functioning?

A. You went too fast on that one. I didn't get it.

Q. Can you diagnose somebody with a 72 I.Q. as being mentally retarded if they have deficits in their adaptive functioning?

A. You could, yes.

Q. Where does a full scale I.Q. of 72 place an individual amongst the general population? At what percentile does he rank?

A. It would be -- let me think about it for a minute. It would be at about, I guess, the third or fourth percentile,

U.S. DISTRICT COURT

Direct - Macaluso/Coons          120

prosecution at times and sometimes you are called to offer

testimony on behalf of the defendant?

A. Yes.

Q. Doctor, let me ask you if you have occasion -- or if you

had occasion to be requested and then permitted by the Court to

examine an individual by the name of Bruce, initial C, or

Carneil Webster?

A. Yes.

Q. Do you see him here in the courtroom today?

A. The gentleman seated to the left of defense table.

Q. To the far left of the table?

A. He appears to have a gray tie on.

MR. MACALUSO: Your Honor, we would ask that the

record reflect that the witness has pointed to and described

the defendant in open court?

THE COURT: The record will so reflect.

Q. (By Mr. Macaluso) And, doctor, do you recall when it was,

approximately, you were requested to perform an evaluation or

to visit Mr. Webster and when it was that you actually did

visit with him and perform that evaluation?

A. I was contacted in January of 1996, and the evaluation took

place on March 9, 1996.

Q. And let me ask you, Doctor, where did that evaluation take

place?

A. In the Mansfield Correctional Center.

U.S. DISTRICT COURT

Direct - Macaluso/Coons          121

Q. And do you recall who it was, if anyone else, accompanied you for that evaluation?

A. Dr. George Parker.

Q. And Dr. George Parker was the doctor, the forensic psychologist that testified just before you; is that correct?

A. That's my understanding.

Q. How long have you known Dr. Parker?

A. I think I met Dr. Parker in about 1977. So nearly 20 years.

Q. At whose request was Dr. Parker brought in to assist you in the evaluation of Mr. Webster?

A. Mine.

Q. You say you have worked with him since, what, almost 20 years; is that correct?

A. Yes.

Q. What would be his function -- in a nutshell, what would be Dr. Parker's function, or what sort of assistance would you expect from Dr. Parker to perform the analysis of Mr. Webster?

A. Let me back up a minute. You say I've worked with him. He has an office across town from mine. He's in private practice and I am, too. So we're not associated in practice in any way.

The function that Dr. Parker would have in an evaluation like this is to perform certain psychological testing and interpret whatever psychological testing was available in the

U.S. DISTRICT COURT

Direct - Macaluso/Coons          136

Q.  His cell?

A.  Yes.

Q.  What can you tell us about that?

A.  I was escorted to Mr. Webster's cell.  It was neatly kept. There were newspapers in the cell, mail, numerous books, and various writings of Mr. Webster.

Q.  Was the area where he lived, was it neat and tidy and well organized, or was it messed up and sloppy?

A.  The former.  It was neat, tidy and well organized.

Q.  You said you saw books in there; is that correct?

A.  Yes.

Q.  Were you able to determine from any of those individuals that you spoke to there at Mansfield whether or not, in fact, Mr. Webster made requests for reading materials?

A.  Yes.

Q.  For example, what kind of reading materials?

A.  Novels.  I was told that he reads library books, newspapers, that he read a story to B. J. Valdez out of the newspaper, and they discussed the story, an article in the newspaper.

Debra Harrison talked about him going to the law library. I spoke with Gary Cardinale about his communicating through his written messages of requests and complaints.

I was also told that he gets novels -- oh, and Debra Harrison told me that she has seen him reading in books that

U.S. DISTRICT COURT

Direct - Macaluso/Coons          137

don't have any pictures in them. So there wouldn't be any reason for reading them just to look at the pictures.

Q. Why do you look at these sorts of things, again, specifically, with regard to your diagnosis of whether or not somebody is mentally retarded or not?

A. Well, you see how a person utilizes their time. What do they do? Do they sit and stare at the wall, or do they just hum to themselves, or do they read and so forth like other folks who are interested in learning or entertaining themselves.

Q. The D.S.M. 4, the Diagnostic and Statistical Manual, Volume 4 --

A. Yes.

Q. -- sets out two criteria for mental retardation, does it not, Doctor?

A. It does.

Q. What is the first one?

A. Well, basically, that a person has sub-average intelligence.

Q. We'll come back to that in just a second. What's the second criteria?

A. It has to do with adaptive functioning, whether they have adaptive skills or not.

Q. What does that mean, seat of the pants, just so we can understand it?

Direct - Macaluso/Coons          139

A. Well, here is a person that perceives something that they want to complain about or want to discuss about, and they send in a complaint to have it dealt with, and if it's not dealt with, as in some cases with Mr. Webster, then he files a subsequent complaint, why hasn't this been dealt with? So they want to change their surroundings or their situation or have an exercise of their rights or their needs or desires.

Q. Okay. And I believe you said that you had a number of those complaints; is that right?

A. Yes.

Q. And are those some evidence to you or some indication to you of his ability to adapt his behavior to the circumstances that he's in?

A. Yes, sir.

Q. Did you become aware, for example, he was able to detect and then complain about errors in his commissary?

A. Yes, he was.

Q. What about that? Is that of any significance to you?

A. Yes. I mean, that's looking out for your rights and your change.

Q. How about visitations to the law library?

A. Yes. That is an adaptive function, given the situation that he's in.

Q. Let me ask you, Doctor, with regard to the complaints. Have you been made aware of the fact that he discontinued, or

U.S. DISTRICT COURT

Direct - Macaluso/Coons          140

suggested he was told to discontinue filing those complaints himself, in other words, writing them out by hand? Have you been made aware of that, Doctor?

A. Yes.

Q. What's the significance of that, if any, to your assessment?

A. That he was listening to the advice he was given and adapting to the situation he was in and following the advice.

Q. All right. Were you able to determine or give an assessment, or at least get some information from the guards over there, as to how he got along with them on a regular basis?

A. Yes.

Q. Okay. Is that significant to you in your determination?

A. Yes.

Q. Why is it significant in that respect?

A. One of the adaptive functions in your dealing with your situation is dealing with people around you.

Q. Let me ask you if it's come to your attention, either through the defendant or by other means, about him leaving his cell and escaping, basically, to another part of the Mansfield Law Enforcement Center, back over there to the women's section? Did you become aware of that?

A. Yes.

Q. How did you find out about that?

U.S. DISTRICT COURT

Direct - Macaluso/Coons          141

A. I think I had heard about it before, and then I talked to Mr. Webster about it.

Q. Did he tell you about it?

A. Yes.

Q. Did he tell you about how many times he went over there and he was able to successfully get out of his cell undetected gaining entrance to the women's quarters over there down the hall?

A. Yes.

Q. How many times did he tell you he did that?

A. Four or five times before he was caught.

Q. Any significance of that, Doctor?

A. Well, he was able to figure out what he wants and do it in a hidden fashion and adapt, basically, to the situation he found himself in, incarceration.

Q. There are a number of things, I gather, that you evaluated in making your determination, did you not, sir?

A. Yes.

Q. Let me ask you, also. Let's just shift gears for just a second and go back to the first criteria, which was, I believe, in essence, a low score on an I.Q. test?

A. Yes.

Q. What's the difference -- and I don't mean to play games with you, Doctor, but what's the difference between a low score on an I.Q. test and a low I.Q.?

U.S. DISTRICT COURT

Cross - Moore/Coons          177

penitentiary or they are out running the streets or at home or whatever they are doing.

Q. Are you not familiar with the manual, the mental retardation manual of the American Association on Mental Retardation?

A. That's correct.

Q. You're not familiar with that?

A. That's correct.

Q. Are you licensed, or are you certified by the Texas Department of Mental Health and Mental Retardation to do assessments of mentally retarded people, do mental retardation evaluations for the purposes of determining diagnosis of mental retardation?

A. No. As I told you, I don't do the psychological testing.

Q. And it's your belief that when we're talking about adaptive functioning, that the adaptive functioning that is being addressed in the D.S.M. 4 or elsewhere might involve or entail how well he functions in an institutional setting as opposed to how he does in the real world?

A. Wherever the person is would be his adaptive -- his adaptive functioning would be taken into consideration.

Q. Does it take the same degree of intellectual functioning to be able to adapt in an institutional setting as it does to be able to function in the real world?

A. I would say that the stresses and strains and the behaviors

U.S. DISTRICT COURT

Cross - Roper/Moore                224

with Mr. Webster the issue of mental retardation, whether or not he was mentally retarded or any effect that a finding of mental retardation might have on the ability to execute the defendant.

At that time, he had already been tested by Dr. Raymond Finn. I don't believe that Dr. Keyes had completed any of his testing at that point. But that was the first -- to my knowledge and recollection, that was the first time that it was ever discussed with him or in his presence throughout our testing and throughout all the testing that was done. We have always told him that prior to the time that I advised him of the mental retardation issue on those occasions when Dr. Finn had tested him, our advice was for him to do the best he could do, to take the test, do as good as he could do, and we would go from there.

That would be the sum of the testimony we would offer.

THE COURT: Thank you.

Does the government wish to cross?

CROSS EXAMINATION

BY MR. ROPER:

Q. Well, are you familiar with jailhouse lawyers and folks that are in jail?

A. Uh-huh.

Q. Some of them are pretty knowledgeable about the law?

A. That's true.

U.S. DISTRICT COURT

Cross - Roper/Moore            225

Q. And have you ever heard of jailhouse folks talking and suggesting defenses for other defendants, even including capital murder defendants?

A. Yes, I have.

MR. ROPER: That's all I have.

THE COURT: All right. Thank you.

MR. ROPER: Your Honor -- I'm sorry.

MR. MOORE: That would be all that we would have in regard to that issue. We just wanted to make sure that that was before the Court.

THE COURT: All right. Thank you.

MR. ROPER: The only thing that we would have in addition to what we presented at trial would be, we would move to introduce Government's Exhibit 94-B, which is actually two transcripts, and then I had an excerpt of the transcripts that relate to the defendant's testimony -- or, actually, the colloquy he had with Judge McGlinchey on several occasion in the magistrate's court regarding how he wanted to hire a lawyer and what efforts he was doing to make bond, and I think those are relevant to the determination whether the defendant was mentally retarded.

That would be 93-B and C and 94-B. And C is actually a composite that has all the relevant portions. I didn't know if the Court wanted the whole transcript or not.

THE COURT: Okay. You're offering 93-A and B and 94-B?

U.S. DISTRICT COURT

227

MR. ROPER: Oh, you mean in the statute?

THE COURT: Yes.

MR. ROPER: It's 3595, I think.

MR. BUTCHER: It's 3596.

THE COURT: It's 3596(c). I knew it was at the top of one of these.

Your position then, is it, Mr. Moore, that 3596 impliedly requires the Court to make a finding at the close of the evidence as to whether or not the defendant is mentally retarded; is that correct?

MR. MOORE: No, it is not, Your Honor. It is our intention to request of the Court, at this time, that you make a finding as a matter of law, based on the evidence, that he is mentally retarded. I don't believe there is any particular procedure that's set out by that section of the statute. We're simply asking -- I believe mental retardation, as a mitigating factor, can be cited by the jury on the basis of the evidence. However, it's our position that at this point we're going to request the Court to make a finding as a matter of law on that issue.

THE COURT: That's what I meant.

All right. I do not find, as a matter of law, that the defendant is mentally retarded. I do not believe that the evidence shows that he is, as a matter of law, mentally retarded. If you think it needs to be any further than that,

U.S. DISTRICT COURT

229

EXHIBITS

| Exhibit Number | Offered | Admitted |
|---|---|---|
| Government's 117-B | 24 | 24 |
| Government's 117-C | 25 | 25 |
| Government's 117-D | 27 | 27 |
| Government's 117-E | 28 | 28 |
| Government's 117-F | 28 | 28 |
| Government's 117-H | 31 | 32 |
| Government's 117-J | 38 | 38 |
| Court's 8 | 221 | |
| Government's 93-B, 93-C, 94-B | 225 | 226 |

-oOo-

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter, and that the transcript was prepared by me and under my supervision.

Ana P. Warren, CSR #2302                    Date
U.S. District Court Reporter

-oOo-

U.S. DISTRICT COURT

# Wells Decl. Ex. F

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA          . CRIMINAL ACTION NO.
                          .      4:94-CR-121-Y
V.
                          . Fort Worth, Texas
BRUCE CARNEIL WEBSTER          . June 19 & 20, 1996
. . . . . . . . . . . . . . .

VOLUME 27
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          MR. RICHARD B. ROPER
                    MR. PAUL D. MACALUSO
                    MR. CHRISTOPHER CURTIS
                    Assistant United States Attorney
                    801 Cherry Street, Suite 1700
                    Fort Worth, Texas  76102-6897
                    (817) 978-3291

For the Defendant:          MR. LARRY M. MOORE
                    Attorney at Law
                    1112-A East First Street
                    Fort Worth, Texas  76102
                    (817) 338-4800

                    MR. ALLAN K. BUTCHER
                    Hill, Beatty, Butcher
                       & Gallagher
                    201 Main Street, Suite 1300
                    Fort Worth, Texas  76102
                    (817) 336-3600

Court Reporter:          Ana P. Warren
                    U.S. District Court Reporter
                    501 W. 10th Street, Room 204B
                    Fort Worth, Texas  76102-3637
                    (817) 335-3050

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

U.S. DISTRICT COURT

EXHIBIT F

19

factors as listed on Page 9, then you must consider whether the government has proven beyond a reasonable doubt the existence of any nonstatutory aggravating factors. As is the case for the statutory aggravating factors, you must unanimously agree on the existence of any of the alleged nonstatutory aggravating circumstances beyond a reasonable doubt.

The nonstatutory aggravating factors that the government has alleged in this case are:

One, the defendant's future dangerousness to the lives and safety of other persons; and, two, the effect of the offense on Lisa Rene and her family, namely, that the commission of the offense caused emotional injury and anguish to Lisa Rene and emotional injury, anguish, sorrow, and loss to her family.

Whether any aggravating factor, statutory or nonstatutory, has been sufficiently established is for you alone to determine, but the only aggravating factors that you may consider are those that I have outlined for you in these instructions.

In the event that the government proves beyond a reasonable doubt the existence of an aggravating factor or factors as outlined above, you must then consider whether the defendant has proven the existence of any mitigating factors before you may consider whether the penalty of death is an appropriate punishment in this case for the defendant.

The law of the United States provides a list of some

U.S. DISTRICT COURT

20

mitigating factors that you, as jurors, must consider if you find one or more of them to be present by a preponderance of the evidence. These are called statutory mitigating factors. However, this list is not to be viewed as a complete list of the mitigating factors you may consider. Indeed, each of you may consider any factor you, as an individual find has been established by a preponderance that relates to any aspect of the defendant's character or background, any circumstance of the offense or any other fact or circumstance, which you, as an individual, conclude indicates or tends to indicate that the defendant should not be sentenced to death.

The statutory mitigating factors are:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired.

2. The defendant was under unusual and substantial duress.

3. Another defendant or defendants, though equally culpable in the crime will not be punished by death.

4. The defendant does not have a significant or prior history of other criminal conduct.

5. The defendant committed the offense under severe mental or emotional disturbance.

The nonstatutory factors in the defendant's background, record, or character, or any other circumstance of the offense that mitigates against imposition of the death sentence, which

U.S. DISTRICT COURT

21

are alleged by the defendant, are:

1. The defendant is or may be mentally retarded.

2. The defendant has low intellectual functioning.

3. The defendant suffered from physical abuse, from emotional abuse, and/or from parental neglect during his upbringing.

4. The defendant, as a result of a mental disease or illness, personality disorder, and/or low intellectual functioning has a lesser capability to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirements of the law than that of a normal person.

5. The defendant was youthful at the time of the commission of the crime, although, not under the age of 18.

6. The defendant has talents, capabilities, or qualities which are of some value to society such as musical talent, religious devotion, et cetera.

7. The defendant is unduly susceptible to influence by others.

8. The defendant's level of participation in the commission of this offense was attributable, at least in part, to the influence of one or more of the other participants involved in the commission of this crime.

9. The defendant grew up in an atmosphere of violence and fear, which has misshaped his perception as to the acceptability or necessity of violent conduct.

U.S. DISTRICT COURT

101

want to get out of the courtroom as quick as you can because we don't seem to have any air conditioning in here.

You may retire at this time.

(Trial recesses, June 20, 1996, 12:00 a.m. - 12:35 a.m.)

THE COURT: Ladies and gentlemen of the jury, have you you reached a verdict?

THE FOREMAN: Yes, Your Honor.

THE COURT: If you will hand the verdict form to Mr. Bell?

All right. As to the element of intent, the defendant, Bruce Carneil Webster, intentionally killed Lisa Rene?

No.

Intentionally inflicted serious bodily injury?

No.

Intentionally engaged in conduct intending that she would be killed or that lethal force be employed?

Yes.

Intentionally engaged in conduct he knew would create a grave risk of death?

Yes.

Aggravating factors: Caused the death or injury relating in death to Lisa Rene, which occurred during the commission of the offense of kidnapping?

No.

Aggravating factor of especially heinous, cruel, or

102

depraved?

Yes.

Substantial planning and premeditation?

Yes.

Particularly vulnerable due to her age?

Yes.

Nonstatutory aggravating factors: Future danger to the lives and safety of other persons?

Yes.

Effect of the instant offense on Lisa Rene's family?

Yes.

Statutory mitigating factors: Number 1 -- I will not read them off except as to number.

Number 1, zero. Number 2, zero. Number 3, four. Number 4, zero. Number 5, zero.

Nonstatutory mitigating factors:

Number 1, four. Number 2, four. Number 3, as to physical abuse, 12. Personality disorder mental illness, et cetera, Number 4, zero. Number 5 is zero. Number 6 is zero. Number 7 is zero. Number 8 is four. Number 9 is six. In fact, 10 is two. Number 11 is zero. Number 12 is 11. Number 13 is zero. Number 14 is zero. Number 15 is two. Number 16 is zero.

Decision Form C is filled out. Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to

U.S. DISTRICT COURT

106

Do you have any questions, sir?

DEFENDANT WEBSTER: No, sir.

THE COURT: All right. We're adjourned.

(End of proceedings, 12:40 a.m.)

-oOo-

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter, and that the transcript was prepared by me and under my supervision.

Ana P. Warren, CSR #2302                    Date
U.S. District Court Reporter

-oOo-

U.S. DISTRICT COURT

# Wells Decl. Ex. G

 **DEPARTMENT OF HEALTH & HUMAN SERVICES** Social Security Administration

Refer to: ██████████

Office of Hearings and Appeals
Room 2418, 700 West Capitol
Little Rock, Arkansas 72201
Telephone: 501-324-6381
Date: ‾‾‾‾
JAN 2 5 1995

## NOTICE OF DISMISSAL

Bruce C. Webster
██████████
Pine Bluff, AR 71603

I have issued the enclosed order dismissing your request for hearing. Please read this notice and the order carefully.

**If You Disagree With The Order of Dismissal**

If you do not agree with my order, you may file an appeal requesting the Appeals Council to review and vacate the order.

**How To File An Appeal**

To file an appeal you or, if you appoint one, your representative must request the Appeals Council to review the order of dismissal. You must make the request in writing. You may use our Request for Review form, HA-520, or write a letter.

You may file your request at any local Social Security office or a hearing office. You may also mail your request right to the Appeals Council, Office of Hearings and Appeals, 5107 Leesburg Pike, Falls Church, VA 22041-3255. Please put the Social Security number shown above on any appeal you file.

**Time To File An Appeal**

To file an appeal, you must file your request for review **within 60 days** from the date you get this notice.

The Appeals Council assumes you got the notice 5 days after the date shown above unless you show you did not get it within the 5-day period. The Council will dismiss a late request unless you show you had a good reason for not filing it on time.

See Next Page

**REDACTED**

EXHIBIT G

G.01



**Do You Want To Submit Evidence?**

You may submit evidence to show why you think I should not have dismissed your request for hearing. You should submit any evidence you wish the Appeals Council to consider with your request for review.

**Rules About An Appeal**

Our regulations state the rules the Appeals Council applies to decide whether to review a case and in reviewing a case. These rules appear in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J) and Part 416 (Subpart N). The Council will review an order of dismissal for the reasons listed in sections 404.970 and 416.1470 of our regulations.

**If You Do Not File an Appeal With The Appeals Council**

If you do not appeal my order and the Appeals Council does not review the order on its own motion, the action or determination upon which you requested a hearing cannot be changed except under special rules.

**Your Right To Representation**

You may have a lawyer or other person help you in any request for review you file with the Appeals Council. There are groups that can help you find a lawyer or give you free legal services if you qualify. There are also lawyers who do not charge unless you win your case. Your local Social Security office has a list of groups that can help you with a request for review.

If you get someone to help you, you or that person should let the Appeals Council know. If you hire someone, we must approve the fee before he or she can collect it. And if you hire a lawyer, we will withhold up to 25 percent of any past due insurance benefits to pay towards the fee.

**REDACTED**

G.02

**Do You Have Any Questions?**

If you have any questions, you may call, write or visit any Social Security office.  If you visit an office, please bring this notice and decision with you.  The telephone number of the local office that serves your area is 501-534-0183.  Its address is P. O. Box 8309, Pine Bluff, AR.  71601.

JOHN HECK GOREE
Administrative Law Judge

Enclosure:

REDACTED

G.03

**DEPARTMENT OF
HEALTH AND HUMAN SERVICES**
Social Security Administration
**OFFICE OF HEARINGS AND APPEALS**

ORDER OF DISMISSAL

<table>
<tr><td><u>IN THE CASE OF</u></td><td><u>CLAIM FOR</u></td></tr>
<tr><td></td><td>Period of Disability,<br>Disability Insurance Benefits, and<br>Supplemental Security Income</td></tr>
<tr><td>Bruce C. Webster<br>(Claimant)</td><td></td></tr>
<tr><td>Willie C. Webster<br>(Wage Earner)</td><td>████████████████<br>(Social Security Number)</td></tr>
</table>

This case is before the Administrative Law Judge on the request for hearing filed by the claimant on April 13, 94.

On October 24, 1994, a Notice of Hearing was mailed to the claimant to advise him of the time and place set for the hearing.

Social Security Administration Regulations No. 4 and No. 16 provide that the Administrative Law Judge may dismiss a claimant's request for hearing when neither the claimant nor his representative appears at the time and place set for the hearing and the claimant does not give a good reason for the failure to appear within 10 days after the Administrative Law Judge mails the claimant a notice asking why he did not appear (20 CFR 404.957(b)(2) and 416.1457(b)(2)). A Notice to Show Cause for Failure to Appear was mailed to the claimant on November 23, 1994.

No response to the Notice to Show Cause for Failure to Appear request was received.

**REDACTED**

G.04

Bruce C. Webster

█████████████████                    2

Accordingly, the claimant has not established a good reason for
the failure to appear at the scheduled hearing.  Therefore, the
request for hearing is hereby dismissed and the determination
dated April 5, 1994 remains in effect.

_____
JOHN HECK GOREE
Administrative Law Judge

___JAN 2 5 1995_____
Date

REDACTED

G.05

## LIST OF EXHIBITS

Bruce C. Webster
_____
(Claimant)

████████████████████
(Social Security Number)

Willie L. Webster  ████████████████████
_____

(Wage Earner) (Leave blank in Title XVI Cases or if name is same as above)

| EXHIBIT NO. | DESCRIPTION | NO OF PAGES |
|---|---|---|
| 1 | Leads/Protective Filing Worksheet (showing Protective Filing Date of 9/9/93) | 1 |
| 2 | Medical History and Disability Report, dated 10/4/93 (in lieu of application for DAC benefits)(with Protective Filing date of 9/9/93) | 6 |
| 3 | Application for Supplemental Security Income, filed 10/4/93 (with Protective Filing Date of 9/9/93) | 3 |
| 4 | Disability Determination by State Agency, Title II, dated 2/3/94, with attachment | 3 |
| 5 | Disability Determination by State Agency, Title XVI, dated 2/3/94 | 2 |
| 6 | Social Security Notice, dated 2/8/94 | 2 |
| 7 | Supplemental Security Income Notice, dated 2/8/94 | 3 |
| 8 | Request for Reconsideration, filed 3/17/94 | 2 |
| 9 | Disability Determination by State Agency, Title II, dated 3/29/94, with attachments | 16 |
| 10 | Disability Determination by State Agency, Title XVI, dated 3/29/94 | 2 |
| 11 | Social Security Notice of Reconsideration, dated 4/5/94 | 2 |
| 12 | Supplemental Security Income Notice of Reconsideration – Disability, dated 4/5/94 | 3 |
| 13 | Request for Hearing, filed 4/13/94 | 2 |
| 14 | Earnings Record and DEQY, dated 9/13/94 | 4 |
| 15 | Vocational Report, dated 10/6/93 | 6 |
| 16 | Disability Report, dated 10/4/93 | 8 |
| 17 | Reconsideration Disability Report, dated 3/17/94 | 6 |
| 18 | Disability Supplemental Interview Outline, undated | 6 |
| 19 | Statements of Claimant, undated and dated 4/13/94 | 4 |
| 20 | Report of consultative General Physical Examination by C. M. Rittelmeyer, M.D., dated 10/25/93 | 8 |

Form HA-540-U6 (6-88)

REDACTED

G.06

**LIST OF EXHIBITS**

Page 2

Bruce C. Webster



_____
(Claimant)                                      (Social Security Number)

Willie L. Webster

(Wage Earner) (Leave blank in Title XVI Cases or if name is same as above)

| EXHIBIT NO | DESCRIPTION | NO OF PAGES |
|---|---|---|
| 21 | Letter from Lou Jackson, Special Education Supervisor, Watson Chapel Schools, dated 11/8/93 | 1 |
| 22 | Report of consultative Psychometric Evaluation by Edward V. Hackett, Ph.D., on 10/22/93; and medical report dated 11/10/93 | 3 |
| 23 | Report of consultative Evaluation For Mental Disorders by Charles M. Spellmann, Ph.D., Palaver, Inc., dated 12/22/93 | 3 |
| 24 | Letter to F. J. Massey, Jr., Vocational Expert from ALJ Goree, dated 10/25/94 requesting testimony at hearing | 2 |
| 25 | Resume of Experience and Background of F. J. Massey, Vocational Expert, dated 7/1/93 | 1 |

Form HA-540-U6 (6-88)

ATTACH TO CLAIMANT'S COPY OF THE DECISION

G.07

SOCIAL SECURITY ADMINISTRATION
OFFICE OF HEARINGS AND APPEALS
REGIONAL OFFICE
1200 MAIN TOWER BLDG., ROOM 1135
DALLAS, TEXAS 75202

RESUME OF EXPERIENCE AND BACKGROUND

7-1-93
DATE

Print or type all entries, attach extra sheets as needed and submit in duplicate.

HOME PHONE: ███████████        SOCIAL SECURITY NO. ███████████
(Area Code)                                              Mr.
OFFICE PHONE: 624-4411                                   Ms.
                                                        Mrs.
1.  NAME: MASSEY        F.      JOHN (JR) Miss
         (Last)    (First)    (Middle)   Dr.

2.  MAILING ADDRESS: Hot Springs Rehabilitation Center

    P.O. Box 1358, Hot Springs, AR. 71902
                                    (Zip Code)

3.  PRESENT EMPLOYMENT
         ARKANSAS
    Present Employer REHABILITATION SERVICES        Date Employment Began 7-1-93

    Your Position or Title & Description of Duties Rehabilitation Assistant

Administrator for Client Services at the Hot Springs Rehabilitation Center.
Responsible for managing all aspects of a major client service program
including personnel management for Approximately 120 staff members and all
fiscal and Administrative Services Necessary to support the work unit.

4.  PREVIOUS EXPERIENCE - Begin with your next most recent employment in rehabilitation

| Position or Title | Employed | Institution or Fir |
|---|---|---|
| (a) Rehabilitation Field Supervisor | July 1986 - July 1993 | Arkansas Rehabilit. Services / State of |

Duties Supervised 8 master degree Counselors and placement workers in two field offices

| (b) Vocational Rehabilitation Counselor | June 1967 - July 1986 | Arkansas Rehabilit. Services / State of A |

Duties Evaluate disabled clients, Determine Eligibility, Arrange Vocational & medical
training and provide placement service EXHIBIT NO. 25 (1) PAGES

REDACTED    G.08

DEPARTMENT OF HEALTH AND HUMAN SERVICES          Social Security Administration

Office of Hearings and Appeals
700 West Capitol, Room 2418
Little Rock, Arkansas 72201
Telephone: (501) 324-6381

October 25, 1994

F. J. Massey, Jr.
P. O. Box 1358
Hot Springs, AR 71902

Dear Mr. Massey:

The claimant named below has an application for Child's Insurance Benefits and Supplemental Security Income.

A hearing on the claim is scheduled, date and time shown below.

Claimant: Webster, Bruce C.  Social Security Number: ▮▮▮▮▮▮▮▮

1:45 p.m. on Wednesday, November 16, 1994, at Federal Building, Room 3611, 8th and Main Streets in Pine Bluff, Arkansas

You are requested to give testimony as a vocational expert, primarily to cover the following period:

ALLEGED ONSET DATE

5/31/83  TO  date of hearing

Your presence throughout the hearing is desired since your testimony will be based, in part, on the testimony given by the claimant and any other witnesses, including a medical expert if needed. Enclosed are copies of some of the pertinent exhibits tentatively selected for inclusion in the record of this case. Please bring this material to the hearing. For additional information concerning your testimony, please see the attached notice.

Your charges for this service should be submitted in accordance with your contract with the Department of Health and Human Services.

Enclosures: Exhibit File

Sincerely yours,

John Heck Goree
Administrative Law Judge

cc:

EXHIBIT NO. 24 (2) PAGES

REDACTED   G.09

# IMPORTANT INFORMATION

NOTE: IT IS REQUIRED THAT YOU DISQUALIFY YOURSELF IF YOU HAVE HAD ANY PRIOR KNOWLEDGE OF THIS CLAIMANT OR EXPERIENCE IN THIS CASE OTHER THAN AS A VOCATIONAL EXPERT FOR THE OFFICE OF HEARINGS AND APPEALS.

While medical factors alone may justify a finding that the claimant is or is not disabled, it is necessary in some cases to consider vocational factors in order to determine whether or not the claimant is able to engage in any substantial gainful activity. Two basic questions will be presented to you at this hearing.

The first question pertains to the kind of work, if any, the claimant can do in light of prior work activity and residual functional capacity considering age, education, training and work experience. Your testimony will be predicated on various assumptions, posed at the hearing, with respect to the claimant's residual functional capacity. You will not be expected to testify as to whether or not the claimant is under a disability, since you do not have the responsibility for deciding this ultimate legal issue. You should not express any opinion regarding the impairments involved and their effects on residual functional capacity, since these are medical matters. You will be requested to furnish a rationale and complete explanation for your opinions. In forming your judgement as to whether or not the claimant could transfer vocational skills to any other type of work, please consider only work which the claimant could perform after a normal period of training, usually given to new employees, rather than after extended vocational rehabilitation.

The second question is whether such work exists in the "national economy", i.e., whether it exists in significant numbers either in the region where the claimant lives or in several other regions of the country. You should be prepared to testify from personal knowledge gained from vocational surveys of businesses and industries (whether such surveys were made by you or by other vocational experts) and from other current vocational resource materials.

Questions may also be asked of you by the claimant (or representative, if any).

G.10



 **PALAVER, INC.**

Rt. 1, Box 29A
DeValls Bluff, Arkansas 72041
501-998-7206    1-800-844-4425

## EVALUATION FOR MENTAL DISORDERS

**RECEIVED**
JAN 0 4 1994

DISABILITY DETERMINATION

**BRUCE WEBSTER**
███████████████
**PINE BLUFF, ARKANSAS    71603**

**SSN:** █████████████
**DOB:** ███████73

**DECEMBER 22, 1993**

**REASON FOR REFERRAL:**

Client was referred for a psychological evaluation in order to better ascertain eligibility for Social Security benefits.

**OBSERVATIONS:**

Client was brought by his mother.  He was a thin fellow, of average height and twenty years of age.  He was clean, neatly dressed and groomed.  Posture and gait were nonremarkable.

**PRESENT ILLNESS:**

When asked how he was disabled he said he sneezes, his eyes water and his head hurts.  It makes him mad.  He said he is also slow to learn.

He worked one time helping pour cement but he was vague about his work history.  Generally he was vague and did not seem to have a good grasp on things.

**PAST HISTORY OF MENTAL DISORDERS:**

In 1992 he said they tried to admit him to the third floor of the hospital.  That is the psychiatric wing but he refused to go. "They acted like my mind wasn't right".  He said he went to mental health for a few weeks and they gave him some pills but he was not able to tell much about it.  He had no insight as to what they were trying to do or why he had gone.

12/22/93

EXHIBIT NO. 23 (3) PAGES

**REDACTED**    G.11

Bruce Webster
Page 2

**FAMILY, SOCIAL AND ENVIRONMENTAL HISTORY:**

He went to the eighth grade.  He is single and has one child.

He was in prison in 1992 for two months for having an automatic weapon.  When they caught him with the weapon he was on probation for jumping on a policeman.

**MENTAL STATUS EXAMINATION:**

Client was a poor historian.  He was mostly coherent and relevant but at times it was hard to follow him.

Ideation was sparse and this appeared to be more of a function of his lower cognitive ability than of any mental illness.  He came across as a slow fellow who did not know much and did not know how to communicate well.

Contact with reality appeared adequate.  He said he sometimes worries about his brother in law killing him.  "Last year my brother in law killed my brother and now I think he looks at me lots.  I'm kind of afraid of him".  Client is not suicidal and he said he was hard to sleep nights because he sleeps a lot during the day.  He denied any hallucinations or delusions.

Affect was appropriate and mood was essentially normal.  He said he gets sad over the loss of his brother last year but otherwise did not express any depression or anxiety.  He said he gets mad a lot.  "Nobody listens to me.  They think I'm dumb".

**INTELLECTUAL FUNCTIONING:**

Client was oriented times three.

He could repeat four digits forward and three backward.

He was not able to register three objects.

Cities named were Pine Bluff and Little Rock.

He was not able to do simple calculations.

He did not know what the sayings meant.

G.12

Bruce Webster
Page 3

He was able to handle similarities and differences adequately.

If he found an envelope he would keep it.
If he saw a fire in a theater he would put it out.

**ESTIMATED IQ:**

  69 or lower

**CURRENT LEVEL OF FUNCTIONING:**

He lives with his mother.  He watches television, listens to the
radio and goes walking.  He has a girlfriend and he likes to kiss
and hold her hand.  He has friends.  He said he likes to drive,
then he laughed and said he sometimes steals his mother's car out
of the garage.  He goes shopping sometimes.  He accompanies his
mother to church.  He does no chores around the house.  Mostly he
seems to be idle around the house and on the streets.

He gets along alright with others.

**CURRENT MEDICATION:**

He takes no medication.

**DIAGNOSIS:**

1.   Mental Retardation
2.   Antisocial Personality by History

**PROGNOSIS:**

Client will not get any better

He is not competent to manage funds, if awarded.

There was no evidence of exaggeration or malingering.

Charles M. Spellmann, Ph.D.
Psychologist

G.13

MEDICAL REPORT

INFORMATION FURNISHED BY:

This information was secured by telephone by the DDS representative signing the form. A copy of this report was sent to the doctor for signature on_____11-10-93_____.

Claimant's Name:_____Bruce C. Webster_____ SSN:___███████████████___

Dr. Hackett provided the following additional information:

The claimant was quite verbal. There may have been some malingering, however, Dr. Hackett could not be sure. The IQ scores are not normal considering history. The claimant was viewed as a somewhat mild retarded con man, but very street wise.

The claimant could follow instructions as far as the test was concerned. He had some locomotion and ability to direct himself. He was not distressed. Dr. Hackett described him as being a predator, in that he could not be functional in a community setting. He would take advantage of other people. He would also not function well in the work place.

Dr. Hackett did not feel that the claimant could manage his own benefits. His behavior was somewhat bazaar. On the IQ scores performance was estimated lower than verbal. A person that displays antisocial personality usually scores higher on performance.

Dr. Hackett felt some organic function may be involved.

RECEIVED

NOV 1 9 1993

DISABILITY
DETERMINATION

Please proofread, make any necessary corrections or additions, sign and return to this office.

Signature _Edward V. Hackett_

Edward V. Hackett, Ph.D.

11/10/93

11/3/93 & 11/10/93

Signature _Joyce Franey_

Joyce Franey, Medical Relations

Date

EXHIBIT NO. 22 (3) PAGES

**REDACTED**      G.14

*Goo*

EDWARD V. HACKETT, PH.D.
PSYCHOLOGIST
510 Greenbriar
Pine Bluff, AR   71603
(501) 536-5812

**RECEIVED**

NOV 5 1993

DISABILITY DETERMINATION

## PSYCHOMETRIC EVALUATION

| | | | |
|---|---|---|---|
| Name: | Bruce C. Webster | Examiner: | Edward V. Hackett, Ph.D. |
| SSN: | ▮▮▮ | | Psychologist |
| DOB: | ▮▮73 | Date of Examination: | October 22, 1993 |
| Age: | ▮▮ | Date Transcribed: | November 3, 1993 |

### Referral:

Bruce Webster drove himself to the evaluation. He was dressed appropriately in khaki pants and a t-shirt. He appeared to be somewhat cocky from the start, which eventuated in personal comments toward the end. Example: he wanted to know if he could have the change on my counter (the answer was no). He made several sexual references which seemed untoward. He stated that he had been in the Arkansas Department of Correction - Tucker Unit, for assaulting an Arkansas State Police officer.

### Test Administered:

Wechsler Adult Intelligence Scale - Revised (WAIS-R)

### Results:

WAIS-R Subtest Scaled Scores

| Verbal | | Performance | |
|---|---|---|---|
| Information | 3 | Picture Completion | 1 |
| Digit Span | 6 | Picture Arrangement | 1 |
| Vocabulary | 4 | Block Design | 1 |
| Arithmetic | 4 | Object Assembly | 3 |
| Comprehension | 4 | Digit Symbol | 1 |
| Similarities | 6 | | |
| Sum | 27 | | 7 |

| | |
|---|---|
| Verbal IQ | 71 |
| Performance IQ | 49 |
| Full Scale IQ | 59 |

**REDACTED**

G.15

PSYCHOMETRIC EVALUATION
██████████████
SSN: ██████████████
Page 2

Evaluation:

Mr. Webster manifested many inconsistencies regarding his street behavior and current attempts to seek employment. He was referred for evaluation by his parents and friend. He is mildly retarded, but is also antisocial. His diagnoses are as follows:

Axis I: Mild Mental Retardation (317.00)
Antisocial Personality Disorder (301.70) (by history)

Mr. Webster manifests no signs of wanting to improve or to seek employment. He appears to be a user of others.

_Edward V. Hackett_
Edward V. Hackett, Ph.D.
Psychologist

EVH/ks

**REDACTED**

G.16

# *Watson Chapel Schools*

**MEMBER OF NORTH CENTRAL ASSOCIATION**
4100 CAMDEN ROAD
PINE BLUFF, ARKANSAS 71603
Phone 879-0220  879-0221
FAX 879-0588

November 8, 1993

**DIRECTORS**
**JIM JOHNSON**
PRESIDENT
**BILL THOMPSON**
VICE PRESIDENT
**RONNIE TERRELL**
SECRETARY
**CALVIN JOHNSON**
**J.J. JONES**
**MAXINE NELSON**
**HAROLD POINTER**

**CHARLES D. KNIGHT**
SUPERINTENDENT
**ED W. HARRIS**
ASSISTANT SUPERINTENDENT
**C. C. STUART**
ASSISTANT SUPERINTENDENT
**ROBERT HALL**
FEDERAL PROGRAMS/TRANSPORTATION

Disability Determination For
  Social Security Administration
701 Pulaski Street
Little Rock, AR   72201

Attn:  Ms. Helen Rumpf, Adjudicator

        Re:   Bruce C. Webster
        SSN: █████████
        DOB: █████73

The above student's Special Education records were destroyed
in 1988.  A letter was mailed to parents  at the last known
address, telling them they could have the records if they
wanted them.  There was no response to the letter.

        Sincerely,

        Lou Jackson
        Special Educaiton Supervisor

LJJ/pc





11/8/93

EXHIBIT NO  2-1  /1  PAGES

**REDACTED**

G.17

900

**DISABILITY DETERMINATION FOR SOCIAL SECURITY ADMINISTRATION**
701 Pulaski Street · Little Rock, Arkansas 72201

## GENERAL PHYSICAL EXAMINATION

| APPLICANT'S NAME | DATE OF BIRTH | SSN | DATE OF EXAM |
|---|---|---|---|
| Bruce Webster | ▇▇/21 | ▇▇▇▇ | 10-21-9▇ |

**ALL PROCEDURES MUST BE AUTHORIZED BY A STATE AGENCY EXAMINER OR PHYSICIAN.**
Call this office for authorization prior to performing any procedure not listed on the authorization.
Local: 682-3030 or Long Distance Toll Free: 1-800-482-9950.

Please ask for _Hele flump 900_ ,DDS Claims Examiner.

ALLEGED IMPAIRMENTS: _Sinuses + headache_

HISTORY: (Please include onset of significant problems)

20 YEAR OLD BLACK MALE HAS PROBLEMS WITH SINUS DRAINAGE AND HEADACHES.   HE HAS HAD IT FOR A NUMBER OF YEARS.   HE HAS NOT SEEN ANY PHYSICIANS AND ONLY TAKES OVER-THE-COUNTER MEDICATION WITH TEMPORARY RELIEF.   HE HAS NEVER BEEN HOSPITALIZED.   HE QUIT SCHOOL IN THE 8TH GRADE, SAID HE WAS ASKED TO LEAVE.   HE JUST GOT OUT OF PRISON AFTER AN ELEVEN MONTH SENTENCE.   I DON'T KNOW THE REASON FOR THAT.   HE IS NOT WORKING BUT STAYING AT HOME WITH AN ELDERLY GRANDMOTHER.

Myocardial infarctions: _NEC_

Previous stress testing or angiograms: _NEC_

Surgical: _NO_

Present Medications: _NO_

REVIEW OF SYSTEMS (Fill in if relevant)

HEENT: _Sinus drainage_

RESPIRATORY: _NEC_

_____. If asthmatic, number of severe attacks

requiring IPPB or I.V. drugs during the past year: _____

10/25/93

EXHIBIT NO. _20_ ( _8_ ) PAGES

**REDACTED**   G.18

GASTROINTESTINAL: _____*NEC*_____

H present, give frequency and duration of:

Jaundice: _____*No*_____

Hematemesis: _____*No*_____

Ascites: _____*No*_____

Bloody Stools: _____*No*_____

ORTHOPEDIC: _____*NEC*_____

If there is a history of significant joint pain, swelling, heat, and tenderness, give the joints involved and the duration of active inflammation: _____*No*_____.

NEUROLOGICAL: _____*NEC*_____

If seizures are alleged, describe a typical episode, postictal manifestations, and give frequency of attacks: _____*No*_____

If seizures are not controlled, is the patient seeking treatment? _____*No*_____

Previous EEG: _____

PSYCHIATRIC: (Is there a past history of hospitalization or outpatient treatment?)
_____*No*_____

PHYSICAL EXAMINATION

VITAL SIGNS:
Height (without shoes) *675* Weight *136* Pulse *76* Blood Pressure *110/74* Respiratory Rate *18*
GENERAL APPEARANCE: _____*WDWN*_____

EYES _____*NEC*_____

FUNDI (Check if present):

| | Neovascularization | Hemmorrhages | Exudates | Papilledema | Normal |
|---|---|---|---|---|---|
| O.D. | | | | | ✓ |
| O.S. | | | | | |

Central Visual Acuity: Uncorrected - O.D. _____*20/20*_____ O.S. *20/20*

(Snellen)    Corrected - O.D. _____ O.S. _____

(3)

G.19

**PASSIVE** Range of Motion (In Degrees)

| | | Right | Normal | Left | Heat | Swelling |
|---|---|---|---|---|---|---|
| Elbows: | | ___ | 0°—150° | ___ | ___ | ___ |
| Wrists: | Dorsiflexion | ___ | 0°—70° | ___ | ___ | ___ |
| | Palmar Flexion | ___ | 0°—70° | ___ | ___ | ___ |
| Hands: | DIP | ___ | 0°—80° | ___ | ___ | ___ |
| | PIP | ___ | 0°—100° | ___ | ___ | ___ |
| | MP | ___ | 0°—90° | ___ | ___ | ___ |
| Hips: | Forward Flexion | ___ | 0°—115° | ___ | ___ | ___ |
| | Rotation—Internal | ___ | 0°—45° | ___ | ___ | ___ |
| | Rotation—External | ___ | 0°—45° | ___ | ___ | ___ |
| Knees: | | ___ | 0°—135° | ___ | ___ | ___ |
| Ankles: | Dorsiflexion | ___ | 0°—20° | ___ | ___ | ___ |
| | Plantar Flexion | ___ | 0°—50° | ___ | ___ | ___ |

Describe any other joint abnormalities, deformities, instability, anklylosis, contractures, etc: _____
___ None ___

Is there any purulent drainage or inflammation from possible osteomyelitis? _____
___ No ___

**NEUROLOGICAL:**

Cranial Nerves: ___ Normal ___

| Reflexes: | Right | Left |
|---|---|---|
| Biceps: | 2+ | 2+ |
| Triceps: | 1+ | 1+ |
| Patellar: | 3+ | 3+ |
| Achilles: | 1+ | 1+ |

Muscle Weakness: (be specific) ___ No ___

Muscle Atrophy: ___ No ___

If atrophy is present, measure extremity circumference: _____

Sensory Abnormalities: ___ None ___

(5)

G.20

**VEINS**

Varicose Veins: _____ *No*

Stasis Dermatitis: _____ *No*

Brawny Edema: _____ *No*

Active Ulcers: _____ *No*

Scars from Healed Ulcers: _____ *No*

**MENTAL STATUS:**

Is the applicant oriented to time, person, place? _____ *Yes*

Any evidence of psychosis (such as hallucinations or delusions) or of serious mood disorder? _____ *No*

**LAB STUDIES, X-RAY RESULTS, ETC:** _____

**DIAGNOSIS:** MENTAL RETARDATION.   FLAT FEET.   CHRONIC SINUS PROBLEMS AND ALLERGIES BY HISTORY.

(7)

G.21

**CARDIOVASCULAR:** _____ *NEC* _____

Chest Pain _____Yes _____No

Please give a detailed **current** description of chest pain, if present:

Location and radiation: _____

Quality of Pain: (sharp, dull, tightness, etc.) If pain is "sharp", specify if this means a rhythmic pain, e.g., "stabbing", "jabbing", or "throbbing". _____

_____

Precipitating Factors: Is the above pain predictably exertional? _____Yes _____No
If _yes_, specify type and amount of exertion that produces pain, giving three examples.

TYPE _____ (1)_____AMOUNT

_____ (2)_____

_____ (3)_____

Is the above chest pain brought on by any of the following items? a) Deep breathing _____
b) Eating _____ c) Twisting/Turning movements _____ d) Palpation of chest wall _____
e) Other _____

Mode of Relief: Nitroglycerin _____ In minutes, duration until relief _____ Number of
tablets in last month _____ Rest _____ In minutes, duration until relief _____
Any unusual mode of relief such as antacid or belching? _____Yes _____No

Frequency of above chest pain (three times per day, or week, or month, etc.) _____

How long has above pain been present? _____

Pertinent associated symptoms:_____

PND _____ Orthopnea _____ Edema _____

SYNCOPE _____ If yes, give description and frequency: _____

_____

INTERMITTENT CLAUDICATION _____. If yes, how far can patient walk before symptoms start?

_____

Quality of pain _____ Location of pain _____

Any radiation of pain, where? _____ Pain Duration _____

Mode of relief _____

**HEMATOLOGY:** _____ *NEC* _____

Give frequency of transfusions in the past year: _____

G.22

EARS _*NEG*_

Can the patient hear normal conversation? _*yes*_

Estimate % auditory loss if noted: *0%*

OROPHARYNX: _*NEG*_

If speech is impaired, describe ability to carry on speech which can be understood and sustained:

NECK _*NEG*_

Neck Vein distention: _*NO*_   Adenopathy _*NO*_

LUNGS: Normal breath sounds _*yes*_ Increased A.P. Diameter _*NO*_ Hyper-resonance _*NO*_

Prolonged expiration _*NO*_ Wheezing _*NO*_ Other _____

HEART (Clinical enlargement, murmurs, gallops, etc.): _*Normal*_

ABDOMEN: _*NEG*_

Ascites: _*NO*_   Organomegaly: _*NO*_

SKIN CHANGES: _*NO*_

Cyanosis _*NO*_ Clubbing _*NO*_ Jaundice _*NO*_

ORTHOPEDIC: (If joint motion is limited by more than 30%, please call for authorization to perform X-ray)

| SPINE | | Normal Motion | Range of Motion (In Degrees) |
|---|---|---|---|
| Cervical Spine: | Forward Flexion | 0° — 40° | |
| | Flexion | 0° — 30° | |
| | Extension | 0° — 30° | |
| | Rotation | 0° — 40° R & L | |
| Lumbar Spine: | Flexion-Extension | 0° — 90° | |
| | Lateral Flexion | 0° — 20° R & L | |

Muscle Spasm: _*NO*_

EXTREMITIES:

PASSIVE Range of Motion (In Degrees)

| | Right | Normal | Left | Heat | Swelling |
|---|---|---|---|---|---|
| Shoulders: Abduction | | 170° | | | |
| Forward Elevation | | 170° | | | |

G.23

Gait and Coordination: (indicate specific abnormal findings) _____

_____ *Normal* _____

_____

Romberg: ___ *Neg* _____    Tremor: ___ *No* _____

Ataxia: ___ *No* _____    Cogwheel Rigidity: ___ *No* _____

Heel to Shin: ___ *yes* _____    Bradykinesis: *No* _____

Finger to Nose: ___ *yes* _____    Past Pointing: *NO* _____

Proprioception: ___ *yes* _____

**LIMB FUNCTION:** Describe ability to:

1. Hold a pen and write ___ *yes* _____

2. Touch fingertips to palm: ___ *yes* _____

3. Grip (estimate % of normal) ___ *100%* _____

4. Oppose thumb to fingers: ___ *yes* _____

5. Abduct and flex arms at the shoulders 90 degrees or more: ___ *yes* _____

6. Stand and walk without assistive devices: ___ *yes* _____

_____

7. Ability to walk on heel-toes ___ *yes* _____

8. Squat and arise from a squatting position: ___ *yes* _____

**CIRCULATORY:** .

**Pulses:** (Absent, decreased or normal)

|  | right | left |
|---|---|---|
| Carotid: | *N* | *N* |
| Radial: | | |
| Femoral: | | |
| Popliteal: | | |
| Dorsalis Pedis: | | |
| Posterior Tibial: | | |

Hair Loss: ___ *NO* _____    Skin Temperature *Normal* _____

Edema: ___ *NO* _____

(6)

G.24

**FOLLOWING YOUR EXAMINATION, PLEASE ANSWER THESE SPECIFIC QUESTIONS:** _____

THE PATIENT APPEARED TO BE HEALTHY WITH NO ABNORMAL PHYSICAL FINDINGS.

_____

_____

_____

_____

**REPORTING PHYSICIAN'S SIGNATURE, AND DATE**

Signature: _C.M. Rittelmeyer_ Date: 10-25-93

C. M. Rittelmeyer M.D.

(8)

G.25

Form Approved
OMB No. 0960-0316

# CLAIMANT'S STATEMENT WHEN REQUEST FOR HEARING IS FILED
# AND THE ISSUE IS DISABILITY

Print, type or write clearly and answer all questions to the best of your ability. Complete answers will aid in processing the claim. IF ADDITIONAL SPACE IS NEEDED, ATTACH A SEPARATE STATEMENT TO THIS FORM.

CLAIMANT'S NAME    Bruce C Webster

SOCIAL SECURITY NUMBER

WAGE EARNER (Leave blank if name is the same as the claimant's)    Willie Webster

SOCIAL SECURITY NUMBER

PRIVACY ACT AND PAPERWORK ACT NOTICE: The Social Security Act (section 205(a), 702, 1631(e)(1)(A) and (B), and 1869(b)(1) and (c), as appropriate authorizes the collection of information on this form. We will use the information on your recent activities, condition, medical treatment, and medications to help us decide if we need to obtain more information. You do not have to give it, but if you do not you may not receive benefits under the Social Security Act. We may give out the information on this form without your written consent if we need to get more information to decide if you are eligible for benefits or if a Federal law requires us to do so. Specifically, we may provide information to another Federal, State, or local government agency which is deciding your eligibility for a government benefit or program; to the President or a Congressman inquiring on your behalf; to an independent party who needs statistical information for a research paper or audit report on a Social Security program; or to the Department of Justice to represent the Federal Government in a court suit related to a program administered by the Social Security Administration.

We may also use the information you give us when we match records by computer. Matching programs compare our records with those of other Federal, State, or local government agencies. Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by the Federal government. The law allows us to do this even if you do not agree to it.

These and other reasons why information about you may be used or given out are explained in the Federal Register. If you want to learn more about this, contact any Social Security Office.

TIME IT TAKES TO COMPLETE THIS FORM

We estimate that it will take you about 15 minutes to complete this form. This includes the time it will take to read the instructions, gather the necessary facts and fill out the form. If you have comments or suggestions on how long it takes to complete this form or on any other aspect of this form, write to the Social Security Administration, ATTN: Reports Clearance Officer, 1-A-21 Operations Bldg., Baltimore, MD 21235, and to the Office of Management and Budget, Paperwork Reduction Project (0960-0316), Washington, D.C. 20503. Do not send completed forms or information concerning your claim to these offices.

1. Have you worked since ___3-12-94___, the date your request for reconsideration was filed? *(If yes, describe the nature and extent of work.)* ⟶    ☐ Yes    ☑ No

2. Has there been any change in your condition since the above date? *(If yes, describe the change.)* ⟶    ☑ Yes    ☐ No

My sinus condition is worse

3. Have your daily activities and/or social functioning changed since the above date? *(If yes, describe the changes.)* ⟶    ☑ Yes    ☐ No

I sleep more because of medication.

4a. Have you been treated or examined by a physician (other than as a patient in a hospital) since the above date? *(If yes, complete the following.)* ⟶    ☑ Yes    ☐ No

NAME OF PHYSICIAN    Dr Aubrey Worrell

ADDRESS *(Include ZIP Code)*    Pine Bluff Ar 71603

AREA CODE AND TELEPHONE NUMBER    501 -

HOW OFTEN DO YOU SEE THIS PHYSICIAN    Only have to see him once

DATES YOU SAW THIS PHYSICIAN    4/94

REASONS FOR VISIT    Sinus

TYPE OF TREATMENT RECEIVED *(Include drugs, surgery, tests)*    Gave medication - Pedahist - Ansenase AQ

Form HA 4486 (2-92) Prior editions may be used until supply is exhausted    (OVER)

19  L

G.26

**REDACTED**

4b. Have you seen any other physician since the above date? ⟶ ☐ Yes ☑ No
    If "Yes," show the following:

| NAME OF PHYSICIAN | ADDRESS (Include ZIP Code) |
|---|---|
| | |
| AREA CODE AND TELEPHONE NUMBER | |
| HOW OFTEN DO YOU SEE THIS PHYSICIAN? | DATES YOU SAW THIS PHYSICIAN |
| REASONS FOR VISITS | |

TYPE OF TREATMENT RECEIVED (Include drugs, surgery, tests)

If you have seen other physicians since you filed your claim, attach a list of their names, addresses, dates and reasons for visits.

5. Have you been hospitalized, or treated at a clinic or confined in a nursing home or extended care facility for your illness or injury since the above date? ⟶ ☐ Yes ☑ No
   If "Yes," show the following:

| NAME OF FACILITY | ADDRESS OF AGENCY (Include ZIP Code) |
|---|---|
| PATIENT OR CLINIC NUMBER | |
| WERE YOU AN INPATIENT? (Stayed at least overnight) ☐ Yes ☐ No    IF "YES," SHOW ⟶ | DATES OF ADMISSIONS AND DISCHARGES |
| WERE YOU AN OUTPATIENT? ☐ Yes ☐ No    IF "YES," SHOW ⟶ | DATES OF VISITS |

REASON FOR HOSPITALIZATION, CLINIC VISITS, OR CONFINEMENT

TYPE OF TREATMENT RECEIVED (Include drugs, surgery, tests)

If you have been in other hospitals, clinics, nursing homes, or extended care facilities for your illness or injury, attach a list of the names, addresses, patient or clinic numbers, dates and reasons for hospitalization, clinic visits, or confinement.

6. Have you received medical or vocational services from a community agency since the above date? ⟶ ☐ Yes ☑ No

7. Are you now taking any prescription drugs or medications? ⟶ ☑ Yes ☐ No
   (If yes, list them below.)

| NAME OF MEDICATION(S) | DOSAGE BEING TAKEN | NAME OF PHYSICIAN(S) |
|---|---|---|
| Fedahist Gyrocaps | 2X day | Dr Aubrey Worrell |
| Vancenase AQ | 2X day | Dr Aubrey Worrell |

8. Are you now taking any nonprescription drugs or medications? ⟶ ☐ Yes ☑ No
   (If yes, list them below.)

| NAME OF MEDICATION(S) | DOSAGE BEING TAKEN |
|---|---|
| | |

Knowing that anyone making a false statement or representation of a material fact for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal Law, I certify that the above statements are true.

| SIGNATURE OF CLAIMANT OR PERSON FILING ON THE CLAIMANT'S BEHALF | DATE SIGNED |
|---|---|
| SIGN HERE ▶ ✓ *Bruce Webster* | 4-13-94 |

Form HA-4486 (2-92)    *U.S. Government Printing Office: 1992 — 312-183/60039

G.27

DEPARTMENT OF
HEALTH AND HUMAN SERVICES
SOCIAL SECURITY ADMINISTRATION

# STATEMENT OF CLAIMANT OR OTHER PERSON

| - NAME OF WAGE EARNER, SELF-EMPLOYED PERSON, OR SSI CLAIMANT | SOCIAL SECURITY NUMBER |
|---|---|
| NAME OF PERSON MAKING STATEMENT (If other than above wage earner, self-employed person, or SSI claimant) | RELATIONSHIP TO WAGE EARNER, SELF-EMPLOYED PERSON, OR SSI CLAIMANT |

Understanding that this statement is for the use of the Social Security Administration, I hereby certify that- the information below is correct

A. Describe your pain (or other symptoms) it causes ME to get up set easily head hurts diffieNt ot breah

1. What does it feel like? It feels real bad

2. Where does it hurt? all in my head, nose, eyes

3. What activities cause the pain (or other symptoms)? dust grass coloNse spray being out side

4. How long does it usually last? to ha times windba

B. Medications

1. Please list the medications you are taking now for your pain and/or other symptoms. Sinutab

| Name of Medicine | Date 1st prescribed | Dosage (how often) |
|---|---|---|
| a. Sinuatab | wasnt | |
| b. | | |
| c. | | |
| d. | | |

2. Do you have any side effects of the medicine you are taking?

No _____ Yes _✓_ If yes, please explain:

I sleep better

C. Names and addresses of drug stores where prescriptions have been filled.
(If more information about these prescriptions is needed to make a decision on your claim, we will contact these drug stores):

NONE

D. Do you require any special treatment or equipment (such as braces, oxygen, physical therapy, etc.)? No ✓    Yes _____ If yes, please describe: I have not been in a long long time

I know that anyone who makes or causes to be made a false statement or representation of material fact in an application or for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal law and/or State law. I affirm that all information I have given in this document is true.

## SIGNATURE OF PERSON MAKING STATEMENT

| Signature (First name, middle initial, last name) (Write in ink) | Date (Month, day, year) |
|---|---|
| SIGN HERE ► | |
| | Telephone Number (Include Area Code) |

Mailing Address (Number and street, Apt. No., P.O. Box, Rural Route)

| City and State | ZIP Code |
|---|---|

Witnesses are required ONLY if this statement has been signed by mark (X) above. If signed by mark (X), two witnesses to the signing who know the individual must sign below, giving their full addresses.

| 1. Signature of Witness | 2. Signature of Witness |
|---|---|
| Address (Number and street, City, State, and ZIP Code) | Address (Number and street, City, State, and ZIP Code) |

☆U.S. G.P.O. 1985-461-272/30103

ACI-6116

G.29

DISABILITY
SUPPLEMENTAL INTERVIEW OUTLINE

Name: _Bruce Webster_    SSN: ██████████

1.A. Describe what you do on an average day. Tell what you usually do in the mornings, what takes most of your time during the day, etc.

_I sleeps look at cartoon_

B. Describe any changes in your routine since your condition began:

_get upset easy_

2.A. How many hours do you usually sleep each night?

_don't sleep to good at night wakes up sneesing, couhing._

B. Describe any problems you have sleeping:

_Don't know_

C. Describe any changes in your sleeping habits since your condition began:

_Sneesing, couhing, running Nose headach_

3.A. Describe where you live (house) apartment, etc.):

B. Who lives in your household with you?

_Mom, Dad, grandma Chimeka_

C. Do you get along well with these persons?

_every once in a while_

D. Do you get along well with other persons in general?

_No_

E. Describe any changes in these things since your condition began:

_aint got no chang_

SS-RVI-400                                    - 1 -                    EXHIBIT NO. 18 (6) PAGES

REDACTED

G.30

4    Personal Needs and Grooming

Do you need help taking care of your personal needs or grooming? |_| Yes   |✓| No

If yes. what kind of help do you need? _____

_____

Who helps you? _____

Describe any changes in your ability to take care of your personal needs since your condition began: _NO_____

5.  Meals

Do you prepare your own meals?  |_| Yes   |✓| No

If yes. which meals do you prepare? _____

How often do you cook? _don't cook_____

How long does it take you? _____

If no. describe why not: _moma cook it_____

Describe any changes in cooking habits since your condition began: _____
_moma cook it_____

- 2 -

G.31

## 6. Household Maintenance

Do you clean your house, launder clothes, or do any other work around the house?
|✓| Yes  |_| No

If yes, describe which of these things you do: _make my room_

Do you need help doing these things? Explain: _Nope_
_dust make my room_

How much time do you spend to do these? _____
_I doin't know_

If no, describe why not: _I doin't know_

Describe any changes in household maintenance since your condition began:
_I told you I make my room_

## 7. Shopping

Do you do any shopping? |✓| Yes  |_| No

If yes, describe what you shop for: _potato ships, pops Kookies_

How often do you shop? _not much_

How long does it take you? _hours_

Do you need help shopping? Explain: _Every once a while it taks hours_

If no, describe why not: _____

Describe any changes in shopping since your condition began: _Nope Changes_

- 3 -

G.32

Recreational Activities and Hobbies

A. Do you do any reading? |☑| Yes |☐| No

If yes, describe what you read: _Playboy naKEd_
_booKs_

How often and how long do you read? ____
_long times_

If no, describe why not: ____

B. Do you watch television or listen to the radio? |☑| Yes |☐| No

If yes, describe what you watch or listen to: _cartoons_
_BEt cinamacks rap musics_

How much time do you spend doing this? ____
_lots of times_

If no, describe why not: ____

C. Do you have any hobbies or pastimes? |☑| Yes |☐| No

If yes, describe the things you do: _radio, tv past_
_my times_

How often do you do these things? _EVEry day_

How much time do you spend doing these? _a lots of_
_time_

If no, describe why not: ____

D. Describe any changes in these activities since your condition began:
_thats my EVEry day thang_

- 4 -

G.33

## 9. Social Activities

A. Do you go out and visit friends or relatives? |✗|Yes |☐|No

If yes, describe how often you visit: _SomEtimes_
_I visit my sister and brothers_

How much time do you spend visiting? _all night_

Does anyone help you go visiting? _NOPE_

If no, describe why not: _I go by myself_

B. Do you drive? |✗| Yes |☐| No

If yes, can you drive on unfamiliar routes? _NOPE_

Do you need help driving? _NOPE_

If no, explain why not: _I do'nt got that far_

C. Are you active in clubs, or other groups? |✗| Yes |☐| No

If yes, explain the activities that you do: _I walk around in the club_

How often do you do these activities? _EvEry once in awhile_

Do you need any help doing these? _nope_

If no, describe why not: _I don't nEEd help walking around_

D. Describe any changes in social activities since your condition began: _I don't social much_

-5-

10. Please provide the names, addresses, phone numbers and relationships of other persons (not doctors) we can contact who know about your condition:

A. Mother █████████████

B. _____

11. Remarks – Use this space to complete any previous answers: _____

## DO CERTIFICATION

The information shown on this outline was obtained during an interview with the following individual(s):

_____    (Show relationship to claimant if an individual other than the claimant furnished the information).

Interviewer Signature _____

Title _____

District Office _____

Date _____

- 6 -

REDACTED

G.35

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Social Security Administration

Form Approved
OMB No. 0960-0144

| For SSA Use Only - Do NOT Complete This Item. | |
|---|---|
| Name of Wage Earner *Bruce C. Webster* | Social Security Number ▮▮▮▮▮ |
| Name of Claimant | Social Security Number |
| Type of Claim: | |

Title II — ☐ Freeze    ☐ DIB    ☐ DWB    ☒ CDB    Title XVI — ☒ Disability    ☐ Blind    ☐ Child

## RECONSIDERATION DISABILITY REPORT

PLEASE PRINT, TYPE OR WRITE CLEARLY AND ANSWER ALL ITEMS TO THE BEST OF YOUR ABILITY. If you are filing on behalf of someone else, answer all questions. COMPLETE ANSWERS WILL AID IN PROCESSING THE CLAIM.

PRIVACY ACT/PAPERWORK REDUCTION ACT NOTICE: The Social Security Administration is authorized to collect the information on this form under sections 205(a), 223(d) and 1633(a) of the Social Security Act. The information on this form is needed by Social Security to make a decision on your claim. While giving us the information on this form is voluntary, failure to provide all or part of the requested information could prevent an accurate or timely decision on your claim and could result in the loss of benefits. Although the information you furnish on this form is almost never used for any purpose other than making a determination on your disability claim, such information may be disclosed by the Social Security Administration as follows: (1) To enable a third party or agency to assist Social Security in establishing rights to Social Security benefits and/or coverage; (2) to comply with Federal laws requiring the release of information from Social Security records (e.g., the General Accounting Office and the Veterans Administration); (3) to facilitate statistical research and audit activities necessary to assure the integrity and improvement of the Social Security programs (e.g., to the Bureau of the Census and private concerns under contract to Social Security). These and other reasons why information about you may be used or given out are explained in the **Federal Register.** If you would like more information about this, any Social Security office can assist you.

Date Claim Filed    9/9/93

### PART I — INFORMATION ABOUT YOUR CONDITION

1. Has there been any change (for better or worse) in your illness or injury since you filed your claim? .................................................................. ☒ Yes    ☐ No
   If "Yes," describe any changes in your symptoms.

   *Constantly sneezing, itching, draining, headaches, getting worse.*

2. Describe any physical or mental limitations you have as a result of your condition since you filed your claim.

   *Sinus problems make me upset.*

3. Have any restrictions been placed on you by a physician since you filed your claim? ........ ☐ Yes    ☒ No
   If "Yes," give name, address, and telephone number of the physician and show what kinds of restrictions have been imposed.

4. Do you have any additional illness or injury that you feel we should know about? ........... ☐ Yes    ☒ No
   If "Yes," describe the kind of illness or injury and the date that it occurred.

FORM SSA-3441-F6 (2-88)                                1

EXHIBIT NO    17

REDACTED    G.36

## PART II — INFORMATION ABOUT YOUR MEDICAL RECORDS

5. Have you seen any physician since you filed your claim? .............................. ☐ Yes  ☒ No
   If "Yes," provide the following about the physician you last visited:

| NAME | ADDRESS (Include ZIP Code) |
|---|---|
| AREA CODE AND TELEPHONE NUMBER | |
| HOW OFTEN DO YOU SEE THIS PHYSICIAN? | DATE YOU SAW THIS PHYSICIAN |

REASONS FOR VISITS

TYPE OF TREATMENT RECEIVED (Include drugs, surgery, tests)

6. Have you see any other physician since you filed your claim? ........................... ☐ Yes  ☒ No
   If "Yes," show the following:

| NAME | ADDRESS (Include ZIP Code) |
|---|---|
| AREA CODE AND TELEPHONE NUMBER | |
| HOW OFTEN DO YOU SEE THIS PHYSICIAN? | DATE YOU SAW THIS PHYSICIAN |

REASONS FOR VISITS

TYPE OF TREATMENT RECEIVED (Include drugs, surgery, tests)

If you have seen other physicians since you filed your claim, list their names, addresses, dates and reasons for visits in Part V.

7. Have you been hospitalized, or treated at a clinic or confined in a nursing home or extended
   care facility for your illness or injury since you filed your claim? ........................... ☐ Yes  ☒ No
   If "Yes," show the following:

| NAME OF FACILITY | ADDRESS OF AGENCY (Include ZIP Code) |
|---|---|
| PATIENT OR CLINIC NUMBER | |
| WERE YOU AN INPATIENT? (Stayed at least overnight) ☐ Yes   ☐ No   IF "YES," SHOW ⟶ | DATES OF ADMISSIONS AND DISCHARGES |
| WERE YOU AN OUTPATIENT? ☐ Yes   ☐ No   IF "YES," SHOW ⟶ | DATES OF VISITS |

REASON FOR HOSPITALIZATION, CLINIC VISITS, OR CONFINEMENT

TYPE OF TREATMENT RECEIVED (Include drugs, surgery, tests)

If you have been in other hospitals, clinics, nursing homes, or extended care facilities for your illness or injury, list the names, addresses, patient or clinic numbers, dates and reasons for hospitalization, clinic visits, or confinement in Part V.

8. Have you been seen by other agencies for your injury or illness? ........................... ☒ Yes  ☐ No
   (VA, Workmen's Compensation, Vocational Rehabilitation, Welfare, Special Schools, Unions, etc.)
   If "Yes," show the following:

| NAME OF AGENCY | ADDRESS OF AGENCY (Include ZIP Code) |
|---|---|
| YOUR CLAIM NUMBER | *Pine Bluff Ar* |
| DATES OF VISITS | NAME OF COUNSELOR, SOCIAL WORKER, ETC. |

TYPE OF TREATMENT OR EXAMINATION RECEIVED (Include drugs, surgery, tests)

If more space is needed, list the other agencies, their addresses, your claim numbers, dates, and treatment received in Part V.

G.37

---

**PART III — INFORMATION ABOUT WORK**

9. Have you worked since you filed your claim? ........................................... ☐ Yes  ☒ No

  If "Yes," you will be asked to give details on a separate form.

---

**PART IV — INFORMATION ABOUT YOUR ACTIVITIES**

10. How does your illness or injury affect your ability to care for your personal needs?

  *NO*

11. What changes have occurred in your daily activities since you filed your claim?
  (If none, show, "None")

  *Can't sleep well, Hard for me to breathe*

---

**PART V — REMARKS AND AUTHORIZATIONS**

12.(a) READ CAREFULLY: I authorize the Social Security Administration to release information from my records, as necessary to process my claim, as follows:

  Copies of my medical records may be furnished to a physician or a medical institution for background information if it is necessary for me to have a medical examination by that physician or medical institution. The results of any such examination may be given to my personal physician.

  Information from my records may also be furnished, if necessary, to any company providing clerical and administrative services for the purposes of transcribing, typing, copying or otherwise clerically servicing such information. The State Vocational Rehabilitation Agency may also have access to information in my records to determine my eligibility for rehabilitative services.

  I understand and concur with the statement and authorizations given above, except as follows (If there are no exceptions, write "None" in the space below. If you do not concur with any part of the above statement, state your objections clearly):

| 12.(b) | Telephone number where you can be reached: | Best time to reach you: |
|---|---|---|
| | ( ▇▇▇▇▇▇▇▇▇ ) | *anytime* |

FORM **SSA-3441-F6** (2-88)               3

**REDACTED**

**G.38**

12.(b)  Use this section to continue information required by prior sections. Identify the section for which the information is provided.
        Note: This section may also be used for any special or additional information which you wish to be recorded.

We may also use the information you give us when we match records by computer. Matching programs compare our records with those of other Federal, State, or local government agencies. Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by the Federal government. The law allows us to do this even if you do not agree to it.

These and other reasons why information about you may be used or given out are explained in the Federal Register. If you want to learn more about this, contact any Social Security office.

TIME IT TAKES TO COMPLETE THIS FORM

We estimate that it will take you about 30 minutes to complete this form. This includes the time it will take to read the instructions, gather the necessary facts and fill out the form. If you have comments or suggestions on this estimate, or on any other aspect of this form, write to the Social Security Administration, ATTN: Reports Clearance Officer, 1-A-21 Operations Bldg., Baltimore, MD 21235, and to the Office of Management and Budget, Paperwork Reduction Project (0960-0144), Washington, D.C. 20503. Do not send completed forms or information concerning your claim to these offices.

**Knowing that anyone making a false statement or representation of a material fact for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal Law, I certify that the above statements are true.**

NAME (SIGNATURE OF CLAIMANT OR PERSON FILING ON THE CLAIMANT'S BEHALF)

| SIGN HERE ▶ ✓ *Bruce White* | DATE ✓ 8-17-94 |

Witnesses are required ONLY if this statement has been signed by mark (X) above. If signed by mark (X), two witnesses to the signing who know the person making the statement must sign below, giving their full addresses.

| 1. Signature of Witness | 2. Signature of Witness |
|---|---|
| Address (Number and street; city, state, and ZIP code) | Address (Number and street, city, state, and ZIP code) |

FORM SSA-3441-F6 (2-88)                    4

G.39

**PART VI — FOR SSA USE ONLY — DO NOT WRITE BELOW THIS LINE**

| Name of Wage Earner | Social Security Number |
|---|---|
| Name of Claimant | Social Security Number |

13. Check each item to indicate whether or not any difficulty was observed:
(Explain all items checked "Yes," in Item 14 below)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Reading: | ☐ Yes | ☐ No | Using Hands: | ☐ Yes | ☐ No |
| Writing: | ☐ Yes | ☐ No | Breathing: | ☐ Yes | ☐ No |
| Answering: | ☐ Yes | ☐ No | Seeing: | ☐ Yes | ☐ No |
| Hearing: | ☐ Yes | ☐ No | Walking: | ☐ Yes | ☐ No |
| Speaking: | ☐ Yes | ☐ No | Sitting: | ☐ Yes | ☐ No |
| Understanding: | ☐ Yes | ☐ No | Assistive Devices: | ☐ Yes | ☐ No |

Other *(Specify)*: ___

*not observed*

14. If any of the above items were checked "Yes," describe the observed difficulty:

15. Describe fully: General appearance, behavior, any unusual observed difficulties not noted elsewhere, any unusual circumstances surrounding the interviews.

FORM **SSA-3441-F6** (2-88) *Prior editions usable*          5

G.40

16. Claimant requires assistance ....................................................... ☐ Yes    ☒ No
   If "Yes," show name, address, phone number, and relationship of interested person.
   Also show why claimant requires assistance (foreign-speaking, unable to ambulate, etc.)

17. Capability development appears needed ............................................. ☐ Yes    ☒ No
   If "Yes," indicate whether DO will undertake development because it is also developing
   medical evidence from a special arrangement source. (Show name and address of source.)

18. Is development of work activity necessary? ......................................... ☐ Yes    ☒ No

   If "Yes," is an SSA-821 or SSA-820-F4 ☐ Pending    ☐ In File

19. SSA-3441 Taken By:
   ☐ Personal Interview
      ☐ DO/BO  ☐ Home  ☐ Other _____
   ☐ Telephone
   ☒ Mail

| Signature of Interviewer or Reviewer | Title | DO, BO, or TSC | Date |
|---|---|---|---|
| P. Hollowell | CR | 759 | 3\|17\|94 |

FORM SSA-3441-F6 (2-88) *Prior editions usable*    6

G.41

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Social Security Administration

Form Approved
OMB No. 0960-0141

# DISABILITY REPORT

PLEASE PRINT, TYPE, OR WRITE CLEARLY AND ANSWER ALL ITEMS TO THE BEST OF YOUR ABILITY. If you are filing on behalf of someone else, enter his or her name and social security number in the space provided and answer all questions. COMPLETE ANSWERS WILL AID IN PROCESSING THE CLAIM.

PRIVACY ACT/PAPERWORK REDUCTION ACT NOTICE: The Social Security Administration is authorized to collect the information on this form under sections 205(a), 223(d) and 1633(a) of the Social Security Act. The information on this form is needed by Social Security to make a decision on your claim. While giving us the information on this form is voluntary, failure to provide all or part of the requested information could prevent an accurate or timely decision on your claim and could result in the loss of benefits. Although the information you furnish on this form is almost never used for any purpose other than making a determination on your disability claim, such information may be disclosed by the Social Security Administration as follows: (1) To enable a third party or agency to assist Social Security in establishing rights to Social Security benefits and/or coverage; (2) to comply with Federal laws requiring the release of information from Social Security records (e.g., to the General Accounting Office and the Veterans Administration); and (3) to facilitate statistical research and audit activities necessary to assure the integrity and improvement of the Social Security programs (e.g., to the Bureau of the Census and private concerns under contract to Social Security). These and other reasons why information about you may be used or given out are explained in the Federal Register. If you would like more information about this, any Social Security office can assist you.

| A. NAME OF CLAIMANT | B. SOCIAL SECURITY NUMBER | C. TELEPHONE NUMBER where you can be reached (include area code) |
|---|---|---|
| Brace Winston | ██████████████ | ████████ |

D. WHAT IS YOUR DISABLING CONDITION? *(Briefly explain the injury or illness that stops you from working.)*

Sinus problem and headaches

## PART I — INFORMATION ABOUT YOUR CONDITION

| | MONTH | DAY | YEAR |
|---|---|---|---|
| 1. When did your condition first bother you: | 5 | 31 | 83 |

| | | |
|---|---|---|
| 2A. Did you work after the date shown in item 1? (If "no", go on to items 3A and 3B.) | ☐ YES | ☒ NO |

2B. If you did work since the date in item 1, did your condition cause you to change —

| | | |
|---|---|---|
| Your job or job duties? | ☐ YES | ☐ NO |
| Your hours of work? | ☐ YES | ☐ NO |
| Your attendance? | ☐ YES | ☐ NO |
| Anything else about your work? | ☐ YES | ☐ NO |

(If you answered "no" to all of these, go to items 3A and 3B.)

2C. If you answered "yes" to any item in 2B, explain below what the changes in your work circumstances were, the dates they occurred, and how your condition made these changes necessary.

| | MONTH | DAY | YEAR |
|---|---|---|---|
| 3A. When did your condition finally make you stop working? | | | |

3B. Explain how your condition now keeps you from working.

If I work more than 15-20 minutes I begin sneezing and my eyes water

Form SSA-3368-BK (1-89)

1

I.R        σ

REDACTED    G.42

## PART II — INFORMATION ABOUT YOUR MEDICAL RECORDS

4. List the name, address and telephone number of the doctor who has the latest medical records about your disabling condition.

If you have no doctor check. ☒

NAME

ADDRESS

TELEPHONE NUMBER (include area code)

HOW OFTEN DO YOU SEE THIS DOCTOR?    DATE YOU FIRST SAW THIS DOCTOR    DATE YOU LAST SAW THIS DOCTOR

REASONS FOR VISITS (show illness or injury for which you had an examination or treatment)

TYPE OF TREATMENT OR MEDICINES RECEIVED (such as surgery, chemotherapy, radiation and the medicines you take for your illness or injury, if known. If no treatment or medicines, show NONE)

5A. Have you seen any other doctors since your disabling condition began?    ☐ YES    ☐ NO
If "yes", show the following:

NAME

ADDRESS

TELEPHONE NUMBER (include area code)

HOW OFTEN DO YOU SEE THIS DOCTOR?    DATE YOU FIRST SAW THIS DOCTOR    DATE YOU LAST SAW THIS DOCTOR

REASONS FOR VISITS (show illness or injury for which you had an examination or treatment)

TYPE OF TREATMENT OR MEDICINES RECEIVED (such as surgery, chemotherapy, radiation and the medicines you take for your illness or injury, if known. If no treatment or medicines, show NONE)

5B. Identify below any other doctors you have seen since your illness or injury began.

NAME

ADDRESS

TELEPHONE NUMBER (include area code)

HOW OFTEN DO YOU SEE THIS DOCTOR?    DATE YOU FIRST SAW THIS DOCTOR    DATE YOU LAST SAW THIS DOCTOR

REASONS FOR VISITS (show illness or injury for which you had an examination or treatment)

TYPE OF TREATMENT OR MEDICINES RECEIVED (such as surgery, chemotherapy, radiation and the medicines you take for your illness or injury, if known. If no treatment or medicines, show NONE)

Form SSA-3368-BK (1-2003)

G.43

6A. Have you been hospitalized or treated at a clinic for your disabling condition? If "yes", show the following. ☐ YES ☒ NO

NAME OF HOSPITAL OR CLINIC:

ADDRESS:

PATIENT OR CLINIC NUMBER:

WERE YOU AN INPATIENT? (stayed at least overnight?)
☐ YES  ☐ NO  (If "yes", show:)

WERE YOU AN OUTPATIENT?
☐ YES  ☐ NO  (If "yes", show:)

| DATES OF ADMISSIONS: | DATES OF DISCHARGES: | DATES OF VISITS: |
| --- | --- | --- |
|  |  |  |

REASON FOR HOSPITALIZATION OR CLINIC VISITS (show illness or injury for which you had an examination or treatment.)

TYPE OF TREATMENT OR MEDICINES RECEIVED (such as surgery, chemotherapy, radiation and the medicine you take for your illness or injury, if known. If no treatment or medicines, show "NONE".)

6B. If you have been in other hospital or clinic for your illness or injury, identify it below.

NAME OF HOSPITAL OR CLINIC:

ADDRESS:

PATIENT OR CLINIC NUMBER:

WERE YOU AN INPATIENT? (stayed at least overnight?)
☐ YES  ☐ NO  (If "yes", show:)

WERE YOU AN OUTPATIENT?
☐ YES  ☐ NO  (If "yes", show:)

| DATES OF ADMISSIONS: | DATES OF DISCHARGES: | DATES OF VISITS: |
| --- | --- | --- |
|  |  |  |

REASON FOR HOSPITALIZATION OR CLINIC VISITS (show illness or injury for which you had an examination or treatment.)

TYPE OF TREATMENT OR MEDICINES RECEIVED (such as surgery, chemotherapy, radiation and the medicine you take for your illness or injury, if known. If no treatment or medicines, show "NONE".)

If you have been in other hospital or clinic for your illness or injury, list the names, addresses, patient or clinic numbers, dates and reasons for hospitalization or clinic visit in PART VI.

7. Have you been seen by other agencies about your disabling condition (like VA, Workmen's Compensation, vocational rehabilitation, Welfare, etc.)?
If "yes", show the following: ☐ YES ☒ NO

NAME OF AGENCY:

ADDRESS:

YOUR CLAIM NUMBER:

DATE OF VISITS:

TYPE OF TREATMENT, EXAMINATION OR MEDICINES RECEIVED (such as surgery, chemotherapy, radiation and the medicines you take for your illness or injury, if known. If no treatment or medicines, show "NONE".)

G.44

8. Have you had any of the following tests in the last year?

| TEST | CHECK APPROPRIATE BLOCK OR BLOCKS | | IF YES SHOW | |
|---|---|---|---|---|
| | | | WHERE DONE | WHEN DONE |
| Electrocardiogram | ☐ YES | ☒ NO | | |
| Chest X-Ray | ☐ YES | ☒ NO | | |
| Other X-Ray (name body part here) | ☐ YES | ☒ NO | | |
| Breathing Tests | ☐ YES | ☒ NO | | |
| Blood Tests | ☒ YES | ☒ NO | Dept of Corr, Diagnostic - | 10/12 |
| Other (Specify) | ☐ YES | ☒ NO | | |

9. If you have a medicaid card, what is your number  (some hospitals and clinics file your records by your medicaid number.)  _Nov._

**PART III — INFORMATION ABOUT YOUR ACTIVITIES**

10. Has your doctor told you to cut back or limit your activities in any way?    ☐ YES  ☒ NO
If yes, give the name of the doctor below and tell what he or she told you about cutting back or limiting your activities.

11. Describe your daily activities in the following areas and state what and how much you do of each and how often you do it.
● Household maintenance (including cooking, cleaning, shopping, and odd jobs around the house as well as any other similar activities)

● Recreational activities and hobbies (hunting, fishing, bowling, hiking, musical instruments, etc.)

● Social contacts (visits with friends, relatives, neighbors, etc.)

● Other (drive car, motorcycle, ride bus, etc.)

## PART IV — INFORMATION ABOUT YOUR EDUCATION

12. What is the highest grade of school that you completed and when?    8th. Unk

13. Have you gone to trade or vocational school or had any type of special training? *If "yes", show:*    ☐ YES    ☒ NO

- The type of trade or vocational school or training:

- Approximate dates you attended:

- How this schooling or training was used in any work you did:

## PART V — INFORMATION ABOUT THE WORK YOU DID

14. List all jobs you have had in the last 15 years before you stopped working, beginning with your usual job. Normally, this will be the kind of work you did the longest. (If you have a 6th grade education or less, AND did only heavy unskilled labor up to 35 years or more, list all of the jobs you have had since you began to work. If you need more space, use remarks.)

| JOB TITLE (Be sure to begin with your usual job) | TYPE OF BUSINESS | DATES WORKED (Month and Year) | | RATE OF PAY (per hour, day, week, month or year) |
|---|---|---|---|---|
| | | FROM | TO | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

15A. Provide the following information for your usual job shown in item 14, line 1.

- In your job did you    • Use machines, tools, or equipment of any kind?    ☐ Yes    ☐ No
- Use technical knowledge or skills?    ☐ Yes    ☐ No
- Do any writing, complete reports, or perform similar duties?    ☐ Yes    ☐ No
- Have supervisory responsibilities?    ☐ Yes    ☐ No

15B. Describe your basic duties (explain what you did and how you did it) below. And, explain, if it applies, give a full DESCRIPTION of the types of machines, tools, or equipment you used and the exact operations you performed, the technical knowledge or skills involved, the type of writing you did, and the nature of any reports, and the number of people you supervised and the extent of your supervision.

Form SSA-3368-BK (1-89)    5

G.46

15C. Describe the kind and amount of physical activity this job involved during typical day in terms of:

- **Walking** (circle the number of hours a day spent walking) — 0  1  2  3  4  5  6  7  8

- **Standing** (circle the number of hours a day spent standing) — 0  1  2  3  4  5  6  7  8

- **Sitting** (circle the number of hours a day spent sitting) — 0  1  2  3  4  5  6  7  8

- **Bending** (circle how often a day you had to bend) — Never · Occasionally · Frequently · Constantly

- **Reaching** (circle how often a day you had to reach) — Never · Occasionally · Frequently · Constantly

- **Lifting and Carrying:** Describe below what was lifted, and how far it was carried. Check heaviest weight lifted, and weight frequently lifted and/or carried:

| HEAVIEST WEIGHT LIFTED | WEIGHT FREQUENTLY LIFTED/CARRIED |
|---|---|
| ☐ 10 lbs. | ☐ Up to 10 lbs. |
| ☐ 20 lbs. | ☐ Up to 25 lbs. |
| ☐ 50 lbs. | ☐ Up to 50 lbs. |
| ☐ 100 lbs. | ☐ Over 50 lbs. |
| ☐ Over 100 lbs. | |

**PART VII - REMARKS**

Use this section for continuation of or answers to previous questions. Also use this space to give any additional information that you think will be helpful in making a decision on your disability claim. If it has information about an other illness or injuries not shown in Part I, please refer to the previous item by number.

I have not been seen by a doctor or hosp. for my disabilities,

Public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time it takes to review instructions, search existing data sources, gather the necessary facts, and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Social Security Administration, AFYN, Reports Clearance Officer, 6401 Security Blvd., Baltimore, MD 21235. Send only comments to the Office of Management and Budget, Paperwork Reduction Project (OMB 0960-0579), Washington, D.C. 20503.

Knowing that anyone making a false statement or representation of a material fact for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal law, I certify that the above statement is true.

NAME (Signature of claimant or person filing on the claimant's behalf)

SIGN HERE ▶ X  *Bruce Webster*                              DATE  10/4/03

Witnesses are required ONLY if this statement has been signed by mark (X) above. If signed by mark (X), two witnesses to the signing who know the person making the statement must sign below, giving their full address.

1. Signature of Witness 1                  |  2. Signature of Witness 2

Address (Number and street, city, state and ZIP Code)  |  Address (Number and street, city, state and ZIP Code)

Form SSA-3369-BK (1-89)

**PART VII — FOR SSA USE ONLY : DO NOT WRITE BELOW THIS LINE**

| NAME OF CLAIMANT | SOCIAL SECURITY NUMBER |
|---|---|
| Bruce Webster | ▮▮▮▮▮▮ |

16. Check any of the following categories which apply to this case

**PRESUMPTIVE DISABILITY CONSIDERATION**
(If any of these boxes are checked, DO's and DDS's should be alert to the possibility of a presumptive disability determination in SSI claims per DI 11055.240 and 23535.005.)

A. ☐ Amputation of two limbs

B. ☐ Amputation of a leg at the hip

C. ☐ Allegation of total deafness

D. ☐ Allegation of total blindness

E. ☐ Allegation of bed confinement or immobility without a wheelchair, walker, or crutches, allegedly due to a longstanding condition — exclude recent accident and recent surgery.

F. ☐ Allegation of a stroke (cerebral vascular accident) more than 3 months in the past and continued marked difficulty in walking or using a hand or arm.

G. ☐ Allegation of cerebral palsy, muscular dystrophy or muscular atrophy and marked difficulty in walking (e.g., use of braces), speaking or coordination of the hands or arms.

H. ☐ Allegation of diabetes with amputation of a foot.

I. ☐ Allegation of Down's Syndrome (Mongolism).

J. ☐ An applicant filing on behalf of another individual alleges severe mental deficiency for claimant who is at least 7 years of age. The applicant alleges that the individual attends (or attended) a special school, or special classes in school, because of his mental deficiency, or is unable to attend any type of school (or if beyond school age was unable to attend), and requires care and supervision of routine daily activities.

L. ☐ Allegation of Acquired Immune Deficiency Syndrome (AIDS)

| | Yes | No |
|---|---|---|
| Does the claimant speak English? | ☒ | ☐ |
| Does the claimant have a language/speech/hearing problem for which... | ☐ | ☒ |

| NAME | ADDRESS | RELATIONSHIP | TELEPHONE NUMBER |
|---|---|---|---|
| | | | |

| | Yes | No |
|---|---|---|
| Can the claimant or his representative be easily reached by telephone with no communication problem due to language, speech, or hearing difficulties? | ☐ | ☒ |

**REDACTED**     G.48

18A. Check each item to indicate if any difficulty was observed

| | | | | | |
|---|---|---|---|---|---|
| Reading | ☐ Yes | ☑ No | Using Hands | ☐ Yes | ☑ No |
| Writing | ☐ Yes | ☑ No | Breathing | ☐ Yes | ☑ No |
| Answering | ☐ Yes | ☑ No | Seeing | ☐ Yes | ☑ No |
| Hearing | ☐ Yes | ☑ No | Walking | ☐ Yes | ☑ No |
| Sitting | ☐ Yes | ☑ No | | | |
| Understanding | ☐ Yes | ☑ No | Other (Specify) | | |

18B. If any of the above items were checked "yes", describe the exact difficulty involved

18C. Describe the claimant's age, general build, height, weight, behavior, any difficulties that add to or supplement those noted above, etc.

Claimant was neatly dressed & groomed.

Height - 5'9"

Weight - 150 b.

19. Medical Development

| SOURCE | DATE REQUESTED | DATE(S) OF FOLLOW-UP | CAPABILITY DEVELOPMENT REQUESTED |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| | | |
|---|---|---|
| 20. DO or BO initiated completion of Form (DI 2050-005) | ☑ YES | ☐ NO |
| 21. Is capability development necessary? If yes, show DRS Capability Development record (SSA-4515) | ☐ YES | ☑ NO |
| 22. Is development of prior Work Activity needed? If yes, is an SSA-3033-BK completed? | ☐ YES ☐ Pending | ☑ NO ☐ In File |

| 23. SSA-3368-BK taken by | | | 24. Form supplemented? If yes, by | | ☐ Yes | ☑ No |
|---|---|---|---|---|---|---|
| ☑ Personal Interview | ☐ Telephone | ☐ Mail | ☐ Personal Interview | ☐ Telephone | | ☐ Mail |

| SIGNATURE OF DO OR BO INTERVIEWER OR REVIEWER | TITLE | DATE |
|---|---|---|
| | R | 10/7/92 |

Form SSA-3368-BK

DEPARTMENT OF HEALTH AND HUMAN SERVICES
SOCIAL SECURITY ADMINISTRATION

90.0

Form Approved
OMB No. 0960-0141

# VOCATIONAL REPORT

This report supplements the Disability Report (Form SSA-3368-BK) by requesting additional information about your past work experience. PLEASE PRINT, TYPE, OR WRITE CLEARLY AND ANSWER ALL ITEMS TO THE BEST OF YOUR ABILITY. If you are filing on behalf of someone else, enter his or her name and Social Security number in the space provided and answer all questions. COMPLETE ANSWERS WILL AID IN PROCESSING THE CLAIM.

**PRIVACY ACT/PAPERWORK REDUCTION ACT NOTICE:** The Social Security Administration is authorized to collect the information on this form under sections 205(a), 223(d) and 1633(a) of the Social Security Act. The information on this form is needed by Social Security to make a decision on your claim. While giving us the information on this form is voluntary, failure to provide all or part of the requested information could prevent an accurate or timely decision on your claim and could result in the loss of benefits. Although the information you furnish on this form is almost never used for any purpose other than making a determination on your disability claim, such information may be disclosed by the Social Security Administration as follows: (1) to enable a third party or agency to assist Social Security in establishing rights to Social Security benefits and/or coverage; (2) to comply with Federal laws requiring the release of information from Social Security records (e.g., to the General Accounting Office and the Veterans Administration); and (3) to facilitate statistical research and audit activities necessary to assure the integrity and improvement of the Social Security programs (e.g., to the Bureaus of the Census and private concerns under contract to Social Security). These and other reasons why information about you may be used or given out are explained in the Federal Register. If you would like more information about this, any Social Security office can assist you.

**TIME IT TAKES TO COMPLETE THIS FORM**
We estimate that it will take you about 20 minutes to complete this form. This includes the time it will take to read the instructions, gather the necessary facts and fill out the form. If you have comments or suggestions on how long it takes to complete this form or on any other aspect of this form, write to the Social Security Administration, ATTN: Reports Clearance Officer, 1-A-21 Operations Bldg., Baltimore, MD 21235, and to the Office of Management and Budget, Paperwork Reduction Project (0960-0141), Washington, D.C. 20503. Do not send completed forms or information concerning your claim to these offices.

| A. Name of Claimant | B. Social Security Number | C. Telephone number where you can be reached (include area code) |
|---|---|---|
| Bruce Webster | ███████████ | ███████████ |

## PART I — INFORMATION ABOUT YOUR WORK HISTORY

List all jobs you have had in the last 15 years before you stopped working, beginning with your usual job; normally, this will be the kind of work you did the longest. (If you have a 6th grade education or less, **AND** did only heavy unskilled labor for 35 years or more, list all of the jobs you have had since you began to work. If you need more space, use Part III.) If you have already given information about your usual job on the Form SSA-3368-BK (Disability Report), begin with your other jobs.

| JOB TITLE (Be sure to begin with your usual job) | TYPE OF BUSINESS | DATES WORKED (Month and Year) FROM | DATES WORKED (Month and Year) TO | DAYS PER WEEK | RATE OF PAY (Per hour, day, week, month or year) |
|---|---|---|---|---|---|
| 1 CEMENT | PC.I | JUNE 22 | JUNE 24 | 7.25 | 7.00 to 7.25 hr |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | OCT 07 1998 | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |

Form SSA-3369-F6 (1-89)     1     EXHIBIT NO  15  ( 6 ) PAGES

REDACTED

G.50

## PART II — INFORMATION ABOUT YOUR JOB DUTIES

Provide the following information (on pages 2-5) for each of the jobs listed in Part I starting with your usual job:

Job Title (from Part I):

*Cement*

A. In your job did you:
- Use machines, tools, or equipment of any kind?  ☑ Yes  ☐ No
- Use technical knowledge or skills?  ☐ Yes  ☐ No
- Do any writing, complete reports, or perform similar duties?  ☐ Yes  ☐ No
- Have supervisory responsibilities?  ☑ Yes  ☐ No

B. Describe your basic duties (explain what you did and how you did it) below. Also, explain all "Yes" answers by giving a FULL DESCRIPTION of the types of machines, tools, or equipment you used and the exact operation you performed, the technical knowledge or skills involved, the type of writing you did, and the nature of any reports, and the number of people you supervised and the extent of your supervision.

*I really did no what I was doing I had helpe from the other worker that work with me. I help spread the cement out.*

C. Describe the kind and amount of physical activity this job involved during a typical day in terms of:

- **Walking** (circle the number of hours a day spent walking) — 0 1 2 3 4 5 6 7 ⑧

- **Standing** (circle the number of hours a day spent standing) — 0 1 2 3 4 5 6 7 8

- **Sitting** (circle the number of hours a day spent sitting) — 0 1 2 3 4 5 6 7 8

- **Bending** (circle how often a day you had to bend) — Never · Occasionally · ⟨Frequently⟩ · Constantly

- **Lifting and Carrying:** Describe what was lifted, and how far it was carried. Check below heaviest weight lifted, and weight frequently lifted and/or carried.

*Cement hose*

| Heaviest weight lifted | Weight frequently lifted/carried |
|---|---|
| ☐ 10 lbs. | ☐ Up to 10 lbs. |
| ☑ 20 lbs. | ☑ Up to 25 lbs. |
| ☑ 50 lbs. | ☐ Up to 50 lbs. |
| ☐ 100 lbs. | ☐ Over 50 lbs. |
| ☐ Over 100 lbs. | |

G.51

Job Title (from Part I):

CEMENT

A. In your job did you:
- Use machines, (tools) or equipment of any kind? ☑ Yes ☐ No
- Use technical knowledge or skills? ☐ Yes ☐ No
- Do any writing, complete reports, or perform similar duties? ☐ Yes ☐ No
- Have supervisory responsibilities? ☐ Yes ☐ No

B. Describe your basic duties (explain what you did and how you did it) below. Also, explain all "Yes" answers by giving a FULL DESCRIPTION of: the types of machines, tools, or equipment you used and the exact operation you performed; the technical knowledge or skills involved; the type of writing you did, and the nature of any reports; and the number of people you supervised and the extent of your supervision.

I rEally didnt no what I was doing I had help from thE othEr workers that work with me I help sprEad the cEmEnt out

C. Describe the kind and amount of physical activity this job involved during a typical day in terms of:

- **Walking** (circle the number of hours a day spent walking) — 0 1 2 3 4 5 6 7 (8)
- **Standing** (circle the number of hours a day spent standing) — 0 1 2 3 4 5 6 7 8
- **Sitting** (circle the number of hours a day spent sitting) — 0 1 2 3 4 5 6 7 8
- **Bending** (circle how often a day you had to bend) — Never · Occasionally - (Frequently) Constantly

- **Lifting and Carrying:** Describe what was lifted, and how far it was carried. Check below heaviest weight lifted, and weight frequently lifted and/or carried.

CEMEN+ hosE

| Heaviest weight lifted | Weight frequently lifted/carried |
|---|---|
| ☐ 10 lbs. | ☐ Up to 10 lbs. |
| ☐ 20 lbs. | ☑ Up to 25 lbs. |
| ☑ 50 lbs. | ☐ Up to 50 lbs. |
| ☐ 100 lbs. | ☐ Over 50 lbs. |
| ☐ Over 100 lbs. | |

Form SSA-3369-F6 (1-89)    3

G.52

## PART III — REMARKS

Use this section for any other information you may want to give about your work history, or to provide any other remarks you may want to make to support your disability claim:

_(If you need more space, use separate sheets of paper.)_

Knowing that anyone making a false statement or representation of a material fact for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal law, I certify that the above statements are true.

NAME (Signature of Claimant or Person Filing on the Claimant's Behalf)

SIGN HERE ▶ ✓ _Bruce Whiten_          DATE  10-6-93

Witnesses are required ONLY if this statement has been signed by mark (X) above. If signed by mark (X), two witnesses to the signing who know the person making the statement must sign below, giving their full addresses.

| 1. Signature of Witness | 2. Signature of Witness |
|---|---|
| Address (Number and street, city, state, and ZIP code) | Address (Number and street, city, state, and ZIP code) |

Do not write below this line

| SA-3369-F6 taken by: | FORM SUPPLEMENTED: | | |
|---|---|---|---|
| ☐ PERSONAL INTERVIEW | If "Yes," by | ☐ YES | ☐ NO |
| ☐ TELEPHONE  ☐ MAIL | ☐ PERSONAL INTERVIEW | ☐ TELEPHONE  ☐ MAIL | |
| GNATURE OF INTERVIEWER OR REVIEWER | TITLE (also check office) | DATE | |
| | ☐ DDS  ☐ DO  ☐ BO | | |

Form SSA-3369-F6 (L-89)                    6                    U.S. Government Printing Office: 1992 — 300-141

**G.53**

Title (from Part I):

CEMENT

A. In your job did you:
- Use machines, tools, or equipment of any kind?  ☑ Yes  ☐ No
- Use technical knowledge or skills?  ☐ Yes  ☐ No
- Do any writing, complete reports, or perform similar duties?  ☐ Yes  ☐ No
- Have supervisory responsibilities?  ☐ Yes  ☐ No

B. Describe your basic duties (explain what you did and how you did it) below. Also, explain all "Yes" answers by giving a FULL DESCRIPTION of the types of machines, tools, or equipment you used and the exact operation you performed; the technical knowledge or skills involved; the type of writing you did, and the nature of any reports; and the number of people you supervised and the extent of your supervision.

Treall didnt no what I was doing
I had help from the other workers
that work with me. I help spread
the cement out.

C. Describe the kind and amount of physical activity this job involved during a typical day in terms of:

- **Walking** (circle the number of hours a day spent walking) — 0  1  2  3  4  5  6  7  ⑧
- **Standing** (circle the number of hours a day spent standing) — 0  1  2  3  4  5  6  7  8
- **Sitting** (circle the number of hours a day spent sitting) — 0  1  2  3  4  5  6  7  8
- **Bending** (circle how often a day you had to bend) — Never - Occasionally - ⟨Frequently⟩ - Constantly
- **Lifting and Carrying**: Describe what was lifted, and how far it was carried. Check below heaviest weight lifted, and weight frequently lifted and/or carried.

CEMENT hose

| Heaviest weight lifted | Weight frequently lifted/carried |
|---|---|
| ☐ 10 lbs. | ☐ Up to 10 lbs. |
| ☐ 20 lbs. | ☑ Up to 25 lbs. |
| ☑ 50 lbs. | ☐ Up to 50 lbs. |
| ☐ 100 lbs. | ☐ Over 50 lbs. |
| ☐ Over 100 lbs. | |

IF YOU NEED ADDITIONAL SPACE TO PROVIDE INFORMATION ABOUT OTHER JOBS LISTED IN PART I OF THIS FORM, USE PART III OR ASK THE SOCIAL SECURITY OFFICE FOR ADDITIONAL COPIES OF THIS FORM.

Form SSA-3369-F6 (1-89)

**G.54**

Job Title (from Part I):

CEMENt

A. In your job did you:
- Use machines, tools, or equipment of any kind?  ☑ Yes  ☐ No
- Use technical knowledge or skills?  ☐ Yes  ☐ No
- Do any writing, complete reports, or perform similar duties?  ☐ Yes  ☐ No
- Have supervisory responsibilities?  ☐ Yes  ☐ No

B. Describe your basic duties (explain what you did and how you did it) below. Also, explain all "Yes" answers by giving a FULL DESCRIPTION of the types of machines, tools, or equipment you used and the exact operation you performed, the technical knowledge or skills involved, the type of writing you did, and the nature of any reports and the number of people you supervised and the extent of your supervision.

I really bidn't no what I was doing I had help from the other wonker that worked with me. I help spread the cement out

C. Describe the kind and amount of physical activity your job involved during a typical day in terms of:

- **Walking** (circle the number of hours a day spent walking) — 0  1  2  3  4  5  6  7  ⑧
- **Standing** (circle the number of hours a day spent standing) — 0  1  2  3  4  5  6  7  8
- **Sitting** (circle the number of hours a day spent sitting) — 0  1  2  3  4  5  6  7  8
- **Bending** (circle how often a day you had to bend) — Never · Occasionally · ⟨Frequently⟩ · Constantly

- **Lifting and Carrying.** Describe what was lifted and how far it was carried. Check below the heaviest weight lifted, and weight frequently lifted and/or carried.

CEMENt hose

| Heaviest weight lifted | Weight frequently lifted / carried |
|---|---|
| ☐ 10 lbs. | ☐ Up to 10 lbs. |
| ☐ 20 lbs. | ☑ Up to 25 lbs. |
| ☑ 50 lbs. | ☐ Up to 50 lbs. |
| ☐ 100 lbs. | ☐ Over 50 lbs. |
| ☐ Over 100 lbs. | |

Form SSA-3369-F6 (1-89)

G.55

DEPARTMENT OF HEALTH AND HUMAN SERVICES
SOCIAL SECURITY ADMINISTRATION
OFFICE OF HEARINGS AND APPEALS

Form Approved
OMB No. 0960-0269

## REQUEST FOR HEARING BY ADMINISTRATIVE LAW JUDGE
[Take or mail original and all copies to your local Social Security Office]

**PRIVACY ACT NOTICE ON REVERSE SIDE OF FORM.**

| 1. CLAIMANT | 2. WAGE EARNER, IF DIFFERENT | 3. SOC. SEC. CLAIM NUMBER | SPOUSE's CLAIM NUMBER |
|---|---|---|---|
| Bruce C Webster | Willie Webster | ▓▓▓▓▓ | |

5. I REQUEST A HEARING BEFORE AN ADMINISTRATIVE LAW JUDGE. I disagree with the determination made on my claim because:

CDB and SSI          SSI-▓▓▓

I have had sinus problems –
My medication make me sleepy –

You have a right to be represented at the hearing. If you are not represented but would like to be, your Social Security Office will give you a list of legal referral and service organizations. (If you are represented, complete form SSA-1696.)

An Administrative Law Judge of the Office of Hearings and Appeals will be appointed to conduct the hearing or other proceedings in your case. You will receive notice of the time and place of a hearing at least 20 days before the day set for a hearing.

6. Check one of these blocks.                   **OHA, Little Rock, AR**      7. Check one of the blocks:

[✔] I have no additional evidence to submit.

[ ] I have additional evidence to submit.    **APR 15 1994**
(Please submit it to the Social
Security Office within 10 days.)

[✔] I wish to appear at a hearing.

[ ] I do not wish to appear and I request that a decision be made based on the evidence in my case
(Complete Waiver Form HA-4608)

[You should complete No. 8 and your representative (if any) should complete No. 9. If you are represented and your representative is not available to complete this form, you should also print his or her name, address, etc. in No. 9.]

8. ✔ Bruce Webster
(CLAIMANT'S SIGNATURE)

9.
(REPRESENTATIVE'S SIGNATURE/NAME)

ADDRESS ▓▓▓▓▓
Pine Bluff Ar 71603

| (ADDRESS) [ ] ATTORNEY; [ ] NON ATTORNEY |
|---|

| CITY | STATE | ZIP CODE | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|

| DATE 4-13-94 | AREA CODE AND TELEPHONE NUMBER ▓▓▓▓ | DATE | AREA CODE AND TELEPHONE NUMBER |
|---|---|---|---|

### TO BE COMPLETED BY SOCIAL SECURITY ADMINISTRATION—ACKNOWLEDGMENT OF REQUEST FOR HEARING

10. Request for Hearing RECEIVED for the Social Security Administration on __4/13/94__ by: P Hallowell

CR                    Pine Bluff                                  759
(TITLE)            ADDRESS                          Servicing FO Code    PC Code

11. [✔] Request timely filed

[ ] Request not timely filed-Attach (1) claimant's explanation for delay, (2) any pertinent letter, material, or information in the Social Security Office.

12. Claimant not represented –
[✔] list of legal referral and service organizations provided

13. Interpreter needed –
[ ] enter language (including sign language): _____

14.
Check one: [✔] Initial Entitlement Case
[ ] Disability Cessation Case
[ ] Other Postentitlement Case

15.
Check claim type(s):
[ ] RSI only ........................................ (RSI)
[ ] Disability—worker or child only ........... (DIWC)
[ ] Disability—Widow(er) only ................. (DIWW)
[ ] SSI Aged only ................................ (SSIA)
[ ] SSI Blind only ................................ (SSIB)
[ ] Disability only ................................ (SSID)
[ ] SSI Aged/Title II ........................... (SSAC)
[ ] SSI Blind/Title II .......................... (SSBC)
[✔] SSI Disability/Title II ..................... (SSDC)
[ ] HI Entitlement ............................. (HIE)
[ ] Other—Specify: (_____)

16.
HO COPY SENT TO: 5072 HO on 4/13/94
[✔] CF Attached: [✔] Title II; [✔] Title XVI; or
[ ] Title II CF held in FO to establish CAPS ORBIT; or
[ ] CF requested: [ ] Title II; [ ] Title XVI
(Copy of teletype or phone report attached).

17.
CF COPY SENT TO: _____ HO on _____
[ ] CF attached: [ ] Title II; [ ] Title XVI
[ ] Other attached _____

FORM HA-501-U5 (5-88)
Issue old stock

CLAIMS FOLDER

13

REDACTED

G.56

DEPARTMENT OF HEALTH AND HUMAN SERVICES
SOCIAL SECURITY ADMINISTRATION
OFFICE OF HEARINGS AND APPEALS

Form Approved
OMB No. 0960-0269

## REQUEST FOR HEARING BY ADMINISTRATIVE LAW JUDGE
[Take or mail original and all copies to your local Social Security Office]

**PRIVACY ACT NOTICE ON REVERSE SIDE OF FORM.**

| 1. CLAIMANT | 2. WAGE EARNER, IF DIFFERENT | 3. SOC. SEC. CLAIM NUMBER | SPOUSE's CLAIM NUMBER |
|---|---|---|---|
| Bruce C Webster | Willie Webster | | |

5. I REQUEST A HEARING BEFORE AN ADMINISTRATIVE LAW JUDGE. I disagree with the determination made on my claim because:

CDB and SSI                                    SSI-

I have had sinus problems -
My medication make me sleepy -

You have a right to be represented at the hearing. If you are not represented but would like to be, your Social Security Office will give you a list of legal referral and service organizations. (If you are represented, complete form SSA-1696.)

An Administrative Law Judge of the Office of Hearings and Appeals will be appointed to conduct the hearing or other proceedings in your case. You will receive notice of the time and place of a hearing at least 20 days before the day set for a hearing.

**OHA, Little Rock, AR**

**APR 15 1994**

6. Check one of these blocks.

[X] I have no additional evidence to submit.

[ ] I have additional evidence to submit.
(Please submit it to the Social Security Office within 10 days.)

7. Check one of the blocks:

[X] I wish to appear at a hearing.

[ ] I do not wish to appear and I request that a decision be made based on the evidence in my case
(Complete Waiver Form HA-4608)

[You should complete No. 8 and your representative (if any) should complete No. 9. If you are represented and your representative is not available to complete this form, you should also print his or her name, address, etc. in No. 9.]

| 8. Bruce Webster | 9. |
|---|---|
| (CLAIMANT'S SIGNATURE). | (REPRESENTATIVE'S SIGNATURE/NAME) |

| ADDRESS Pine Bluff Ar 71603 | (ADDRESS) [ ] ATTORNEY; [ ] NON ATTORNEY |
|---|---|
| CITY          STATE          ZIP CODE | CITY          STATE          ZIP CODE |

| DATE 4-13-94          AREA CODE AND TELEPHONE NUMBER | DATE          AREA CODE AND TELEPHONE NUMBER |
|---|---|

### TO BE COMPLETED BY SOCIAL SECURITY ADMINISTRATION—ACKNOWLEDGMENT OF REQUEST FOR HEARING

10.
Request for Hearing RECEIVED for the Social Security Administration on ___4/13/94___ by: P Hallowell

CR
(TITLE)          Pine Bluff          759
          ADDRESS          Servicing FO Code   PC Code

11.
[X] Request timely filed

[ ] Request not timely filed-Attach (1) claimant's explanation for delay, (2) any pertinent letter, material, or information in the Social Security Office.

12. Claimant not represented –
[X] list of legal referral and service organizations provided

13. Interpreter needed –
[ ] enter language (including sign language): _____

14.
Check one: [X] Initial Entitlement Case
[ ] Disability Cessation Case
[ ] Other Postentitlement Case

15.
Check claim type(s):
[ ] RSI only .......................... (RSI)
[ ] Disability—worker or child only ........... (DIWC)
[ ] Disability—Widow(er) only .............. (DIWW)
[ ] SSI Aged only .................... (SSIA)
[ ] SSI Blind only ................... (SSIB)
[ ] Disability only .................. (SSID)
[ ] SSI Aged/Title II ................ (SSAC)
[ ] SSI Blind/Title II ............... (SSBC)
[X] SSI Disability/Title II .......... (SSDC)
[ ] HI Entitlement .................. (HIE)
[ ] Other—Specify: (_____)

16.
HO COPY SENT TO: S072 HO on 4/13/94
[X] CF Attached: [X] Title II; [X] Title XVI; or
[ ] Title II CF held in FO to establish CAPS ORBIT; or
[ ] CF requested: [ ] Title II; [ ] Title XVI
(Copy of teletype or phone report attached).

17.
CF COPY SENT TO: _____ HO on _____
[ ] CF attached: [ ] Title II; [ ] Title XVI
[ ] Other attached _____

FORM HA-501-U5 (5-88)
Issue old stock

CLAIMS FOLDER

13

REDACTED

## PRIVACY ACT AND PAPERWORK ACT NOTICE

The Social Security Act (sections 205(a),702, 1631 (e)(1)(A) and (B), and 1869(b)(1) and (c), as appropriate) authorizes the collection of information on this form. We need the information to continue processing your claim. You do not have to give it, but if you do not you may not receive benefits under the Social Security Act. We may give out information on this form without your written consent if we need to get more information to decide if you are eligible for benefits or if a Federal law requires us to do so. Specifically, we may provide information to another Federal, State, or local government agency which is deciding your eligibility for a government benefit or program; to the President or a Congressman inquiring on your behalf; to an independent party who needs statistical information for a research paper or audit report on a Social Security program; or to the Department of Justice to represent the Federal Government in a court suit related to a program administered by the Social Security Administration. We explain, in the Federal Register, these and other reasons why we may use or give out information about you. If you would like more information, get in touch with any Social Security Office.

We may also use the information you give us when we match records by computer. Matching programs compare our records with those of other Federal, State, or local government agencies. Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by the Federal government. The law allows us to do this even if you do not agree to it.

These and other reasons why information about you may be used or given out are explained in the Federal Register. If you want to learn more about this, contact any Social Security Office.

## TIME IT TAKES TO COMPLETE THIS FORM

We estimate that it will take you about 10 minutes to complete this form. This includes the time it will take to read the instructions, gather the necessary facts and fill out the form. If you have comments or suggestions on how long it takes to complete this form or on any other aspect of this form, write to the Social Security Administration. ATTN: Reports Clearance Officer, 1-A-21 Operations Bldg., Baltimore, MD 21235, and to the Office of Management and Budget, Paperwork Reduction Project (0960-0269), Washington, D.C. 20503. Do not send completed forms or information concerning your claim to these offices.

FORM **HA-501-U5** (5-88)
*Issue old stock*

# Social Security
# Notice of Reconsideration

From:   Department of Health and Human Services
        Social Security Administration

Bruce C. Webster ███████████

Pine Bluff, AR   71603

Date:                    APR   5 1994

Claim Number: ████████████

Claim for
☐  Disability Insurance Benefits
☐  Disabled Widow, Widower Benefits
☒  Childhood Disability Benefits
☐  Medicare Coverage Only

Upon receipt of your request for reconsideration we had your claim independently reviewed by a physician and disability examiner in the State agency which works with us in making disability determinations. The evidence in your case has been thoroughly evaluated; this includes the medical evidence and the additional information received since the original decision. We find that the previous determination denying your claim was proper under the law. Attached to this notice is an explanation of the decision we made on your claim and how we arrived at it. The reverse of this notice identifies the legal requirements for your type of claim.

The determination on your claim was made by an agency of the State. It was not made by your own doctor or by other people or agencies writing reports about you. However, any evidence they gave us was used in making this determination. Doctors and other people in the State agency who are trained in disability evaluation reviewed the evidence and made the determination based on Social Security law and regulations.

If you believe that the reconsideration determination is not correct, you may request a hearing before an administrative law judge of the Office of Hearings and Appeals. If you want a hearing, you must request it not later than 60 days from the date you receive this notice. You may make your request through any Social Security office. Read the enclosed leaflet for a full explanation of your right to appeal.

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision. You might lose benefits if you file a new application instead of filing an appeal. Therefore, if you think this decision is wrong, you should ask for an appeal within 60 days.

This decision refers only to your claim for benefits under the Social Security Disability Insurance Program. If you applied for other benefits, you will receive a separate notice when a decision is made on that claim(s).

If you have questions about your claim, you should get in touch with any Social Security office. Most questions can be handled by telephone or mail. If you visit an office, however, please take this letter with you.

Enclosure:
SSA Pub. No. 70-10281
759

**Important: See other side for additional information.** ▶        EXHIBIT NO. 11    (2) PAGES

Form SSA-L928-U2 (2-90)

**REDACTED**        G.59

Summarized below are legal requirements for the various types of disability claims:

**Disability Insurance Claim**

To be considered disabled, a person must be unable to do any substantial gainful work due to a medical condition which has lasted or is expected to last for at least 12 months in a row. The condition must be severe enough to keep a person from working not only in his or her usual job, but in any other substantial gainful work. We look at the person's age, education, training and work experience when we decide whether he or she can work.

**Disabled Widow (Widower) Claim**

A widow, widower, or surviving divorced wife (age 50-60) must meet the disability requirement of the law within a specified 7-year period. A person may be considered disabled only if he or she has a physical or mental impairment that is so severe as to ordinarily prevent a person from working. The disability must have lasted or be expected to last for a continuous period of at least 12 months.

**Childhood Disability Benefits**

Childhood disability benefits may be paid to a person age 18 or older if the person has a disability which began before age 22 or within 84 months of the end of an earlier period of childhood disability. The condition, whether physical or mental, must be severe enough to keep the person from doing any substantial gainful work. We look at the person's age, education and previous training when we decide whether he or she can work. In addition, the condition must have lasted or be expected to last for at least 12 months in a row.

Form SSA-L928-U2 (2-90)

G.60

DEPARTMENT OF HEALTH AND HUMAN SERVICES
SOCIAL SECURITY ADMINISTRATION                                    TOE 710

## REQUEST FOR RECONSIDERATION

*(Do not write in this space)*

The information on this form is authorized by regulation (20 CFR 404.907 – 404.921 and 416.1407 – 416.1421). While your responses to these questions is voluntary, the Social Security Administration cannot reconsider the decision on this claim unless the information is furnished.

| NAME OF CLAIMANT | NAME OF WAGE EARNER OR SELF-EMPLOYED PERSON *(If different from claimant.)* |
|---|---|
| Bruce C. Webster | Willie Webster |

| SOCIAL SECURITY CLAIM NUMBER | SUPPLEMENTAL SECURITY INCOME (SSI) CLAIM NUMBER |
|---|---|
| ▮▮▮▮▮▮▮▮▮▮ | ▮▮▮▮▮ |

SPOUSE'S SOCIAL SECURITY NUMBER *(Complete ONLY in SSI cases)*

3/17/94

CLAIM FOR: *(Specify type, e.g., retirement, disability, hospital insurance, SSI, etc.)*
Disability, CD B Claim

I do not agree with the determination made on the above claim and request reconsideration. My reasons are:
I feel I have problems. Seures and other problems/slow learner that make me disabled

### SUPPLEMENTAL SECURITY INCOME RECONSIDERATION ONLY *(See reverse of claimant's copy)*

"I want to appeal your decision about my claim for supplemental security income, SSI. I've read the back of this form about the three ways to appeal. I've checked the box below."

[X] Case Review   [ ] Informal Conference   [ ] Formal Conference

EITHER THE CLAIMANT OR REPRESENTATIVE SHOULD SIGN – ENTER ADDRESSES FOR BOTH

| SIGNATURE OR NAME OF CLAIMANT'S REPRESENTATIVE | CLAIMANT SIGNATURE |
|---|---|
| [ ] NON-ATTORNEY [ ] ATTORNEY | Bruce Webster |

| STREET ADDRESS | STREET ADDRESS ▮▮▮▮▮▮▮▮ |
|---|---|

| CITY | STATE | ZIP CODE | CITY Pine Bluff | STATE Ar | ZIP CODE 71603 |
|---|---|---|---|---|---|

| TELEPHONE NUMBER *(Include area code)* ( — — — ) | DATE | TELEPHONE NUMBER *(Include area code)* (▮▮▮▮▮▮▮▮) | DATE 3/17/94 |
|---|---|---|---|

### TO BE COMPLETED BY SOCIAL SECURITY ADMINISTRATION

See reverse of claim folder copy for list of initial determinations

| 1. HAS INITIAL DETERMINATION BEEN MADE? | [X] YES [ ] NO | 2. CLAIMANT INSISTS ON FILING | [ ] YES [ ] NO |
|---|---|---|---|

3. IS THIS REQUEST FILED TIMELY?
*(If "NO", attach claimant's explanation for delay and attach only pertinent letter, material, or information in social security office.)*    [X] YES [ ] NO

| RETIREMENT AND SURVIVORS RECONSIDERATIONS ONLY (CHECK ONE) REFER TO (GN 03102.125) | SOCIAL SECURITY OFFICE ADDRESS |
|---|---|
| [X] NO FURTHER DEVELOPMENT REQUIRED   (GN 03102.125) | P.O. Box 8309 |
| [ ] REQUIRED DEVELOPMENT ATTACHED | Pine Bluff, Ar |
| [ ] REQUIRED DEVELOPMENT PENDING, WILL FORWARD OR ADVISE STATUS WITHIN 30 DAYS | 71611 |

| ROUTING INSTRUCTIONS (CHECK ONE) ——▶ | [ ] DISABILITY DETERMINATION SERVICES *(ROUTE WITH DISABILITY FOLDER)* | [ ] ODO, BALTIMORE | [ ] PROGRAM SERVICE CENTER |
|---|---|---|---|
| | [ ] RNTPSC, BALTIMORE | [ ] DISTRICT OFFICE RECONSIDERATION | [ ] OCRO BALTIMORE |

**NOTE:** TAKE OR MAIL COMPLETED COPIES TO YOUR SOCIAL SECURITY OFFICE

FORM SSA-561-U2 (9-85)                     CLAIMS FOLDER

8

REDACTED

G.61

## ADMINISTRATIVE ACTIONS THAT ARE INITIAL DETERMINATIONS
### (See GN 03101.190, GN 03101.200, and GN 03110.210)

NOTE: These lists cover the vast majority of administrative actions that are initial determinations. However, they are not all inclusive.

### Title II

1. Entitlement or continuing entitlement to benefits;
2. Reentitlement to benefits;
3. The amount of benefit;
4. A recomputation of benefit;
5. A reduction in disability benefits because benefits under a worker's compensation law was also received;
6. A deduction from benefits on account of work;
7. A deduction from disability benefits because of claimant's refusal to accept rehabilitation services;
8. Termination of benefits;
9. Penalty deductions imposed because of failure to report certain events;
10. Any overpayment or underpayment of benefits;
11. Whether an overpayment of benefits must be repaid;
12. How an underpayment of benefits due a deceased person will be paid;
13. The establishment or termination of a period of disability;
14. A revision of an earnings record; ..
15. Whether the payment of benefits will be made, on the claimant's behalf to a representative payee, unless the claimant is under age 18 or legally imcompetent;
16. Who will act as the payee if we determine that representative payment will be made;
17. An offset of benefits because the claimant previously received Supplemental Security Income payments for the same period;
18. Whether completion of or continuation for a specified period of time in an appropriate vocational rehabilitation program will significantly increase the likelihood that the claimant will not have to return to the disability benefit rolls and thus, whether the claimant's benefits may be continued even though the claimant is not disabled; and

19. Nonpayment of benefits because of claimant's confinement in a jail, prison, or other penal institution or correctional facility for conviction of a felony.

### Title XVI

1. Eligibility for, or the amount of, Supplement Security Income benefits;
2. Suspension, reduction, or termination of Supplemental Security Income benefits;
3. Whether an overpayment of benefits must be repaid;
4. Whether payments will be made, on claimant's behalf to a representative payee, unless the claimant is under age 18, legally incompetent, or determined to be a drug addict or alcoholic; ·
5. Who will act as payee if we determine that representative payment will be made;
6. Imposing penalties for failing to report improtant information;
7. Drug addiction or alcoholism;
8. Whether claimant is eligible for special SSI cash benefits;
9. Whether claimant is eligible for special SSI eligibility status;
10. Claimant's disability; and
11. Whether completion of or continuation for a specified period of time in an appropriate vocational rehabilitation program will significantly increase the likelihood that claimant will not have to return to the disability benefit rolls and thus, whether claimant's benefits may be continued even though he or she is not disabled.

NOTE: Every redetermination which gives an individual the right of further review constitutes an initial determination.

### Title XVIII

1. Entitlement to hospital insurance benefits and to enrollment for supplementary medical insurance benefits;
2. Disallowance (including denial of application for HIB and denial of application for enrollment for SMIB);
3. Termination of benefits (including termination of entitlement to HI and SMI).

# Social Security Notice

From:   Department of Health and Human Services
        Social Security Administration

Date:      FEB  8 1994

Bruce C. Webster

Pine Bluff, AR  71603

Claim Number: 

☐  Disability Insurance Benefits

☐  Disabled Widow/Widower Benefits

☒  Childhood Disability Benefits

We have determined that you are not entitled to disability benefits based on the claim that you filed. The attached page explains why we decided that you are not disabled. However, you may appeal this determination if you still think you are disabled.

The determination on your claim was made by an agency of the State. It was not made by your own doctor or by other people or agencies writing reports about you. However, any evidence they gave us was used in making this determination. Doctors and other people in the State agency who are trained in disability evaluation reviewed the evidence and made the determination based on Social Security law and regulations. The law is explained on the back of this page.

In addition, you are not entitled to any other benefits based on this application. If you applied for other benefits, you will receive a separate notice when a decision is made on that claim(s).

## YOUR RIGHT TO APPEAL

If you think we are wrong, you can ask that the determination be looked at by a different person. This is called a reconsideration. IF YOU WANT A RECONSIDERATION, YOU MUST ASK FOR IT WITHIN 60 DAYS FROM THE DATE YOU RECEIVE THIS NOTICE. IF YOU WAIT MORE THAN 60 DAYS, YOU MUST GIVE US A GOOD REASON FOR THE DELAY. Your request must be made in writing through any Social Security office. Be sure to tell us your name, Social Security number and why you think we are wrong. If you cannot write to us, call a Social Security office or come in and someone will help you. You can give us more facts to add to your file. However, if you do not have the evidence yet, you should not wait for it before asking for a reconsideration. You may send the evidence in later. We will then decide your case again. You will not meet with the person who will decide your case. Please read the enclosed leaflet for a full explanation of your right to appeal.

## NEW APPLICATION

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision. You might lose benefits if you file a new application instead of filing an appeal. Therefore, if you think this decision is wrong, you should ask for an appeal within 60 days.

cs                                                                      759

Enclosure:
SSA Publication No. 05-10058

**Important:**  See other side for additional information.▶

Form SSA-L443-U2 (2-90)

EXHIBIT NO. 6      2 PAGES

**REDACTED**   G.63

If you have any questions, call, write, or visit, any Social Security office. Most questions can be handled by telephone or mail. If you visit a Social Security office, please take this notice with you.

## REQUIREMENTS FOR DISABILITY BENEFITS

### Disability Insurance Benefits

To be considered disabled, a person must be unable to do any substantial gainful work due to a medical condition which has lasted or is expected to last for at least 12 months in a row. The condition must be severe enough to keep a person from working not only in his or her usual job, but in any other substantial gainful work. We look at the person's age, education, training and work experience when we decide whether he or she can work.

The condition must be disabling at a time when the person meets the earnings requirement. If you were not disabled when the earnings requirement was met, we have enclosed a leaflet which explains the earnings requirement and tells how Social Security credits are earned.

### Disabled Widow or Widower Benefits

To be considered disabled, a widow, widower or surviving divorced spouse (age 50 to 60) must have a physical or mental condition severe enough to keep a person from working. The condition must have lasted or be expected to last for at least 12 months in a row.

The person's disability must start:

- not later than 7 years after the month of death of the wife or husband, or;
- for a widow, widower or surviving divorced spouse formerly entitled to mother's or father's benefits not later than 7 years after the month those benefits ended, or;
- for a widow/widower or surviving divorced spouse who was previously disabled and who becomes disabled again, not later than 7 years after the prior period of disability ended.

### Childhood Disability Benefits

Childhood disability benefits may be paid to a person age 18 or older if the person has a disability which began before age 22 or within 84 months of the end of an earlier period of childhood disability. The condition, whether physical or mental, must be severe enough to keep the person from doing any substantial gainful work. We look at the person's age, education and previous training when we decide whether he or she can work. In addition, the condition must have lasted or be expected to last for at least 12 months in a row.

## OTHER IMPORTANT INFORMATION

Definitions of disability are not the same in all government and private disability programs. Government agencies must follow the laws that apply to their own disability programs. A finding by a private organization or other government agency that a person is disabled does not necessarily mean that the person meets the disability requirements of the Social Security Act.

No benefits may be paid to a wife, husband or child unless the wage earner or self-employed person is entitled to Social Security disability insurance benefits.

Form SSA-L443-U2 (2-90)

G.64

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Social Security Administration

Form Approved
OMB No. 0960-0504

# MEDICAL HISTORY AND DISABILITY REPORT
## WIDOW, WIDOWER, SURVIVING DIVORCED WIFE, OR DISABLED CHILD

PLEASE PRINT, TYPE, OR WRITE CLEARLY AND ANSWER ALL ITEMS TO THE BEST OF YOUR ABILITY. If you are filing on behalf of someone else, enter his or her name and social security number in the space provided and answer all questions. COMPLETE ANSWERS WILL AID IN PROCESSING THE CLAIM.

PRIVACY ACT/PAPERWORK REDUCTION NOTICE: The Social Security Administration is authorized to collect the information on this form under sections 205(a), 223(d) and 1633(a) of the Social Security Act. The information on this form is needed by Social Security to make a decision on your claim. While giving us the information on this form is voluntary, failure to provide all or part of the requested information could prevent an accurate or timely decision on your claim and could result in the loss of benefits. Although the information you furnish on this form is almost never used for any purpose other than making a determination on your disability claim, such information may be disclosed by the Social Security Administration as follows: (1) To enable a third party or agency to assist Social Security in establishing rights to Social Security benefits and/or coverage; (2) to comply with Federal laws requiring the release of information from Social Security records (e.g., to the General Accounting Office and the Veterans Administration); and (3) to facilitate statistical research and audit activities necessary to assure the integrity and improvement of the Social Security programs (e.g., to the Bureau of Census and private concerns under contract to Social Security).

We may also use the information you give us when we match records by computer. Matching programs compare our records with those of other Federal, state, or local government agencies. Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by the Federal government. The law allows us to do this even if you do not agree to it.

These and other reasons why information about you may be used or given out are explained in the Federal Register. If you want to learn more about this, contact any Social Security Office.

### TIME IT TAKES TO COMPLETE THIS FORM

We estimate that it will take you about 20 minutes to complete this form. This includes the time it will take to read the instructions, gather the necessary facts and fill out the form. If you have comments or suggestions on how long it takes to complete this form or on any other aspect of this form, write to the Social Security Administration, ATTN: Reports Clearance Office, 1-A-21 Operations Bldg., Baltimore, MD 21235, and to the Office of Management and Budget, Paperwork Reduction Project (0960-0147), Washington, D.C. 20503. Do not send completed forms or information concerning your claim to these offices.

## PART I — IDENTIFYING INFORMATION

| 1. Print name of person on whose Social Security record this claim is being filed. (First name, middle initial, last name) | Enter his or her Social Security Number |
|---|---|
| *Willie L. Webster* | ▮▮▮▮▮▮ |
| 2. Print your name (disabled person) (First name, middle initial, last name) | Enter your Social Security Number |
| *Bruce Webster* | ▮▮▮▮▮▮ |

## PART II — INFORMATION ABOUT YOUR CONDITION AND TREATMENT

3A. What is your disabling condition? (Briefly describe the disabling illness or injury.)

*Sinus problems + headaches*

| 3B. When did you become disabled? | MONTH 5 | DAY 31 | YEAR 83 |
|---|---|---|---|

4A. Have you worked since you became disabled?  ☐ YES  ☐ NO

4B. If "yes," show the dates you worked and the amount of money you earned.

| DATES | AMOUNTS |
|---|---|
|  |  |
|  |  |

| 5. If you are no longer disabled, show the date you believe your disability ended | MONTH | DAY | YEAR |
|---|---|---|---|

Form SSA-3820-F6 (1-92)

1

EXHIBIT NO. 2    ( /o) PAGES

**REDACTED**    G.65

If more space is needed, list the other agencies, their addresses, your claim numbers, dates, and treatment received in Part III.

6. List the name, address and telephone number of the doctor who has the latest medical records about your disabling condition.

If you have no doctor, check here. ☐

NAME

ADDRESS

TELEPHONE NUMBER (include area code)

| HOW OFTEN DO YOU SEE THIS DOCTOR? | DATE YOU FIRST SAW THIS DOCTOR. | DATE YOU LAST SAW THIS DOCTOR |
|---|---|---|

REASONS FOR VISITS (show illness or injury for which you had an examination or treatment.)

TYPE OF TREATMENT OR MEDICINES RECEIVED. (such as surgery, chemotherapy, radiation, and the medicines you take for your illness or injury; if known. If no treatment or medicines, show "NONE".)

7. Have you seen any other doctors since your disabling condition began? If "yes", show the following:

☐ YES    ☐ NO

NAME

ADDRESS

TELEPHONE NUMBER (include area code)

| HOW OFTEN DO YOU SEE THIS DOCTOR? | DATE YOU FIRST SAW THIS DOCTOR | DATE YOU LAST SAW THIS DOCTOR |
|---|---|---|

REASON FOR VISITS (show illness or injury for which you had an examination or treatment.)

TYPE OF TREATMENT OR MEDICINES RECEIVED (such as surgery, chemotherapy, radiation, and the medicines you take for your illness or injury, if known. If no treatment or medicines, show "NONE".)

If you have seen other doctors since your illness began, list their names, addresses, dates and reasons for visits in Part III.

8. Have you been hospitalized or treated at a clinic for your disabling condition? If "yes", show the following:

☐ YES    ☐ NO

NAME OF HOSPITAL OR CLINIC

ADDRESS

PATIENT OR CLINIC NUMBER

Were you an inpatient (Stayed at least overnight?)
☐ YES  ☐ NO    If "yes", show:

Were you an outpatient?
☐ YES  ☐ NO    If "yes", show:

| DATES OF ADMISSIONS | DATES OF DISCHARGES | DATE OF VISITS |
|---|---|---|

REASON FOR HOSPITALIZATION OR CLINIC VISITS (show illness or injury for which you had an examination or treatment.)

TYPE OF TREATMENT OR MEDICINES RECEIVED (such as surgery, chemotherapy, radiation, and the medicines you take for your illness or injury, if known. If no treatment or medicines, show "NONE".)

If you have been in other hospitals or clinics for your illness or injury, list the names, addresses, patient or clinic numbers, dates and reasons for hospitalization or clinic visits in Part III.

9. Have you been seen by other agencies for your disabling condition? (VA, Workmen's Compensation, Vocational Rehabilitation, Welfare, etc.) If "yes" show:

☐ YES    ☐ NO

NAME OF AGENCY

ADDRESS OF AGENCY

YOUR CLAIM NUMBER

DATES OF VISITS

TYPE OF TREATMENT, EXAMINATION, OR MEDICINES RECEIVED (such as surgery, chemotherapy, radiation, and the medicines you take for your illness or injury, if known. If no treatment or medicines, show "NONE".)

Form SSA-3820-F6 (1-92)

2

G.66

10. Have you had any of the following tests in the last year?

| TEST | CHECK APPROPRIATE BLOCK OR BLOCKS | | If "Yes", show | |
|------|-----------------------------------|---|----------------|---|
| | | | WHERE DONE | WHEN DONE |
| Electrocardiogram | ☐ YES | ☑ NO | | |
| Chest X-Ray | ☐ YES | ☑ NO | | |
| Other X-Ray (Name the body part here) | ☐ YES | ☑ NO | | |
| Breathing Tests | ☐ YES | ☑ NO | | |
| Blood Tests | ☐ YES | ☑ NO | | |
| Other (Specify) | ☐ YES | ☐ NO | | |

11. If you have a Medicaid card, what is your number (some hospitals and clinics file your records by your Medicaid number)

12A. Give the names(s) and addresses(es) of any schools(s) where you received special training or attended special classes. Also show the dates you attended such school(s). If you did not attend any such school or classes, show "None".

| NAMES AND ADDRESSES OF SCHOOLS | DATES ATTENDED |
|--------------------------------|----------------|
| Watson Chapel School  RR 7 BX 500 Pine Bluff AR 71603 | 1984 in 85 - 1987 in |
| (Coleman School ) 4600 W 13 Ave Pine Bluff, AR 71603 | 1979 - 1984 5 |

12B. What is the highest grade you completed in school?  HIGHEST GRADE COMPLETED  8th

12C.

Form SSA-3820-F6 (1-92)

3

## PART III — REMARKS

Use this section for additional space to answer any previous questions and to provide any additional information that you think will be helpful in making a decision on your disability claim. Please refer to the previous questions by number.

## PART IV — AUTHORIZATION AND NOTIFICATION STATEMENTS

I authorize any physician, hospital, agency, or other organization to disclose to the Social Security Administration or to the State Agency that may review my claim or continuing disability, any medical records or other information about my disability, and to the Social Security Administration if my medical condition improves or if I am able to work.

I know that anyone who makes a false statement or representation of a material fact in an application for or for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal Law. I affirm that the above statements are true.

| SIGNATURE OF CLAIMANT OR PERSON FILING ON THE CLAIMANT'S BEHALF (first name, middle initial, last name) | DATE (Month, Day, Year) |
|---|---|
| X Bruce Webster | |
|  | TELEPHONE NUMBER(S) at which you may be contacted during the day (include area code) |

MAILING ADDRESS (Number and Street, Apt. No., P. O. Box, or Rural Route)

| CITY AND STATE | ZIP CODE | ENTER NAME OF COUNTY (if any) IN WHICH YOU NOW LIVE |
|---|---|---|
|  |  |  |

Witnesses are required ONLY if this statement has been signed by mark (X) above. If signed by mark (X), two witnesses to the signing who know the person making the statement must sign below, giving their full addresses.

| 1. SIGNATURE OF WITNESS | 2. SIGNATURE OF WITNESS |
|---|---|
|  |  |
| ADDRESS (Number and Street, City, State, and Zip Code) | ADDRESS (Number and Street, City, State, and Zip Code) |

Form SSA-3820-F6 (1-92)

4

G.68

DETACH THIS PAGE

PART V — FOR SSA USE ONLY — DO NOT WRITE BELOW THIS LINE

| NAME OF CLAIMANT | CLAIM NUMBER |
|---|---|
| *Bruce Webster* | ▓▓▓▓▓▓▓ |

**14A.** Was claimant ever or is now entitled to any type of monthly Social Security benefits?

☒ YES (If "yes", answer B, C, D and E)          ☐ NO (If "no", go on to item 15.)

| 14B. ENTER NAME OF PERSON ON WHOSE SOCIAL SECURITY RECORD CLAIMANT FILED OTHER APPLICATION. *Willie L. Webster* | 14C. ENTER SOCIAL SECURITY NUMBER OF PERSON NAMED IN B (If unknown, so indicate). ▓▓▓▓▓▓ |
|---|---|

| 14D. WHAT KIND OF BENEFITS DID OR DOES CLAIMANT RECEIVE? (For example, widows, mother's, disabled child's) *Child* | 14E. ENTER MONTH AND YEAR BENEFITS ENDED OR WILL END. |
|---|---|
| | MONTH *05* | YEAR *91* |

15. Check any of the following categories which apply to this case:

Presumptive Disability or Blindness Considerations
(If any of these boxes are checked, DO's (and DDS's) should be alert to the possibility of a presumptive disability or blindness decision in SSI claims per DI 00404.210 and DI 2152.5)

A ☐ Amputation of two limbs

B. ☐ Amputation of a leg at the hip

C. ☐ Allegation of total deafness

D. ☐ Allegation of total blindness

E. ☐ Allegation of bed confinement or immobility without a wheelchair, walker, or crutches, allegedly due to a longstanding condition - exclude recent accident and recent surgery.

F. ☐ Allegation of a stroke (cerebral vascular accident) more than 3 months in the past and continued marked difficulty in walking or using a hand or arm.

G. ☐ Allegation of cerebral palsy, muscular dystrophy or muscular atrophy and marked difficulty in walking (e.g., use of braces), speaking or coordination of the hands or arms.

H. ☐ Allegation of diabetes with amputation of a foot.

I. ☐ Allegation of Down's Syndrome (Mongolism).

J. ☐ An applicant filing on behalf of another individual alleges severe mental deficiency for claimant who is at least 7 years of age. The applicant alleges that the individual attends (or attended) a special school, or special classes in school, because of his mental deficiency, or is unable to attend any type of school (or if beyond school age was unable to attend), and requires care and supervision of routine daily activities.

K. ☐ Allegation of renal disease requiring dialysis on a regularly scheduled basis.

| 16. Does the claimant speak English? ☒ YES    ☐ NO (If "no", what language does he or she speak?) | LANGUAGE(S) |
|---|---|

17. Does the claimant need assistance in prosecuting his or her claim? (If "yes", show name, address, relationship and telephone number of interested party willing to assist claimant.)          ☐ YES  ☒ NO

| NAME | ADDRESS | RELATIONSHIP | TELEPHONE NUMBER (area code) |
|---|---|---|---|
| | | | |

18. Is capability development by the DDS necessary? (If "yes", show "DDS Capability Development needed" in item 11 of the SSA-831-U5.)          ☐ YES  ☐ NO

Form SSA-3820-F6 (1-88)

5

REDACTED

19A. Check each item to indicate if any difficulty was observed:

| | | | | | |
|---|---|---|---|---|---|
| Reading | ☐ Yes | ☐ No | Using Hands | ☐ Yes | ☐ No |
| Writing | ☐ Yes | ☐ No | Breathing | ☐ Yes | ☐ No |
| Answering | ☐ Yes | ☐ No | Seeing | ☐ Yes | ☐ No |
| Hearing | ☐ Yes | ☐ No | Walking | ☐ Yes | ☐ No |
| Sitting | ☐ Yes | ☐ No | | | |
| Understanding | ☐ Yes | ☐ No | Other (Specify): | | |

19B. If any of the above items were checked "yes," describe the exact difficulty involved:

**PRESCRIBED PERIOD — COMPLETE IN ALL CASES EXCEPT DISABLED CHILD CASES.**

| | MONTH |
|---|---|
| 20A. Beginning date (fill in all applicable dates, check latest) | |
| ☐ W/E's death | |
| ☐ Last month of previous entitlement to Disabled Widow(er) benefits | |
| ☐ Last month of entitlement to Mother's benefits | |

| 20B. Ending date (fill in dates, check earliest) | MONTH |
|---|---|
| ☐ If filing for monthly benefits, the month before the month widow(er) attains age 60 | |
| ☐ If filing for Medicare only, the month before the month widow(er) attains age 65 | |
| ☐ Eighty-four months (7 years) following the beginning date checked in 20A. | |

| 21. Controlling date for development of medical evidence — DWB case | MONTH | DAY | YEAR |
|---|---|---|---|
| | | | |

22. Medical Development — Initiated by District or Branch office

| SOURCE | DATE REQUESTED | DATE(S) OF FOLLOW-UP | CAPABILITY DEVELOPMENT REQUESTED |
|---|---|---|---|
| | | | |
| | | | |

| 23. DO curtailed completion of items 12 and 13 per DI 11005.035 (DI 20501.005B) | ☒ Yes  ☐ No |
|---|---|

| 24. Is development of work activity necessary? | ☐ Yes  ☒ No |
|---|---|
| If "yes", is an SSA-820-F4 or SSA-821-F4 | ☐ Pending  ☐ In File |

| 25. SSA-3820-F6 taken by: | 26 Form supplemented if "yes" by:  ☐ Yes  ☐ No |
|---|---|
| ☐ Personal Interview  ☐ Telephone  ☐ Mail | ☐ Personal Interview  ☐ Telephone  ☐ Mail |

| Signature of DO or BO Interviewer or Reviewer | TITLE | DATE |
|---|---|---|
| *Caroline Crisp–Hallewell* | CR | 10/4/93 |

Form SSA-3820-F6 (1-88)

6

U.S. Government Printing Office: 1991 — 281-906/40042

**G.70**

# Wells Decl. Ex. H

PSYCHIATRIC HISTORY, MENTAL STATUS AND NEUROLOGICAL EXAMINATION

Re:  Willie Webster
     A/N █████████
     January 4, 1972

Identifying Data:
      This is a 52 year old married black male from Pine Bluff, Arkansas, who was referred to me by the Disability Determination Section of the Social Security Administration for neuropsychiatric examination. He is accompanied by his wife who drove him to my office. He is currently unemployed.

Present Illness:
      This man states that in June 1969, while working on the job, he was struck in the right side of his head by a log in a timber cutting accident. Since that time he has had marked changes in his personality and in his total ability to function.

      He states that at the present time his major symptoms are pain in the left shoulder and back, headache, primarily on the right side, dizziness, a weakness in all extremities, slowness of thought, irratability and decrease of libido. He has had all of these symptoms in a varying severity since the accident and although they have improved to some degree, there are still numerous occasions on which these symptoms are quite disturbing to the point that he feels that he is "losing my mind".

      He has been evaluated on several occasions in the past and apparently has been judged to be unable to be gainfully employed on each examination. In addition to his being unemployable, his wife reports that he also has had such a severe personality change that she and the children are quite afraid of him. She reports that he is rather suspicious and verbally abusive and relates that earlier he had even been charged with second degree murder. She relates that his temper outbursts are considerably improved and she says that things at home are not as bad as they once were.

DIRECT PSYCHIATRIC EXAMINATION

General Appearance and Behaviour:
      This is a well developed, well nourished negro male who appears to be about the stated age. He walks into the examiner's office without noticeable evidence of any neurological disturbance. From the very beginning, he was somewhat suspicious of the examiner and was rather difficult to examine. He exhibited no other unusual behavior, however.

Stream of Talk and Activity:
      The patient answered direct questions with some suspiciousness and

REDACTED

EXHIBIT H

H.01

Re:  Willie Webster
A/N ██████████
January 4, 1972
Page 2.

-evasiveness. He could not give a coherent story and much of the information
was obtained from his wife. When he chose to answer a question, he did so
without any spontaneous elaboration. He was quite restless throughout the inter-
view and showed a good deal of overt anxiety, but made no attempt to prevent
the examiner from completing the examination nor any attempt to leave the room.

Mood and Affect:
The patient's mood is somewhat surley and hostile. His affect was appropriate.

Sensorium and Intellectual Resources:
The patient appeared to be well oriented in all spheres. In spite of this fact,
however, he had a rather slow recall of both remote and recent events with a lot
of blanks in his memory.

His fund of knowledge of general information was quite poor. He answered
very few of the usual test questions, but was unable to present any distinct
localizing signs. He could count change accurately but was unable to name the
months of the year either forward or backward and could not do serial sevens.

Content and Trend of Thought:
The patient's thought content was somewhat distorted by his degree of sus-
piciousness but he did give the examiner some information about his injury and
what had been going on since that time. He was markedly evasive about any of
the information concerning the physical and verbal abusiveness related by his wife.

He states that his most disturbing symptoms are his headache and his irritat-
ability. The pain in his shoulder and back are somewhat irritating to him but he
said that these did not bother him enough now to be much trouble. He stated that
his irritatability was what bothered him most because he was sometimes rather
short tempered with his wife and children.

He did feel that the people responsible for giving him employment and/or
social security and welfare benefits were not very sympathetic to his needs of
the moment. Although he had shown a great deal of paranoid ideation in the past
as related by his wife, he showed very little of this type thought content at this
time. He denied either auditory or visual hallucinations. He insisted that all
he was interested in was the social security benefits to which he felt himself
entitled since he had paid in so much money.

Judgment and Insight:
The patient's judgment is very poor and his insight is rather limited.

**REDACTED**

H.02

Re:  Willie Webster
A/N [REDACTED]
January 4, 1972
Page 3.

## NEUROLOGICAL EXAMINATION

The patient's sensorium and cerebral functions are outlined above. His station and gait were normal throughout the examination. He was able to walk on his toes and heels, to bend, to stoop and to squat without difficulty.

The cranial nerves all appeared to be intact. The fundi were visualized with considerable difficulty but appeared to be normal in appearance. The pupils were round, regular and equal and reacted briskly to both light and accomodation. The extra-ocular movements appeared to be normal and the visual fields were full to confrontation. The palate elevated and the tongue protruded in the midline. The gag reflex was brisk.

The Rhomberg test for balance indicated that the patient had a tendency to fall toward the back and to the right but it appeared that he could right himself before completely falling down had he not been caught by the examiner. Coordination as tested by the finger-nose-finger and heel-knee-ankle test was normal.

The deep tendon reflexes were hyperactive in the right upper extremity and both lower extremities tested at 4 plus. In the left upper extremity the deep tendon reflex was somewhat decreased as compared to that on the right, but was still two plus. The abdominal and cremasteric reflexes were both present and the Babinski's were negative. There was no indication of demonstrable sensory deficits as tested by pin prick, proprioception and vibratory sense.

Summary:
This is a 52 year old black male who was injured in a logging accident in June of 1969 and since that time has had marked neuropsychiatric difficulties which have apparently left him with a rather severe personality change and physical limitations to the point of making him unemployable.

At the present time he continues to complain of headache, pain in the left shoulder, and back, dizziness, weakness, slowness of thought and loss of libido. The previously seen psychotic reaction is not grossly apparent but this examiner felt that his reality testing was tenous, at best, and that his psychotic is simply in remission. A strong depressive component is currently very obvious and probably accounts for much of his symtomatology.

Diagnostic Impression:
Psychotic organic brain syndrome associated with gross force trauma (in partial remission).

**REDACTED**

H.03

Re: Willie Webster
A/N █████████
January 4, 1972
Page 4.

Conclusions:
This man's prognosis for full recovery is poor and his employability is grossly impaired. Maximum improvement has probably occurred. Appropriate psychotrophic drugs are probably indicated. He is not competent to manage his own funds.

Sincerely,

*Lewis R. Sutton, M.D.*

Lewis R. Sutton, M.D.

LRS/lew

**REDACTED**

H.04

RICHARD E. WALTERS, M. D.
OFF. 663.4549 . EX. 372.6789
5422 WEST MARKHAM
LITTLE ROCK, ARK. 72205

February 4, 1971

Disability Determination for Social Security Administration
Suite 700 — The 1515 Building
1515 West Seventh Street
Little Rock, Arkansas 72203

Re:   Willie L. Webster
A/N ████████████

Dear Mr. Lofton:

This 47 year old, married, Negro male from Pine Bluff,
Arkansas, reported for neuropsychiatric evaluation on
January 30, 1971. He was driven to and from the examina-
tion by his wife. The client himself was unable to give
any reasonable history of injury or description of symp-
toms, other than the fact that he had a skull fractured
by a flying log. He could recall no dates nor approximate
time duration since the injury or anything about the
treatment received. He did indicate that he had some
weakness of his left arm and leg with a numb, dead feeling
much of the time and he further stated that his vision was
getting smoky. Beyond that the history was obtained from
his wife, that he was involved in an injury in the timber
fields during June, 1969, when a log was thrown somehow
from a bulldozer and struck him on the right side of the
head. She said that he was taken to the Pine Bluff hospit-
al and then transferred to the Baptist Medical Center in
Little Rock for repair of the cranial defect.

Further questioning of Mr. Webster regarding effects of
the injury and current personality functioning, resulted
in his rising from the chair and attempting to leave the
room, stating that he was hot and would have to get out of
there. With persuasion he did return to the chair, a
window was opened and his wife continued to give a descrip-
tion of her observations. She stated that her husband had
become increasingly irritable around any noise, especially
by the children. He would either strike them or walk out
of the house for an hour or more. She said that he frequent-
ly complains of hot and cold sensations over the right side
of the head and about six months ago he had a convulsive
seizure and was treated overnight at Jefferson Hospital.

**REDACTED**   H.05

Page 2   -   Willie L. Webster

He was given some capsules to take but is irregular and
sometimes refuses to take the medicine.  When I asked if
her husband had been involved in any difficulty in the
community outside the home, she reluctantly reported that
he had been charged with Second Degree Murder one month ago.
When I turned to Mr. Webster for details he again wanted to
leave the room, so no further information is available on
the details of that event.

The past history revealed that Mr. Webster was born in
Louisiana, had no formal education, but has learned to sign
his own signature.  Both parents are deceased and he said
with some uncertainty, that he thought there were 24 children
in his family.  He has been married twice, seven years to his
present wife and they have seven children.

In The evaluation of his mental status reveals him to be
functioning on a psychotic level.  He was inappropriately
suspicious of all the examining procedures and seemed to be
preoccupied with the delusional belief that he was being pre-
pared for some dire event, such as confinement in a hospital.
With great patience he did allow testing of his cranial
nerves, but he followed the moving finger quite erratically;
he was unable to focus on an object for a funduscopic exam
and he seemed not to understand the purpose of my asking him
to go through various motions with the facial muscles and
sticking out the tongue, swallowing, hunching the shoulders,
etc.  As near as I could tell however, from his spontaneous
motions, there was no significant impairment of cranial
nerve function.

With the wife in the room, I asked him to strip to his waist
and again he was very suspicious, looked at his wife and
asked her what I was going to do to him.  On some of the
occasions during the interview, I asked him to give the name
of the examiner and he never did concentrate on that task
sufficient to recall.  He said that he did not know the
names of the month but did slowly name the days of the week
and stated that the current day was Saturday, which was
correct.  Throughout the exam he made remarks indicating a
sense of fearfulness and mistrust regarding the purpose of
the procedures.  He would not answer any questions of a per-
sonal nature or regarding changes in his feelings.  He seemed
to become more tense and close to a point of behavior explo-
sion.  His apperception therefore, was markedly impaired and
he had no insight or judgement into his present functioning.
There was no modulation of affect and he maintained a quiz-
zical, confused and suspicious attitude throughout the con-
tact.

H.06

Page 3 - Willie L. Webster

In addition to the cranial nerve functions it was noted
that there was no atrophy of the musculature.     There was
a noticably weaker grip in the left arm.  He was able to
perform tests of balance and coordination normally.  His
deep tendon reflexes were more elicited on the left side
compared to 3+ to 4+ on the right side, both in the upper
and lower extremity, indicating some paresis plus a dim-
inished sensation to pin prick over the left arm and left
leg.

SUMMARY AND CONCLUSIONS:    Though authorities recommend
no final conclusions on neurological injuries for a period
of 24 months, it does not appear that there has been very
little change in his mental or neurological functioning
since the examination by Dr. James Moore in June, 1970,
which would have been 12 months following the injury.  The
findings on this examination are compatible with a right
parietal skull fracture with depression and apparently a
permanent contusion injury to the cortical cells straddl-
ing the Sylvian fissure sparing the speech and hearing
centers.  The mental status indicates some catastrophic
emotional reactions and disturbed cognative and appercep-
tive functions.  He is in my opinion, functioning in a
psychotic state and is considered extremely dangerous and
subject to violent behavioral outbursts with minimul
stressing.  He is therefore incapable of relating to any
social situation requiring directions from others or sus-
tain work procedures since he questions every direction
and is apparently delusional even toward his wife, who
stated that he has struck out at her without provocation.

The psychotropic drugs are of little value in treating
this type of psychosis but should be offered along with
anti convulsants for behavioral control.  If he is placed
on disability status, complete neurologic studies should
be repeated in about six months along with electroencephalo-
gram if he will permit it, to make a final determination as
to his permanent disability.

Sincerely yours,

Richard E. Walters, M.D.

REW/ab

H.07

January 21, 1971

Richard E. Walters, M. D.
5422 West Markham
Little Rock, Arkansas 72205

Re:    Willie L. Webster
A/N ████████████████

Dear Doctor:

Enclosed is our authorization for a consultative neuro-psychiatric evaluation of the above named person on Saturday, January 30, 1971 at 12:00 noon.

Please submit your report in narrative form, original and three copies, relative to claimant's orientation, judgment, insight, hallucinations, delusions, presence or absence of psychosis, diagnosis, prognosis, and describe any of the following conditions that are present, indicating severity, distribution and residual function in affected parts: i.e., atrophy, paralysis, hemiplegia, impaired speech, tremors, gait and reflexes.

Use of the report that you prepare in connection with this examination (plus any background material about the individual which we may furnish you) is restricted by the provisions of Federal Law and Regulation (42 U.S.C. 1306 and 20 CFR 401.1 et.seq.). Unauthorized release is strictly prohibited and subject to legal penalties. Should you receive a request for the report or the background material, or should your records or personal testimony be subpoenaed, notify this office at once. In any action seeking to compel the disclosure of your report, the services of the Department's Regional Attorney will be available and, where necessary, every effort will be made to secure the services of the US Attorney on your behalf.

Your cooperation in this matter is indeed appreciated.

Very truly yours,

Wayne J. Lofton, Director
Disability Determination for
Social Security Administration

dh
Enclosures

**REDACTED**

H.08

DRS. PADBERG AND MOORE
NEUROLOGICAL SURGERY
SUITE 704 - DOCTORS BUILDING
500 SOUTH UNIVERSITY AVENUE
LITTLE ROCK, ARKANSAS 72205

MOHAWK 6-5466

FRANK PADBERG, M.D.                                                                JIM J. MOORE II, M.D

August 11, 1970

RECEIVED
DEC 15 1970
DISABILITY
DETERMINATION

John E. Cowne, Jr., Secretary
Workmen's Compensation Commission
Justice Building
State Capitol Grounds
Little Rock, AR   72201

Dear Mr. Cowne:

Re Willie Lee Webster vs. Pulpwood Producers Co.
   WCC File ▮▮▮▮▮▮▮

I received a letter from Mr. Owens, Mr. Webster's attorney,
requesting some additional opinions.  I do not have a release
from the patient to submit this information.  I, therefore,
though it would be advisable to write you some additional
comments.  If you feel that it is correct to pass this infor-
mation on to Mr. Owens, of course, this is perfectly acceptable
with me.

In Mr. Owens' letter he indicated residuals and I did indicate
that I would prefer to see Dr. Jouett's opinions.  Actually,
in review of a letter Dr. Jouett wrote dated January 21, 1970,
there is really very little that he and I would be in disagree-
ment about.  He does describe the symptoms that he feels are
secondary to contusion as I suggested in my evaluation on June 22,
1970.  I notice, also, that he suggests a permanent partial dis-
ability rating of 18% to the body as a whole and this would be
in an acceptable range; though perhaps I would consider 20 to
22%, in view of the fact that the patient does have the cranial
defect with a cranial prosthesis and his residual symptoms and,
also, the findings that suggest some psychological distress.

Very sincerely yours,

Jim J. Moore, II, M.D.

bc - 8/18/70

Commission Exhibit No. 3

-17-

REDACTED

H.09

**DRS. PADB⎯⎯ AND MOORE**
NEUROLOGICAL SURGERY
SUITE 704 - DOCTORS BUILDING
500 SOUTH UNIVERSITY AVENUE
LITTLE ROCK, ARK. 72205
PHONE MO 6-5466

JUN 2 5 1970

**PROFESSIONAL SERVICES RENDERED**

| DATE | CODE | CHARGES | CREDITS | BALANCE |
|------|------|---------|---------|---------|
|      |      |         |         |         |

All Accounts are Payable 10 Days after Receipt of This Statement Unless Other Terms Have Been Arranged.

CODE:
1. NEUROLOGICAL CONSULTATION AND EXAM.
2. OFFICE FOLLOW-UP VISIT
3. HOSPITAL VISITS
4. SPINAL PUNCTURE
5. ARTERIOGRAM
6. MYELOGRAM
7. VENTRICULOGRAM
8. PNEUMOENCEPHALOGRAM
9. SURGERY
10. NERVE INJECTION
11. REPORT
12. MISCELLANEOUS

H.10

**DRS. PADBERG AND MOORE**

NEUROLOGICAL SURGERY

SUITE 704 - DOCTORS BUILDING

800 SOUTH UNIVERSITY AVENUE

LITTLE ROCK, ARKANSAS 72205

MOHAWK 6-5466

FRANK PADBERG, M.D.

JIM J. MOORE II, M.D.

June 22, 1970

Robert E. Diles, Referee
Workmen's Compensation Commission
Justice Building, State Capitol Grounds
Little Rock, Arkansas   72201

Dear Mr. Diles:

Re Willie Lee Webster vs. Pulpwood Producers Co.
    WCC File ▬▬▬▬▬

This 47 year old colored male was in the office today accompanied by his wife.

HISTORY:  He states, with some urging, that his complaints are continued, migrating, pains in his head; a numbness of the left side of the body, head down; and periodic dizziness.  His wife, on questioning, adds that he has some problem with memory, he tends to lose his temper easily and is rough on both her and their children. The patient states that he does not do too much in the way of activities at present; though he has been doing some driving of his personal car; but that when it zig-zags, he stops.  He states that his past history is excellent and that he never knew what a doctor was until his injury.  We have copies of the discharge summary and admission note from the Arkansas Baptist Medical Center which indicate his injury; the injury occurring on or about June 11, 1969, when he sustained a blow to the top of his head and right shoulder area and with findings pointing to a compound, depressed, skull fracture in the right parietal region.  Dr. Jouett saw him and, apparently, carried out immediate repair and removal of the depressed fragments and apparently, according to the note, a plate was inserted at the same time.  The neurologic examination, according to those notes, indicates a fairly symmetrical pattern.  There is a history, apparently, of some momentary unconsciousness.  A review of the surgical note reveals that there was no dural laceration; that is, there was no involvement, apparently, of the soft tissues or brain underlying the bony fracture.

NEUROLOGICAL EXAMINATION:  Examination on this patient is somewhat difficult; it is difficult to get his attention; frequently he appears a bit hostile or, at least, surly.  He tends toward much deep sighing during both the interview and examination.  He moves around very fluidly; he walked into the examining room without difficulty nor

REDACTED

H.11

Robert E. Diles, Referee
Re Willie Lee Webster vs. Pulpwood Producers Co.
Page 2
June 22, 1970

limp.  His Romberg's was noted to be normal.  He followed simple
commands fairly well; though complex commands, such as rapid alter-
native movements of the upper extremities, must be demonstrated to
him.  Motor power seems well preserved.  Muscle development is good.
Left handgrasp is a bit depressed as compared to the right, however.
He suggests a drifting of the outstretched left upper extremity with
his eyes closed.  He, also, suggests a relative extinction phenomenon
on the left side of the body.  He relates depressed sensory acuity to
pin-stick testing on the left side of the body as compared to the
right.  His skull is symmetrical.  There is a well healed fine line
of craniotomy incision in the right parietal region.  His cranial
nerves appear intact.  There is no extraocular muscle palsy; his
extraocular muscle function seems good.  The visual fields, also,
are grossly full.  The fundi reveal sharp and distinct disc margins
and normally sized retinal vessels.  There is no facial weakness.
The tongue extends to the midline.  His reflexes are active and sym-
metrical.  There are no pathologic reflexes.  Heel and toe walking
is well accomplished.

X RAYS:  His X rays from Arkansas Baptist Medical Center were re-
viewed and revealed the evidence of a depressed fracture in the right
parietal region of the skull.

CONCLUSIONS AND RECOMMENDATIONS:  This patient stated that he is pri-
marily left-handed and, therefore, if this is the case, his injury
would have been on, possibly, his dominant hemisphere.  There was no
evidence of any aphasia, apparently, following his injury and there
is none demonstrated today.  He does show some changes that might be
related to minimal parietal lobe dysfunction in the sense of some
altered sensory response of the left side of the body.  He, also, ex-
hibits some changes, primarily that are thought to be personality;
but it is difficult to say how real this is as I have no way of know-
ing what the patient's pattern in this area was prior to his injury.

Physically, it is felt that this patient has shown a good response
to his course of treatment.  There may be some residuals related to
parietal lobe dysfunction in the sense of the sensory changes that
are described above.  As best as can be told, in talking with the pa-
tient and his wife, no postoperative X rays of the skull nor other
studies have been accomplished.  For completeness, it is felt that,
likely, postoperative X rays of the skull, if not accomplished, should
be obtained as well as an electroencephalogram would be in order.
Furthermore, this patient might be a candidate for psychological
study to see if there is any organicity in his somewhat unusual be-
havior, as described above.  Other than these areas mentioned, it is
felt that he has achieved a good response from his surgery.

Very sincerely yours,

Jim J. Moore, II, M.D.

bc - 6/25/70

**DOCTORS WATSON, ADAMETZ AND JOUETT**
NEUROLOGICAL SURGERY
1026 Donaghey Building
LITTLE ROCK, ARKANSAS 72201

ROBERT WATSON, M. D.
JOHN H. ADAMETZ, M. D.
RAY JOUETT, M. D.

December 17, 1969

TELEPHONE FRanklin 5-5547

Dr. R. D. Dickins
1003 Cherry treet
Pine Bluff, Arkansas

Re: Willie Lee Webster vs.
Pulpwood Producers Co.
Ins. Co. # █████████

Dear Dr. Dickins:

Willie Lee Webster was seen in the office on December 12, 1969, and was definitely improved over his last visit. He continues to complain of pain in the right side of his head when he is out in the cold. Seemingly, this discomfort disappears once he gets warm.

Neurologically, things look well with this man.

I asked him to let me see him again in one month, at which time I plan to make a disability rating and dismiss him from my care.

Thank you again for allowing me to help with his care.

Sincerely,

Ray Jouett, M. D.

RJ:ab

cc  Employers Mutuals of Wausau
Fausett Plaza
Little Rock, Arkansas

REDACTED

H.13

DOCTORS WATSON, ADAMETZ AND JOUETT
NEUROLOGICAL SURGERY
1026 Donaghey Building
LITTLE ROCK, ARKANSAS 72201

ROBERT WATSON, M. D.
JOHN H. ADAMETZ, M. D.
RAY JOUETT, M. D.

November 15, 1969

TELEPHONE FRanklin 5 5547



Dr. R. D. Dickins
1003 Cherry Street
Pine Bluff, Arkansas

Re: Willie Lee Webster vs.
Pulpwood Producers Co.
Ins. Co. #

Dear Dr. Dickins:

Willie Lee Webster was seen in the office on November 14, 1969, and seemingly is doing well, although he was complaining of some discomfort of the scalp over the region of his plate which he stated the cold weather had made worse.

Neurologically, things look well. He continues to complain of some dizziness, and I advised him to continue with the Cyclospasmol and to let me see him again in one month.

I am having great difficulty getting this man to return to work. Perhaps we will be able to do so when I next see him.

Thank you again for allowing me to help with his care.

Sincerely,

Ray Jouett, M. D.

RJ:ab

cc   Employers Mutuals of Wausau
     Fausett Plaza
     Little Rock, Arkansas

**REDACTED**

H.14

**DOCTORS WATSON, ADAMETZ AND JOUETT**
NEUROLOGICAL SURGERY
1026 Donaghey Building
LITTLE ROCK, ARKANSAS 72201

ROBERT WATSON, M. D.
JOHN H. ADAMETZ, M. D.
RAY JOUETT, M. D.

October 23, 1969

TELEPHONE FRanklin 5-5547



Dr. R. D. Dickins
1003 Cherry Street
Pine Bluff, Arkansas

Re: Willie Lee Webster vs.
Pulpwood Producers Co.
Ins. Co. #

Dear Dr. Dickins:

Willie Lee Webster was seen in the office on October 15, 1969.

He was complaining of dizziness, which he stated had been a problem with him since I last saw him. He described this as coming on when he would attempt to look up or down.

Neurologically, no abnormality could be found.

I placed him on Cyclospasmol again, 200 mg., three times a day, and will see him again in one month.

Thank you again for allowing me to help with his care.

Sincerely,

Ray Jouett, M. D.

RJ:ab

cc Employers Mutuals of Wausau
Fausett Plaza
Little Rock, Arkansas

REDACTED

H.15

—Revised 1-1-42

THE USE OF THIS FORM IS REQUIRED UNDER THE PROVISIONS
OF THE ARKANSAS WORKMEN'S COMPENSATION LAW

# REPORT OF INITIAL PAYMENT OF COMPENSATION OR INTENTION TO CONTROVERT CLAIM

| State's Number For: | File |
| | Carrier |
| | Employer |

Carrier's File No. ███████
(The space above not to be filled in by employer.)

1. Employee .....Willie Lee Webster........... Address ████████, Pine Bluff, Ark.
2. Employer .Pulpwood Producers Co., Inc.... Address... P.O. Box 580, Pine Bluff, Ark.
3. Insurance Carrier...... EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN
4. Address of Claim Office making this report...... FAUSETT PLAZA    LITTLE ROCK, ARKANSAS 72205

IF COMPENSATION IS BEING STARTED COMPLETE THIS SECTION

5. Date of injury... 6-11-69
6. Nature of injury..... Fract. Skull
7. Date disability began........... 7-12-69
8. Date of first compensation check.. $  6-24-69
9. Amount of first compensation check.. $98.00...., representing compensation from 6-12-69  to 6-26-69
10. Employee's normal work week............... 5 .....days; .....8..... hours
11. Piece or time worker?..... time
12. Employee's rate of pay at time of injury......... $80.00
    (Hour)        (Day)        (Week)        (Month)
13. Number of days operated by employer per week .....
14. Number of hours operated by employer per day.....
15. Employee's average weekly wage..... $ 80.00
16. Weekly rate of compensation..... $49.00

IF COMPENSATION IS BEING CONTROVERTED COMPLETE THIS SECTION

17. Date of injury or death.....
18. Reason for controverting claim.....

IF A DEATH CASE, EITHER COMPENSABLE OR CONTROVERTED, COMPLETE THIS SECTION

19. Name, address and age of employee's wife .....
20. Name, address and ages of employee's children .....
21. Name, address and age of other dependents of employee .....

22. Date of this report.......... 8-14-69    Employer. Pulpwood Producers Co.
    By..... _Johnson_
    (Adjuster)

NOTE TO INJURED EMPLOYEE: This is a copy of a report furnished the Commission by your employer or insurance carrier relating the above information regarding your injury. If it is not substantially correct, please notify the Arkansas Workmen's Compensation Commission, Union Life Building, Little Rock, Arkansas.

(OVER)

1303-0318

**REDACTED**

H.16



**WORKMEN'S COMPENSATION COMMISSION**
STATE OF ARKANSAS
JUSTICE BUILDING
STATE CAPITOL GROUNDS
LITTLE ROCK
72201

December 8, 1970

Social Security Administration
P. O. Box 5700
Pine Bluff, Arkansas   71601

> In re:  Willie Lee Webster vs.
> Pulpwood Producers Company
> WCC File ████████

Gentlemen:

In response to your forms requesting information as to what has been paid to the above claimant, we are enclosing to you a copy of the Final Report and Settlement Receipt along with a copy of the Joint Petition Order filed September 30, 1970.

Very truly yours,

JOHN E. COWNE, JR.
Secretary of Commission

JECjr/dr
Enclosures

**REDACTED**

H.17

THE USE OF THIS FORM IS REQUIRED UNDER THE PROVISIONS OF THE ARKANSAS
WORKMEN'S COMPENSATION LAW

Form A-11
2M—1-41—

# FINAL REPORT AND SETTLEMENT RECEIPT

| State's | File _____ ▓▓▓▓ _____ |
| Number | Carrier _____ |
| For: | Employer _____ |
| Carrier's File No. ____ ▓▓▓▓ _____ | |

(The spaces above not to be filled in by Employer)

(1) Employer's name __Pulpwood Producers Co., Inc.__    Employer File No. _____

(2) Office address __P.O. Box 5516__    __Pine Bluff, Arkansas__
(Number and street)    (City or town)

(3) Name of injured employee __Willie Lee Webster__

(4) Address ____ ▓▓▓▓▓▓▓▓▓ ____    __Pine Bluff, Arkansas__
(Number and street)    (City or town)

Compensation payments were made on following basis:

(5) Date of injury __6-11-69__, 19____

(6) Last day employee worked __6-11-69__, 19____

(7) Date on which employee was able to return to work __1-13-70__, 19____

(8) Employee returned to work on _____, 19____

(9) Did employee work between the date of injury and last day of disability? __no__

(10) If so, give dates _____

(11) Length of temporary disability: __30__ weeks, __5__ days

(12) Average weekly wage _____ $ _____

(13) Rate of weekly compensation: _____, $ _____

(14) __30__ Weeks __5__ days temporary total disability ........ $ __1505 00__

(15) ____ Weeks ____ days temporary partial disability ........

(16) ____ Weeks permanent partial disability for loss of

____% loss of use of __Paid on Acct. PPD__ __1666 00__

(17) ____ Weeks permanent total disability ........

(18) ____ Weeks for death ........

(19) Other (specify) __Joint Petition__ __5449 00__

Total compensation ........ $ __8620 00__

(20) Hospital expense ........ __798 60__

(21) Medical expense ........ __1430 54__

(22) Funeral expense ........

(23) Other (specify) ........

Total cost ........ $ __10849 14__

## FINAL RECEIPT

EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN

(24) Received from __Pulpwood Producers Co., Inc.__ and __INSURANCE COMPANY OF WISCONSIN__ the sum of
(Name of employer or insurance carrier)

_____ Dollars and _____ Cents ($ _____)

making in all, with payments already received, a total of __Eighty-Six Hundred Twenty ----__ Dollars and __No/100 ----__ Cents ($ __8620.00__)

as compensation for the disability indicated above.    Date __10-6-70__, 19____

Witnessed by* _____    Employee's signature _____
(*To be signed when injured employee is not able to sign his name)    (Or agent or beneficiary)

Address ____ ▓▓▓▓ ____ __Pine Bluff, Arkansas__

(25) Insurance carrier __EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN__    Insurance Company File No. _____

(26) If full compensation was not paid, explain why _____

(27) If receipt is not signed by injured, explain why __Joint Petition__

Signed by _____
Position __Clerical Claim Supervisor__

**REDACTED**

H.18

BEFORE THE ARKANSAS WORKMEN'S COMPENSATION COMMISSION

CLAIM NO. ▓▓▓▓▓

WILLIE LEE WEBSTER, EMPLOYEE                          CLAIMANT

PULPWOOD PRODUCERS COMPANY, EMPLOYER                  RESPONDENT

EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY,
INSURANCE CARRIER                                    RESPONDENT

JOINT PETITION ORDER

Now on this 30th day of September, 1970, the above-styled cause comes on for consideration pursuant to a Joint Petition filed herein by all parties. Claimant appeared in person and by his attorney, Mr. Edward M. Owens, and respondents appeared by Mr. Tom Abercrombie, a hearing having been conducted on the 19th day of September, 1970, at Pine Bluff, Arkansas, before Referee L. Philip McClendon, with the claimant being advised of his rights under the provisions of Section 19(L) of the Arkansas Workmen's Compensation Act, and with full consideration of the facts, issues and the law; it was found to be in the best interest of the claimant.

IT IS THEREFORE ORDERED that the Joint Petition as filed herein be approved; that the respondents are ordered and directed to pay to claimant $4,949.00 in full settlement of the claim filed herein for the acknowledged, alleged claim which arose on June 11, 1969. Claimant's attorney is hereby awarded a fee of $300.00 to be paid by respondents.

IT IS FURTHER ORDERED that upon payment of these sums by the respondents this claim shall be forever barred, and the Arkansas Workmen's Compensation Commission loses any and all jurisdiction.

IT IS SO ORDERED.

*L. Philip McClendon*

L. PHILIP McCLENDON, REFEREE

bt

**REDACTED**

H.19

DRS. PADBERG AND MOORE
NEUROLOGICAL SURGERY
SUITE 704 - DOCTORS BUILDING
500 SOUTH UNIVERSITY AVENUE
LITTLE ROCK, ARKANSAS 72205

MOHAWK 6-5466

FRANK PADBERG, M.D.                                                      JIM J. MOORE II, M.D.

August 11, 1970

John E. Cowne, Jr., Secretary
Workmen's Compensation Commission
Justice Building
State Capitol Grounds
Little Rock, AR   72201

Dear Mr. Cowne:

Re Willie Lee Webster vs. Pulpwood Producers Co.
  WCC File ▮▮▮▮▮

I received a letter from Mr. Owens, Mr. Webster's attorney,
requesting some additional opinions. I do not have a release
from the patient to submit this information. I, therefore,
though it would be advisable to write you some additional
comments. If you feel that it is correct to pass this infor-
mation on to Mr. Owens, of course, this is perfectly acceptable
with me.

In Mr. Owens' letter he indicated residuals and I did indicate
that I would prefer to see Dr. Jouett's opinions. Actually,
in review of a letter Dr. Jouett wrote dated January 21, 1970,
there is really very little that he and I would be in disagree-
ment about. He does describe the symptoms that he feels are
secondary to contusion as I suggested in my evaluation on June 22,
1970. I notice, also, that he suggests a permanent partial dis-
ability rating of 18% to the body as a whole and this would be
in an acceptable range, though perhaps I would consider 20 to
22%, in view of the fact that the patient does have the cranial
defect with a cranial prosthesis and his residual symptoms and,
also, the findings that suggest some psychological distress.

Very sincerely yours,

Jim J. Moore, II, M.D.

bc - 8/18/70

RECEIVED
AUG 20 1970
ARKANSAS WORKMEN'S
COMPENSATION COMMISSION

**REDACTED**

H.20

The original document, of which this is
a photocopy, appears to be genuine and
unaltered and to have been made at the
time purported. This photocopy consists
of ___2___ pages.

Signature _____

Date 12/13/7  Title CP

H.21

DRS. [illegible] AND [illegible]
NEUROLOGICAL SURGERY
SUITE 104 - DOCTORS BUILDING
500 SOUTH UNIVERSITY AVENUE
LITTLE ROCK, ARKANSAS 72205
MOHAWK 6-5466

JIM J. MOORE II, M.D. FRANK PALMBERG, M.D.

August 11, 1970

John E. Coney, Jr., Secretary
Workmen's Compensation Commission
Justice Building
State Capitol Grounds
Little Rock, AR 72201

Dear Mr. Coney:

Re Willie Lee Webster vs. Pulpwood Producers Co.
WCC File [redacted]

I received a letter from Mr. Owens, Mr. Webster's attorney, requesting some additional opinions. I do not have a release from the patient to submit this information. I, therefore, thought it would be advisable to write you some additional comments. If you feel that it is correct to pass this information on to Mr. Owens, of course, this is perfectly acceptable with me.

In Mr. Owens' letter he indicated residuals and I did indicate that I would prefer to see Dr. Jouett's opinions. Actually, in reviewing a letter Dr. Jouett wrote dated January 21, 1970, there is really very little that he and I would be in disagreement about. He does describe the symptoms that he feels are secondary to contusion as I suggested in my evaluation on June 22, 1970. I notice, also, that he suggests a permanent partial disability rating of 18% to the body as a whole and this would be in an acceptable range, though perhaps I would consider 20 to 25%, in view of the fact that the patient does have the cranial defect with a cranial prosthesis and his residual symptoms and, also, the findings that suggest some psychological distress.

Very sincerely yours,

Jim J. Moore, II, M.D.

bc - 8/18/70

RECEIVED
AUG 20 1970
ARKANSAS WORKMEN'S COMPENSATION COMMISSION

REDACTED

H.22

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
Social Security Administration

Form Approved.
Budget Bureau No. 72-R0530

## APPLICATION FOR DISABILITY INSURANCE BENEFITS

(Do not write in this space)

*Pine Bluff*
*Ark*

*12-3-70*

NOTICE. — (a) Whoever makes or causes to be made any false statement or representation of a material fact in an application or for use in determining a right to payment under the Social Security Act, or (b) whoever, having received a payment for the use and benefit of another person, knowingly and willfully uses such payment for other than the person for whom it is received, is subject, under the Social Security Act, to a fine of not more than $1,000 or 1 year's imprisonment, or both.

I hereby apply for a period of disability and/or all insurance benefits payable to me under Title II of the Social Security Act, as amended.

1. Enter your full name — *Willie Lee Webster*

(Check one) ☒ Male ☐ Female

Enter your Social Security number (If none or unknown so indicate)

2. Enter your date of birth (Show month, day, and year) — ▓▓ 2 3

Enter the name of the State or Foreign Country where you were born — *La.*

3. (a) Have you (or has someone on your behalf) ever filed an application for a period of disability or social security benefits before?
☐ Yes (If "Yes," answer (b), (c), and (d).)    ☒ No (If "No," go on to item 4).

(b) Kind of claim filed

(c) Enter name of person on whose earnings record you filed other application(s)

(d) Enter Social Security Number of person named in (c)

4. What is your disability? (Briefly describe your impairment, that is, the injury or illness that prevents, or has prevented, you from working.)
*Shortness of breath - head hurts -*

5. (a) When did you become unable to work because of your disability?
Date (Month, day, and year) *6-11-69*

(b) Are you still disabled?
☒ Yes (If "Yes," go on to item 6.)    ☐ No (If "No," answer (c).)

(c) If you are no longer disabled, enter the date you were again able to work. ——————→
Date (Month, day, and year)

6. Check any of the following which apply to you:

(a) ☐ Confined in a medical institution other than a general hospital
(b) ☐ Patient in a general hospital
(c) ☐ Confined in bed at home
(d) ☐ Confined in a chair (Including wheel chair)
(e) ☐ None of the above but unable to go outside
(f) ☒ Able to go outside but only with help of another person or device
(g) ☐ Able to go outside without help

FORM SSA-16 (1-70)    (Over)

**REDACTED**

H.23

7. (a) Have you EVER filed (or do you intend to file) claims for disability benefits under any workmen's compensation law or plan?

☒ Yes (If "Yes," answer (b) and (c).)        ☐ No (If "No," go on to item 8.)

(b) Has there been any decision or any payment (temporary, permanent, or lump-sum) made on the claim(s) filed?

☒ Yes (If "Yes," answer (c) and (d).)        ☐ No (If "No," answer (c).)

(c) Workmen's compensation claim number(s) ..............W.C.C. – ▓▓▓▓▓▓▓ .

(d) Enter the amount of the weekly payment made to you $ _settlement made last Sept._

(If you are receiving or have received payments on other than a weekly basis, such as bi-weekly or monthly payments, or if you have received a lump-sum payment based on your workmen's compensation claim, please indicate in "Remarks" and include the amount of such payment or payments. _$ 4,900. lump sum_

8. Did you work in the railroad industry any time on or after January 1, 1937?

☐ Yes                              ☒ No

9. (a) Were you in active military or naval service after September 7, 1939?

☐ Yes (If "Yes," answer (b) and (c).)        ☒ No (If "No," go on to item 10.)

(b) Enter name of branch (Army, Navy, etc.), country served (if other than U.S.) and dates of service.

(c) Have you received, or do you expect to receive, a benefit from any other Federal agency?

☐ Yes (If "Yes," enter the names of all such agencies.)        ☐ No

10. • Enter the names and addresses of all the persons, companies or government agencies for whom you worked during the last 12 months.
• If you worked in agricultural employment, give this information for this year and last year.
NOTE: If you were not an employee this year or last year, enter the information for your *last* period of employment no matter how long)
• If you have never been an employee, enter "none" below and go on to item 12 regarding self-employment.

| NAME AND ADDRESS OF EMPLOYER | WORK BEGAN | | WORK ENDED (If still working show "Not Ended") | |
|---|---|---|---|---|
| | Month | Year | Month | Year |
| Pulpwood Producers Co Pine Bluff, Ark. (If you need more space, use "Remarks" space on the back page.) | | | June | '69 |

11. May the Social Security Administration or the State agency reviewing your case ask your employers for information needed to process your claim?        ☒ Yes    ☐ No

12. Were you self-employed this year, last year, or the year before?

☐ Yes (If "Yes," answer item 13.)        ☒ No (If "No," go on to item 14.)

13.

| CHECK THE YEAR OR YEARS IN WHICH YOU WERE SELF-EMPLOYED | IN WHAT KIND OF TRADE OR BUSINESS WERE YOU SELF-EMPLOYED? | WERE YOUR NET EARNINGS FROM YOUR TRADE OR BUSINESS $400 OR MORE? (Check "Yes" or "No") |
|---|---|---|
| ☐ This Year | | ▓▓▓▓▓▓▓ |
| ☐ Last Year | | ☐ Yes    ☐ No |
| ☐ Year Before Last | | ☐ Yes    ☐ No |

**REDACTED**

**H.24**

| 14. | How much were your total earnings last year? *(Count both wages and self-employment income. If none, write "None")* .............................. $ | |
|---|---|---|
| 15. | How much have you earned so far this year? *(If none, write "None")* ...... $ | O |

**16.** (a) Check (✔) whether you are:

☒ MARRIED *(Whether living together or separated)*   ☐ WIDOWED   ☐ DIVORCED   ☐ SINGLE

*(If you checked "MARRIED" or "WIDOWED," complete (b), (c), and (d) if appropriate.)*   *(If you checked "DIVORCED" or "SINGLE" go on to item 18.)*

| (b) Enter your wife's maiden name or your husband's name | Date of Birth *(If unknown, give age)* | Date of Marriage | If husband or wife is age 62 or over or is filing for disability benefits, enter his or her Social Security No. |
|---|---|---|---|
| *Beatrice Harris* | ▮ -42 | 1964 | ▮▮▮▮▮ |

(c) If your husband or wife is deceased, enter ⟶ the date of death here    Date of Death

(d) If you are a married woman, was your husband receiving at least one-half of his support from you at the time you became unable to work because of your disabling condition, or is he receiving at least one-half of his support from you now?    ☐ Yes    ☐ No

**17.** Answer item 17 only if you are married AND your husband or wife is applying for benefits.

(a) Check (✔) whether your marriage was performed by:
Clergyman or authorized public official ☒ or other ☐ ................................... *(Explain)*

(b) Were you married before your present marriage?    ☒ Yes    ☐ No
*(If "Yes," give the following information about each of your previous marriages.)*

| | To Whom Married | When *(Month, day, and year)* | Where *(Enter name of city and State)* |
|---|---|---|---|
| Previous marriage | *Missouri Turner* | *about 1938* | *Claiborne Parish, La.* |
| | How marriage ended | When *(Month, day, and year)* | Where *(Enter name of city and State)* |
| | *Divorce* | *in the early 1940's* | *Ithuile El Dorado ark* |
| Previous marriage | To Whom Married | When *(Month, day, and year)* | Where *(Enter name of city and State)* |
| | How marriage ended | When *(Month, day, and year)* | Where *(Enter name of city and State)* |

*(Use "Remarks" space on back page for information about any other marriage.)*

**18.** (a) Do you have ANY children (including natural children, adopted children, and stepchildren) who are now or were in the past 12 months UNMARRIED and

| • UNDER AGE 18 | ☒ Yes | ☐ No |
|---|---|---|
| • AGE 18 TO 22 AND ATTENDING SCHOOL | ☐ Yes | ☒ No |
| • DISABLED (18 OR OVER AND DISABILITY BEGAN BEFORE AGE 18) | ☐ Yes | ☒ No |

If you have children who may qualify for benefits under any of the above conditions, answer (b) and (c).

| (b) Full Name of Child | Full Name of Child |
|---|---|
| | |
| | |

(c) Do you wish to apply on behalf of all the children named in item 18(b) for all insurance benefits payable to them under Title II of the Social Security Act, as amended?    ☐ Yes    ☐ No

If you are not applying for any child you name, enter the child's name under "Remarks" (back page of this form) and explain why you are not applying for such child. You may apply for a child even though you do not wish to be the payee for the child's benefits.

*(Over)*

REDACTED

H.25

| 19. | Do you have a dependent parent who was receiving at least one-half of his or her support from you at the time shown in item 5(a) when you became unable to work because of your disability? | ☐ Yes | ☒ No |
|---|---|---|---|
| 20. | Do you authorize any physician, hospital, agency, or other organization to disclose to the Social Security Administration or to the State agency that may review this application or your continuing disability, any medical records or other information about your disability? | ☒ Yes | ☐ No |

YOU MUST NOTIFY THE SOCIAL SECURITY ADMINISTRATION PROMPTLY IF:
- Your MEDICAL CONDITION IMPROVES so that you would be able to work, even though you have not yet returned to work.
- You GO TO WORK whether as an employee or a self-employed person.
- You apply for periodic benefits under any workmen's compensation law or plan.
- You are DISCHARGED FROM THE HOSPITAL if you are now hospitalized.

| 21. | Do you agree to notify the Social Security Administration promptly if any of the above events occur? | ☒ Yes | ☐ No |
|---|---|---|---|

Remarks: (*This space may be used for explaining any answers to the questions. If additional space is required, attach separate sheet.*)

IMPORTANT INFORMATION. PLEASE READ CAREFULLY.—A claimant for disability insurance benefits is required to submit medical evidence showing the nature and extent of his disability during the time he alleges he was under a disability. If such evidence is not sufficient to arrive at a determination, he may be requested to have an independent medical examination at the expense of the Social Security Administration. Should Social Security obtain information useful to his physican for treatment, such information may be furnished to him.

I know that anyone who makes a false statement or representation of a material fact in an application or for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal Law. I affirm that the above statements are true.

| SIGNATURE OF WITNESSES | SIGNATURE OF APPLICANT |
|---|---|
| If this application has been signed by mark (X), two witnesses who know the applicant must sign below, giving their full addresses. | Signature (*First name, middle initial, last name*) (*Write in ink*) |
| 1.  Signature | SIGN HERE ▶ *[signature]* |
| Address (*Number and street, City, State, and ZIP Code*) | Mailing address (*Number and street, Apt. No., P.O. Box, or Rural Route*) ▬▬▬▬▬ |
| 2.  Signature  *Call One Day Toy Store* | City and State  *Pine Bluff Ark* — Zip Code *71601* |
| Address (*Number and street, City, State, and ZIP Code*) *on W. 6th · Mrs Louise Carter* — | Date (*Mo., day and year*) *12-3-70* — Telephone number *none* |
|  | Enter name of county (*if any*) in which you now live  *Jefferson* |

H.26

# Wells Decl. Ex. I

*What are the details of the Abuse/Neglect of the children?*

**Why are you calling Today?**

**What Happened? When Happened? Who did it? Does the person still have access to the child?**

CHILDREN BEATEN;FORCED TO HAVE SEX WHILE FATHER WATCHES.

**What are the children's conditions/injuries now? Describe the children's current conditions and any injuries.**

**When were the children last seen and by whom?**

**Where are the children located and how long will they be there (include address and county)?**

**What are the risk factors in the home?  (Domestic Violence, Safety Hazards, Physically/Mentally Disabled Victim, Etc.)**

**Who else was told or knows of this situation?**

**Additional Information:**

EXHIBIT I

I.01

Arkansas Department of Human Services

## Maltreatment Summary Report

10/31/2008 09:30 am

| Referral Number | Referral Date | Family Name |
|---|---|---|
| 554482 | 11/28/1983 01:00 PM | WEBSTER |
| Staff Name | | Incident County |
| | | Jefferson (Pine Bluff) |

## CLIENT INFORMATION

| Client Number 1: ▆▆▆ WEBSTER | | Primary Role in Referral Alleged Offender | |
|---|---|---|---|
| Client ID | Gender | Birth Date | Approx. Age |
| 1137089 | Female | | 41 |

## CLIENT INFORMATION

| Client Number 2: ▆▆ WEBSTER | | Primary Role in Referral Alleged Offender | |
|---|---|---|---|
| Client ID | Gender | Birth Date | Approx. Age |
| 1137090 | Male | | 66 |

## CLIENT INFORMATION

| Client Number 3: BRUCE WEBSTER | | Primary Role in Referral Alleged Victim | |
|---|---|---|---|
| Client ID | Gender | Birth Date | Approx. Age |
| 1137094 | Male | | 10 |

| Allegations | |
|---|---|
| Allegation #1 | Age of Injury |
| Abuse Category Abuse | Abuse Type |

## CLIENT INFORMATION

| Client Number 4: D▆▆ W ▆▆▆ | | Primary Role in Referral Alleged Victim | |
|---|---|---|---|
| Client ID | Gender | Birth Date | Approx. Age |
| 1137092 | Male | | 13 |

| Allegations | |
|---|---|
| Allegation #1 | Age of Injury |
| Abuse Category Abuse | Abuse Type |

**REDACTED**

I.02

**CLIENT INFORMATION**

| Client Number 5:  T███ W' ███████ | Primary Role in Referral Alleged Victim | | |
|---|---|---|---|
| **Client ID**<br>1137093 | **Gender**<br>Male | **Birth Date** | **Approx. Age**<br>12 |

| **Allegations** |
|---|

| Allegation #1 | Age of Injury |
|---|---|
| Abuse Category  Abuse | Abuse Type |

**CLIENT INFORMATION**

| Client Number 6:  D███ W ██████ | Primary Role in Referral Alleged Victim | | |
|---|---|---|---|
| **Client ID**<br>1137091 | **Gender**<br>Male | **Birth Date** | **Approx. Age**<br>16 |

| **Allegations** |
|---|

| Allegation #1 | Age of Injury |
|---|---|
| Abuse Category  Abuse | Abuse Type |

**COLLATERAL INFORMATION**

| Collateral Name | | |
|---|---|---|
| **Relation to Family** | **Start Date** | **End Date** |

**CURRENT FINDINGS**

| Name | Abuse/Neglect | Abuse/Neglect Type | Injury | Offender | Findings |
|---|---|---|---|---|---|
| D███ W ████ | Sexual Abuse | | Unknown | ████████ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Sexual Abuse | | Unknown | ████████ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Sexual Abuse | | Unknown | █████ WEBSTER | See Legacy File |
| D. ████ W'█████ | Abuse | | Cuts, Bruises, Welts | ███████ WEBSTER | True |
| D ███ W ████ | Abuse | | Cuts, Bruises, Welts | ██████ WEBSTER | True |
| D. █████ W ████ | Sexual Abuse | | Unknown | ████████ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Abuse | | Cuts, Bruises, Welts | ████████ WEBSTER | True |
| D███ W █████ | Abuse | | | | |

**REDACTED**

I.03

## CURRENT FINDINGS

| Name | Abuse/Neglect | Abuse/Neglect Type | Injury | Offender | Findings |
|------|---------------|--------------------|--------|----------|----------|
| T██ W██ | Abuse | | Cuts, Bruises, Welts | ██ WEBSTER | True |
| T██ W██ | Sexual Abuse | | Unknown | ██ WEBSTER | See Legacy File |
| T██ W██ | Abuse | | | | |
| BRUCE WEBSTER | Abuse | | | | |
| D██, W██ | Abuse | | Cuts, Bruises, Welts | ██ WEBSTER | True |
| D██. W██ | Abuse | | Cuts, Bruises, Welts | ██ WEBSTER | True |
| D██ W██ | Sexual Abuse | | Unknown | ██ WEBSTER | See Legacy File |
| D██, W██ | Sexual Abuse | | Unknown | ██ WEBSTER | See Legacy File |
| D. ██ W. ██ | Abuse | | | | |
| T██ W██ | Abuse | | Cuts, Bruises, Welts | ██ WEBSTER | True |
| T██ W██ | Sexual Abuse | | Unknown | ██. WEBSTER | See Legacy File |
| BRUCE WEBSTER | Abuse | | Cuts, Bruises, Welts | ██. WEBSTER | True |

## WORKER/STATUS INFORMATION

| Family Service Worker | County |
|-----------------------|--------|
| | |

| Current Status | True |
|----------------|------|

**REDACTED**

I.04

Arkansas Department of Human Services

## Maltreatment Summary Report

10/29/2008 02:52 pm

| Referral Number | Referral Date | Family Name |
|---|---|---|
| 554482 | 11/28/1983 01:00 PM | WEBSTER |
| Staff Name | | Incident County |
| | | Jefferson (Pine Bluff) |

### CLIENT INFORMATION

| Client Number 1: ▇▇▇▇. WEBSTER | | Primary Role in Referral Alleged Offender | |
|---|---|---|---|
| Client ID | Gender | Birth Date | Approx. Age |
| 1137089 | Female | | 41 |

### CLIENT INFORMATION

| Client Number 2: ▇▇▇▇ WEBSTER | | Primary Role in Referral Alleged Offender | |
|---|---|---|---|
| Client ID | Gender | Birth Date | Approx. Age |
| 1137090 | Male | | 66 |

### CLIENT INFORMATION

| Client Number 3: BRUCE WEBSTER | | Primary Role in Referral Alleged Victim | |
|---|---|---|---|
| Client ID | Gender | Birth Date | Approx. Age |
| 1137094 | Male | | 10 |

| Allegations | |
|---|---|
| Allegation #1 | Age of Injury |
| Abuse Category  Abuse | Abuse Type |

### CLIENT INFORMATION

| Client Number 4: D. ▇▇▇, W ▇▇▇▇ | | Primary Role in Referral Alleged Victim | |
|---|---|---|---|
| Client ID | Gender | Birth Date | Approx. Age |
| 1137092 | Male | | 13 |

| Allegations | |
|---|---|
| Allegation #1 | Age of Injury |
| Abuse Category  Abuse | Abuse Type |

**REDACTED**

I.05

## CLIENT INFORMATION

| Client Number 5:  T██ W█████ | Primary Role in Referral Alleged Victim |
|---|---|

| Client ID | Gender | Birth Date | Approx. Age |
|---|---|---|---|
| 1137093 | Male | | 12 |

| Allegations |
|---|

| Allegation #1 | Age of Injury |
|---|---|
| Abuse Category  Abuse | Abuse Type |

## CLIENT INFORMATION

| Client Number 6:  D. ███W' ██████ | Primary Role in Referral Alleged Victim |
|---|---|

| Client ID | Gender | Birth Date | Approx. Age |
|---|---|---|---|
| 1137091 | Male | | 16 |

| Allegations |
|---|

| Allegation #1 | Age of Injury |
|---|---|
| Abuse Category  Abuse | Abuse Type |

## COLLATERAL INFORMATION

| Collateral Name | | |
|---|---|---|
| Relation to Family | Start Date | End Date |

## CURRENT FINDINGS

| Name | Abuse/Neglect | Abuse/Neglect Type | Injury | Offender | Findings |
|---|---|---|---|---|---|
| D ██ W██████ | Sexual Abuse | | Unknown | ██████ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Sexual Abuse | | Unknown | █████ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Sexual Abuse | | Unknown | ██████ WEBSTER | See Legacy File |
| D ██ W' ████ | Abuse | | Cuts, Bruises, Welts | ██████ WEBSTER | True |
| D/██ WI█████ | Abuse | | Cuts, Bruises, Welts | █████ WEBSTER | True |
| D. ███ 'VI████ | Sexual Abuse | | Unknown | ██████ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Abuse | | Cuts, Bruises, Welts | ██████ WEBSTER | True |
| D.███ WI████ | Abuse | | | | |

**REDACTED**

I.06

## CURRENT FINDINGS

| Name | Abuse/Neglect | Abuse/Neglect Type | Injury | Offender | Findings |
|------|---------------|--------------------|--------|----------|----------|
| T█ W█████ | Abuse | | Cuts, Bruises, Welts | ████ WEBSTER | True |
| T█ W█████ | Sexual Abuse | | Unknown | ████████ WEBSTER | See Legacy File |
| T█ W█████ | Abuse | | | | |
| BRUCE WEBSTER | Abuse | | | | |
| D████, W████ | Abuse | | Cuts, Bruises, Welts | ████████ WEBSTER | True |
| D████ W████ | Abuse | | Cuts, Bruises, Welts | ████ WEBSTER | True |
| D███ W'████ | Sexual Abuse | | Unknown | ████ WEBSTER | See Legacy File |
| D████, W████ | Sexual Abuse | | Unknown | ████ WEBSTER | See Legacy File |
| D████ W████ | Abuse | | | | |
| T████ W████ | Abuse | | Cuts, Bruises, Welts | ████████ WEBSTER | True |
| T███ W████ | Sexual Abuse | | Unknown | ████ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Abuse | | Cuts, Bruises, Welts | ████ WEBSTER | True |

## WORKER/STATUS INFORMATION

| Family Service Worker | County |
|-----------------------|--------|
| | |

| Current Status | True |
|----------------|------|

**REDACTED**

I.07

*What are the details of the Abuse/Neglect of the children?*

Why are you calling Today?

What Happened? When Happened? Who did it? Does the person still have access to the child?

CHILDREN BEATEN;FORCED TO HAVE SEX WHILE FATHER WATCHES.

What are the children's conditions/injuries now? Describe the children's current conditions and any injuries.

When were the children last seen and by whom?

Where are the children located and how long will they be there (include address and county)?

What are the risk factors in the home? (Domestic Violence, Safety Hazards, Physically/Mentally Disabled Victim, Etc.)

Who else was told or knows of this situation?

Additional Information:

I.08

Arkansas Department of Human Services
## Maltreatment Summary Report

10/29/2008 02:52 pm

| Referral Number | Referral Date | Family Name |
|---|---|---|
| 541374 | 01/15/1986 01:00 PM | WEBSTER |
| **Staff Name** | | **Incident County** |
| | | Jefferson (Pine Bluff) |

**CLIENT INFORMATION**

| Client Number 1: ▆▆ WEBSTER | | Primary Role in Referral Alleged Offender | |
|---|---|---|---|
| Client ID | Gender | Birth Date | Approx. Age |
| 1090276 | Male | | 66 |

**CLIENT INFORMATION**

| Client Number 2: ▆▆▆ WEBSTER | | Primary Role in Referral Alleged Offender | |
|---|---|---|---|
| Client ID | Gender | Birth Date | Approx. Age |
| 1090277 | Female | | 43 |

**CLIENT INFORMATION**

| Client Number 3: BRUCE WEBSTER | | Primary Role in Referral Other Person in Home | |
|---|---|---|---|
| Client ID | Gender | Birth Date | Approx. Age |
| 1090281 | Male | | 00 |

**CLIENT INFORMATION**

| Client Number 4: D ▆▆ W ▆▆ | | Primary Role in Referral Other Person in Home | |
|---|---|---|---|
| Client ID | Gender | Birth Date | Approx. Age |
| 1090279 | Male | | 00 |

**CLIENT INFORMATION**

| Client Number 5: T▆ W▆ | | Primary Role in Referral Other Person in Home | |
|---|---|---|---|
| Client ID | Gender | Birth Date | Approx. Age |
| 1090280 | Male | | 00 |

**REDACTED**

I.09

## CLIENT INFORMATION

| Client Number 6:  D⬛ W ⬛ | Primary Role in Referral Alleged Victim |
|---|---|

| Client ID 1090278 | Gender Male | Birth Date | Approx. Age 16 |
|---|---|---|---|

### Allegations

| Allegation #1 | Age of Injury |
|---|---|
| Abuse Category  Neglect | Abuse Type |

## COLLATERAL INFORMATION

| Collateral Name | | |
|---|---|---|
| Relation to Family | Start Date | End Date |

## CURRENT FINDINGS

| Name | Abuse/Neglect | Abuse/Neglect Type | Injury | Offender | Findings |
|---|---|---|---|---|---|
| D⬛ W⬛ | Neglect | | | | |
| D⬛ W'⬛ | Neglect | | Inadequate Supervision | ⬛ WEBSTER | True |
| D⬛ W⬛ | Neglect | | Inadequate Supervision | ⬛ WEBSTER | True |

## WORKER/STATUS INFORMATION

| Family Service Worker | County |
|---|---|

| Current Status | True |
|---|---|

**REDACTED**

I.10

10/29/2008

**Arkansas Department of Human Services**
**Referral Narrative: WEBSTER [541374]**

*What are the details of the Abuse/Neglect of the children?*

**Why are you calling Today?**

**What Happened? When Happened? Who did it? Does the person still have access to the child?**
CHILD ARRESTED AND PARENTS REFUSED TO COME AND GET HIM.

**What are the children's conditions/injuries now? Describe the children's current conditions and any injuries.**

**When were the children last seen and by whom?**

**Where are the children located and how long will they be there (include address and county)?**

**What are the risk factors in the home?  (Domestic Violence, Safety Hazards, Physically/Mentally Disabled Victim, Etc.)**

**Who else was told or knows of this situation?**

**Additional Information:**

I.11

# Wells Decl. Ex. J

## PETITION FOR EXECUTIVE CLEMENCY
## TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

        CRIMINAL ACTION NO. 4:94-CR-121-Y

        FROM

        THE UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF TEXAS

v.

Bruce Carneil Webster,

        **DECLARATION OF**

    Defendant.

        **LEONDA DANIELS**

I, **Leonda Daniels**, declare as follows:

1.     I live in Pine Bluff, Arkansas. I have lived here since I was 12 years old. I am employed by Welspun, Inc., a gas pipeline company in Little Rock. I have worked there for 2 years.

2.     I met Bruce Webster through his sister, Future Mae, when I was roughly 16 years old and he was 17. We dated for a couple of years and lived together at his sister's house.

3.     Bruce was a fun-loving happy sort of guy and he was fun to be around but he had very obvious mental problems. Bruce was unable to be serious about anything. It was not a matter of being disrespectful because Bruce was always very respectful. It was just that he truly could not understand the seriousness of anything, no matter what it was.

4.     It was impossible for Bruce to focus on anything for long. He had the attention span of a small child. He could not sit through a television program or a movie without

1

EXHIBIT J

getting up every 5 minutes to do something. He could not follow the plot of anything and would always have to ask me what was going on and what the characters were talking about.

5.     We would play games like cards or dominoes with our friends, but Bruce was not able to keep up. He could not play a card game like "Spades" where the rules required you to "follow suit." He truly could not tell the difference between spades and clubs. Playing dominoes was out of the question for Bruce. He could not think fast enough and calculate fast enough to make a correct or proper move. He would just sit there and stare at his pieces and not know what to do. Finally, he would just give up. He would make some sort of comment about how he wanted to do something else and he would just drop out to save face.

6.     In all my time around Bruce, I never once saw him read a book, magazine or newspaper.

7.     Bruce could not do any kind of paper work. I had to fill out a job application for him. When I testified at his trial in 1996, the government lawyer got me all confused about this and got me to say that Bruce could fill out an application but that he just did not want to. The reality is that Bruce really could not do it himself.

8.     Bruce would go along with anything. He could not think for himself. Whatever anybody wanted to do, that was alright with Bruce.

9.     Bruce could not be counted on to do anything where he had to exercise judgment or common sense. If you sent him to the store for, say, a coke, a pack of cigarettes and a bag of chips, when he came back there would always be something

2

wrong. I would say, "You can't remember three things?" Even if you wrote him out a list, like "milk, Fruit Loops, etc.," he could not follow directions.

10.    Bruce did not have any money of his own. His mother would give him money.

11.    Bruce did not understand a lot of words. Like, he thought "double date" meant going out on two dates, one this week and one next week.

12.    Bruce and I split up about two years before he was arrested in the murder case. I heard about the case when my cousin called me on the phone. I was asleep when she called and said, "Hurry up! Turn on Channel 7. The guy you used to date is on TV." I turned on the television and saw Bruce's picture. I could not believe it. Bruce was always sweet to me and was never violent or abusive. I was in total shock.

Pursuant to 28 U.S.C. § 1746, I, **Leonda Daniels**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 12-9-08          _Leonda Daniels_

Leonda Daniels

3

# Wells Decl. Ex. K

**PETITION FOR EXECUTIVE CLEMENCY**
**TO THE PRESIDENT OF THE UNITED STATES OF AMERICA**

United States of America,

                                CRIMINAL ACTION NO. 4:94-CR-121-Y

                                                     FROM

                        THE UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT OF TEXAS

V

Bruce Carneil Webster,

        Defendant.

                                **DECLARATION OF**

                                **LANETRA EVANS**

I, **Lanetra Evans**, declare as follows:

1.    I live in Pine Bluff, Arkansas. I am a Licensed Practical Nurse. I am presently employed in a supervisory position at a convalescent home in Pine Bluff.

2.    Prior to my current employment, I worked at a facility for children with developmental disabilities including mental retardation and Down Syndrome.

3.    I have known Bruce Webster since we were children. I went through school with Bruce and his brothers and sisters and I spent a lot of time as a child at the home of my friend who lived directly across the street from the Webster home.

4.    The Webster home was known in the neighborhood as a very strange place. Even though I would visit and play right across the street and I knew all the Webster kids I would never go over there. The father was someone you did not want to have anything to do with. He was known to abuse his children and they were all obviously affected by it.

Declaration of Lanetra Evans

EXHIBIT K

5.  I always thought that two of the Webster children were especially slow mentally, Bruce and Tony. Bruce was always very needy and dependent as a child. He wanted a lot of attention and he would act silly to get attention. From the things he would do and say you could tell he was not normal.

6.  When we got a little older, Bruce got romantically involved with my cousin, Gwen. Gwen stayed with us a lot when she was in high school and Bruce would often stay at our house with her when they were teenagers. He obviously did not want to be in his own home.

7.  Gwen would have to do everything for Bruce. She would pick out his clothes for him and she would even tie his shoes for him which I thought was extremely odd.

8.  He spent a lot of time in our home but I do not remember ever seeing him read or write.

9.  Bruce was not a mean person at all. He was polite and respectful towards everyone in our home. He mostly wanted people to like him.

Pursuant to 28 U.S.C. § 1746, I, **Lanitra Evans**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: __11/12/08__                    _Lanitra Evans_

Lanitra Evans

Page 2

# Wells Decl. Ex. L

**PETITION FOR EXECUTIVE CLEMENCY
TO THE PRESIDENT OF THE UNITED STATES OF AMERICA**

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT TEXAS

V

Bruce Carneil Webster,

Defendant.

**DECLARATION OF**

**LUKETHA FRAZIER**

I, **Luketha Frazier**, declare as follows:

1.     Bruce Webster is my uncle. I am the daughter of Bruce's older sister, Dassie Mae Frazier.

2.     I grew up with Bruce. I saw him almost every day, and when I was seven or eight years old I lived with Bruce's family for about a year.

3.     Bruce and I were in the same grade at school. We both had to repeat the first grade. Bruce was always a poor student.

4.     Most of the kids liked Bruce because he was funny and goofy. Since he was not good at school, he was sort of a class clown.

5.     Even though I repeated first grade and was never a very good student, I was a better student than Bruce and would help him with his school work.

6.     Bruce and I were in 8th grade science class together. Other students would do

Declaration of Luketha Frazier

Page 1

EXHIBIT L

Bruce's work for him or show him how to do it. Some of them would let Bruce look at their papers during tests. Other students liked Bruce and wanted to help him. They knew he could not pass tests on his own, so they would help him.

7.  School was very hard for Bruce. I know he was embarrassed that he could not keep up and by eighth grade he was going to school less and less.

8.  When Bruce got his driver's license I had gotten the answers to the written part of the test from a man who worked at the drivers license department, a relative of a classmate of ours. I gave the answers to Bruce so he could pass the test. Bruce could never have been able to pass it otherwise.

9.  When I lived with Bruce's family, I often heard Willie beating Bruce and his brothers and sisters. The sounds were gruesome. He would beat Bruce and his siblings two or three times a week, often for the smallest things or for nothing at all. He would beat them with extension cords and a water hose that gave them big bruises and welts. We were all terrified of Willie. He kept us all in constant fear of his anger and cruelty.

10.  Willie beat me with a belt when I was 7 or 8 years old. I wanted to go to church with my grandmother. He told me I could not go, but I went anyway. His brutal beating left a large bruise on my back.

11.  Willie would make his own children do awful things. He would make one of his children pour a cup of warm water into another one of his children's ear. Tony used to wet the bed, so Willie put one end of a hose on Tony's penis with a clothespin and the other end in his mouth when he went to sleep. He did that so he

Declaration of Luketha Frazier

Page 2

would urinate into his mouth instead of on the bed. He beat the bottom of David's feet with a water hose. I would hear the kids yelling when they got beat.

12. Willie would force his sons to call my grandmother's sister, my Great-aunt Ruby, to harass her and say nasty things and bad stuff over the phone.

13. Bruce was a sweet, fun uncle. He was my favorite uncle. He always there for me and he was very protective of me and the girls in his family. I have never seen him be violent. The Bruce I knew was not a mean person at all. I will never understand how he could have been involved in what he was charged with and sentenced to death for.

Pursuant to 28 U.S.C. § 1746, I, **Luketha Frazier**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: __11|11|08__                    _____
                                        Luketha Frazier

Declaration of Luketha Frazier

Page 3

# Wells Decl. Ex. M

## PETITION FOR EXECUTIVE CLEMENCY
## TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

                              CRIMINAL ACTION NO. 4:94-CR-121-Y

                                            FROM

                    THE UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT TEXAS

V

Bruce Carneil Webster,

      Defendant.

                             **DECLARATION OF**

                             **MARVIN HOLLOWAY**

I, **Marvin Holloway**, declare as follows:

1.    I live in Pine Bluff, Arkansas. I was Bruce Webster's co-defendant in the murder case that resulted in Bruce being sentenced to death. I testified for the United States government against Bruce and Orlando Hall.

2.    I served twelve years in prison as part of a plea agreement in return for my testimony against Bruce. I was released from prison one year ago, on December 5, 2007. Since my release from prison, I have been employed as a salesman at a major car dealership in Little Rock.

3.    Other than this offense, I have no other felony convictions.

4.    I knew Bruce for several years before the offense, but I did not know him well. I could tell that Bruce was not right mentally and that he was lacking in intelligence.

5.    In the first paragraph of its opinion affirming Bruce's death sentence, the U.S Court of Appeals for the Fifth Circuit stated: "Webster, Hall and Marvin Holloway ran a

EXHIBIT M

marihuana trafficking enterprise in Pine Bluff, Arkansas." The Court was totally incorrect about this. Bruce was definitely not a partner in the marihuana enterprise. As far as I know, Bruce did not run anything.

Pursuant to 28 U.S.C. § 1746, I, **Marvin Holloway**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 12/07/08

Marvin Holloway

# Wells Decl. Ex. N

**PETITION FOR EXECUTIVE CLEMENCY**
**TO THE PRESIDENT OF THE UNITED STATES OF AMERICA**

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

v.

Bruce Carneil Webster,

Defendant.

**DECLARATION OF**

**ANGELA MADISON**

I, **Angela Madison**, declare as follows:

1. My name is Angela Madison and I live in Pine Bluff, Arkansas. I was born and grew up in a house a couple of blocks from where Bruce Webster grew up. I am 37 years old, roughly two years older than Bruce and the same age as his brother, Tony.

2. As a child, I used to play with Bruce and his brothers and one of his sisters. The one thing I remember most about Bruce back then is that he would always do whatever anybody asked him to do, no matter what it was. I remember one time, we were all sitting around listening to the radio and we decided we wanted to listen to tapes. Bruce had to be no more than 10 or 11 years old at the time. We knew his brother David collected music but we also knew he did not like anybody messing with his stuff. We told Bruce to go sneak some of his brother's tapes out. We told him, "He won't know." Bruce, as always, did what we asked him to

1

EXHIBIT N

do without any questions or hesitation. David came over and heard us listening to his music and, of course, Bruce got beat up for it.

3. Bruce could never sit still so it was very hard for him to sit in church. Our house was right across the street from his family's church on 13th Street. Bruce would sneak out and come over. His mother was extremely strict and he would always get in trouble for this – time after time after time.

4. Truthfully, I thought all of Bruce's brothers were retarded. The ones I knew best were David, Tony and Bruce and they were all very slow mentally, but Bruce was the slowest. His mind would wander. You would be talking to him and he would just ramble from one subject to another. I'd tell him, "We weren't even talking about that." It seemed like he would change the subject to cover up the fact that he did not understand what we were talking about. As Bruce got a little older, maybe 11 or 12, it was hard or impossible to have a normal conversation with him. He would just talk in an ignorant sort of slang, saying nothing intelligent.

5. When I was 13 or 14 years old we moved to Milwaukee, Wisconsin, so I never saw Bruce again. When I was 22, I moved back to Pine Bluff, but I never did see Bruce again after we were children.

Pursuant to 28 U.S.C. § 1746, I, **Angela Madison**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 12-09-08          *Angela Madison*

Angela Madison

# Wells Decl. Ex. O

**PETITION FOR EXECUTIVE CLEMENCY
TO THE PRESIDENT OF THE UNITED STATES OF AMERICA**

United States of America,

                               CRIMINAL ACTION NO. 4:94-CR-121-Y

                                        FROM

                          THE UNITED STATES DISTRICT COURT
                             NORTHERN DISTRICT OF TEXAS

v.

Bruce Carneil Webster,

                               **DECLARATION OF**

      Defendant.

                          **THERESSIA MARTIN MOTEN**

I, **Theressia Martin Moten**, declare as follows:

1. I am Bruce Webster's cousin. I live in Pine Bluff, Arkansas. I am 50 years old which makes me about 15 years older than Bruce.

2. My mother and Bruce's mother were sisters. My mother passed away about two years ago.

3. There is a lot of mental retardation in my mother's and Bruce's mother's family. Bruce and I have a first cousin in Little Rock named Alpercy Cox, our Aunt Delores' son, who is severely retarded. He is around 50 years old and can barely speak. He went to special schools and rehabilitation his whole life just to learn how to speak at all. His sister, Denise, has to take care of him. We have another first cousin in Monticello, Arkansas, Varner Martin, who is around 40 years old who cannot take care of himself at all. He still goes to a special school for the retarded. I have a nephew named Johnny Foster who is 8 years old. He is severely mentally disabled

1

EXHIBIT O

and cannot talk at all.

4. There were a number of other people in our family who were very abnormal. Our Auntie Leola was very strange. She was afraid to stay by herself. She would pay you a week's pay just to stay the night with her. She would get confused and think her nephew was her own child. Meanwhile, she could not raise her own daughter at all and had to let other people raise her.

5. Bruce's sister Dassie Mae was the same way. She did not develop properly and was always very tiny. Her head hurt all the time and she had two brain operations. She is very hard to communicate with unless you are family or know her well.

6. I always thought Bruce was the same way. When Bruce was a youngster, the way he moved and carried himself was not normal. He didn't talk and he didn't play with the other children when he was small. Even his brother Tony, who was definitely "not all there" either, did a lot better than Bruce did.

Pursuant to 28 U.S.C. § 1746, I, **Theressia Martin Moten**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 12/9/08

Theressia Martin Moten

2

# Wells Decl. Ex. P

## PETITION FOR EXECUTIVE CLEMENCY
## TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT TEXAS

V

Bruce Carneil Webster,

Defendant.

**DECLARATION OF**

**MICHAEL PARKS**

I, **Michael Parks**, declare as follows:

1. I live in Hensley, Arkansas. I have a barber shop in Pine Bluff and I am a supervisor for UPS. I have an associate degree in electronics from Arkansas College of Technology.

2. I have known Bruce Webster's family my entire life. I grew up in the same neighborhood and I went through school with Bruce's older brother, Mark.

3. My mother did not allow me to go to the Webster home when I was growing up. Their father was known to be very abusive and there was a lot of family violence in the home. The father was reputed to have killed a man and gotten away with it.

4. All the Webster children were mentally slow and most of them were in special education classes. They were also very lacking in social skills. Even so, some of Bruce's brothers overcame these obstacles and were able to acquire some job skills and to make

EXHIBIT P

decent lives for themselves. For example, Bruce's brother, Mark, is a very good carpenter and Tony is a minister and has had a steady job with the sanitation department. This was not true of Bruce, however. Bruce never developed any of these skills due, I am quite sure, to his mental limitations. He never seemed to be able to develop skills like his brothers did despite their own limitations.

5.     Bruce was always a fun-loving person and pretty outgoing but I believe he used this to cover up for the fact that he was mentally impaired. It was deceptive because it hid the fact that he was far below average in intelligence.

Pursuant to 28 U.S.C. § 1746, I, **Michael Parks**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 12/8/08

Michael Parks

# Wells Decl. Ex. Q

**PETITION FOR EXECUTIVE CLEMENCY**
**TO THE PRESIDENT OF THE UNITED STATES OF AMERICA**

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

V

Bruce Carneil Webster,

**DECLARATION OF**

Defendant.

**JODIN SMITH**

I, **Jodin Smith**, declare as follows:

1.    I am the ex-wife of Bruce Webster's brother Mark. I live in Pine Bluff, Arkansas. I am employed as the Agency Manager for an insurance and tax preparation agency.

2.    I moved to Pine Bluff when I was 16 to live in a youth home. My family had abandoned me and I had nowhere to turn.

3.    I met Mark Webster in 1986 and we were married in 1987 shortly before I graduated from high school. We were both working at the book store at the University of Arkansas in Pine Bluff. He is one year older than I am.

4.    I married Mark and we have two children together, a daughter who is 20 and a son, 17. I left Mark in 1996 because I could no longer tolerate his violence and his physical and mental abuse. I was genuinely afraid that he might kill me.

Declaration of Jodin Smith

Page 1

EXHIBIT Q

5.  During the time I was dating and married to Mark Webster, I became very close to all of his family. To this day, I think of them as my own family and I remain close to many of Mark's brothers and sisters, his Aunt Ruby and others in his family.

6.  Bruce was around 13 years old when I met him. He was a very sweet kid who loved to have fun more than anything else. Bruce and I were very close and I was always crazy about him. I considered their brother Darrie to be my best friend. Darrie's nickname was "Tacky." That's what everybody called him. Darrie was stabbed to death in 1992 by their sister's husband.

7.  The Webster kids had a terrible childhood. I heard many stories from all of them about the horrible things that were done to them by their father. Their father's nickname was "Bear" or "Mr. Bear." Mr. Bear was a ferocious mean man. I heard about a lot of what he did to them, but I saw some of it firsthand. I know for a fact he hit Darrie with a 2x4 and left welts all over his back and shoulder. He beat David and Darrie with a water hose and PVC pipe. David told me his father made him drink out of the slop jar they kept in the house to urinate and defecate in before they had a toilet. He also told me about his father forcing him to have sex with his own mother. Their sister, Future Mae, told me her father forced her to have sex with her sister Dassie Mae.

8.  The Webster kids never really had a chance to be children. They were deprived of the opportunity children should have to be care free and to have fun. Instead, they lived in a constant state of fear and terror. Because of their home life they were all very sexual at a young age, before they even reached adulthood.

Declaration of Jodin Smith

9.    When my daughter was a small baby, Mr. Bear would pick her up by her limbs. He almost broke her arm one time. He picked my son up by his foot when he was a baby and scared me half to death.

10.   Mark has serious problems with uncontrollable anger and violence. I know it is a result of what his father did to him and his brothers and sisters. It is as if he has multiple personalities. He has three sides to him. One is childlike and sweet, one is a fairly normal adult, and one is a violent terrifying demon. The demonic Mark was very physically abusive to me and our children. He hit me in the head with an iron skillet. He pounded me repeatedly in the chest and bruised three ribs and my breast bone. He also stomped on my face and left a shoe print on it. He would threaten to blow up the house with me and the kids in it. When he shot at me, that was the last straw. I was afraid he would eventually kill me and I knew I had to leave him. Once when he was in a violent rage, he even referred to himself by a different name which terrified me. He said, "You don't know who I am, bitch? I'm William." His father's name is Willie, so that struck me as very strange.

11.   When my daughter got a little older, I could see that she was developing violent tendencies that she was picking up from her father. One time after we had split up, they were having a fight and he picked her up by her leg and slammed her on the floor. He had a scratch on his face and neck and he claimed she attacked him, but really she was just trying to get away from him. I took him to court over it and the judge called his actions "reasonable discipline."

12.   Bruce was a wonderful kid. When I met him he was about 13, but he was still

Declaration of Jodin Smith

very much a Mama's boy. His mother still called him her "Titty baby" because he was still very immature. To me he was always a childlike, even when he was full grown.

13. Bruce had a hard time expressing himself with words. He would have trouble finding the right word for things and would even ask you in the middle of a sentence to help him find the word he was looking for. He did not understand some basic concepts that we take for granted. For example he did not understand that a quarter, the coin, was ¼ of a dollar or that a quarter of an hour was the same thing as 15 minutes. He could not do simple things like give directions and would have to ask me to do it. He would just hand me the phone and say, "Hold on, Jodin will tell you." You could never count on him to handle any type of responsibility like going to the store or dealing with any sort of emergency. He was just not mentally up to it. I never saw him read a book or newspaper or talk about anything serious.

Pursuant to 28 U.S.C. § 1746, I, **Jodin Smith**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 11\11\2008

Jodin Smith

Declaration of Jodin Smith

# Wells Decl. Ex. R

**PETITION FOR EXECUTIVE CLEMENCY
TO THE PRESIDENT OF THE UNITED STATES OF AMERICA**

United States of America,

V

Bruce Carneil Webster,

    Defendant.

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

<u>**DECLARATION OF**</u>

<u>**DOROTHY HARRIS
WALLACE**</u>

I, **Dorothy Harris Wallace,** declare as follows:

1. My name is Dorothy Harris Wallace. I am Bruce Webster's sister. I live in Pine Bluff, Arkansas.

2. I am thirteen years older than Bruce. Bruce and I have different fathers. My mother brought my sister and me to live with Bruce's father, Willie Webster, when I was about two years old. I have a memory of hiding up under the house all night when I was about 2 or 3 years old because I was so afraid of my step-father. I have no other memories until I was about 9 years old. I thought he was my real father until I was about 14. My Aunt Ruby told me he was not my father. I was glad to know he was not really my father.

3. My step-father, Willie Webster, is a violent perverted man who tortured,

Declaration of Dorothy Harris Wallace

- Page 1

EXHIBIT R

brutalized and sexually abused everyone living under his roof. He did things to me and my brothers and sisters that most people could never imagine people doing to each other – especially a father to his own children. He beat us constantly, hit us with belts, cords, hoses, fire pokers, hoes – anything he could get his hands on. He made us all be sexual with each other and even made my brother do sexual things with our own mother. He beat my mother all the time.

4. My step-father even beat my mother when she was pregnant. I remember him jumping on her when she was pregnant with Bruce. He held her down and beat her. I always thought he might have damaged the fetus and that maybe that is why Bruce was not normal mentally.

5. Our childhood was pure hell. Not a one of us really survived life with Willie Webster without lasting and deep mental injuries. We are all very damaged people after those horrible experiences. Most of us have needed long years of therapy just to get from one day to the next without totally falling apart, without killing ourselves and without doing terrible things to our own children and spouses.

6. One time Willie tied my hands to the side of the house and beat me on the back with a water hose until my back split open. He often whipped me and the others with a water hose folded over. I still have the scars on my back. Another time, he hit me in the leg with a hoe so hard it knocked a big chunk out of my leg. I ran to my Aunt Ruby's house, but Willie followed me and shot at my auntie. I still have a big scar on my leg more than 40 years later. When I was around 13, he made me

Declaration of Dorothy Harris Wallace
- Page 2

carry jugs of water long distances in the snow barefoot. Then he tied me up and beat the bottoms of my feet. They were frozen so I couldn't feel anything. I could not walk for days.

7. He called it punishing us but he got pleasure out of it and most times it did not have anything to do with something we had done that was so wrong. He made David drink urine out of a slop bucket we used instead of a bathroom before we had indoor plumbing. The girls were usually whipped with extension cords high up on their legs and backs so the wounds would be covered by our clothes. He would do all sorts of things to humiliate us and dominate us. He forced our mother to eat a spoonful of black pepper at gun point.

8. Willie was jealous of Bruce's relationship with our mother. Bruce was the baby of the family and our mother always treated him like her baby. Bruce developed slowly compared to my daughter who is two years younger than Bruce. She learned to speak earlier and she could always explain herself better than Bruce even when they were small. When she was 4 years old and he was 6, you could understand her but you could not understand what he was trying to say.

9. Bruce had a hard time learning to tell time. Our father would get mad and beat him for not being able to tell him what time it was.

10. Bruce was very babyish for a long time. He always stayed up under Mama, hanging onto her. She would have to help him with everything, tying his shoes, dressing him, feeding him. He always needed more help than the others.

11. Most of us had learning disabilities. Out of the nine children in our family, only

Declaration of Dorothy Harris Wallace
- Page 3

three graduated from high school. I always thought Bruce and Tony were the slowest of all. Tony got disability when he was a child for being mentally retarded but Bruce was just as slow as Tony.

12. I remember Willie beating Bruce for coming home after dark. He tied his hands behind his back and tied his feet. Then he took him underneath the car shed and beat him with a water hose. He would normally give twenty-five licks and if you'd move, he'd double it. He beat Bruce with a hose a lot.

13. David and Bruce got the most whooping. I think Bruce got it the worst because Willie was jealous of the extra attention my mother gave him.

14. Willie physically and verbally abused our mother constantly. He was always threatening to kill her or to burn the house down with her inside. He always made it known that he would kill her if she ever reported him to the police or child protection agencies. She wanted to run away and sometimes she would leave him when it got real bad, but she would always come right back.

15. He even abused my daughters when they were little. I heard screaming one morning and ran out of my house to find him beating my daughter because she didn't want to comb his hair. He was whipping her with an extension cord. He beat my other daughter with an extension cord when she was only one year old. She got welts all over her back from it. I called SCAN, the child protection service. Mama put peroxide and ointments on her so by the time SCAN came out to check on it, the bruises had healed up and they didn't do anything. He did the same thing to my sister Future Mae's son when he was about six. The boy's father

Declaration of Dorothy Harris Wallace

- Page 4

Case: 09-11039    Document: 5    Page: 291    Date Filed: 10/22/2009

called SCAN. When they got there, Future Mae said she had done it to cover for our father.

16. Willie would beat you for any reason he could think of. If you didn't get him water fast enough or wash the dishes right or fast enough, he would beat you. He would beat my slower brothers because they could not tell time. You never knew when or why you might get beat. He didn't need a real reason.

17. He sexually abused the girls. He would make us get naked and touch and kiss each other's private parts. I wouldn't do it so he would beat me.

18. One time my brother David had taken all he could take and he tried to kill Willie, but Willie got a gun and put David back in his place.

19. I believe my little brother Darrie died because Willie kicked him out of the house. After Willie put him out, he was roaming the streets. He got into a knife fight with our brother-in-law, my sister Dassie Mae's husband, Boyd Lee Frazier. Boyd Lee stabbed him real bad and Darrie ended up bleeding to death in a ditch outside our house.

20. Willie beat my sister Dassie Mae in the head three weeks after she had brain surgery.

21. No one ever went to the doctor for injuries from the abuse. He would not let us get medical attention or treatment. All us kids were afraid to tell our teachers about the abuse and Willie was careful to beat us in places that would be covered by clothes.

22. One time, he came home early and my brother David was sleeping in bed with our

Declaration of Dorothy Harris Wallace
- Page 5

Mama. Willie got mad and told them to have sex with each other. He ordered David to take off Mama's clothes and lie on top of her. They were both crying and screaming so he told David to get out of the house and if he ever caught him in bed again he would make them do it.

23. I got pregnant when I was 15 years old. My step-father beat me and ran the boy off. He beat me across the head with a belt buckle.

24. I have had a tough life because of the abuse I experienced at the hands of Willie Webster. I left his house when I turned seventeen and went to California. I took a lot of drugs there and became suicidal. When I came back to Pine Bluff I went to the mental health clinic and got antidepressants. I still have headaches and my brain goes crazy and I get very angry. I have to spend long periods of time alone to work through my anger. I have been with my present husband, Robert Wallace, for thirteen years. We have been married for three years. I was on disability for many years but when we got married I lost some of my benefits. Sometimes I go into sort of a trance and I don't know what I'm doing. I walked clear across town one night and did not even know it.

25. I am in therapy now and I am on medications for depression.

26. Our mother was physically abusive also. I guess all that violence and meanness rubbed off on her. Being around it all the time, she got to be the same way. She would hit my brother David in the head with a jug of frozen water or a plate. She beat me with a broomstick.

27. We have all had mental and emotional problems as adults. All of my brothers

Declaration of Dorothy Harris Wallace

- Page 6

have had trouble with domestic violence. All of them have had to work very hard not to be like their father and not to abuse their wives the way he abused our mother. My sisters and I have all been in very abusive relationships.

27. Bruce has never been able to relate to other people normally. He did not even really know how to relate to us. He never made much sense verbally. Most of the time he could not relate to the world like normal people do. He has always been very easily influenced by others and because of his low intelligence he has always been a follower. You could tell him something and he would just do what you say. Whatever you tell him, he would always go along with it. I have never known Bruce to be a leader at all. There is no one he could lead.

28. I have known my baby brother Bruce his whole life. He was a good boy and a sweet child. Everybody liked him because he was easy-going and silly. He was not a violent person and I never knew him to start trouble. After he stopped going to school, he started to fall in with a bad crowd and one thing led to another. I really don't think Bruce ever would have meant to harm anyone and certainly he would not ever mean to kill someone, especially a young woman. In fact, he was always very protective of the girls in our family, his sisters, nieces and cousins. I know in my heart he had to have been forced into that. It is not something he would have done or thought of on his own. Bruce is just not that kind of person.

29. I could not have gotten to where I am today without the help of the Lord. At times, it was too much for me to bear, but He always got me through.

Declaration of Dorothy Harris Wallace
- Page 7

30.    I hope and pray the President will see fit to grant mercy to Bruce.

Pursuant to 28 U.S.C. § 1746, I, **Dorothy Harris Wallace,** declare under penalty

of perjury under the laws of the United States of America that the foregoing is true and

correct.

Dated: 11/11/08

Dorothy Harris Wallace

Declaration of Dorothy Harris Wallace

# Wells Decl. Ex. S

**PETITION FOR EXECUTIVE CLEMENCY
TO THE PRESIDENT OF THE UNITED STATES OF AMERICA**

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

V

Bruce Carneil Webster,

Defendant.

**DECLARATION OF**

**SHARON WEBSTER**

I, **Sharon Webster**, declare as follows:

1.    I am married to Bruce Webster's brother, Tony Webster. Tony and I met when we were both seventeen years old. We married when we were both 21. We have three children, ages 16, 14 and 11.

2.    I am a substitute teacher in the Dollarway School District in Pine Bluff. I work in the Special Education department. My brother is a special education teacher. Between my work and my conversations with my brother, I have learned a great deal about special education and learning disabilities.

3.    My husband, Tony Webster, was raised in a home of unthinkable physical, sexual, mental and emotional abuse. His father, Willie, constantly beat and tormented his children and their mother and made them do terrible things to each other. They were all terrified of their father. Even to this day he holds a power over some of

Declaration of Sharon Webster

Page 1

EXHIBIT S

them, especially their mother, Beatrice.  Very recently I heard Willie scream at her that he was going to beat her.

4.    I always told Tony he did not have to be like his parents.  Maybe they could not control themselves, but he could.  Tony has always tried to be a good person, but because he was constantly subjected to abuse as a child, he has at times been abusive to me.  In January of 1994, I was pregnant with our second child.  One day Tony came home very angry.  He held a gun to my head.  Of course, this is something his father used to do to his mother and he was just imitating the behavior he learned in his home.  Although I always knew that Tony wanted to be a good person and did not really want to hurt me, I had had enough and I left him.  On Easter of that year I realized he had changed.  He has not been abusive since that time, but I know he struggles constantly to manage the pain and rage caused by his horrible childhood.

5.    Both Beatrice and Willie have intellectual impairments. I have always suspected they are both mentally retarded.  When I first knew them, they wanted to get on welfare but could not figure out how to do it.  My grandmother had to help them with their paperwork and the process.  Willie can not read at all, and can not even sign his own name.  The best he can do is to scratch out a shaky "WW."  Beatrice can read, but she does not understand what she is reading.  She needs someone to explain the meaning of what she reads.  She can not understand insurance papers or medical information, so someone has to explain them to her.

6.    Education was not valued in the Webster home.  There was no effort to make sure

Declaration of Sharon Webster

Page 2

the children got to school or did their school work. On the contrary, their father often kept them home from school, whether it was because he wanted them to do chores or did not want anyone to see the bruises and injuries he regularly inflicted on them.

7.    Of the nine Webster children, Tony was one of only three to graduate from high school. He was 20 years old when he graduated. When Tony was 21 he was awarded disability payments for mental retardation, back-dated to the time he was 12 years old.

8.    I met Bruce Webster when he was 15 years old. He was a sweet, nice boy, but I could tell right off that there was something wrong with him intellectually. He could not do many of the normal tasks of every day life. He didn't take care of himself like other teenagers. Everyone, especially his mother, helped him with his clothes and getting himself together for a regular day.

9.    Bruce had a very short attention span, like that of a three-year old. He could never stay still. He had trouble focusing on a conversation. Bruce was not someone I could go to if I needed something done, even a small errand. He just didn't know how to do relatively simple things. He had difficulty listening and he had a limited vocabulary, so it was hard to explain things to him. He seemed to be stuck at about the 3rd or 4th grade level as far as his literacy skills. I have never seen him read anything. Even after all his time in prison, the letters we receive from him are still on about the same level as my son in 6th grade.

10.    As Bruce got older, he would pretend he was "too cool" to do things for himself,

Declaration of Sharon Webster

Page 3

like shop or find his way around town. It has always been very clear to me that he was covering up for some kind of deficiency in his ability to function like a normal person in every day life. He had a lot of defense mechanisms for hiding what he could not do for himself.

11. My husband, Tony, who received disability from the age of 12 for mental retardation, is far more functional than Bruce. Tony is a reliable hard worker who has held down a job for many years. He is quite handy when it comes to repairs and fixing things, and he relates to people normally. None of these things are true of Bruce. Bruce is definitely impaired mentally.

12. In light of Bruce's mental impairments, it is impossible to imagine that he was the leader of any type of criminal enterprise or that anyone would take orders from him.

13. Based on all of these factors, I would hope and pray that the federal authorities would see it in their hearts to spare his life.

Pursuant to 28 U.S.C. § 1746, I, **Sharon Webster**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 11/11/08

Sharon Webster

Declaration of Sharon Webster

Page 4

# Wells Decl. Ex. T

**PETITION FOR EXECUTIVE CLEMENCY**
**TO THE PRESIDENT OF THE UNITED STATES OF AMERICA**

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

V

Bruce Carneil Webster,

Defendant.

**DECLARATION OF**

**TONY WEBSTER**

I, **TONY WEBSTER,** declare as follows:

1.    I am Bruce Webster's brother. I am two years older than Bruce.

2.    When I was in school, they said I was a slow learner. I received social security most of my life for what they called mental retardation. Of the nine children in our family, I am one of three to graduate high school. I was 20 years old when I graduated.

3.    My brother Bruce is definitely no smarter than I am. In fact, there are many things I could always do better than Bruce could and there is really nothing I can think of that Bruce could do that I can't do. Bruce flat-out could not build or fix anything. He could not do any plumbing work or work on cars. Bruce could not even put up shelves. He would have to get me or someone else to do anything like that for him. It took Bruce too long to do everything, whether it was get dressed, iron a

Declaration of Tony Webster

- Page 1

EXHIBIT T

shirt or use the bathroom. It always took him twice as long as everybody else. Even playing checkers, he would take 5 or 10 minutes to make a move. We would get tired of waiting on him. He would do other stupid things like cut the grass or work in the yard in his good clothes. When we got older, I learned to do things for myself like cook and take care of myself. Bruce never did learn those things. So, if they can say I am mentally retarded, the same has to be true for Bruce. He must be retarded, too.

4. We had a very hard childhood. I am the only boy in our family to never do a day in jail or prison, but I am quite sure our home was a lot worse than any prison. Our Daddy was a mean nasty man. Most people would not believe the things he did to us and made us do to each other. He beat all of us on a regular basis. He would beat me 2 or 3 times a week, but my brothers Bruce and David got it worse than me. He would make the boys beat and whip each other and if they didn't do it hard enough they would get a whooping instead. He would tell you to be still while he beat you and if you didn't be still he would whoop you double. He would hit you with anything he had in his hand – belt, water hose, extension cords, an opossum tail – anything he could use to hurt you. He would try to hit you where no one would see it, where the marks would be covered by your clothes.

5. When I was about 19, he hit me in the back of the head with a cast-iron fire poker. It knocked me silly. Since then, I get dizzy spells and other problems. Years after that, I would sometimes pass out. In church, I was playing the organ and I passed out for 10 or 15 minutes. They took me to the hospital and did a CT scan and

Declaration of Tony Webster

found that I had a trauma to the brain in the same spot where my father had hit me with the fire poker. They said it was like I had a stroke.

6. He knocked one of my brothers out cold with an iron pipe.

7. He would make you sit down and eat human feces and you better eat it or you'll get a beating. He would make us lick the cat's anus or get a beating. I refused so he beat me.

8. He would make all of us -- both the boys and the girls -- take off our clothes and he would beat us in the house or out in the yard.

9. He would wake us up at 4:00 in the morning banging on a big metal pot with a spoon, yelling at us to do chores. I can still hear that loud clanking in my head from when he would beat on those metal pots.

10. We were not allowed to go in the ice box or take a drink of water without asking him first. If we didn't ask permission, we would get beaten.

11. Our daddy told us that he had killed people and that he did time in Angola penitentiary for it. He would tell us how mean he was so we would be afraid of him. He told us how mean his daddy was, too, that he would whip him with a razor strap.

12. Our father would make us call our Aunt Ruby, our Mama's sister, and talk nasty to her over the phone. He would make us ask her about her sex life and about her private parts. We loved our Aunt Ruby and hated to do it but he would beat us if we refused, so we had no choice. We would apologize to her later and she understood we had to do it or get beat.

Declaration of Tony Webster

- Page 3

13.    It was a joyful time when our father was gone from the house. Friday night he would take off and we would not see him again until Monday. He would be out running around with other women and going to night clubs. We were so happy when he would leave --Friday night was a joyful time in our home.

14.    When I was 17, I would run away and hide from my father. I would sleep in abandoned cars, abandoned houses and old schools.

15.    I have been married for sixteen years to my wife Sharon. I used to beat Sharon like my father used to do to our mother but I spent many years praying and working on my anger and now I have control of it. With the Lord's help I have gotten better, but it was not easy after all we went through as children.

16.    I love my brother Bruce and I will never believe he could have done what they say he did except if someone else told him to do it. Bruce always would do what he was told and he is not the type of person to tell other people what to do. It's just not the way he is. Never was.

17.    I have always gone to church and been a very religious person. I play the organ in two churches and I am now an ordained minister myself. I pray that the Lord will guide the President's hand and let him see that my brother may have been

Declaration of Tony Webster

involved in a terrible thing but that he is deserving of mercy and the right to go on living.

Pursuant to 28 U.S.C. § 1746, I, **Tony Webster,** declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _11-11-08_

Tony Webster

Declaration of Tony Webster

# Wells Decl. Ex. U



COPY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**Fort Worth Division**

> U.S. DISTRICT COURT
> NORTHERN DISTRICT OF TEXAS
> **FILED**
> COPY
> SEP 29 2000
> CLERK, U.S. DISTRICT COURT
> By _____
> Deputy

UNITED STATES OF AMERICA,

  Plaintiff/Respondent

vs.                              No. CR 4-94-121-Y

BRUCE CARNEIL WEBSTER,            4:_94_-CR-_121_-_Y_

  Defendant/Petitione            (4:_00_-CV-_1646_-_Y_)

**MOTION OF BRUCE CARNEIL WEBSTER TO VACATE**
**CONVICTION AND SENTENCE AND FOR NEW TRIAL**
**PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF THE**
**FEDERAL RULES OF CRIMINAL PROCEDURE**

## I.

### INTRODUCTION

Comes now, BRUCE CARNEIL WEBSTER, petitioner, and would respectfully show

this Court that he is a prisoner in the custody of the United States government. Mr. Webster is

sentenced to death and currently resides in the United States Penitentiary, Federal Death Row, at

Terre Haute, Indiana. Mr. Webster would show this Court that he was convicted and sentenced

to death in a manner which violated the Constitution and Laws of the United States. Mr.

Webster herein demonstrates constitutional error and moves the Court to set aside and vacate his

conviction and sentence, and order a new trial. In support of this motion Mr. Webster would

show as follows:

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 1

EXHIBIT U

# II.

## JURISDICTION

This District Court has jurisdiction to entertain the claims raised and grant relief thereon

under 28 U.S.C. Sec. 2255.

# III.

## PROCEDURAL HISTORY

### A. Prior trial Court Proceedings

On October 26, 1994, the United States District Court for the Northern District of Texas

issued a criminal complaint charging petitioner, Orlando Hall, Steven Beckley and Demetrius

Hall with kidnapping and aiding and abetting, in violation of 18 U.S.C. Section 1201(a)(1) and

(2). (TR.1:1). On November 4, 1994, a six-count superseding indictment was returned, charging

Petitioner, Hall, D. Hall, Beckley, and Marvin Holloway with kidnapping in which a death

occurred, in violation of 18 U.S.C. Section 1201(a)(1) and (2) in Count 1, and with various

noncapital offenses in the remaining Counts. (TR.1:15-34).

On February 23, 1995, the United States Attorney filed notice of its intention to seek the

death penalty against petitioner under the Federal Death Penalty Act of 1994, 18 U.S.C. Section

3591 et seq. (TR.1:55-60). On February 27, 1996, the United States Attorney filed its amended

notice of its intention to seek the death penalty against petitioner. (TR.8:936-942).

Trial commenced on March 5, 1996, (TR.8:1036); and continued until April 4,1996,

when jury selection was concluded, the jury was seated, and trial was recessed. (TR.10:1237). On

June 3, 1996, trial resumed, (TR.10:1337), and evidence began on June 4, 1996, (TR.11:1391),

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 2

continuing until June 7, 1996, when the jury found petitioner guilty of Counts 1,2, and 6 of the indictment. (TR.11: 1405; 1406). The punishment hearing on Count 1 of the indictment began before the same jury on June 11, 1996, TR.11:1425) and continued until June 20, 1996, when the jury returned their special punishment findings and Petitioner was sentenced to death. (TR.11:1515-1530).

On September 24, 1996, petitioner was sentenced on the remaining counts of the indictment. (TR.12:1620). On September 30, 1996, petitioner filed his Notice of Appeal. (TR.12: 1629-1630). The United States Court of Appeals affirmed petitioner's conviction on December, 3, 1988 and overruled his motions for rehearing. The United States Supreme Court deneid certiorari on October 4, 1999.

**B. Statement of the Evidence**

On September 21, 1994, Orlando Hall flew from Little Rock, Arkansas to the Dallas-Fort Worth area to meet his brother Demetrius Hall and Stephen Beckley to buy some marijuana. (R.19:22-24). The drug dealers, Stanfield Vitales and Neil Rene, took $5,000.00 from the men but failed to supply the marijuana.[1] (R.19-213). The men decided to force the drug dealers to return their money and telephoned petitioner, requesting that he come to the Dallas-Fort Worth area to help them. (R.18-89). Marvin Holloway, an associate of Orlanda Hall in Arkansas, bought petitioner's airline ticket, drove him to the airport, and showed petitioner how to board the plane.. (R.20-282-283). Therefore, the group from Arkansas now included four men: Orlando Hall, Demetrous Hall, Steven Beckley and petitioner.

---

[1]    Vitales and Rene were brothers of the victim of this offense, Lisa Rene.

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 3

On September 24, 1994, the men went to the drug dealers' apartment in order to retrieve the stolen $5000.00. The drug dealers were not home, but their sister was. The men broke into the apartment, abducted the victim, and drove her to Arkansas. (R.18: 106-113). The victim was sexually assaulted before and after her arrival in Pine Bluff. (R.18:124, 125, 134). The victim was held in two different Pine Bluff motels for a period of time. The victim later accompanied Orlando Hall, Beckley, and petitioner to a park where she was struck in the head with a shovel and buried. (R.19:102-107).

Based on information from the victim's brothers, Demetrius was arrested and then Beckley and Orlando surrendered to the police. (R.19-128). Petitioner was arrested when he drove up to the motel where the girl had been kept. (R.19-248). Petitioner gave a statement and led law enforcement officers to the grave, the victim's clothes, and other physical evidence. (R.20:23, 24, 35).

During the penalty phase of the trial, evidence showed that petitioner was probated at age 15 for the burglary of a bait shop but this was subsequently revoked when he was charged with an assault and a robbery. (R22-110). Other evidence was introduced showing misconduct while incarcerated and assaultive conduct directed at his girlfriend. (R.22:50-55; 149-160).

Petitioner further presented evidence of his abused background and mental impairment. Petitioner, his mother, brothers and sisters suffered significant physical abuse.[2] Additionally,

---

[2]    All twelve jurors found that he had "suffered from physical abuse, from emotional abuse, and/or parental neglect during his upbringing." (TR.11:1515-1530).

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 4

petitioner presented evidence from some five mental health professionals demonstrating his mental retardation and mental impairment.[3]

### C. Verdict of the Jury and Factual Findings of the Court.

The following Nonstatutory Mitigating factors were presented to the jury in the Court's Charge on punishment:

1. The defendant is or may be mentally retarded.

2. The defendant has low intellectual functioning.

3. The defendant suffered from physical abuse, from emotional abuse, and/or from parental neglect during his upbringing.

On June 20, 1996, four of the twelve jurors found that Petitioner "is or may be mentally retarded" and that he "has low intellectual functioning". Twelve found that Petitioner "suffered from physical abuse, from emotional abuse, and/or from parental neglect during his upbringing." However, they still answered the special punishment issues in such a way that required a death sentence be imposed. (Tr: 11:1515-1530 )

### D. Findings on Mental Retardation.

On June 21, 1995, the trial court entered its FACTUAL FINDING REGARDING MENTAL RETARDATION in which it found, as a matter of law, that "defendant Webster is not mentally retarded and that he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him." (Tr. 12:1536)

---

[3]    The government sought to challenge the retardation evidence with testimony from school teachers, prison officials, and others.

**E. Mitigation.**

Because many of the allegations herein will focus on the mitigating evidence presented by trial counsel, the mitigation evidence from is summarized as follows:

- Petitioner was so mentally limited that a codefendant, Marvin Holloway had to make the flight arrangements and buy Petitioner's ticket.

- The government brought several school teachers and administrators who testified that Petitioner was not retarded. Some of these had only limited contact with Petitioner (R.24:240) and others had experience with him in "Basic" classes (i.e., basic classes are not special education, but it is the lowest level of course work [R.25:47, 49]).

- Much of the punishment phase evidence dealt with Petitioner's childhood, living conditions and his mental retardation. His competency and sanity were never an issue. (R.23:206, 24:49).

- Petitioner was one of nine children, one of whom, Dary, was murdered by a brother-in-law while Petitioner was in prison.(R.23:2,18).

- Dary's death greatly affected Petitioner and, on his release from prison, his mother had him seek mental health treatment. (R.23:147, 148).

- Petitioner, his mother and the other children suffered significant physical abuse by the father. (R.23:6,7, 14, 27, 105). The father routinely beat the children with a hose, fan belt, fireplace poker, or anything else he could reach. Sometimes he forced a child to strip naked and had the other children hold the naked child as the father beat him/her. (R.23:7-11, 37, 55, 60).

- Petitioner was often beaten by the father (R.23:47) A sister testified that she saw the father tie petitioner's hands and feet and beat him. Usual punishment was said to be 25 licks on the feet and back, doubled if the child moved. (R.23:107, 143).

- The father hit one child with a garden hoe and "knocked a big chunk out" of her leg. (R.23:109).

- The father hit one of the brothers with a piece of iron and knocked him on the driveway, bleeding from his ears and nose. (R.23:122).

- Petitioner's father could not read or write and did not work after being hit in the head in an industrial accident in 1969 (R.23:54, 134). Petitioner's mother dropped out of school in the 7th grade. (R.23: 21, 135).

- The abuse by petitioner's father included forced sex between the children or between a child and the mother, forcing children to "kiss the cat's behind," placing a clothespin on a child's penis, forcing a child to eat black pepper, "slop," human waste, "piss in bread," and other heinous acts such as dropping the children on concrete, burning or branding them with a hot iron, shocking a child with the spark plug wire from a lawnmower, and placing a concoction of hot sauce, pepper and alcohol on a child's anus. (R.23:13, 17,21,39, 55, 57-59, 112,113, 123, 126; 24:176, 177).

- On occasion the father fired gun shots at the children and their mother and one time he shot at her and then told the children that he had shot their mother. (R.23:12, 56, 57, 110, 124)

- Petitioner's father killed petitioner's dog while petitioner was at school. (R.23:127).

- State authorities investigated petitioner's home and twice removed one of the boys. (R.23:141; 24:177).

- All of the male children were in special education classes and several were labeled "mentally retarded." (R.23:19, 20). Petitioner's brother, Tony, received government assistance due to his "slowness" (R.23:36). Petitioner's sister, Future, was in extended treatment for mental illness. Two of Future's children were treated for mental illness. (R.23:71) Petitioner's sister, Dorothy, received mental health treatment, (R.23-118, 119), as did petitioner's mother, and his siblings Tony and Dassie. (R.23:136, 149).

- Petitioner went to prison on a probation revocation and was assigned to a hoe squad. He attended school in prison, but after four years he still had not qualified for his GED and the "good time" credit that went with it.(R.22:98, 102).

- Petitioner never had a bank account, credit card or his own apartment. He has always lived with someone who did everything for him. (R.23:154). For example, his mother bought him a car and his girlfriend paid the insurance on it. Petitioner subsisted on money from his mother, sisters and brothers as well as welfare and food stamps.(R.22:47, 64, 65; 23:133, 145, 150).

- Petitioner was evaluated in 1992 by the Southeast Arkansas Mental Health Clinic in Pine Bluff. His Wechsler Adult Intelligence Scale (WAIS) showed a score of 48, well within the retarded range (R.23:177, 178). The Arkansas report also noted the appellant suffered from intense anxiety and paranoia. (R.177, 178).

- Dr. Raymond Finn tested the Appellant and found WAIS scores of 59 verbal, 60 performance and 59 overall (R.23:187) Dr. Finn's scores place Petitioner in the third percentile and Dr. Finn concluded that Petitioner was retarded.(R.23:189). Finn said these tests were consistent with the earlier Arkansas testing.

- Immediately before trial Dr. Finn administered another test and expected Petitioner to be "better" because of the "practice effect." While Petitioner did improve, receiving scores of 72 for verbal, 59 for performance and 65 combined, petitioner's scores were still within the mental retardation range. R. 23:192, 193. These scores, coupled with petitioner's adaptive skills, indicated mental retardation. R.23:193. Dr. Finn noted Petitioner's word knowledge was one of his stronger points, but he cannot draw inferences, make general statements or conclusions. Petitioner could absorb only the rudiments of schools and could communicate only at a basic level. (R.23:193, 194).

- Dr. Finn said that the Appellant "very clearly" met a number of the requirements for a person with an anti-social personality disorder (R.23:217-222). He also testified that earlier in his life Petitioner probably suffered from a major mental illness, perhaps hallucinations and schizophrenia. (R. 23:188, 233).

- Dr. Keyes is a specialist in mental retardation. He administered a Stanford-Benet Intelligence test on which Petitioner scored in the lowest .2 percent of the population with a composite score of 51. R.24:20. If one lined 1,000 people up in accordance with their intelligence, Petitioner would be the second from the last. (R.24:26).

- Dr. Keyes' examination was consistent with Petitioner's 1992 Arkansas tests and Dr. Finn's testing. Dr. Keyes' testing reveals "soft signs" of neurological or brain damage that warranted testing. (R.24:18, 19).

- Dr. Keyes wrote his dissertation on malingering and was initially suspicious of Petitioner's low scores. He functioned verbally at a higher level than his IQ scores would indicate R.24:46, 47. Other testing revealed unexpected reading and writing skills which made Keyes give yet another intelligence test (the Kaufman). The results were very similar to the Stanford-Benet --a composite score that put Petitioner below the first percentile. The way the scores were consistent was enough for Keyes to conclude that any question of malingering was "out the window." (R.24:31).

- Dr. Keyes conducted a Vineland Social Maturity and Adaptive Behavior Scale to examine Petitioner's ability to function in the every day world. Because mental retardation has an onset of prior to age 18, Keyes had to interview people who had significant, ongoing contact with Petitioner before he turned eighteen. (R.24:38, 39).

- Based on all of his findings, Dr. Keyes concluded the Appellant adaptively functioned at the level of a six or seven year old. (R.24:43, 44).

- Dr. Keyes concluded that Petitioner was mentally retarded and functioned at a level significantly lower than the vast majority of the population. Petitioner was unable to see the consequences of his actions, unable to plan situations appropriately, unable to think in abstract methods and ways, unable to communicate under certain circumstances and had a poor short term memory. Petitioner had difficulty concentrating on a task, was very distractable, and could not learn from his mistakes in many situations. (R.24:47, 48).

- Dr. Keyes concluded Petitioner suffered from both organic (brain damage) and non-organic (environmental) mental retardation. (R.24:95).

- Dr. Fulbright is a neuropsychologist who gave various tests to Petitioner for memory, reasoning, problem solving, academic ability, sensory and motor functioning, thought process and auditory and visual skills. (R.24:129). He reviewed the materials from the other defense experts. On the Pace Auditory Serial Test, Petitioner did not function at a level at which he could even take the test. He could not add single digits in order (R.24:131). Overall Dr. Fulbright's findings were consistent with those of Drs. Finn and Keyes and were what one would expect in a mentally retarded person. (R.24:131, 132).

- Dr. Fulbright found that the Appellant was severely impaired in his ability to think abstractly or to plan and carry out a plan of action. (R.24:134). On one test that normally required 50 seconds for a person his age, the Appellant required 266 seconds and that was with coaching. (R.24:135).

- On tests of reasoning abilities, logical analysis and abstract reasoning, Petitioner had "significant intellectual limitations." (R.24:136).

- Dr. Fulbright concluded that Petitioner is "not able to think in an abstract manner, not able to consider different alternatives from one point to the next and, basically, has just severe impairment in his ability to think through, reason and plan, and kind of critically judge situations." (R.24:137).

- Of particular importance were tests given by Dr. Fulbright that indicated the possibility of right hemisphere impairment in the brain. (R.24:141, 142).

- On core communication skills, Petitioner scored in the second percentile. (R.24:139). On tests for auditory processing and visual skills, Petitioner scored in the seventh percentile which is the borderline range. (R.24:141, 142).

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 9

- Dr. Fulbright concluded that his test results were consistent with either a non-mentally retarded person with severe brain injury or an across the board problem in brain functioning. (R.24:144).

- Dr. Fulbright testified that these results could not have been faked--they indicate either mental retardation or organic brain injury. (R.24:144, 145). On intellectual ability, Dr. Fulbright placed Petitioner in the first percentile or lower. His memory was low average or impaired. His reasoning abilities were severely impaired --lower than the first percentile. (R.24:147,148).

- Dr. Cunningham interviewed Petitioner, numerous family members and reviewed voluminous records in the case. As a result Dr Cunningham concluded Petitioner had psychological disorders, including auditory and visual hallucinations.

- Dr. Cunningham concluded Petitioner was retarded and had antisocial, narcissistic and dependent personality disorders. (R.24:188, 189).

- Dr. Cunningham noted an association between Petitioner's antisocial personality disorder and the chronic abuse and childhood trauma that he had suffered. (R.24:190).

- Dr. Cunningham believed Petitioner's history of brutal abuse took away his dignity, self control, self direction, and self esteem. (R.24:192). While a normal family operated to protect a child from the world, Petitioner's was the opposite. The family traumatized and damaged Petitioner with physical violence and sadistic and perverse discipline, incestuous accusations, corruptive sexual abuse, deadly threats to family members, violent abuse of his mother, impossible rules and psychological and emotional stress. (R.24:193).

- According to Dr. Cunningham, concepts of fairness and justice never developed and there was no provision for empathy in the family. Children were beaten indiscriminately without regard for their feelings and no one stepped in to protect them. (R.24:194, 196).

- The moral lessons Petitioner learned were "pretty consistently aberrant and twisted." (R. 24:197). His comment that the killing of Lisa Rene was "just business" was the result of Petitioner's childhood and the numbing of pain. Id.

- Petitioner did not suffer from a mental disease that would render him insane --he knew right from wrong. His situation was far more complex due to his morals and other issues associated with retardation. (R.24:210).

- Dr. Cunningham testified that there was a direct connection between the abuse Petitioner suffered and his participation in this offense. (R.24:203).

- Dr. Denkowski, unlike either of the government experts, was certified to render diagnostic opinions on mentally retarded people for the Texas Department of Mental Health and Mental Retardation. He testified that all eleven parts of the WAIS had to be given if the test was to be used for diagnostic purposes, and even if it is to be used for non-diagnostic reasons, one still had to administer a minimum of nine subtests. Dr. Parker gave seven --or 65% of the complete test. (R.26:201-204). Dr. Denkowski testified that there was no authority for administering less than the full test and excluding difficult subtests while including only the easier subtests, as Dr. Parker did. (R.26:204-206). Consequently, Dr. Parker's results were substantially inflated. Id.

- Dr. Parker said that an IQ score in the 50s, as found by Dr. Finn, would "raise the possibility" of adaptive functioning problems, but, he said, the correlation was not perfect. (R.26:109). Parker also administered a competency exam although competency was never an issue. He also gave Petitioner an MMPI although the test manual states that an eighth grade reading level is required (R.26:87, 90). Dr. Parker's results on the "S" scale indicated that Petitioner did not understand the test questions even though Parker read the questions to him. (R.26:91).

# IV.

## CLAIMS FOR RELIEF

A.  GROUND FOR REVIEW NO. ONE: PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT, EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT AND THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BY THE RACIALLY DISCRIMINATORY MANNER WHICH RESULTS FROM THE FEDERAL CAPITAL SENTENCING SCHEME.

B.  GROUND FOR REVIEW TWO: PETITIONER'S RIGHTS TO DUE PROCESS WERE VIOLATED BY THE TRIAL JUDGE'S USURPATION OF THE JURY'S DETERMINATION OF MENTAL RETARDATION.

C.  GROUND FOR REVIEW THREE: TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT ADDITIONAL EVIDENCE DEMONSTRATING PETITIONER'S MENTAL RETARDATION AND HIS ADAPTIVE SKILLS.

D.  GROUND FOR REVIEW FOUR: TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT EVIDENCE OF RACIAL BIAS IN THE WATSON CHAPEL SCHOOL SYSTEM AND THE POTENTIAL BIAS OF THE GOVERNMENT'S WITNESSES.

E.  GROUND FOR REVIEW FIVE: PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO OBJECT TO THE TRIAL JUDGE'S DETERMINATION THAT HE WOULD MAKE THE REQUISITE FINDINGS CONCERNING MENTAL RETARDATION

F.  GROUND FOR REVIEW SIX: PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN ALLOWING A BREAKDOWN IN COMMUNICATION WITH THEIR MITIGATION SPECIALIST TO AFFECT THE DISCOVERY, INVESTIGATION AND PRESENTATION OF EVIDENCE AT TRIAL.

G.  GROUND FOR REVIEW SEVEN: PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT THE JURY AN ACCURATE ASSESSMENT OF THE EXTREME ABUSE SUFFERED BY PETITIONER AS MITIGATING EVIDENCE.

H. GROUND FOR REVIEW EIGHT: PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO PRESENT EVIDENCE OF PETITIONER'S SPECIAL TALENTS, MUSICAL ABILITIES, AND RELIGIOUS DEVOTION IN MITIGATION OF THE DEATH PENALTY.

I. GROUND FOR REVIEW NINE: PETITIONER'S RIGHTS TO DUE PROCESS WERE VIOLATED BECAUSE THE GOVERNMENT WAS IN POSSESSION OF THE INFORMATION WHICH SUGGESTS PETITIONER WAS NOT PROVIDED SPECIAL EDUCATION SERVICES DUE TO RACIAL DISCRIMINATION.

J. GROUND FOR REVIEW TEN: PETITIONER'S RIGHTS TO DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BY THE PRESENTATION OF UNTRUE AND DAMAGING TESTIMONY BY PETITIONER'S CO-DEFENDANT, STEVE BECKLEY.

K. GROUND FOR REVIEW ELEVEN: PETITIONER'S RIGHTS TO DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BY THE PRESENTATION OF UNTRUE AND DAMAGING TESTIMONY BY PETITIONER'S CO-DEFENDANT, MARVIN HOLLOWAY.

L. GROUND FOR REVIEW TWELVE: PETITIONER IS INELIGIBLE FOR EXECUTION BECAUSE HE IS MENTALLY RETARDED.

M. GROUND FOR REVIEW THIRTEEN: THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE TRIAL JUDGE'S DETERMINATION THAT PETITIONER IS NOT MENTALLY RETARDED.

N. GROUND FOR REVIEW FOURTEEN: THE TRIAL JUDGE ERRED IN DISMISSING JURY MEMBER ALFRED FOX AND REPLACING HIM WITH AN ALTERNATIVE JUROR WHO DID NOT PARTICIPATE IN THE JURY'S DELIBERATION DURING THE GUILT/INNOCENCE STAGE.

O. GROUND FOR REVIEW FIFTEEN: 18 U.S.C. Sec. 3596 IS UNCONSTITUTIONALLY VAGUE AND VIOLATES PETITIONER'S RIGHTS TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS.

P.    GROUND FOR REVIEW SIXTEEN:  BINDING INTERNATIONAL LAW
FORBIDS PETITIONER'S EXECUTION BECAUSE PETITIONER IS
MENTALLY RETARDED.

# V.

## GROUNDS FOR REVIEW

**GROUND FOR REVIEW NO. ONE:  PETITIONER'S RIGHTS UNDER THE
DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT, EQUAL PROTECTION
CLAUSE OF THE FOURTEENTH AMENDMENT AND THE EIGHTH AMENDMENT
PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED
BY THE RACIALLY DISCRIMINATORY MANNER  WHICH RESULTS FROM THE
FEDERAL CAPITAL SENTENCING SCHEME.**

Petitioner filed several motions challenging the racial motivation underlying his

prosecution.  Petitioner requested for discovery of information relative  to the Government's

capital charging practices.  Within these motions petitioner contended that the United States had

engaged in a systematic pattern of racial discrimination in its prosecution of the death penalty and

petitioner requested that the Court order a hearing and discovery on these issues.  Through this

information, petitioner sought to prove that, despite knowledge of a racial imbalance, the United

States continued policies which created such inequity.

In support of his motions, petitioner provided the trial court with additional information.

Petitioner filed with the Court an affidavit by Kevin McNally, one of the Federal Death Penalty

Resource Counsel.  Mr.  McNally, and his office, systematically kept statistics concerning the

decisions of the decisions of the United States Attorney General's decisions to seek the death

penalty.  Based upon these statistics, out of the total number of prosecutions seeking the death

penalty, the United States Justice Department sought the death penalty against black defendants

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 14

almost three times more than against white defendants. Sixty-six percent of death penalty prosecutions were against black defendants; Twenty percent of death penalty prosecutions were against white defendants; eleven percent of death penalty prosecutions were against Hispanic defendants; and, three percent of death penalty prosecutions were against Asian defendants. Mr. McNally provided the Court with specific information against every such defendant.

Since petitioner was sentenced in this cause, the United States Department of Justice released it's own study concerning the federal capital sentencing scheme. *See, Survey of the Federal Death Penalty System (1988-2000)* (Attached hereto as Attachment "A"). This study traces and analyzes Federal death penalty cases since the death penalty was re-established in the federal system in 1988. Between 1988 and 1994, of the 52 "death eligible" defendants forwarded to the Attorney General's office for consideration of a death sentence, only thirteen percent (13%) were white. Eighty-seven (87%) of those defendants were a member of a "minority" race. The statistics are only slightly better when one looks at the period between 1995 and 2000. Here of 682 defendants, only twenty percent (20%) of the defendants are white. *Id.*, pg. 9.

Of those 682 defendants who were "eligible" for the death penalty between 1995 and 2000, prosecutors recommended that the death penalty be sought against 183 defendants. Of those 183 defendants, only twenty-six percent (26% or 48 defendants) were white. And, once the prosecutors have made their recommendation, the cases are reviewed by a committee of senior attorneys in the Department of Justice. The recommendations of this committee are similar. Of the 183 defendants for which the committee recommended seeking a death penalty, only twenty-six percent (26% or 47 defendants) were white.

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 15

The ultimate decision is made by the United States Attorney General. Between 1995 and 2000, our Attorney General has authorized prosecutors to seek the death penalty against 159 defendants. When one views the number of these defendants (against whom prosecutors are seeking the death penalty) who later received and entered plea bargains, the racial distinction becomes more apparent. Only twenty-eight percent (28% or 44) of the defendants against whom the Attorney General authorized the death penalty were white. Yet white defendants accounted for forty-one percent (41%) of those cases in which the Government later plea bargained for a sentence less than death. And, while forty-five percent (45% or 71) of the defendants against whom the Attorney General authorized the death penalty were black, black defendants only accounted for thirty-five percent of those cases in which the Government later plea bargained for a sentence less than death. Indeed, while there were almost twice as many "death eligible" defendants, more white defendants plea bargained for lesser sentences.

Considering these statistics, it hardly surprising that black defendants accounted for sixty-five percent (65%) of the death penalty verdicts in our country since 1995. Nor is it surprising that black defendant comprise sixty-eight percent (68%) of federal death row. Yet the United States Census Department projects that Black member of the United States population comprise only 12.8 percent of the total population. (*See* Attachment "K")

Petitioner contends that such statistics demonstrate a violation of his rights to Due Process under the Fifth Amendment, Equal Protection under the Fourteenth Amendment, and to be free from Cruel and Unusual Punishment under the Eighth Amendment. Petitioner would show the Court that such racial disparity has existed for a prolonged period of time, indeed since

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 16

the inception of the capital sentencing scheme. The government was aware of such disparity and no actions have been taken to ensure the fair and racially neutral application of the death penalty in this country.

## GROUND FOR REVIEW TWO: PETITIONER'S RIGHTS TO DUE PROCESS WERE VIOLATED BY THE TRIAL JUDGE'S USURPATION OF THE JURY'S DETERMINATION OF MENTAL RETARDATION.

### FACTS AND PROCEDURAL HISTORY

Trial counsel expended significant time and resources investigating petitioner's mental retardation and litigating that issue before the jury. At the close of the punishment phase or trial, counsel requested the trial judge to enter a finding as a matter of law that Petitioner is mentally retarded. The Court refused that request. The Court did, however, submit as a Nonstatutory Mitigating Factor, a question of whether "the defendant is or may be mentally retarded." Trial counsel objected to the Court's "or may be" language in the submission, requesting one that simply stated "the defendant is mentally retarded."

On June 20, 1996, the jury returned the "Special Findings Form" in which four of the jurors found that Petitioner "is or may be mentally retarded". On June 21, 1996, the Court entered a "Factual Finding Regarding Mental Retardation" finding as a matter of law, that Petitioner is not retarded thereby removing Petitioner from the exemption provided by 18 U.S.C. 3596(c). No objection to the Court's factual finding is found in the record.

### STATUTORY AUTHORITY

18 U.S.C. 3596(c),entitled "Implementation of a sentence of death," states: "A sentence of death shall not be carried out upon a person who is mentally retarded." The statute does not authorize the judge to make the determination on mental retardation, and, in fact, provides absolutely no guidance on who is authorized to act as fact-finder in the event mental retardation is an issue in a death penalty case.

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 18

The only authority for making sentencing decisions in a death penalty case under the applicable statute is found in 18 U.S.C. 3593 wherein the statute requires a separate hearing on sentencing unless, upon motion of the defendant and with approval of the government, a jury is waived. At no time did petitioner waive a jury in his case—and the judge was without statutory authority to make a finding that Petitioner was not mentally retarded.

18 U.S.C. 3596 ( c ) in effect provides a "defense" to the imposition of the death penalty for mentally retarded individuals in much the same way the Federal Code and Rules provides for other defenses such as insanity. (*See* 18 U.S.C. 17) In the case of insanity, the burden is on the defendant to prove the defense by "clear and convincing evidence." The determination of the existence of insanity at the time of the offense is submitted to the jury upon motion of the defendant.[4]

At the close of he punishment phase of trial, Petitioner made his objections to the charge. The relevant portion of Petitioner's objection to the Court's punishment charge follows:

> MR. MOORE: Judge, we would object, first, to the manner in which the Court is submitting the nonstatutory mitigating factor Number 1, where it reads, the defendant is or may be mentally retarded, and we object to that portion of the mitigating factor -- submission of the mitigating factor that includes the language "or may be." We think that the submission should read that the defendant is mentally retarded, and that's the issue that the jury is to decide, that is, the existence of mental retardation is a mitigating factor under Penry and other authorities of the United States Supreme Court, but it's a mitigating factor the jury is called on to find, and it's our belief that it's the function of the jury, as

---

[4] 18 U.S.C. 4242(b) provides "on the motion of he defendant or of the attorney for the Government or on the court's own motion, the jury shall be instructed to find, or in the event of a non-jury trial, the court shall find the defendant–
  (1) guilty;
  (2) not guilty; or
  (3) not guilty by reason of insanity.

U.S.A. v. Bruce Cameil Webster
Motion filed under 28 U.S.C. § 2255
Page 19

the fact finders, to determine the existence of that particular mitigating factor, and for that reason we would request that it be submitted simply in the manner that we requested it, that the defendant is mentally retarded.

THE COURT: And you want it to be submitted not only so that the jury may consider it as a mitigating factor, but, also, so that if all agree unanimously, then you will have a finding that he is mentally retarded, which would bar execution; is that correct?

MR. MOORE: I think that if there is a finding -- the statute allows the jury to find the mitigating factor. I don't even think it has to be unanimous. I think if there is a finding by any of the jurors that he is mentally retarded, that that may well operate as a bar. I don't know that there is a particular procedure that's envisioned by the statute which says you don't execute a mentally retarded person, but I do know that a mitigating factor is to be determined by the jury, and that is a mitigating factor. And if at some later point we were to try to raise that as a bar, which, obviously, is an issue that we've discussed and we would know might well come into play, then we get into the discussion as to whether or not the law envisions that there be some other proceeding or some other authority, other than the jury, to make that determination.

From the above colloquy, it is apparent that petitioner requested the court to submit the issue of mental retardation to the jury both as a mitigating factor and as a potential bar to execution. Without further guidance from the statute, Petitioner's request was adequate and appropriate under the circumstances. The request was that the question of fact concerning mental retardation be submitted to the appropriate fact finder, the jury, just as any other "defensive" issue would be in the same or similar circumstances. The appropriate fact-finder under the circumstances was the jury to determine whether Petitioner was mentally retarded.

## CONSTITUTIONAL AUTHORITY

In a recent Supreme Court decision[5], the Court held that it was unconstitutional to remove from the jury, assessment of facts that increase the prescribed range of penalties to which Petitioner is exposed.

In *Apprendi v. New Jersey*, the Supreme Court considered a New Jersey law in which, upon a finding by a judge by a preponderance of the evidence that a crime is racially motivated, allowed the judge to enhance the sentence. The Supreme Court held that the issue of "racial bias" was an element of the offense that was constitutionally required to be submitted to a jury and found to exist beyond a reasonable doubt.

*Apprendi* speaks in terms of guarantees of a right "to a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Apprendi citing United States v. Gaudin,* 515 U.S. 506, 501, 132 L.Ed. 2d 444, 115 S.Ct. 2310 (1995). Although mental retardation is not listed as an element of petitioner's offense, there can be no doubt that a finding by the Court in petitioner's case that he was *not* mentally retarded, increased the prescribed range of penalties to which petitioner was exposed. Rather than being precluded from consideration for execution, petitioner is now death eligible as a result of the Trial Court's finding that he is not mentally retarded.

The core concept of *Apprendi* is due process. Although the facts of Petitioner's case and *Apprendi* diverge, due process requires an issue as important as mental retardation in Federal death penalty litigation be submitted to a jury. In *Apprendi,*, the New Jersey Courts attempted to

---

[5]    *See Apprendi v. New Jersey,* No. 99-478, ____ U.S.____, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

make the distinction between an "element" of the offense and a "sentencing factor" citing the judge's finding of racial bias as a "sentencing factor". The Supreme Court, however, noted that "any possible distinction between an "element" of a felony offense and a "sentencing factor" was unknown to the practice of criminal indictment, trial by jury, and judgment by courts as it existed during the years surrounding our nations founding."

Although mental retardation was not an element of the offense to be plead and proved by the government, the element of "willfully" was plead and required proof beyond a reasonable doubt. The element of "willfully" and mental retardation are inextricably intertwined. The legislative history of 18 U.S.C. 3596 ( c ) indicates the proponents of the death penalty legislation were concerned about executing individuals who do "not have the mental capacity to achieve the ability to act, ever, as an adult." Congressional Record-Senate S-6874, May 24, 1990, Comments of Senator Biden. Senator Biden felt there were "graduations of culpability," and that there should be provisions in the death penalty legislation under which a mentally retarded person should be exempt from execution. Even Senator Thurmond, who opposed the amendment prohibiting the execution of the mentally retarded, felt the constitution recognized that punishment must be directly related to the defendant's personal culpability. Congressional Record-Senate S-6873, May 24, 1990.

Although mental retardation may not have been an enumerated element in Petitioner's indictment, the ability to form the culpable mental state "willfully" had to be plead and proven by the government beyond a reasonable doubt. Thus an elemental quality is given to the issue of

mental retardation, i.e., did the mental retardation effect the ability of Petitioner to form the culpable mental state of "wilfully".

The issue of mental retardation, therefore, is much more than a "sentencing factor." It goes to the very heart of the elements of the offense, elements that due process requires, be plead and proven to a *jury* beyond a reasonable doubt.

## GROUNDS FOR REVIEW 3-7

### PETITIONER SUFFERED INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

The Sixth Amendment guarantees petitioner the effective assistance of counsel. To demonstrate a violation of this right petitioner must prove 1) counsels' representation fell below professional norms, and 2) a reasonable probability that, but for counsels' deficiency, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The Supreme Court held the primary consideration is whether counsel's conduct so undermined the proper functioning of the adversary process that the trial cannot be relied upon as having produced a just result. *Id.* The constitutional objective is "to ensure a fair trial." *Id.* at 686, 687, 694, 696.

Under the first prong of *Strickland*, "[c]ounsel . . . has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.*, 466 U.S. at 688. The Supreme Court admonished appellate courts to "keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Id.* at 690. To determine the effectiveness of counsel, an appellate court must look to the totality of the representation. Moreover, the appellate court will assume counsel "made all significant decisions in the exercise of reasonable professional judgment." *Ibid.*

Although, under its second prong, *Strickland* requires petitioner demonstrate prejudice, it does not require petitioner to demonstrate counsels' deficient performance actually altered the

outcome of his trial, or even that it is *more likely than not* this was the result. *Id.*, 466 U.S. at 693. The Court stated "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."[6] *Id.*, at 694. Thus, the Court only requires petitioner to demonstrate "some *conceivable* effect on the outcome of the proceeding." *Id.* at 693 (emphasis added). Moreover, in assessing prejudice, the appellate court may not assess the probability that an individual mistake might have affected the outcome. Rather, the reviewing court must look to all of the errors of counsel which fall below an objective standard of reasonableness, and measure the probability (chance) that, *collectively*, counsels' deficient performance altered the outcome of the case. *See generally, Kyles v. Whitley*, 514 U.S. ___, 115 S.Ct. 1555 (1995) (providing the test for "materiality"). Finally, the appellate court must ensure that its ultimate focus is "on the fundamental fairness of the proceeding whose result is being challenged." *Strickland*, at 696.

The United States recently considered the Constitutional right to effective assistance of counsel with regard to a death penalty case in *Williams v. Taylor*, 529 U.S. ___, 120 S.Ct. 1495 (2000). In *Williams*, the defendant was convicted of capital murder, *id.*, ___ U.S. at ___, 120 S.Ct. at ___, and, after he was sentenced to death, an application for writ of habeas corpus was filed alleging ineffective assistance of counsel for failure to investigate and present mitigating evidence. *Id.*, ___ U.S. at ___, ___ S.Ct. at ___. The evidence which counsel failed to locate and present included evidence of mistreatment, abuse and neglect during the defendant's early

---

[6]    By "reasonable probability," the Supreme Court obviously meant a reasonable *chance* counsel's performance adversely affected the outcome of the case.

childhood, borderline mental retardation, head injuries and possible organic brain impairment. *Ibid.* The Supreme Court held that when errors undermine confidence in the fundamental fairness of a state adjudication, the federal courts should act. *Id.,* ___ U.S. at ___, ___ . The Supreme Court agreed that the failure to investigate and present mitigating evidence fell below the professional norm. *Id.,* ___ U.S. at ___, ___ S.Ct. at ___ . And this failure prejudiced the defendant. Importantly, the Court found it appropriate to "evaluate the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding—in re-weighing it against the evidence in aggravation." *Id.,* ___ U.S. at ___, ___ S.Ct. at ___ .

**GROUND FOR REVIEW THREE: TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT ADDITIONAL EVIDENCE DEMONSTRATING PETITIONER'S MENTAL RETARDATION AND HIS ADAPTIVE SKILLS.**

**GROUND FOR REVIEW FOUR: TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT EVIDENCE OF RACIAL BIAS IN THE WATSON CHAPEL SCHOOL SYSTEM AND THE POTENTIAL BIAS OF THE GOVERNMENT'S WITNESSES.**

E.C. Turner testified that he was a school counselor in the Watson Chapel School District where applicant attended school. However, Turner had additional evidence to present to the jury which was never developed. While the jury was lead to believe that petitioner tended to be a "leader" among his peers, such is not an accurate picture. In Turner's opinion, petitioner was a leader whenever in the company of younger children; i.e. situations where petitioner was

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 26

physically bigger, but equal in mental abilities.[7] However, whenever petitioner was in the company of older children, and children more advanced in their mental abilities, Turner would have testified petitioner was a "follower."[8]

Turner will testify that, academically speaking, he was never able to tell petitioner's level. Petitioner was never challenged or motivated by his parents and did not seem interested in school.[9] Turner counseled petitioner for being "lazy," late to class, and "disrespectful."[10] However, Turner was hampered in his ability to counsel petitioner and others students. Because of the number of students in the school system, and the number of available counselors, Turner states there was never an opportunity to "follow up" with students as needed. However, Turner suspected petitioner may have been on drugs because he "talked in circles" and his disposition was "not normal."

Petitioner's elementary scholastic record was reviewed by Loula Gray, an elementary school teacher with the Watson Chapel School District for thirty-six years. In Ms. Gray's

---

[7]     Petitioner had been held back for at least one year.

[8]     Turner informed petitioner's investigator that petitioner was especially a follower when in the company of a family of boys known as the "Westmorelands," who, in Turner's words, controlled petitioner. The Westmoreland boys were two or three years older than petitioner, students and football players at Watson Chapel High School, and have since had substantial contact with the criminal justice system.(*See* Attachment "L")

[9]     Turner never met petitioner's father but remembered that petitioner lived in a "heavy area." He further remembers rumors that petitioner's father painted his van with a paint brush. Turner did not hold petitioner's father in high regard.

[10]     At the time petitioner was in the Watson Chapel School District, there was no resource officer to enforce truancy laws. Indeed, according to Turner, there was no followup on truancy. While the Arkansas law apparently required petitioner to attend school until he was seventeen years of age, he was "put out" of school at fifteen years of age.

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 27

considered opinion, petitioner was "socially promoted" throughout elementary school.[11] In other words, petitioner was promoted to the next grade even though he had not mastered the skills and knowledge in his current grade. Based upon petitioner's performance in elementary school, Ms. Gray will testify that petitioner should have been directed to special education services.[12] In fact, Ms. Gray states that there is no reasonable explanation for the failure to provide petitioner special education services.[13] She acknowledged that the referral to special education was usually made by a teacher and that "sometimes students get by you."[14]

Petitioner was assigned to "Title One" Math classes in Fifth grade. This class was taught by Ms. Gray. This was a forty-five minute class which petitioner attended daily. Ms. Gray described petitioner as "slow."[15] Petitioner was also in "basic" English classes. Ms. Gray states

---

[11]    While Turner could not explain why petitioner was not in special education classes, Turner indicated his belief that once a student gets behind in school, and becomes a behavioral problem, the student should move up the grades with his peers.

Ms. Gray describes the situation differently. According to Ms. Gray, social promotion is a tool used by the Watson Chapel School district to "get rid of problem students." This was especially true of African American students who were not good athletes. Such students were "pushed out" as soon as possible.(*See* Attachment "L")

[12]    There is a stigma which attaches to special education students and, according to Turner, it is common for students to "mask" or "fake" success in order to avoid such a label and the stigma attached. Moreover, some families refused to put their children in special educational classes in order to help the children "fit in."

[13]    Ms. Gray stated that the Federal government was auditing the racial makeup of the classes at Watson Chapel School District at the time.
Dr. Sally Church, a recognized expert in education, was contacted. Dr. Church reports that sometimes "problem students" will not be classified as mentally retarded, even if they are, because once classified as mentally retarded, such students may not be dismissed from school for their behavior. Dr Church further indicated she would provide similar testimony at any such hearing in this cause.

[14]    Lamoreaux's investigation included an interview with petitioner's brother, Willie Webster, Jr. Willie Webster, Jr. stuttered and collected disability. He once obtained a job in a local "arsenal" but was fired because he was "too slow" and had problems remembering things.

[15]    Based upon Lamoreax's investigation, this opinion was shared by Levi Thomas, a juvenile probation officer who supervised petitioner's brother. Mr. Thomas remembers petitioner as "slow" or learning disabled.

that such a placement evolves from low academic performance and difficulties with reading and comprehension.

Petitioner was assigned to "basic" classes at Watson Chapel Jr. High School.[16] In such classes the teachers endeavor to cover much the same materials as in regular classes, but a much slower rate. Classes focus on "skill areas" or "basic skills." Turner states that, in basic classes, students receive additional instruction with some individual attention.

Ms. Gray described Watson Chapel School District as a "truly ... racist district." She states that African Americans on the school board have experienced difficulties in becoming officers. In 1970 the Watson Chapel School District came under the control of the Federal Courts through a desegregation order.[17] The District Court found that the Watson Chapel School District was operating a dual school system based upon race.[18] Thereafter the school board and superintendant of the Watson Chapel School District failed to comply with the District Court's Order and, after a hearing, the District Court found several or all of the members guilty of civil contempt.[19] The school district was required to file reports with the United States District Court

---

[16]     According to Turner, students are assigned to basic classes upon the recommendation of the teacher, parents, counselor, or the student's test scores.(*See* Attachment "L")

[17]     The records of Annette Lamoreaux, the estranged mitigation specialist, actually discovered some of the evidence of the racial discrimination history of the school district. However, because of the breakdown in communication and the relationship between Lamoreaux and trial counsel, this line of investigation was never pursued.

[18]     A true and correct copy of the 1970 Court Order is attached hereto and incorporated by reference. (*See* Attachment "B")

[19]     A true and correct copy of this February 6, 1971 Court Order is attached hereto and incorporated by reference.(*See* Attachment "C")

concerning the numbers and race of students and teachers in each school.[20] The school district

continued to file reports until 1991 when the District Court entered an Order relieving them from

that burden.[21]

The problems continue today. The School District is under a Justice Department

Investigation because one of the District's schools, at Sulphur Springs, is an all white school.

African American students in need of services are being denied. And, many of the African

American teachers in the District are retiring. This has created problems because they are being

replaced with white teachers.

In Ms. Gray's opinion, Watson Chapel Schools were "hell on black boys" during the time

in which petitioner was in school. In Watson Chapel Schools minority students received

disparate treatment.[22] Ms. Gray described Rick McLaughlin and Gene Stewart as racists and

harassers.[23] In elementary schools, students fared no better. Phyllis Rankin, an elementary

---

[20]    A true and correct copy of the Report filed on October 27, 1989 is attached hereto, incorporated by reference, and provided in order to demonstrate the reporting requirements.

Lamoreaux's investigation notes indicate that, if too many black students were classified "special education," the School District could be disciplined.

[21]    A true and correct copy of this Order attached hereto and incorporated by reference.(See Attachment "E")

[22]    Ms. Gray can describe an incident when Principal Stewart's son carried a weapon on to the Watson Chapel High School campus. Though a black student who committed a similar infraction was expelled, Stewart's son was transferred to another school and received no disciplinary action.

According to Ms. Gray, this incident was addressed at a school board meeting. However, petitioner's attempts to obtain a copy of such school board records were denied by the Watson Chapel School District.

[23]    Ms. Gray reported that such continues to be true today. Children of "mixed race" are discussed in the teacher's lounges as "half breeds." Ms. Gray states Gene Stewart made the duty rosters for teachers at the school. Black teachers were assigned outside duties and white teachers were assigned inside duties. She also stated that Gene Stewart harassed one African American student to the point that her mother pulled the daughter from the Watson Chapel School District and moved her to the nearby Dolloway School District. Another African American

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 30

school principal in the Watson Chapel School District, was investigated for kicking a special education student. Ms. Rankin hid one of the black students "free lunch" cards, forcing Ms. Gray to pay for the child's lunch. Rankin's treatment of minority students was such that Ms. Gray delayed her retirement by a year.

Lydell Willis is an African American teacher in the Watson Chapel School District. She applied for the position of "principal" withing the School District. She was passed over several times. Ms. Willis filed charges of discrimination against the School District and Superintendent Charles Knight alleging discrimination on the basis of her gender and her race.[24] Ms. Willis sued and now receives a principal's salary. She remains a teacher.[25]

Petitioner would respectfully show that trial counsels' failures to discover and present the evidence set forth herein falls far below the expectation of representation expected of an attorney representing a defendant in a federal capital trial. In this trial the Government's experts were less than persuasive.[26] Therefore the evidence of the Government's witnesses from the Webb Chapel School District increased in importance. These witnesses suggested that petitioner was not mentally retarded and had never received special education services. However, with investigation, evidence was available to rebut the Government's evidence. Petitioner was in

---

student who was to become a Valedictorian at the high school was given a C her last semester.

[24]   Ms. Willis filed several different complaints. All of the complaints alleged discrimination based upon her gender. At least one complaint alleged racial discrimination. A true and correct copy of this complaint is attached hereto and incorporated by reference. (*See* Attachment F)

[25]   A true and correct Order entered in Ms. Willis' suit is attached hereto and incorporated by reference. (*See* Attachment "G")

[26]   In his statement attached hereto, Larry Moore indicates that the trial judge threatened to instruct the jury to disregard the testimony of the Government's expert, Dr. George Parker.(*See* Attachment H)

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 31

lower classes at school and his academic record suggests he was entitled to special education services. However, at the time, officials from the Watson Chapel School District had a bias. Many minorities were denied such services and, considering the racial desegregation orders in place, school official could hardly admit they denied petitioner needed services and that later petitioner was "put out" of school in ninth grade. Thus, the evidence available to counsel could have questioned the credibility of the only witnesses presented to demonstrate petitioner was not mentally retarded

Not only has error been shown in counsel's failure to investigate and present such evidence, but harm is shown as well. Petitioner is on death row. Due to a failure to investigate evidence similar to that alleged herein, petitioner's counsel were denied the ability to demonstrate to the jury a reasonable explanation for the testimony of school officials, and the potential bias underlying their testimony.

**GROUND FOR REVIEW FIVE: PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO OBJECT TO THE TRIAL JUDGE'S DETERMINATION THAT HE WOULD MAKE THE REQUISITE FINDINGS CONCERNING MENTAL RETARDATION**

Petitioner has demonstrated herein that the determination whether petitioner was mentally retarded was an issue for the jury's consideration. This was a matter presented to the appellate court in petitioner's brief on direct appeal. However, the Court of Appeals held that petitioner's claimed error was not preserved because trial counsel failed to object to trial judge's written

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 32

determination that petitioner was not mentally retarded. *U.S. v. Webster*, 162 F.3d 308, 351 (5th Cir. 1998).

The failure to object to the trial judge's action was not strategical or even intentional. In his written statement, trial counsel stated,

> ... Although I knew that Judge Means had discussed with Allan Butcher (on the night of the punishment verdict) the possibility of his making a finding on the issue of the Defendant's mental retardation as a matter of fact, I was surprised when I received a copy of the Judge's Finding Concerning Mental Retardation after the conclusion of the trial, finding that Bruce Webster was not mentally retarded as a matter of fact, considering the Judge's remarks at the bench conference concerning Dr. Parker's testimony, and the overwhelming expert testimony to the contrary that had been offered by the defense.

*See,* Larry Moore, written statement attached hereto (and incorporated by reference). Moreover, petitioner was represented on appeal by the same attorneys, and these attorneys challenged the trial judge's authority to make such a determination.

Petitioner contends that the failure to object to the trial judge's determination of mental retardation in this case satisfies the first prong of *Strickland.* As is argued herein, the determination of mental retardation is a matter for the jury's determination. And, in viewing the jury's verdict at the punishment stage, at least four members of the jury were convinced of petitioner's mental retardation. This was without the additional evidence which is alleged *supra.* Considering this additional evidence, it is probable that the jury would have entered a finding that petitioner was mentally retarded.

Petitioner would further show that, because harm is evident, the second prong of *Strickland* is satisfied as well. Had a factual finding of mental retardation been entered, petitioner is ineligible for execution. There could be no death sentence. Petitioner has shown

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 33

"some conceivable effect" by trial counsels' failure to object and preserve error with regard to the

trial judge's determination of mental retardation.

**GROUND FOR REVIEW SIX: PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN ALLOWING A BREAKDOWN IN COMMUNICATION WITH THEIR MITIGATION SPECIALIST TO AFFECT THE DISCOVERY, INVESTIGATION AND PRESENTATION OF EVIDENCE AT TRIAL.**

**GROUND FOR REVIEW SEVEN: PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT THE JURY AN ACCURATE ASSESSMENT OF THE EXTREME ABUSE SUFFERED BY PETITIONER AS MITIGATING EVIDENCE.**

Trial counsel retained the services of Annette Lamoreaux as a mitigation specialist to assist in the preparation of petitioner's case for trial. Lamoreaux is an attorney with specialized training in mitigation investigations in death penalty cases.[27] Lamoreaux was previously employed by the Texas Resource Center, a federally funded entity charged with representing capital defendants and providing resources to private attorneys who represented capital defendants. Lamoreax expended a great deal of effort on petitioner's behalf. As the written statements by trial counsel and Lamoreaux demonstrate, Lamoreaux had unique talents which were not duplicated on the defense team.

---

[27]     Lamoreaux executed a written statement which is attached hereto and incorporated by reference as if fully copied and set forth at length.(*See* Attachment "I")

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 35

Moore indicates that there existed a disagreement between counsel and Lamoreaux which carried forth into the representation.[28]    Moore and Lamoreaux disagreed over her billing.  In Moore's written statement he indicates:

> As I recall, the Court initially approved $15,000 as a fee for Ms. Lammoreaux's services.  When we received Ms. Lammoreaux's initial interim bill, Allan and I had some problems with her bill and indicated that we needed to discuss it with her before we would submit it to the Court.  I remember at least one meal receipt from a casino in Louisiana that I did not feels was appropriate.  I also recall that she traveled out of state to a cemetery to document grave sites on Mr. Webster's family, and I felt like that particular trip was unnecessary.  Further, the amount of her initial bill was in excess of the entire budget originally approved by the Judge for her services, and there was a significant amount of work yet to be done.

*See*, Moore's written statement, attached hereto.  Lamoreaux responds:

> It was my understanding that a request for my appointment would submitted immediately and I would then file vouchers for interim fees and expenses.  I later learned that I was not appointed on the case until September, 1995, although I began working in June—both reviewing the evidence collected by the FBI and traveling to Pine Bluff to do family interviews.

---

[28]    According to Lamoreaux, her disagreement with counsel Moore began as early as their first meeting.  She states "[i]t was my impression , that Mr. Moore, who was a former prosecutor, was not particularly experienced in, nor sympathetic to, mental health and abuse issues being presented at trial.  However, I believed that as the investigation went on, he could be won over to the standard of practice to which I was accustomed."

Lamoreaux further states:

> During the time that I was undertaking this investigation, I attempted to report my findings as regularly as possible to Moore.  While I was accustomed to a "team" approach on a case, I found that Moore was not.  He was not interested in discussing case strategy or possible additional lines of investigation, so much as repeatedly commenting that someone must have thought Bruce was retarded.  He discouraged my investigation on family abuse and violence, specifically telling me not pursue the family history in this regard, even though I told him I believed that because the facts of the murder were so gruesome, we needed to address how someone could come to commit such a violent crime.  I was of the opinion that the jury could have been presented with a story of Bruce's life which might have been mitigating, which complemented the retardation defense.  Moore dismissed this approach.

*See*, Lamoreaux's written statement, attached hereto.

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 36

*See*, Lamoreaux's written statement, attached hereto.

The disagreement between Moore and Lamoreaux festered and grew. Shortly before trial, counsel were unable to locate Lamoreax or her materials. Counsel ordered their factual investigators to interview possible mitigation witnesses and sought to prepare for trial without Lamoreaux. In short, petitioner was sent to trial without the benefit of the mitigation specialist retained/appointed by the Court.

It was unfortunate that Lamoreax and the results of her investigation were unavailable to trial counsel. Lamoreax's investigation documented a cycle of abuse within petitioner's family which existed for several generations, at least through petitioner's grandfather and great-grandfather. Indeed, the information available through Lamoreaux indicated that petitioner was the deseendant of a slave named "Sam" Webster. Within the memory of different family members it can be established that Sam and his decendents were abusive within the family.

Petitioner's father was one of the worst abusers in this lineage. Various family members informed Lamoreaux that petitioner's father was easily provoked and very violent. He was known to beat the children and his wife with a water hose or extension cords and he always continued until they were bleeding.[29] He hit petitioner's sister, Dorothy, in the head with a hoe and once tied her hands to a stick, strung her up in a tree and beat her. Petitioner's father made petitioner's brother, David, drink urine. Lamoreaux's investigation indicated that petitioner's mother was very afraid of her husband, but was planning on testifying.

---

[29] Lamoreaux's investigation indicated that petitioner and his siblings often fled their father by going to the home of their maternal aunt, Ruby Harris Binns. However, once, when petitioner's father found out, he shot out the window of her car and threatened to burn down her home. Ms. Binn's thereafter told the children not to run to her home.

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 37

Lamoreax documented some of the racial prejudices which are alleged and argued elsewhere in this petition. The investigative information which Lamoreax shared with the undersigned counsel revealed the racial segregation policies of the Watson Chappel School District, their reporting requirements, and the possible discipline for assigning too many blacks to special education. All this was information which could have been presented and used in petitioner's behalf at his trial.

Lamoreaux's halted investigation also raised additional issues which could have been explored by trial counsel. Lamoreax determined that petitioner's mother had been exposed to pesticides as a child in the cotton fields where she and her family worked.

Lamoreaux attributes her unavailability just prior to and during trial to another factor—money. She states that if "even a portion of my fees and/or expenses been paid, I would have been able to be present both before and during the trial, as I had always anticipated I would be." She claims to have expended several thousand dollars in expenses, depleted her savings, and filed for bankruptcy while never receiving payment from the Court for her services or expenses. Though her statement contradicts that by Moore, Lamoreaux states that she "re-did and resubmitted" her voucher.

Petitioner would respectfully show this Court that the determining factor in this issue is that all three participants—counsel Moore, counsel Butcher and mitigation specialist Lamoreaux—were attorneys. Each owed a duty to petitioner. Indeed, under the Sixth Amendment, petitioner was entitled to the effective assistance of each one of these participants. Money issues aside, petitioner was on trial for his life. Lamoreaux was in possession of

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 38

information which could have been presented to the jury in mitigation of the death penalty and in support of his claim of mental retardation. She was further in possession of additional information which, if investigated, might have led to other persuasive mitigating evidence. But, because of the "breakdown" in communication between Lamoreaux and the trial attorneys, the jury was denied this information. Petitioner would respectfully contend that the allegations herein are sufficient to demonstrate that the performance by Moore, Butcher and Lamoreaux, with respect to their deteriorating relationship, fell below that to be expected of attorneys representing a capital defendant.

Petitioner would further show this Court that the second prong of *Strickland* is met herein. Petitioner's burden is only to demonstrate some conceivable effect on the trial and verdict. The evidence which Lamoreaux developed, and could have continued to develop, demonstrated the abusive family relationship in a much more detailed and graphic way than that evidence presented in petitioner's trial. Moreover, Lamoreaux's historical evidence of abuse lends more credibility to these mitigating claims. This would have been especially so had counsel been able to discuss such evidence with the mental health experts already available to explain such evidence to the jury. Petitioner contends he is entitled to relief.

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 39

**GROUND FOR REVIEW EIGHT: PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO PRESENT EVIDENCE OF PETITIONER'S SPECIAL TALENTS, MUSICAL ABILITIES, AND RELIGOUS DEVOTION IN MITIGATION OF THE DEATH PENALTY.**

Petitioner comes from a large family with extensive musical talents. Petitioner's father had several talents, including being a musician and singer. He played in many of the clubs throughout Arkansas. Petitioner and his brothers shared their father's musical talent. They performed with their father throughout their childhood, appearing in many different clubs in the Pine Bluff Area. The family also performed in many of the area churches, singing gospel music. The family's talents in this area were well known.

Additionally, petitioner had a devotion to Christianity and his religious training. He attended church regularly, even during his pre-trial incarceration, and read the bible daily. Petitioner met with different persons who assisted him as "spiritual advisors."

The jury was entitled to hear all evidence in mitigation of the death penalty. Indeed, under federal law, the jury did not have to be in unanimous agreement as to which factors were mitigating. Therefore, petitioner's burden was only to establish, by a preponderance of the evidence, a mitigating factor to persuade one juror that life was a better alternative. In such a situation is cannot be reasonable strategy to fail to introduce to the jury any and all available evidence calling for a sentence less than death.

Petitioner would respectfully show that his trial attorneys' failure to present evidence of his special talents, his musical ability and his religious devotion falls short of that representation

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 40

**GROUND FOR REVIEW NINE: PETITIONER'S RIGHTS TO DUE PROCESS WERE VIOLATED BECAUSE THE GOVERNMENT WAS IN POSSESSION OF THE INFORMATION WHICH SUGGESTS PETITIONER WAS NOT PROVIDED SPECIAL EDUCATION SERVICES DUE TO RACIAL DISCRIMINATION.**

This ground for review is made in conjunction with grounds for review three and four which discuss the petitioner's mental retardation. Petitioner would specifically incorporate herein the factual allegations made within grounds for review three and four and if such were fully copied and set forth at length. Within these grounds petitioner contended the education witnesses who testified at his trial were biased and the racial discrimination provided a reasonable explanation why petitioner was not provided special education services by the Watson Chapel School District.

Petitioner would show this Court that all of the evidence, information and factual allegations made within grounds for review three and four (as well as ground for review one) were previously known to the Government. Indeed it was the United States Justice Department who prosecuted the desegregation law suit which began in 1970 and was not resolved until 1991. Additionally, Ms. Willis, through her many complaints to governmental agencies such as the EEOC, informed the Justice Department further of the continued discrimination in the Watson Chapel School District.

A prosecutor has a constitutional duty under the Due Process Clause in the Fifth and Fourteenth Amendment to the United States Constitution to disclose, upon request, to the defendant any evidence which is favorable and material to the issue of the defendant's guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1196 (1962). In *Brady*, the Court

held the State's failure to disclose favorable evidence violated the Due Process Clause, regardless whether the prosecutor acts in good faith or bad faith. *Id.*, 373 U.S. at 87, 83 S.Ct. at 1196-1197.

To be entitled to relief the evidence suppressed must be "material"-- that is, there must be a reasonable probability the result of a proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375 (1985). However, this does not mean the defendant must prove the jury's verdict would have been different. Instead, the defendant is charged with proving the evidence withheld *questions the ultimate fairness of the proceedings.* As the Supreme Court stated in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555 (1995), "[a] reasonable probability of a different result is ... shown when the Government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.*, 514 U.S. at 434, 115 S.Ct. at 1566. And, if the prosecutor has *exculpatory* evidence, such evidence must be disclosed even in the absence of a request. *Bagley*, 473 U.S. at    *and, United States v. Agurs*, 427 U.S. 97 (1976).

In *Kyles*, the Court explained that the rule in *Brady* justifies society's trust in the prosecution as the representative of all people and not simply a litigant striving to win a case.[30] *Id.*, 514 U.S. at 439-440, 115 S.Ct. at 1568-1569. Indeed, "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Brady*, 373 U.S. at 87, 83 S.Ct. at 1197. Therefore, in the determination whether favorable evidence should have been disclosed, the prosecutor's "good faith" is irrelevant. The Supreme Court maintains, "... whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith

---

[30]    Under *Bagley*, there can be no distinction between impeachment evidence and exculpatory evidence where *Brady* was concerned. *Id.*, 473 U.S. at 682, 105 S.Ct. at 3383.

U.S.A. v. Bruce Cameil Webster
Motion filed under 28 U.S.C. § 2255
Page 43

or bad faith ...) The prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." *Id.*, 514 U.S. at 437-438, 115 S.Ct. at 1567-1568.

Petitioner would contend that the Government, by virtue of previous prosecution of the Watson Chappel School District, was in possession of evidence which questioned the credibility of their witnesses. These witnesses were paramount in the Government's quest to defeat petitioner's claims of mental retardation. Therefore, any information which would reflect on the credibility of these witnesses, obviously questions the ultimate fairness of the proceedings. Petitioner is entitled to relief.

**GROUND FOR REVIEW TEN: PETITIONER'S RIGHTS TO DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BY THE PRESENTATION OF UNTRUE AND DAMAGING TESTIMONY BY PETITIONER'S CO-DEFENDANT, STEVE BECKLEY.**

**GROUND FOR REVIEW ELEVEN: PETITIONER'S RIGHTS TO DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BY THE PRESENTATION OF UNTRUE AND DAMAGING TESTIMONY BY PETITIONER'S CO-DEFENDANT, MARVIN HOLLOWAY.**

### EVIDENCE AT TRIAL-BECKLEY

Co-defendant Steven Beckley testified at Petitioner's trial pursuant to an agreement with the government. Beckley's testimony was directly related to Petitioner's alleged involvement in the kidnapping and subsequent murder of Lisa Rene. Among other things, Beckley's testimony relevant to Petitioner's involvement was that:

- Petitioner could be heard in the 911 tape yelling "this is the FBI."

- Petitioner was the one who actually abducted Lisa Rene and was the one who dragged Lisa Rene from her brother's apartment after the break-in.

- Petitioner raped Lisa Rene at least twice on the way to Pine Bluff Arkansas.

- Petitioner tells Beckley that he knows a place where they can take Lisa Rene and burn her and "nobody will ever find her."

- Petitioner returns to the motel where Lisa Rene is being held and tells Beckley "the hole is dug."

- Petitioner and Orlando hall led Beckley and Lisa to a burial site in Byrd Park where a grave had been dug.

- At the grave site, Petitioner struck Lisa Rene in the head with a shovel multiple times.

- Petitioner placed Lisa Rene in the grave.

- Petitioner removed the clothes of Lisa Rene.

- Petitioner pours gasoline on Lisa Rene after she is placed in the grave.

- Petitioner and Orlando Hall are "talking and laughing" when Beckley returns to the grave site.

## EVIDENCE AT TRIAL-HOLLOWAY

Co-defendant Marvin Holloway testified at Petitioner's trial pursuant to an agreement with the government. Although Holloway was not present during the kidnapping or murder of Lisa Rene, his testimony was directly related to Petitioner's alleged involvement in the kidnapping and subsequent murder of Lisa Rene. Among other things, Holloway's testimony relevant to Petitioner's involvement was that:

- When Orlando Hall was asked why he wanted Bruce Webster, he responded that he figured Bruce could "kill someone if it came down to it."

- When Bruce Webster was apprized of the situation In Arlington, Texas, he told Holloway "we can handle these punk motherfuckers."

- Beckley told Holloway that Bruce had been messing with [Lisa Rene] all night."

- Petitioner told Orlando Hall that he didn't have to worry about having a place to kill Lisa Rene "because he know plenty of places to go to do this."

- Petitioner and Orlando Hall talked about how they were going to kill Lisa Rene. They could "either beat her to death, choke her or shoot her."

## NON-RECORD EVIDENCE-BECKLEY

After trial of Petitioner, Beckley was being held in the Federal Correctional Institute in Ft. Worth, Texas. In the presence of Correctional Officer Ward and inmate Albert Williams, Beckley made comments to Ward and Williams that Beckley had lied under oath in the trial of Petitioner in order to garner favor with the government, avoid the death penalty, and procure a favorable sentence. Beckley had an incentive to place blame on Petitioner thereby minimizing his own blameworthiness. He too, could be facing a sentence of death if he failed to cooperate with the government.

## NON RECORD EVIDENCE-HOLLOWAY

In the early months on 2000, Orlando Hall received a letter from Marvin Holloway. A copy of the letter and envelope is attached hereto as Attachment "A" and incorporated herein by reference as if copied herein verbatim. In his letter Hall, Holloway states "Tell B-Love what's up if he is still by you, and I think I owe him a big apology, so if he wants to hear it then, he will half to give me his number." Holloway's desire to apologize is a result of his untruthful testimony concerning Petitioner's role in the offense.

## THE RELEVANCE OF BECKLEY AND HOLLOWAY'S TESTIMONY

At the close of the punishment phase of trial, the trial Court submitted the following Statutory and Non-Statutory Mitigating Factors to the jury:

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 47

II(A). The defendant, Bruce Carneil Webster, caused the death of Lisa Rene, or injury resulting in the death of Lisa Rene, which occurred during the offense of kidnapping.

II(B). The defendant, Bruce Carneil Webster, committed the offense in a especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse of Lisa Rene.

II(C). The defendant, Bruce Carneil Webster, after substantial planning and premeditation, committed the offense of kidnapping in which the death of Lisa Rene resulted.

II(D). The victim, Lisa Rene, was particularly vulnerable due to her age.

III(A). The defendant, Bruce Carneil Webster, constitutes a future danger to the lives and safety of other persons.

III(B). The effect of the instant offense on Lisa Rene's family.

The jury found all of the aggravating factors had been proved beyond a reasonable doubt with the exception of II(A). Holloway and Beckley's testimony was significant for a finding on several of the issues but was especially damning on the issues concerning the cruel, heinous nature of the crime and the planning and premeditation.

The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendants life and liberty may depend. *Napue v. Illinois*, 360 U.S. 64 (1959)

The concept of due process and its application of various constitutional rights is premised on fundamental fairness. *Ake v. Oklahoma*, 470 U.S. 68, 76-77, 105 S.Ct. 1087 (1985). *See*

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 48

*generally, Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127 (1969); *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735 (1961); *Napue v. Illinois*, 360 U.S. at 269, 79 S.Ct. at 1177; *Dispensa v. Lynaugh*, 847 F.2d 211, 218 (5th Cir. 1988); *and, Ex parte Brandley*, 781 S.W.2d 886 (Tex.Cr.App. 1989). Irrespective of whether the government had knowledge of the untruthful testimony of Holloway or Beckley, Petitioner's right to due process under the Fifth and Fourteenth Amendment to the United States Constitution were violated by Holloway and Beckley's untruthful testimony.

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 49

**GROUND FOR REVIEW TWELVE:  PETITIONER IS INELIGIBLE FOR EXECUTION BECAUSE HE IS MENTALLY RETARDED.**

For purposes of this Ground for Review, all of the factual allegations contained in paragraph "E" above entitled "Mitigation" are re-alleged herein and incorporated herein for all purposes as well as the entirety of the record at trial.

18 U.S.C. 3596(c)states in pertinent part: "**Mental capacity.**-A sentence of death shall not be carried out upon a person who is mentally retarded." Petitioner is mentally retarded. Years before the instant offense, Petitioner was tested and determined to possess an IQ of 48, well within the range to be diagnosed retarded.  Investigator Joseph Ward, in interviews with siblings has determined Petitioner attended special education classes while enrolled in Coleman elementary School.  An interview with Ms. Loula Grey, a former teacher of Petitioner, revealed that she thought Petitioner should have and would have been in special education but for the discriminatory practices of the Watson Chapel School District.

Extensive testing in the months prior to trial provided overwhelming evidence of Petitioner's mental retardation. (See facts under Paragraph E above)

Mental retardation is not a condition that one overcomes.  Once a person is diagnosed as mentally retarded, he or she maintains that condition throughout their lives.  The statute does not limit the bar to execution of the mentally retarded to a finding of mental retardation at any particular time in the judicial proceedings.  If at any time in the process, Petitioner is determined to be mentally retarded, such finding acts as a bar to execution.

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 50

Petitioner was mentally retarded in 1992 when his IQ tested at a 48 at an Arkansas Mental Health Facility. Petitioner was mentally retarded in and around the time of trial when his IQ scores tested between 59 and 72. Four Jurors, at the time of trial found that Petitioner "is or may be retarded." Petitioner, to this day is mentally retarded and his execution is barred by 18 U.S.C. 3596.

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 51

**GROUND FOR REVIEW THIRTEEN:   THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE TRIAL JUDGE'S DETERMINATION THAT PETITIONER IS NOT MENTALLY RETARDED.**

Petitioner re-urges and re-alleges the factual allegations previously set forth in **Paragraph E** above and incorporates them herein as if set forth verbatim for purposes of this Ground for Review as well as the entirety of the record at trial.

Petitioner further alleges that the only *expert* testimony for the government concerning Petitioner's mental retardation was from Dr. George Parker and Dr. Richard Coons. Dr. Parker performed a series of flawed psychological tests while Dr. Coons only performed a forensic interview in the Mansfield Correctional Facility and reviewed various reports and tests of other Doctors, (including Parker's) school records, as well as statements of co-defendants. Neither expert interviewed anyone who knew Petitioner outside the correctional setting. The testing by Parker (WAIS-R) revealed a full scale IQ of 72, fully within the range for a diagnosis for mental retardation pursuant to the DSM IV and the American Association on Mental retardation Manuel. Even assuming the result was correct, Parker's administration of the WAIS-R was flawed. He only administrated seven of the eleven subtests and prorated the results of four of the subtests that Petitioner did poorly on in previous testing. Naturally, Parker's prorated scores were higher than the *actual* scores Petitioner obtained on previous tests in which he was actually administered *all* of the subtests. Additionally, Parker admitted on cross-examination that he was not certified by the Texas Department of Mental Health and Mental Retardation to make a diagnosis of mental retardation.

continuing through life in a normal pattern." In order to evaluate Petitioner, Dr. Keyes administered several tests and testified at trial about their results.

Dr. Keyes administered the Bender-Gestalt test which he described as a visual motor integration test. Dr. Keyes testified the purpose was "to see how well a person can take a picture and copy it on to another picture, on to another page, organize the picture, put it together as well as possible given the person's abilities." He added that "it is a very good indicator of soft signs of neurological damage."

According to Dr. Keyes, "[T]he actual results were slightly below average." He also noted there "were several neurological soft signs", indicating brain damage.

Dr. Keyes then administered the Stanford Binet test, Fourth Edition. Dr. Keyes testified that Petitioner performed in the lowest .2 percent of the population with a score of 51. He noted that the score of 51 was essentially the same numbers used in other intelligence tests to define mental retardation. Petitioner fell well below the benchmark of 75.

The next test administered was the Woodcock-Johnson Psycho-Educational Battery, Part 2. The purpose of the test was to test Petitioner's literacy. To Dr. Keyes surprise, Petitioner performed well for a person with his IQ.

Dr. Keyes returned at a later time to perform another intelligence test on Petitioner. He chose the Kaufman Adolescent and Adult Intelligence Test. He did not want to re-administer the Stanford-Binet or the WAIS-R because of the "practice effect" that sometimes results from taking an intelligence test numerous times. Dr. Keyes testified concerning the test, "The I.Q. that I achieved in the Kaufman was almost exactly the combination of numbers that I got on the

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 54

Stanford Binet. In other words, there was virtually no difference between them." He further

testified that he felt, as a result of his testing, Petitioner was not malingering.

Following the extensive testing performed on Petitioner, Dr. Keyes felt it was necessary

to perform an adaptive skills assessment relative to Petitioner. He used the Vineland Adaptive

Skills Assessment that he described as follows:

> I use the Vineland, which is a social maturity scale and adaptive behavior scale, whereby
> I sit down with people who know the individual and get as much information as I can
> from them. I like to find out about the person's background, their childhood, their
> infancy, their developmental history. I get as much history as I can on the individual.
> Then I also like to find out about the social skills of the individual, what kind of people
> they were as far as their work attitude, their work ethic, et cetera, et cetera. I get as much
> information as I can. And it's typically not, I'm asking you questions, you're giving me
> answers. It is a discussion that is held in interview format.

As a result of his evaluation, Dr. Keyes determined that Petitioner functions somewhere

in the range of a seven year old. In summary, Dr. Keyes, as a result of his testing, interviews and

evaluations, formed the opinion that Petitioner is retarded.

Dr. Robert Fulbright, a neuropsychologist performed a battery of tests on Petitioner on

March 19, 1996. As a result of his testing, Dr. Fulbright determined that Petitioner had

significant impairment in his attention capacity. He testified that "[h]is ability to pay attention to

what he hears for a short periods of time does not appear to be too bad. His ability to pay

attention to more than one thing at a time and, at the same time on the flip side of the coin, filter

out a distraction appears to be quite poor." Tests of Petitioner's reasoning abilities led Dr.

Fulbright to conclude "absolutely, he could not get it." Petitioner's psychomotor tests revealed

petitioner was unusually unsystematic, and unorganized. He had difficulty with complex

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 55

communications. Sentences had to broken down and simplified for him to understand. Sensory and motor skills testing indicated to Dr. Fulbright a possible frontal lobe impairment or dysfunction. The only testing that showed anywhere in the average range was verbal fluency.

As a result of Dr. Fulbright's testing, he formed an opinion that Petitioner suffered from some kind of organic brain damage.

Finally, Dr. Mark Cunningham testified that his examinations of Petitioner and interviews with family led him to a diagnosis that Petitioner suffered from mental retardation of a mild variety.

The finding by the Court that Petitioner is not mentally retarded is without support in the record. Not only is the finding against the great weight and preponderance of the evidence, the evidence is insufficient to support the finding.

The standard for sufficiency of the evidence in *habeas corpus* proceedings was announced in *Jackson v. Virginia*, 433 U.S. 307 (1979). In *Jackson*, the Supreme Court held a Petitioner entitled to relief if it was found that upon the record evidence adduced at trial, in a light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt in terms of the substantive elements of the criminal offense as defined by state law. The standard, therefore, is not a "no evidence" standard, but rather sufficiency thereof as defined in *Jackson*.

Here, of course, we are not dealing with issues of guilt or innocence. Further, the statute gives no guidance on what burden of proof is used in our inquiry. However, an analysis of

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 56

whether the elements of mental retardation were established is still possible. The un-rebutted evidence at trial revealed that a diagnosis of mental retardation has three main components:

(1). A full scale IQ of 75 or below;

(2). Deficits in adaptive behavior

(3) An onset of the disability prior to age 18.

## 75 IQ

Even considering the evidence presented by the government, through Dr. Parker, Petitioner fell well within the range of 75 IQ or below necessary for a diagnosis of mental retardation. There is no evidence in the record that Petitioner ever scored higher than the 72 full scale IQ as tested by Dr. Parker.[31]

## ADAPTIVE BEHAVIOR DEFICITS

The only record testimony of anyone making inquiry into the adaptive behaviors of Petitioner outside the structured jail environment was that of Dr. Mark Cunningham, who interviewed family members over the phone, and Dr. Denis Keyes. Dr. Keyes actually traveled to Pine Bluff, Arkansas to interview family, friends, school teachers and other collaterals who could describe Petitioner in the "free world." Dr. Keyes used the Vineland Social Maturity and Adaptive Behavior Scale to examine Petitioner's ability to function in the real world. Based on his assessment, Petitioner possessed the requisite deficits in adaptive behavior necessary to a diagnosis of mental retardation. The government's two witnesses only observed Petitioner in a jail setting and only interviewed personnel who knew him in that environment. In order to

---

[31]    Dr. Parker admitted under cross examination that he was not certified by the Texas Department on Mental Health and Mental Retardation to make a diagnosis of mental retardation.

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 57

accurately assess adaptive behaviors, Dr. Keyes testified that it was necessary to interview persons who knew Petitioner prior to age 18 in order to obtain the necessary background information for accurate diagnosis. Viewing him in the structure of the jail, without more was insufficient.

The record is void of any credible evidence from the government that Petitioner possessed that necessary adaptive functioning to avoid a diagnosis of mental retardation.

## ONSET PRIOR TO AGE 18

The final component of mental retardation is the requirement that the disability manifest itself prior to age 18. A determination of this component can only be made by interviewing individuals who knew and dealt with Petitioner in those developmental years. The only testimony to this component that included such an evaluation was that of Drs. Keyes and Cunningham.

Applied to the case at bar, no rational trier of fact could find that Petitioner *was not* retarded. At least four rational triers of fact found the evidence sufficient to make an affirmative finding that "defendant is or may be retarded." A view of the extensive evidence at trial, concerning the mental retardation of Petitioner, viewed in a light most favorable to the government, reveals evidence wholly insufficient to support the finding of the Court that Petitioner was not retarded. To the contrary, the evidence is overwhelming that Petitioner is retarded.

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 58

**GROUND FOR REVIEW FOURTEEN: THE TRIAL JUDGE ERRED IN DISMISSING JURY MEMBER ALFRED FOX AND REPLACING HIM WITH AN ALTERNATIVE JUROR WHO DID NOT PARTICIPATE IN THE JURY'S DELIBERATION DURING THE GUILT/INNOCENCE STAGE.**

After the jury retired to deliberate at the guilt/innocence phase of the trial, the court discharged three of the five alternate jurors. The two remaining jurors were told to remain but to not discuss the case.

During the punishment phase of trial, prior to deliberations, juror number 12, Alfred Fox, informed the judge that he had been injured in an automobile accident and was suffering pain from his injuries. He was also taking nitroglycerine tablets. Mr. Fox was distraught and concerned about his health when he informed the Court that he could no longer serve as a juror.

After questioning juror Fox, the Court dismissed him without consulting the attorneys and later requested the attorneys to give input on how to proceed. Petitioner questioned the propriety of allowing a juror who did not participate in the deliberations at the guilt/innocence phase of trial to now participate in the punishment phase without benefit of having been involved in all of the deliberations. Petitioner requested a mistrial as a remedy voicing concerns that the new juror "would not be on equal footing with the other 11 jurors."

18 U.S.C. 3593(b)(3) requires that a jury impaneled to consider a death penalty case "shall consist of 12 members, unless, and any time before the conclusion of the hearing, the parties stipulate with the approval of the Court, that it shall consist of a lesser number." No such stipulation was entered into on behalf of Petitioner, therefore, the statute requires the Court proceed with 12 jurors. However, the Court, did not proceed with the 12 who deliberated

Petitioner's guilt/ innocence. Instead, an alternate, without benefit of the prior deliberations on guilt/innocence, was forced to "take up the baton" and consider the punishment evidence.

The Court instructed the jury:

> In deciding whether aggravating or mitigating factors exist, you may consider any evidence that was presented during the guilt phase of the trial and any information that was presented during the penalty phase of the trial, including any matters to which the parties have stipulated. You may also make deductions and reach conclusions that reason and common sense lead you to draw from facts which have been established from the testimony and other evidence and information in the case.

No doubt, the alternate juror had the benefit of hearing all the evidence in the case, however, none of the benefit of discussing that evidence with his fellow jurors. The result was an 11 person jury with an additional party placed in its midst to meet the requirement of 12 jurors.

The 5th Circuit Court of Appeals has voiced concerns over the practice of replacing a juror with an alternate after deliberations have begun.

> An alternate juror replacing a regular juror after the jury has commenced its deliberations may be unable to participate equally with the other jurors, because he will lack the benefit of the prior deliberations. There is a danger that the other juror will have "already formulated positions or viewpoints or opinions" in the absence of the alternate juror and then pressure the newcomer into passively ratifying this predetermined verdict, thus denying the defendant the right to consideration of the case the 12 jurors.

U.S. v. Quiroz-Cortez, 960 F.2d 418 (5th Cir. 1992)

In Petitioner's case, deliberations had already begun, in fact, deliberations on guilt/innocence were complete. The Court, therefore, violated the requirement of 18 U.S.C. 3593

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 60

by replacing a juror after guilt/innocense deliberations but before punishment deliberations were

complete.

## GROUND FOR REVIEW FIFTEEN: 18 U.S.C. Sec. 3596 IS UNCONSTITUTIONALLY VAGUE AND VIOLATES PETITIONER'S RIGHTS TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS.

18 U.S.C. 3596(c)states in pertinent part: "**Mental capacity.**-A sentence of death shall not be carried out upon a person who is mentally retarded." This statement of the law, although succinct, provides no insight into how the statute is to be implemented. Neither 18 U.S.C. 3596 nor any of the ancillary death penalty statutes in Title 18 concerning the death penalty provide any guidance for the courts or counsel concerning (1) who is to be the fact-finder in an issue on mental retardation, (2) the burden of proof when dealing with such an issue (whether the issue is to be resolved by clear and convincing evidence, by a preponderance, or beyond a reasonable doubt) (3) nor what standards are to be utilized in defining mental retardation.[32] 21 U.S.C. 848, the statute providing for the death penalty for "drug kingpins," is written in similar fashion to the statute in question, but provides no guidance for the litigants. The silence of both statutes leaves all parties uncertain of their intent when mental retardation actually becomes an issue.

A statute fails to meet the requirements of the due process clause if it is so vague and standardless that it leaves Judges, attorneys, juries or the public uncertain as to the conduct that is prohibited, or in the case of Petitioner, what the legal standards are for a particular procedure in a particular case. The intended result is outlined, that the mentally retarded are not to be executed,

---

[32]The legislative history indicates that Senator Biden, the proponent of the amendment precluding execution of the mentally retarded, understood the definition of mental retardation to be "a person with the IQ of 70 or less, or put another way, with a mental capacity, with a mental age of 12 or less." (Congressional Record - Senate S6875, May 24, 1990) The House debates on the 1988 Drug Control Bill, 21 U.S.C. 848, which reinstated the death penalty for the Federal Government, included debate on the exemption of persons with mental retardation from execution. Representative Levin of Michigan apparently felt the definition of mental retardation, for purposes of that debate, was the definition promulgated by the American Association on Mental Retardation. (144 Congressional Record H7283, September 8, 1988) The provisions precluding the execution of the mentally retarded in 18 U.S.C. 3596 and 21 U.S.C. 848 are identical.

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 62

but the road to that result has not begun to be outlined in the statute as written. The result in the case of 18 U.S.C. 3596 is a statute that is so vague, indefinite and standardless as to be unconstitutional.

### GROUND FOR REVIEW SIXTEEN: BINDING INTERNATIONAL LAW FORBIDS PETITIONER'S EXECUTION BECAUSE PETITIONER IS MENTALLY RETARDED.

Petitioner respectfully contends that his execution would violate International Law. Petitioner would incorporate by reference all the factual allegations and evidence heretofore plead concerning petitioner's mental retardation. Petitioner would show that he is a mentally retarded person and that all credible evidence and witnesses support such a determination.

Petitioner would further show that International Law is binding upon this Court:

> International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination. For this purpose, where there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.

*The Paquete Habana,* 175 U.S. 677, 700 (1900) (citations omitted).

International Law clearly frowns upon the use of the death penalty. However, when the death penalty is imposed upon mentally ill and mentally retarded persons, the condemnation is certain. In 1988 the United Nations recommended that every member take steps to eliminate that death penalty for all persons suffering from mental retardation or mental illness, whether existing

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 63

at the time of sentence or execution. *See, (Safeguards Guaranteeing Protection of Rights of Those Facing the Death Penalty*, ECOSCO Res. 1989/64, U.N. ESCOR Supp. No. 1, at 51, U.N. Doc. E/1989/91 (1989); U.N. ESCOR 1988); *and, (Report of the Committee on Crime Prevention and Control on its Tenth Session*, U.N. ESCOR, Supp. No. 10, at 28-29, U.N. Doc. E/1988/20 (1988). In 1996, the United Nations adopted a similar resolution recommending protection for persons suffering from mental retardation. *(Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty*, ECOSCO Res. 1996/19, U.N> Doc. E/CN 15/1996/19 (1996)). Indeed, throughout that year the United States received many appeals concerning the execution of mentally retarded persons.

In 1997, the Commission on Human rights called on all countries to abolish the death penalty or at least limit its application to only the most serious crimes and exempting mentally retarded defendants. (Question of the Death Penalty, U.N. Hum. Rts. Comm. Res. 1997/12 adopted Apr. 3, 1997). In 1998, the Commission called on all countries to comply with the *International Covenant on Civil and Political Rights*, GA Res. 2200 A (XXI), U.N. GAOR, 21ˢᵗ Sess. Supp. No. 16, at 52, Article 6 and 7, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171).[33] See, *Question of the Death Penalty*, U.N. Hum. Rts. Comm. Res. 1998/8). In the opinion of the Commission, the execution of mentally retarded persons arbitrarily deprives individuals of the life by subjecting them to cruel and inhuman punishment. *See Id., supra.*

---

[33]    In April of this year the Commission on Human Rights released another request that all countries not "impose the death penalty on a person suffering from any form of mental disorder or to execute any such person ... ." (Question of the Death Penalty, U.N. Hum. Rts. Comm. Res. 2000/65; 3(e)), (*See* Attachment "J").

The United States has been the subject of international criticism with regard to its continued execution of mentally retarded persons. *See*, (United Nations, *Report of the Special Rapporteur, On Extrajudicial Summary or Arbitrary Executions*, E/CN.4/1998/68 ADD.3 (1998)).

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 64

Petitioner understands that the Senate sought to invoke a "reservation" concerning Article 6 and Article 7 of the *International Covenant on Civil and Political Rights*.[34] However, International Law will not recognize any attempted reservation which is incompatible with the object and purpose of the treaty. In 1995 the Human Rights Committee disapproved of the attempted reservation by the United States. *(Consideration of Reports Submitted by States under Article 40 of the Covenant*, Comments of the Human Rights Committee, 53rd Session, 1413, mtg., Par. 14 at p. 4, par. 16, at 4, U.N. Doc. CCPR/C/79/Add.50 (1995)). The attempted reservation of Articles Six and Seven by he U.S. Senate are invalid. Schabas. W., *The Abolition of the Death Penalty in International Law*, 2nd edition, Cambridge Universigty Press (1977); Schabas, W., *The International Sourcebook on Capital Punishment*, Center for Capital Punishment Studies, London, Northeastern University Press, Boston (1997).

The International Community has recognized additional rights for the mentally retarded as well. *Declaration on the Rights of Mentally Retarded Persons*, G.A. res. 2856 (XXVI), 26 U.N. GAOR Supp. (No. 29) at 93, U.N. Doc. Doc. A/8429 (1971)(*See* Attachment "M"). The General Assembly noted that "[t]he mentally retarded person has a right to proper medical care and physical therapy and to such education, training, rehabilitation and guidance as will enable him to develop his ability and maximum potential." *See, id,* at (2). Moreover, "[t]he mentally retarded person has a right to protection from exploitation, abuse and degrading treatment. If

---

[34]    Article 6 of the Covenant provides in part, "Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life." Article 7 provides: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. IN particular, no one shall be subjected without his free consent to medical or scientific experimentation."

prosecuted for any offence, he shall have a right to due process of law with full recognition being given to his degree of mental responsibility." *Id.*, at (6).

Petitioner would respectfully show this Court that each of these actions are "conventional norms," as that term is understood in International law. No other country in our world, save Japan, has executed mentally retarded persons. Additionally, the American Bar Association has twice adopted policies which oppose the execution of the mentally retarded.[35] (ABA 1989 & 1997). The ABA published *Criminal Justice Mental Health Standards* which oppose the execution of the mentally retarded. (ABA 1987). Therefore a norm has evolved which forbids the execution of mentally retarded persons and this norm is binding on the Courts of this country.

## STATEMENT REGARDING AMENDMENTS AND INVESTIGATION

Petitioner would respectfully request the Court to set forth a briefing schedule which will allow continued investigation, full discovery and liberal amendments to this pleading, in accordance with the dictates of justice.

## CONCLUSION and PRAYER FOR RELIEF

---

[35] In addition to the American Bar Association, the American Association on Mental Retardation (AAMR) opposes the execution of mentally retarded persons. (AAMR, 1988). As does the Association of Retarded Citizens. (ARC, 1992).

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 66

Wherefore, petitioner BRUCE CARNEIL WEBSTER respectfully prays that this Court:

1.    Vacate his unlawfully obtained death sentence;

2.    Order that Mr. Webster be relieved from the illegal restraint of his liberty, such restraint being founded upon an unlawful and unconstitutional conviction and sentence;

3.    Permit Mr. Webster a sufficient period of time within which to file such amendments to this Motion as might be necessary to bring all proper matters before the Court and avoid piecemeal litigation of his challenges to the legality and constitutionality of his death sentence;

4.    Grant Mr. Webster an evidentiary hearing on all claims raised herein;

5.    Pursuant to Rule 6 of the Rules Governing Section 2255 Cases in the United States District Courts, grant Mr. Webster leave to pursue such discovery as would be available under the Federal Rules of Civil Procedure, pending a hearing on his claims; and

6.    Grant such other relief as law and justice require.

Respectfully Submitted,

_____        _____
**PHILIP WISCHKAEMPER**                **GARY TAYLOR**
SNUGGS & WISCHKAEMPER                    State Bar No. 19691650
State Bar No. 21802750                  P.O. Box 90212
915 Texas Avenue                        Austin, Texas 78709-0212
Lubbock, TX 79401                       (512) 301-5100
(806) 763-9900                          (512) 301-5329 (fax)

U.S.A. v. Bruce Carneil Webster
Motion filed under 28 U.S.C. § 2255
Page 67

# Affidavit

State of Texas            *

County of Lubbock     *

Before me the undersigned official, personally appeared Philip Wischkaemper, a person known to me, and, after being sworn upon his oath, Philip Wischkamper deposed and stated:

My name is Philip Wischkaemper. I am an attorney licensed by the State of Texas and in this Court. Gary Taylor and I are the attorneys of record for the petitioner, appointed by this Court. Neither Gary Taylor or I represented Mr. Webster at trial or on appeal. Because of the time limitations imposed on filing this pleading, the distance between Texas and the Federal Death Row in Terre Haute, Indiana, and the limitation of funds to travel to Indiana, I am unable to transmit this petition to petitioner for his signature before filing. I have read the foregoing MOTION OF BRUCE CARNEIL WEBSTER TO VACATE CONVICTION AND SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE and pleading is true and correct from my knowledge and belief and based upon my investigation of this case.

_____
Philip Wischkaemper

Sworn to and signed before me on this the 28 Day of September, 2000.

_____
Notary Public in and for
THE STATE OF TEXAS
my comm. exp: 2/09/01


SUE LEWIS
Notary Public, State of Texas
My Commission Expires 02-09-2001

# CERTIFICATE OF DELIVERY

I herein certify that a true and correct copy of the above and foregoing was delivered to the United States Attorney's Office in Fort Worth, Texas by United States Mail, Certified Mail, Return Receipt Requested.

9-28-00
_____
Date

_____
Philip Wischkaemper

# Wells Decl. Ex. V



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
Fort Worth Division

UNITED STATES OF AMERICA,

Plaintiff/Respondent

vs.                                        No. CR 4-94-121-Y

BRUCE CARNEIL WEBSTER,

Defendant/Petitioner

## AMENDED MOTION OF BRUCE CARNEIL WEBSTER TO VACATE CONVICTION AND SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

## I.

## INTRODUCTION

Comes now, BRUCE CARNEIL WEBSTER, petitioner, and would respectfully show this Court that he is a prisoner in the custody of the United States government. Mr. Webster is sentenced to death and currently resides in the United States Penitentiary, Federal Death Row, at Terre Haute, Indiana. Mr. Webster would show this Court that he was convicted and sentenced to death in violation of the Constitution and Laws of the United States. Mr. Webster herein demonstrates constitutional error and moves the Court to set aside and vacate his conviction and sentence, and order a new trial. In support of this motion Mr. Webster would show as follows:

*U.S.A. v. Bruce Carneil Webster*
*Amended* Motion filed under 28 U.S.C. § 2255                                        Page 1

EXHIBIT V

# II.

## JURISDICTION

This District Court has jurisdiction to entertain the claims raised and grant relief thereon under 28 U.S.C. Sec. 2255.

# III.

## PROCEDURAL HISTORY

### A. Prior trial Court Proceedings

Petitioner hereby offers as part of the evidence supporting his petition the entire record of the trial in this case and all exhibits entered therein. Further, petitioner incorporates by reference, as if fully copied and set forth at length, all exhibits previously filed with his original pleadings in this case into this amended pleading. This amended pleading is filed pursuant to the Court's order specifically allowing petitioner to amend his original pleadings.

On October 26, 1994, the United States District Court for the Northern District of Texas issued a criminal complaint charging petitioner, Orlando Hall, Steven Beckley and Demetrius Hall with kidnaping and aiding and abetting, in violation of 18 U.S.C. Section 1201(a)(1) and (2). (TR.1:1). On November 4, 1994, a six-count superseding indictment was returned, charging petitioner, Hall, D. Hall, Beckley, and Marvin Holloway with kidnapping in which a death occurred, in violation of 18 U.S.C. Section 1201(a)(1) and (2) in Count 1, and with various noncapital offenses in the remaining Counts. (TR.1:15-34).

On February 23, 1995, the United States Attorney filed notice of its intention to seek the death penalty against petitioner under the Federal Death Penalty Act of 1994, 18 U.S.C. Section

3591 et seq. (TR.1:55-60). On February 27, 1996, the United States Attorney filed its amended notice of its intention to seek the death penalty against petitioner. (TR.8:936-942).

Trial commenced on March 5, 1996, (TR.8:1036); and continued until April 4,1996, when jury selection was concluded, the jury was seated, and trial was recessed. (TR.10:1237). On June 3, 1996, trial resumed, (TR.10:1337), and evidence began on June 4, 1996, (TR.11:1391), continuing until June 7, 1996, when the jury found petitioner guilty of Counts 1,2, and 6 of the indictment. (TR.11: 1405; 1406). The punishment hearing on Count 1 of the indictment began .before the same jury on June 11, 1996, TR.11:1425) and continued until June 20, 1996, when the jury returned their special punishment findings and petitioner was sentenced to death. (TR.11:1515-1530).

On September 24, 1996, petitioner was sentenced on the remaining counts of the indictment. (TR.12:1620). On September 30, 1996, petitioner filed his Notice of Appeal. (TR.12: 1629-1630). The United States Court of Appeals affirmed petitioner's conviction on December 3, 1988 and overruled his motions for rehearing. The United States Supreme Court denied the petition for writ of certiorari on October 4, 1999.

## B. Statement of the Evidence

On September 21, 1994, Orlando Hall flew from Little Rock, Arkansas to the Dallas-Fort Worth area to meet his brother, Demetrius Hall, and Stephen Beckley to buy marijuana. (R.19:22-24). Drug dealers Stanfield Vitales and Neil Rene received $5,000.00 for marijuana, but failed to supply the marijuana.[1] (R.19-213). The men decided to force the drug dealers to

---

[1]    Vitales and Rene were brothers of the victim of this offense.

return their money, telephoned petitioner and requested that he come to the Dallas-Fort Worth to assist. (R.18-89). Marvin Holloway, an associate of Orlanda Hall in Arkansas, bought petitioner's airline ticket, drove him to the airport, and showed petitioner how to board the plane. (R.20-282-283). The group from Arkansas now included four men: Orlando Hall, Demetrous Hall, Steven Beckley and petitioner.

On September 24, 1994, the men went to the drug dealers' apartment to retrieve the stolen $5000.00. Although the drug dealers were not home, the victim. The men broke into the apartment, abducted the victim, and drove her to Pine Bluff, Arkansas. (R.18: 106-113). The victim was sexually assaulted before and after her arrival in Pine Bluff. (R.18:124, 125, 134). The victim was held in two different motels for a period of time. The victim later accompanied Orlando Hall, Beckley, and petitioner to a park where she was struck in the head with a shovel and buried. (R.19:102-107).

Based on information provided by the victim's brothers, Demetrius Hall was arrested and then Beckley and Orlando Hall surrendered to the police. (R.19-128). Petitioner was arrested when he drove up to the motel where the girl had been kept. (R.19-248). Petitioner gave a statement and led law enforcement officers to the grave, the victim's clothes, and other physical evidence. (R.20:23, 24, 35).

During the penalty phase of the trial, evidence showed that petitioner received probation at age 15 for burglary of a bait shop but petitioner's probation was subsequently revoked when he was charged with an assault and a robbery. (R22-110). Other evidence was introduced showing petitioner's misconduct while incarcerated and assaultive conduct directed at his girlfriend. (R.22:50-55; 149-160).

*U.S.A. v. Bruce Carneil Webster*
*Amended* Motion filed under 28 U.S.C. § 2255                                                                                    Page 4

Petitioner presented evidence of his abused background and mental impairment. Petitioner, his mother, brothers and sisters suffered significant physical abuse.[2] Additionally, petitioner presented evidence from some five mental health professionals demonstrating his mental retardation and mental impairment.[3]

## C.  Verdict of the Jury and Factual Findings of the Court.

The following Nonstatutory Mitigating factors were presented to the jury in the Court's Charge on punishment:

1.  The defendant is or may be mentally retarded.

2.  The defendant has low intellectual functioning.

3.  The defendant suffered from physical abuse, from emotional abuse, and/or from parental neglect during his upbringing.

On June 20, 1996, four of the twelve jurors found that petitioner "is or may be mentally retarded" and that he "has low intellectual functioning". Twelve found that petitioner "suffered from physical abuse, from emotional abuse, and/or from parental neglect during his upbringing." However, the jury answered the special punishment issues in such a way that required a death sentence be imposed. (Tr: 11:1515-1530 )

## D.  Findings on Mental Retardation.

---

[2]    All twelve jurors found that petitioner "suffered from physical abuse, from emotional abuse, and/or parental neglect during his upbringing." (TR.11:1515-1530).

[3]    The government sought to challenge the mental retardation evidence with testimony from school teachers, prison officials, and others.

On June 21, 1995, the trial court entered its FACTUAL FINDING REGARDING

MENTAL RETARDATION in which it found, as a matter of law, that "defendant Webster is not

mentally retarded and that he possesses the requisite mental capacity to understand the death

penalty and why it will be imposed on him." (Tr. 12:1536)

## E. Mitigation.

Because many of the allegations herein focus on the mitigating evidence presented by

trial counsel, the mitigation evidence from trial is summarized as follows:

- Petitioner was so mentally limited that a co-defendant, Marvin Holloway had to make the flight arrangements and buy petitioner's ticket.

- The government brought several school teachers and administrators who testified that petitioner was not retarded. Some of these had only limited contact with petitioner (R.24:240) and others had experience with him in "Basic" classes (i.e., basic classes are not special education, but it is the lowest level of course work [R.25:47, 49]).

- Much of the punishment phase evidence dealt with petitioner's childhood, living conditions and his mental retardation. Petitioner's competency and sanity were never an issue. (R.23:206, 24:49).

- Petitioner was one of nine children, one of whom, Dary, was murdered by a brother-in-law while petitioner was in prison.(R.23:2,18).

- His brother's death greatly affected petitioner and, on petitioner's release from prison, his mother had him seek mental health treatment. (R.23:147, 148).

- Petitioner, his mother and the other children suffered significant physical abuse by the father. (R.23:6,7, 14, 27, 105). The father routinely beat the children with a hose, fan belt, fireplace poker, or anything else he could reach. Sometimes he forced a child to strip naked and had the other children hold the naked child as the father beat him/her. (R.23:7-11, 37, 55, 60).

- Petitioner was often beaten by the father (R.23:47) Petitioner's sister testified she saw her father tie petitioner's hands and feet and beat him. Usual punishment was said to be 25 licks on the feet and back, and was doubled if the child moved. (R.23:107, 143).

- Petitioner's father hit one of the children with a garden hoe and "knocked a big chunk out" of her leg. (R.23:109).

- Petitioner's father hit one of petitioner's brothers with a piece of iron and knocked him on the driveway, bleeding from his ears and nose. (R.23:122).

- Petitioner's father could not read or write and did not work after being hit in the head in an industrial accident in 1969 (R.23:54, 134). Petitioner's mother dropped out of school in the 7th grade. (R.23: 21, 135).

- The abuse by petitioner's father included forced sex between the children or between a child and petitioner's mother, forcing children to "kiss the cat's behind," placing a clothespin on a child's penis, forcing a child to eat black pepper, "slop," human waste, "piss in bread," and other heinous acts such as dropping the children on concrete, burning or branding them with a hot iron, shocking a child with the spark plug wire from a lawnmower, and placing a concoction of hot sauce, pepper and alcohol on a child's anus. (R.23:13, 17,21,39, 55, 57-59, 112,113, 123, 126; 24:176, 177).

- On occasion petitioner's father fired gun shots at his children and their mother and one time he shot at her and then told the children that he had shot their mother. (R.23:12, 56, 57, 110, 124)

- Petitioner's father killed petitioner's dog while petitioner was at school. (R.23:127).

- State authorities investigated petitioner's home and twice removed one of the boys. (R.23:141; 24:177).

- All of the male children were in special education classes and several were labeled "mentally retarded." (R.23:19, 20). Petitioner's brother, Tony, received government assistance due to his "slowness" (R.23:36). Petitioner's sister, Future, was in extended treatment for mental illness. Two of Future's children were treated for mental illness. (R.23:71) Petitioner's sister, Dorothy, received mental health treatment, (R.23-118, 119), as did petitioner's mother, and his siblings Tony and Dassie. (R.23:136, 149).

- Petitioner went to prison on a probation revocation and was assigned to a hoe squad. He attended school in prison, but after four years he still did not qualify for his GED and the "good time" credit that went with it.(R.22:98, 102).

- Petitioner never had a bank account, credit card or his own apartment. He has always lived with someone who did everything for him. (R.23:154). For example, his mother bought him a car and his girlfriend paid the insurance on it. Petitioner subsisted on money

from his mother, sisters and brothers as well as welfare and food stamps.(R.22:47, 64, 65; 23:133, 145, 150).

• Petitioner was evaluated in 1992 by the Southeast Arkansas Mental Health Clinic in Pine Bluff. His Wechsler Adult Intelligence Scale (WAIS) showed a score of 48, well within the retarded range (R.23:177, 178). The Arkansas report also noted the petitioner suffered from intense anxiety and paranoia. (R.177, 178).

• Dr. Raymond Finn tested petitioner and found WAIS scores of 59 verbal, 60 performance and 59 overall (R.23:187) Dr. Finn's scores placed petitioner in the third percentile. Dr. Finn concluded that petitioner was retarded.(R.23:189). Finn said these tests were consistent with the earlier Arkansas testing.

• Immediately before trial Dr. Finn administered another test and expected petitioner to be "better" because of the "practice effect." While petitioner did improve, receiving scores of 72 for verbal, 59 for performance and 65 combined, petitioner's scores were still within the mental retardation range. R. 23:192, 193. These scores, coupled with petitioner's adaptive skills, indicated mental retardation. R.23:193. Dr. Finn noted petitioner's word knowledge was one of his stronger points, but he cannot draw inferences, make general statements or conclusions. Petitioner could absorb only the rudiments of schools and could communicate only at a basic level. (R.23:193, 194).

• Dr. Finn said that petitioner "very clearly" met a number of the requirements for a person with an anti-social personality disorder (R.23:217-222). He also testified that earlier in his life petitioner probably suffered from a major mental illness, perhaps hallucinations and schizophrenia. (R. 23:188, 233).

• Dr. Keyes is a specialist in mental retardation. He administered a Stanford-Benet Intelligence test on which petitioner scored in the lowest .2 percent of the population with a composite score of 51. R.24:20. If one lined 1,000 people up in accordance with their intelligence, petitioner would be the second from the last. (R.24:26).

• Dr. Keyes' examination was consistent with petitioner's 1992 Arkansas tests and Dr. Finn's testing. Dr. Keyes' testing reveals "soft signs" of neurological or brain damage that warranted testing. (R.24:18, 19).

• Dr. Keyes wrote his dissertation on malingering and was initially suspicious of petitioner's low scores. Petitioner functioned verbally at a higher level than his IQ scores would indicate. (R.24:46, 47). Other testing revealed unexpected reading and writing skills which made Keyes give yet another intelligence test (the Kaufman). The results were very similar to the Stanford-Benet --a composite score that put petitioner below the first percentile. The way the scores were consistent was enough for Keyes to conclude that any question of malingering was "out the window." (R.24:31).

- Dr. Keyes conducted a Vineland Social Maturity and Adaptive Behavior Scale to examine petitioner's ability to function in the every day world. Because mental retardation has an onset of prior to age 18, Keyes had to interview people who had significant, ongoing contact with petitioner before he turned eighteen. (R.24:38, 39).

- Based on all of his findings, Dr. Keyes concluded the petitioner adaptively functioned at the level of a six or seven year old. (R.24:43, 44).

- Dr. Keyes concluded that petitioner was mentally retarded and functioned at a level significantly lower than the vast majority of the population. Petitioner was unable to see the consequences of his actions, unable to plan situations appropriately, unable to think in abstract methods and ways, unable to communicate under certain circumstances and had a poor short term memory. Petitioner had difficulty concentrating on a task, was easily distracted, and could not learn from his mistakes in many situations. (R.24:47, 48).

- Dr. Keyes concluded petitioner suffered from both organic (brain damage) and non-organic (environmental) mental retardation. (R.24:95).

- Dr. Fulbright is a neuropsychologist who gave various tests to petitioner, testing petitioner's memory, reasoning, problem solving, academic ability, sensory and motor functioning, thought processes, and auditory and visual skills. (R.24:129). Dr. Fulbright reviewed the materials from the other defense experts. On the Pace Auditory Serial Test, petitioner did not function at a level at which he could even take the test. He could not add single digits in order (R.24:131). Overall Dr. Fulbright's findings were consistent with those of Drs. Finn and Keyes and were what one would expect in a mentally retarded person. (R.24:131, 132).

- Dr. Fulbright found that the petitioner was severely impaired in his ability to think abstractly or to plan and carry out a plan of action. (R.24:134). On one test that normally required 50 seconds for a person his age, petitioner required 266 seconds and that was with coaching. (R.24:135).

- On tests of reasoning abilities, logical analysis and abstract reasoning, petitioner had "significant intellectual limitations." (R.24:136).

- Dr. Fulbright concluded petitioner is "not able to think in an abstract manner, not able to consider different alternatives from one point to the next and, basically, has just severe impairment in his ability to think through, reason and plan, and kind of critically judge situations." (R.24:137).

- Of particular importance were tests given by Dr. Fulbright which indicated the possibility of right hemisphere impairment in the brain. (R.24:141, 142).

- On core communication skills, petitioner scored in the second percentile. (R.24:139). On tests for auditory processing and visual skills, petitioner scored in the seventh percentile which is the borderline range. (R.24:141, 142).

- Dr. Fulbright concluded that his test results were consistent with either a non-mentally retarded person with severe brain injury or an across the board problem in brain functioning. (R.24:144).

- Dr. Fulbright testified that these results could not have been faked--they indicate either mental retardation or organic brain injury. (R.24:144, 145). On intellectual ability, Dr. Fulbright placed petitioner in the first percentile or lower. Petitioner's memory was low average or impaired. His reasoning abilities were severely impaired --lower than the first percentile. (R.24:147,148).

- Dr. Cunningham interviewed petitioner, numerous family members and reviewed voluminous records in the case. As a result, Dr Cunningham concluded petitioner had psychological disorders, including auditory and visual hallucinations.

- Dr. Cunningham concluded petitioner was retarded and had antisocial, narcissistic and dependent personality disorders. (R.24:188, 189).

- Dr. Cunningham noted an association between petitioner's antisocial personality disorder and the chronic abuse and childhood trauma that he had suffered. (R.24:190).

- Dr. Cunningham believed petitioner's history of brutal abuse took away his dignity, self control, self direction, and self esteem. (R.24:192). While a normal family operated to protect a child from the world, petitioner's was the opposite. The family traumatized and damaged petitioner with physical violence and sadistic and perverse discipline, incestuous accusations, corruptive sexual abuse, deadly threats to family members, violent abuse of his mother, impossible rules and psychological and emotional stress. (R.24:193).

- According to Dr. Cunningham, concepts of fairness and justice never developed and there was no provision for empathy in the family. Children were beaten indiscriminately without regard for their feelings and no one stepped in to protect them. (R.24:194, 196).

- The moral lessons petitioner learned were "pretty consistently aberrant and twisted." (R. 24:197). Petitioner's comment that the killing of Lisa Rene was "just business" was the result of petitioner's childhood and the numbing of pain. Id.

- Petitioner did not suffer from a mental disease that would render him insane --he knew right from wrong. His situation was far more complex due to his morals and other issues associated with retardation. (R.24:210).

*U.S.A. v. Bruce Carneil Webster*
*Amended* Motion filed under 28 U.S.C. § 2255                                                    Page 10

- Dr. Cunningham testified that there was a direct connection between the abuse petitioner suffered and his participation in this offense. (R.24:203).

- Dr. Denkowski, unlike either of the government experts, was certified to render diagnostic opinions on mentally retarded people for the Texas Department of Mental Health and Mental Retardation. He testified that all eleven parts of the WAIS had to be given if the test was to be used for diagnostic purposes, and even if it is to be used for non-diagnostic reasons, one still had to administer a minimum of nine subtests. Dr. Parker, one of the government's expert witnesses, gave seven --or 65% of the complete WAIS test. (R.26:201-204). Dr. Denkowski testified that there was no authority for administering less than the full test and excluding difficult subtests while including only the easier subtests, as Dr. Parker did. (R.26:204-206). Consequently, Dr. Parker's results were substantially inflated. Id.

- Dr. Parker stated that an IQ score in the 50s, as found by Dr. Finn, would "raise the possibility" of adaptive functioning problems, but, he said, the correlation was not perfect. (R.26:109). Parker also administered a competency exam although competency was never an issue. He also gave petitioner an MMPI although the MMPI test manual states that an eighth grade reading level is required (R.26:87, 90). Dr. Parker's results on the "S" scale indicated that petitioner did not understand the test questions even though Parker read the questions to him. (R.26:91).

# IV.

## CLAIMS FOR RELIEF

A.    **GROUND FOR REVIEW NO. ONE:** PETITIONER'S RIGHTS TO DUE PROCESS, EQUAL PROTECTION, AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BY THE RACIALLY DISCRIMINATORY MANNER  WHICH RESULTS FROM THE FEDERAL CAPITAL SENTENCING SCHEME.

B.    **GROUND FOR REVIEW TWO:** PETITIONER'S RIGHTS TO DUE PROCESS WERE VIOLATED BY THE TRIAL JUDGE'S USURPATION OF THE JURY'S DETERMINATION OF MENTAL RETARDATION.

C.    **GROUND FOR REVIEW THREE:** TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT ADDITIONAL EVIDENCE DEMONSTRATING PETITIONER'S MENTAL RETARDATION AND HIS ADAPTIVE SKILLS.

D.    **GROUND FOR REVIEW FOUR:** TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT EVIDENCE OF RACIAL BIAS IN THE WATSON CHAPEL SCHOOL SYSTEM AND THE POTENTIAL BIAS OF THE GOVERNMENT'S WITNESSES.

E.    **GROUND FOR REVIEW FIVE:** PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO OBJECT TO THE TRIAL JUDGE'S DETERMINATION THAT HE WOULD MAKE THE REQUISITE FINDINGS CONCERNING MENTAL RETARDATION

F.    **GROUND FOR REVIEW SIX:** PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN ALLOWING A BREAKDOWN IN COMMUNICATION WITH THEIR MITIGATION SPECIALIST TO AFFECT THE DISCOVERY, INVESTIGATION AND PRESENTATION OF EVIDENCE AT TRIAL.

G.    **GROUND FOR REVIEW SEVEN:** PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT THE JURY AN ACCURATE ASSESSMENT OF THE EXTREME ABUSE SUFFERED BY PETITIONER AS MITIGATING EVIDENCE.

H.    **GROUND FOR REVIEW EIGHT:** PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO PRESENT EVIDENCE OF

PETITIONER'S SPECIAL TALENTS, MUSICAL ABILITIES, AND RELIGIOUS DEVOTION IN MITIGATION OF THE DEATH PENALTY.

I.  **GROUND FOR REVIEW NINE:** PETITIONER'S RIGHTS TO DUE PROCESS AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BECAUSE THE GOVERNMENT WAS IN POSSESSION OF THE INFORMATION WHICH SUGGESTS PETITIONER WAS NOT PROVIDED SPECIAL EDUCATION SERVICES DUE TO RACIAL DISCRIMINATION.

J.  **GROUND FOR REVIEW TEN:** PETITIONER'S RIGHTS TO DUE PROCESS AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BY THE PRESENTATION OF UNTRUE AND DAMAGING TESTIMONY BY PETITIONER'S CO-DEFENDANT, STEVE BECKLEY.

K.  **GROUND FOR REVIEW ELEVEN:** PETITIONER'S RIGHTS TO DUE PROCESS AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BY THE PRESENTATION OF UNTRUE AND DAMAGING TESTIMONY BY PETITIONER'S CO-DEFENDANT, MARVIN HOLLOWAY.

L.  **GROUND FOR REVIEW TWELVE:** PETITIONER IS INELIGIBLE FOR EXECUTION BECAUSE HE IS MENTALLY RETARDED.

M.  **GROUND FOR REVIEW THIRTEEN:** THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE TRIAL JUDGE'S DETERMINATION THAT PETITIONER IS NOT MENTALLY RETARDED.

N.  **GROUND FOR REVIEW FOURTEEN:** THE TRIAL JUDGE ERRED IN DISMISSING JURY MEMBER ALFRED FOX AND REPLACING HIM WITH AN ALTERNATIVE JUROR WHO DID NOT PARTICIPATE IN THE JURY'S DELIBERATION DURING THE GUILT/INNOCENCE STAGE.

O.  **GROUND FOR REVIEW FIFTEEN:** 18 U.S.C. Sec. 3596 IS UNCONSTITUTIONALLY VAGUE AND VIOLATES PETITIONER'S RIGHTS TO DUE PROCESS.

P.  **GROUND FOR REVIEW SIXTEEN:** BINDING INTERNATIONAL LAW FORBIDS PETITIONER'S EXECUTION BECAUSE PETITIONER IS MENTALLY RETARDED.

# V.

## GROUNDS FOR REVIEW

**GROUND FOR REVIEW NO. ONE:   PETITIONER'S RIGHTS TO DUE PROCESS, EQUAL PROTECTION, AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BY THE RACIALLY DISCRIMINATORY MANNER  WHICH RESULTS FROM THE FEDERAL CAPITAL SENTENCING SCHEME.**

Petitioner filed several motions challenging the racial motivation underlying his prosecution.  Petitioner requested discovery of information relative  to the Government's capital charging practices.  Within these motions petitioner contended that the United States had engaged in a systematic pattern of racial discrimination in its prosecution of the death penalty and petitioner requested that the Court order a hearing and discovery on these issues.  Through this information, petitioner sought to prove that, despite knowledge of a racial imbalance, the United States continued policies which created such inequity.

In support of his motions, petitioner provided the trial court with additional information. Petitioner filed with the Court an affidavit by Kevin McNally, one of the Federal Death Penalty Resource Counsel.  Mr.  McNally, and his office, systematically kept statistics concerning the decisions of the United States Attorney General's decisions to seek the death penalty.  Based upon these statistics, out of the total number of prosecutions seeking the death penalty, the United States Justice Department sought the death penalty against black defendants almost three times more than against white defendants.  Sixty-six percent of death penalty prosecutions were against black defendants; Twenty percent of death penalty prosecutions were against white defendants; eleven percent of death penalty prosecutions were against Hispanic defendants; and,

three percent of death penalty prosecutions were against Asian defendants. Mr. McNally provided the Court with specific information against every such defendant.

Since petitioner was sentenced in this cause, the United States Department of Justice released it's own study concerning the federal capital sentencing scheme. *See, Survey of the Federal Death Penalty System (1988-2000)* (Attached to petitioner's original pleadings as Attachment "A" and incorporated by reference). This study traces and analyzes Federal death penalty cases since the death penalty was re-established in the federal system in 1988. Between 1988 and 1994, of the 52 "death eligible" defendants forwarded to the Attorney General's office for consideration of a death sentence, only thirteen percent (13%) were white. Eighty-seven (87%) of those defendants were a member of a "minority" race. The statistics are only slightly better when one looks at the period between 1995 and 2000. Here of 682 defendants, only twenty percent (20%) of the defendants are white. *Id.*, pg. 9.

Of those 682 defendants who were "eligible" for the death penalty between 1995 and 2000, prosecutors recommended that the death penalty be sought against 183 defendants. Of those 183 defendants, only twenty-six percent (26% or 48 defendants) were white. And, once the prosecutors have made their recommendation, the cases are reviewed by a committee of senior attorneys in the Department of Justice. The recommendations of this committee are similar. Of the 183 defendants for which the committee recommended seeking a death penalty, only twenty-six percent (26% or 47 defendants) were white.

The ultimate decision is made by the United States Attorney General. Between 1995 and 2000, our Attorney General has authorized prosecutors to seek the death penalty against 159 defendants. When one views the number of these defendants (against whom prosecutors are

seeking the death penalty) who later received and entered plea bargains, the racial distinction becomes more apparent. Only twenty-eight percent (28% or 44) of the defendants against whom the Attorney General authorized the death penalty were white. Yet white defendants accounted for forty-one percent (41%) of those cases in which the Government later plea bargained for a sentence less than death. And, while forty-five percent (45% or 71) of the defendants against whom the Attorney General authorized the death penalty were black, black defendants only accounted for thirty-five percent of those cases in which the Government later plea bargained for a sentence less than death. Indeed, while there were almost twice as many "death eligible" defendants, more white defendants plea bargained for lesser sentences.

Considering these statistics, it hardly surprising that black defendants accounted for sixty-five percent (65%) of the death penalty verdicts in our country since 1995. Nor is it surprising that black defendant comprise sixty-eight percent (68%) of federal death row. Yet the United States Census Department projects that Black members of the United States population comprise only 12.8 percent of the total population. (*See* Attachment "K" which was attached to petitioner's original pleadings and incorporated herein by reference)

Petitioner contends that such statistics demonstrate a violation of his rights to Due Process, Equal Protection, and to be free from Cruel and Unusual Punishment. Petitioner would show the Court that such racial disparity has existed for a prolonged period of time, indeed since the inception of the capital sentencing scheme. The government was aware of such disparity and no actions have been taken to ensure the fair and racially neutral application of the death penalty in this country.

## GROUND FOR REVIEW TWO:   PETITIONER'S RIGHTS TO DUE PROCESS WERE VIOLATED BY THE TRIAL JUDGE'S USURPATION OF THE JURY'S DETERMINATION OF MENTAL RETARDATION.

### FACTS AND PROCEDURAL HISTORY

Trial counsel expended significant time and resources investigating petitioner's mental retardation and litigating that issue before the jury.  A finding by the jury that petitioner was mentally retarded would have precluded a death sentence in this case.  At the close of the punishment phase of trial, counsel requested the trial judge to enter a finding as a matter of law that petitioner is mentally retarded.  The Court refused that request. The Court did, however, submit as a Non-statutory Mitigating Factor, a question of whether "the defendant is or may be mentally retarded."  Trial counsel objected to the Court's "or may be" language in the submission, requesting one that simply stated "the defendant is mentally retarded."[4]

On June 20, 1996, the jury returned the "Special Findings Form" in which four of the jurors found that petitioner "is or may be mentally retarded".  On June 21, 1996, the Court entered a "Factual Finding Regarding Mental Retardation" finding as a matter of law, that petitioner is not retarded thereby removing petitioner from the exemption provided by 18 U.S.C. 3596(c).  No objection to the Court's factual finding is found in the record.

---

[4]
· The Fifth Circuit erroneously stated in it's opinion: "In addition, although Webster did request and receive submission of the mitigating factor that he "is or may be mentally retarded," he did not request a jury instruction that placed in the jury's hands the job of factually finding whether Webster is mentally retarded." *See: U.S. v. Webster* 162 F3d 308 at 352

## STATUTORY AUTHORITY

18 U.S.C. 3596(c),entitled "Implementation of a sentence of death," states: "A sentence of death shall not be carried out upon a person who is mentally retarded." The statute does not authorize the judge to make the determination on mental retardation, and, in fact, provides absolutely no guidance on who is authorized to act as fact-finder in the event mental retardation is an issue in a death penalty case.

The only authority at the time of trial for making sentencing decisions in a death penalty case under the applicable statute is found in 18 U.S.C. 3593 wherein the statute requires a separate hearing on sentencing unless, upon motion of the defendant and with approval of the government, a jury is waived. At no time did petitioner waive a jury in his case—and the judge was without statutory authority to make a finding that petitioner was not mentally retarded.

18 U.S.C. 3596 ( c ) in effect provides a "defense" to the imposition of the death penalty for mentally retarded individuals in much the same way the Federal Code and Rules provides for other defenses such as insanity. (*See* 18 U.S.C. 17). In the case of insanity, the burden is on the defendant to prove the defense by "clear and convincing evidence." The determination of the existence of insanity at the time of the offense is submitted to the jury upon motion of the defendant.[5]

---

[5]    18 U.S.C. 4242(b) provides "on the motion of he defendant or of the attorney for the Government or on the court's own motion, the jury shall be instructed to find, or in the event of a non-jury trial, the court shall find the defendant—
  (1) guilty;
  (2) not guilty; or
  (3) not guilty by reason of insanity.

At the close of the punishment phase of trial, petitioner objected to the charge. The relevant portion of petitioner's objection to the Court's punishment charge follows:

> MR. MOORE: Judge, we would object, first, to the manner in which the Court is submitting the nonstatutory mitigating factor Number 1, where it reads, the defendant is or may be mentally retarded, and we object to that portion of the mitigating factor -- submission of the mitigating factor that includes the language "or may be." We think that the submission should read that the defendant is mentally retarded, and that's the issue that the jury is to decide, that is, the existence of mental retardation is a mitigating factor under Penry and other authorities of the United States Supreme Court, but it's a mitigating factor the jury is called on to find, and it's our belief that it's the function of the jury, as the fact finders, to determine the existence of that particular mitigating factor, and for that reason we would request that it be submitted simply in the manner that we requested it, that the defendant is mentally retarded.
>
> THE COURT: And you want it to be submitted not only so that the jury may consider it as a mitigating factor, but, also, so that if all agree unanimously, then you will have a finding that he is mentally retarded, which would bar execution; is that correct?
>
> MR. MOORE: I think that if there is a finding -- the statute allows the jury to find the mitigating factor. I don't even think it has to be unanimous. I think if there is a finding by any of the jurors that he is mentally retarded, that that may well operate as a bar. I don't know that there is a particular procedure that's envisioned by the statute which says you don't execute a mentally retarded person, but I do know that a mitigating factor is to be determined by the jury, and that is a mitigating factor. And if at some later point we were to try to raise that as a bar, which, obviously, is an issue that we've discussed and we would know might well come into play, then we get into the discussion as to whether or not the law envisions that there be some other proceeding or some other authority, other than the jury, to make that determination.

From the above colloquy, it is apparent that petitioner requested the court to submit the issue of mental retardation to the jury both as a mitigating factor and as a potential bar to execution. Without further guidance from the statute, petitioner's request was adequate and appropriate under the circumstances. Specifically, petitioner requested that a question of fact concerning mental retardation be submitted to the jury just as any other "defensive" issue would

have been in the same or similar circumstances. The appropriate fact-finder under the circumstances was the jury to determine whether petitioner was mentally retarded.

## CONSTITUTIONAL AUTHORITY

*or*

## WHAT WAS ONCE STATUTORY, IS NOW CONSTITUTIONAL

In 2000, the Supreme Court[6], held that it unconstitutional to remove from the jury the assessment of facts which may increase the prescribed range of penalties to which petitioner is exposed.

In *Apprendi v. New Jersey,* the Supreme Court considered a New Jersey statute in which, upon a finding by a judge by a preponderance of the evidence that a crime is racially motivated, the judge could enhance the sentence. The Supreme Court held that the issue of "racial bias" was an element of the offense that was constitutionally required to be submitted to a jury, and must be found by the jury, to exist beyond a reasonable doubt.

*Apprendi* speaks in terms of guarantees of a right "to a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Apprendi citing United States v. Gaudin,* 515 U.S. 506, 501, 132 L.Ed. 2d 444, 115 S.Ct. 2310 (1995). On June 24, 2002, The Supreme Court extended *Apprendi* in *Ring v. Arizona* No. 01-488, 536 U.S. ___, (2002) holding that "[c]apital defendants, no less than non-capital defendants, ......are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." In *Ring,* based upon the jury verdict, the maximum

---

[6]    *See Apprendi v. New Jersey,* No. 99-478, ___ U.S.___, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

sentence the defendant could have been exposed to was life in prison. The only way *Ring* could be sentenced to death was if the trial judge, at the close of the sentencing hearing, was to determine the presence of certain enumerated "aggravating circumstances" and the absence of any "mitigating circumstances". If the judge found at least one aggravating circumstance and further found that there were "no mitigating circumstances sufficiently substantial to call for leniency," then, and only then, the defendant could be sentenced to death. The judge in *Ring*, finding two aggravating circumstances present and that any mitigating circumstances did not "call for leniency," sentenced Ring to death. On appeal, Ring, like Apprendi before him, argued that his state's capital sentencing scheme violated the Sixth and Fourteenth Amendments to the United States Constitution because it entrusts to a judge the finding of a fact that raises the defendant's maximum penalty.

Although mental retardation is an enumerated element of petitioner's offense, there can be no doubt that a finding by the trial judge in this case that petitioner was *not* mentally retarded, increased the prescribed range of penalties to which petitioner was exposed. Rather than being precluded from consideration for execution, petitioner is now death eligible as a result of the trial judge's finding that he is not mentally retarded.

As the Supreme Court asserted in *Appendi* and re-affirmed in *Ring*, the dispositive question "is not one of form, but of effect" (*Ring,* slip opinion at 16 citing *Apprendi*) "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact-no matter how the State labels it-must be found by a jury beyond a reasonable doubt." (*Ring,* slip opinion at 16 citing *Apprendi*)

An increase in petitioner's punishment is authorized upon a finding of fact that he is *not* mentally retarded. In petitioner's case, the judge, rather than a jury made that determination contrary to the Supreme Court's holdings in *Apprendi* and *Ring.*

Further, the core concept of *Apprendi* and *Ring* is due process. Although the facts of petitioner's case and *Apprendi* and *Ring* diverge, due process requires an issue as important as mental retardation in Federal death penalty litigation be submitted to a jury. In *Apprendi*, the New Jersey Courts attempted to make the distinction between an "element" of the offense and a "sentencing factor" citing the judge's finding of racial bias as a "sentencing factor". The Supreme Court, however, noted that "any possible distinction between an "element" of a felony offense and a "sentencing factor" was unknown to the practice of criminal indictment, trial by jury, and judgment by courts as it existed during the years surrounding our nations founding."

Petitioner would further show that the Government was required to plead and prove petitioner "willfully" committed the instant offense beyond a reasonable doubt. The element of "willfully" and mental retardation are inextricably intertwined. The legislative history of 18 U.S.C. 3596 ( c ) indicates the proponents of the death penalty legislation were concerned about executing individuals who do "not have the mental capacity to achieve the ability to act, ever, as an adult." Congressional Record-Senate S-6874, May 24, 1990, Comments of Senator Biden. Senator Biden felt there were "graduations of culpability," and that there should be provisions in the death penalty legislation under which a mentally retarded person should be exempt from execution. Even Senator Thurmond, who opposed the amendment prohibiting the execution of the mentally retarded, felt the constitution recognized that punishment must be directly related to the defendant's personal culpability. Congressional Record-Senate S-6873, May 24, 1990. Thus

*U.S.A. v. Bruce Carneil Webster*
*Amended* Motion filed under 28 U.S.C. § 2255                                    Page 22

petitioner's ability to form the culpable mental state "willfully" had to be plead and proven by the government beyond a reasonable doubt. An elemental quality is given to the issue of mental retardation, i.e., did the mental retardation effect the ability of petitioner to form the culpable mental state of "wilfully"?

The language of the United States Supreme Court in *Atkins v. Virginia* 122 S.Ct. 2242 (2002), further supports the Congressional concerns discussed above. The Court noted "there is abundant evidence that [mentally retarded persons] often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, *but they do diminish their culpability.*" *Atkins,* Slip Opinion at 27-28, (emphasis added).

Therefore, petitioner would respectfully show that mental retardation is much more than a "sentencing factor" in the Federal capital sentencing scheme. Because mental retardation goes to the very heart of the elements of the offense concerning intent, elements that due process requires, mental retardation must be found by a *jury* rather than a judge..

Petitioner objected to the Trial Court's finding that he was "not mentally retarded" in his direct appeal to the Fifth Circuit Court of Appeals. No objection was found in the trial record. The Fifth Circuit held that the error was not preserved because trial counsel failed to object to trial judge's written determination that petitioner was not mentally retarded. *U.S. v. Webster,* 162 F.3d 308, 351 (5th Cir. 1998). As a result, the appellate court's review was limited to plain error. Finding no "plain error" the Appellate Court sanctioned the trial courts factual findings concerning mental retardation. The issue was essentially waived by the negligence of trial counsel.

What was a statutory concern at the time of petitioner's trial became constitutional by the Supreme Court in *Atkins*. In it's holding in *Atkins*, The Supreme Court elevated the statutory prohibition of executing the mentally retarded to a prohibition of constitutional dimension, on par with that of incompetency, i.e.; not being tried for an offense while a defendant does not have a rational as well as factual understanding on the proceedings against him. Because petitioner's mental retardation issues are now constitutional, it may not be waived and may be properly raised in proceedings under 25 U.S.C. 2255. The Trial Court's improper negative factual finding of mental retardation notwithstanding, the petitioner *is* mentally retarded and may not be executed under either the Federal capital sentencing scheme as well as the Supreme Court's holding in *Atkins*.

## *AN APPROPRIATE METHOD FOR DETERMINING MENTAL RETARDATION*

Even if the trial judge had allowed the same jury making the punishment determination to make a factual finding of mental retardation, that method would have been inadequate to protect the rights of the defendant. As noted elsewhere in this petition, the statutes are void of any direction concerning how to make such a determination concerning mental retardation. However, the findings made by a jury in a case such as petitioner's are not unlike a competency determination. In such a situation, a jury is impaneled to hear the facts surrounding incompetency unaware of the offense of the accused. It has been held that failure to impanel a separate jury to determine competence to stand trial violates a defendant's right to due process and is reversible error. See *Pate v. Robinson*, 383 U.S. 375 (1966); *Drope v. Missouri*, 420 U.S. 162 (1975); *Ex Parte Hagans*, 558 S.W.2d 457 (Tex.Crim.App. 1977); *Ex Parte Long*, 564 S.W.2d 760 (Tex.Crim.App. 1978). The reasons underlying these decisions are static: a defendant cannot be

assured of a fair trial when a jury is asked to concurrently decide the issues of incompetence and guilt or innocence of the accused. In order to assure a fair trial and adequate due process for an incompetent defendant, a jury must be allowed to decide issues of competence "uncluttered by that evidence relevant only to the issue of innocence or guilt." *Perryman v. State*, 494 S.W.2d 542, 545 (Tex.Crim.App. 1979); see also *Lee v. Alabama*, 386 F.2d 97 (5th Cir. 1967); *Martin v. Estelle*, 546 F.2d 177 (5th Cir. 1977); *Townsend v. State*, 427 S.W.2d 55, 63 (Tex.Crim.App. 1968); *Ramirez v. State*, 241 S.W. 1020, 1021 (1922).

The parallels between competency findings and mental retardation findings are readily apparent. Both deal with the mental condition of the defendant and have nothing to do with the actual facts of the offense. The fundamental nature of the right to life requires that the principles announced in the cases above also apply, as logically appropriate, to the death penalty system wherein a determination of mental retardation would preclude imposition of a death penalty. Inflammatory evidence concerning the facts of a defendant's offense creates the risk that jury deliberations will be tainted by the prospect that an incompetent, or in this case, a mentally retarded defendant will be "turned loose" on society if he is found incompetent or ineligible to be executed. See *Martin*, 546 F.2d at 179 (5th Cir. 1977). Similarly, failure to impanel a separate jury to determine whether a defendant is mentally retarded and, therefore, exempt from execution under *Atkins* would violate that defendant's right to a fair and impartial jury and, thus, violate his constitutional right to Due Process.

## GROUNDS FOR REVIEW 3-7

### PETITIONER SUFFERED INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

The Sixth Amendment guarantees petitioner the effective assistance of counsel. To demonstrate a violation of this right petitioner must prove 1) counsels' representation fell below professional norms, and 2) a reasonable probability that, but for counsels' deficiency, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The Supreme Court held the primary consideration is whether counsel's conduct so undermined the proper functioning of the adversary process that the trial cannot be relied upon as having produced a just result. *Id.* The constitutional objective is "to ensure a fair trial." *Id*. at 686, 687, 694, 696.

Under the first prong of *Strickland*, "[c]ounsel . . . has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.*, 466 U.S. at 688. The Supreme Court admonished appellate courts to "keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Id*. at 690. To determine the effectiveness of counsel, an appellate court must look to the totality of the representation. Moreover, the appellate court will assume counsel "made all significant decisions in the exercise of reasonable professional judgment." *Ibid.*

Although, under its second prong, *Strickland* requires petitioner demonstrate prejudice, it does not require petitioner to demonstrate counsels' deficient performance actually altered the

outcome of his trial, or even that it is *more likely than not* this was the result. *Id.*, 466 U.S. at 693. The Court stated "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."[7] *Id.*, at 694. Thus, the Court only requires petitioner to demonstrate "some *conceivable* effect on the outcome of the proceeding." *Id.* at 693 (emphasis added). Moreover, in assessing prejudice, the appellate court may not assess the probability that an individual mistake might have affected the outcome. Rather, the reviewing court must look to all of the errors of counsel which fall below an objective standard of reasonableness, and measure the probability (chance) that, *collectively*, counsels' deficient performance altered the outcome of the case. *See generally, Kyles v. Whitley*, 514 U.S. ___, 115 S.Ct. 1555 (1995) (providing the test for "materiality"). Finally, the appellate court must ensure that its ultimate focus is "on the fundamental fairness of the proceeding whose result is being challenged." *Strickland*, at 696.

The United States recently considered the Constitutional right to effective assistance of counsel with regard to a death penalty case in *Williams v. Taylor*, 529 U.S. ___, 120 S.Ct.1495 (2000). In *Williams*, the defendant was convicted of capital murder and alleged he suffered ineffective assistance of counsel because his trial counsel failed to investigate and present mitigating evidence. *Id.*, ___ U.S. at ___, ___ S.Ct. at ___. The evidence which counsel failed to locate and present included evidence of mistreatment, abuse and neglect during the defendant's early childhood, borderline mental retardation, head injuries and possible organic

---

[7]    By "reasonable probability," the Supreme Court obviously meant a reasonable *chance* counsel's performance adversely affected the outcome of the case.

brain impairment. *Ibid.*   The Supreme Court held that when errors undermine confidence in the fundamental fairness of a state adjudication, the federal courts should act. *Id.*, ___ U.S. at ___, ___ .  The Supreme Court agreed that counsel's failure to investigate and present mitigating evidence fell below the professional norm and satisfied the first prong in *Strickland.. Id.*, ___ U.S. at ___, ___ S.Ct. at ___ .   This failure prejudiced the defendant.  Importantly, the Court found it appropriate to "evaluate the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding—in re-weighing it against the evidence in aggravation." *Id.*, ___ U.S. at ___, ___ S.Ct. at ___ .

**GROUND FOR REVIEW THREE:  TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT ADDITIONAL EVIDENCE DEMONSTRATING PETITIONER'S MENTAL RETARDATION AND HIS ADAPTIVE SKILLS.**

**GROUND FOR REVIEW FOUR: TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT EVIDENCE OF RACIAL BIAS IN THE WATSON CHAPEL SCHOOL SYSTEM AND THE POTENTIAL BIAS OF THE GOVERNMENT'S WITNESSES.**

E.C. Turner testified that he was a school counselor in the Watson Chapel School District where applicant attended school.  However, Turner had additional evidence to present to the jury which was never developed.  While the jury was lead to believe that petitioner tended to be a "leader" among his peers, such is not an accurate picture.  In Turner's opinion, petitioner was a leader only when in the company of younger children; i.e. situations where petitioner was physically bigger, but equal in mental abilities.[8]  However, whenever petitioner was in the

---

[8]    Petitioner was held back for at least one year.

company of older children, and children more advanced in their mental abilities, Turner would have testified petitioner was a "follower."[9]

Turner will testify that, academically speaking, he was never able to tell petitioner's level. Petitioner was never challenged or motivated by his parents and did not seem interested in school.[10] Turner counseled petitioner for being "lazy," late to class, and "disrespectful."[11] However, Turner was hampered in his ability to counsel petitioner and others students. Because of the number of students in the school system, and the number of available counselors, Turner states there was never an opportunity to "follow up" with students as needed. However, Turner suspected petitioner may have been on drugs because he "talked in circles" and his disposition was "not normal."

Petitioner's elementary scholastic record was reviewed by Loula Gray, an elementary school teacher with the Watson Chapel School District for thirty-six years. In Ms. Gray's considered opinion, petitioner was "socially promoted" throughout elementary school.[12] In other

---

[9]  Turner informed petitioner's investigator that petitioner was especially a follower when in the company of a family of boys known as the "Westmorelands," who, in Turner's words, controlled petitioner. The Westmoreland boys were two or three years older than petitioner, students and football players at Watson Chapel High School, and have since had substantial contact with the criminal justice system.(*See* Attachment "L"to the original pleadings which is incorporated by reference)

[10]  Turner never met petitioner's father but remembered that petitioner lived in a "heavy area." He further remembered rumors that petitioner's father painted his van with a paint brush. Turner did not hold petitioner's father in high regard.

[11]  At the time petitioner was in the Watson Chapel School District, there was no resource officer to enforce truancy laws. Indeed, according to Turner, there was no followup on truancy. While the Arkansas law apparently required petitioner to attend school until he was seventeen years of age, he was "put out" of school at fifteen years of age.

[12]  While Turner could not explain why petitioner was not in special education classes, Turner indicated his belief that once a student gets behind in school, and becomes a behavioral problem, the student should move up the grades with his peers.

Ms. Gray describes the situation differently. According to Ms. Gray, social promotion is a tool used by the

words, petitioner was promoted to the next grade even though he had not mastered the skills and knowledge in his current grade. Based upon petitioner's performance in elementary school, Ms. Gray will testify petitioner should have been directed to special education services.[13] In fact, Ms. Gray states that there is no reasonable explanation for the failure to provide petitioner special education services.[14] She acknowledged that the referral to special education was usually made by a teacher and that "sometimes students get by you."[15]

Petitioner was assigned to "Title One" Math classes in Fifth grade. This class was taught by Ms. Gray. This was a forty-five minute class which petitioner attended daily. Ms. Gray described petitioner as "slow."[16] Petitioner was also in "basic" English classes. Ms. Gray states that such a placement evolves from low academic performance and difficulties with reading and comprehension.

---

Watson Chapel School district to "get rid of problem students." This was especially true of African American students who were not good athletes. Such students were "pushed out" as soon as possible.(*See* Attachment "L" to the original pleading which is incorporated herein).

[13]      There is a stigma which attaches to special education students and, according to Turner, it is common for students to "mask" or "fake" success in order to avoid such a label and the stigma attached. Moreover, *some families refused to put their children in special educational classes in order to help the children "fit in."*

[14]      Ms. Gray stated that the Federal government was auditing the racial makeup of the classes at Watson Chapel School District at the time.

Dr. Sally Church, a recognized expert in education, was contacted. Dr. Church reports that sometimes "problem students" will not be classified as mentally retarded, even if they are, because once classified as mentally retarded, such students may not be dismissed from school for their behavior. Dr Church further indicated she would provide similar testimony at any such hearing in this cause.

[15]      Lamoreaux's investigation included an interview with petitioner's brother, Willie Webster, Jr. Willie Webster, Jr. stuttered and collected disability. He once obtained a job in a local "arsenal" but was fired because he was "too slow" and had problems remembering things.

[16]      Based upon Lamoreax's investigation, this opinion was shared by Levi Thomas, a juvenile probation officer who supervised petitioner's brother. Mr. Thomas remembers petitioner as "slow" or learning disabled.

Petitioner was assigned to "basic" classes at Watson Chapel Jr. High School.[17] In such classes the teachers endeavor to cover much the same materials as in regular classes, but a much slower rate. Classes focus on "skill areas" or "basic skills." Turner states that, in basic classes, students receive additional instruction with some individual attention.

Ms. Gray described Watson Chapel School District as a "truly ... racist district." She states that African Americans on the school board have experienced difficulties in becoming officers. In 1970, the Watson Chapel School District came under the control of the Federal Courts through a desegregation order.[18] The District Court found that the Watson Chapel School District was operating a dual school system based upon race.[19] Thereafter the school board and superintendent of the Watson Chapel School District failed to comply with the District Court's Order and, after a hearing, the District Court found several or all of the members guilty of civil contempt.[20] The school district was required to file reports with the United States District Court concerning the numbers and race of students and teachers in each school.[21] The school district

---

[17]    According to Turner, students are assigned to basic classes upon the recommendation of the teacher, parents, counselor, or the student's test scores.(*See* Attachment "L" to the original pleading which is incorporated herein)

[18]    The records of Annette Lamoreaux, the estranged mitigation specialist, actually discovered some of the evidence of the racial discrimination history of the school district. However, because of the breakdown in communication and the relationship between Lamoreaux and trial counsel, this line of investigation was never pursued.

[19]    A true and correct copy of the 1970 Court Order is attached to the original pleading and is incorporated herein by reference. (*See* Attachment "B" to petitioner's originally pleading)

[20]    A true and correct copy of this February 6, 1971 Court Order is attached to petitioner's original pleading and incorporated by reference.(*See* Attachment "C" to the petitioner's original pleading).

[21]    A true and correct copy of the Report filed on October 27, 1989 is attached to petitioner's original pleading, incorporated herein by reference, and provided in order to demonstrate the reporting requirements.

Lamoreaux's investigation notes indicate that, if too many black students were classified "special education," the School District could be disciplined.

*U.S.A. v. Bruce Carnell Webster*
*Amended* Motion filed under 28 U.S.C. § 2255                                                    Page 31

continued to file reports until 1991 when the District Court entered an Order relieving them from that burden.[22]

The problems continue today. The School District is under a Justice Department Investigation because one of the District's schools, at Sulphur Springs, is an all white school. African American students in need of services are being denied. And, many of the African American teachers in the District are retiring. This has created problems because they are being replaced with white teachers.

In Ms. Gray's opinion, Watson Chapel Schools were "hell on black boys" during the time in which petitioner was in school. In Watson Chapel Schools minority students received disparate treatment.[23] Ms. Gray described Rick McLaughlin and Gene Stewart as racists and harassers.[24] In elementary schools, students fared no better. Phyllis Rankin, an elementary school principal in the Watson Chapel School District, was investigated for kicking a special education student. Ms. Rankin hid one of the black students "free lunch" cards, forcing Ms. Gray

---

[22]    A true and correct copy of this Order is attached to petitioner's original pleading and is incorporated herein by reference.(See Attachment "E" to petitioner's original pleading).

[23]    Ms. Gray can describe an incident when Principal Stewart's son carried a weapon on to the Watson Chapel High School campus. Though a black student who committed a similar infraction was expelled, Stewart's son was transferred to another school and received no disciplinary action.

According to Ms. Gray, this incident was addressed at a school board meeting. However, petitioner's attempts to obtain a copy of such school board records were denied by the Watson Chapel School District. Efforts to obtain the information through discovery were denied by the court.

[24]    Ms. Gray reported that such discrimination continues to be true today. Children of "mixed race" are discussed in the teacher's lounges as "half breeds." Ms. Gray states Gene Stewart made the duty rosters for teachers at the school. Black teachers were assigned outside duties and white teachers were assigned inside duties. She also stated that Gene Stewart harassed one African American student to the point that her mother pulled the daughter from the Watson Chapel School District and moved her to the nearby Dolloway School District. Another African American student who was to become a Valedictorian at the high school was given a C her last semester.

*U.S.A. v. Bruce Carneil Webster*
*Amended* Motion filed under 28 U.S.C. § 2255                                                    Page 32

Case: 09-11039    Document: 5    Page: 406    Date Filed: 10/22/2009

to pay for the child's lunch. Rankin's treatment of minority students was such that Ms. Gray delayed her retirement by a year.

Lydell Willis is an African American teacher in the Watson Chapel School District. She applied for the position of "principal" within the School District. She was passed over several times. Ms. Willis filed charges of discrimination against the School District and Superintendent Charles Knight alleging discrimination on the basis of her gender and her race.[25] Ms. Willis sued and now receives a principal's salary. She remains a teacher.[26]

Petitioner would respectfully show that trial counsels' failures to discover and present the evidence set forth herein falls far below the expectation of representation expected of an attorney representing a defendant in a federal capital trial. In this trial the Government's experts were less than persuasive.[27] Therefore the evidence of the Government's witnesses from the Webb Chapel School District increased in importance. These witnesses suggested that petitioner was not mentally retarded and had never received special education services. However, with investigation, evidence was available to rebut the Government's evidence. Petitioner was in lower classes at school and his academic record suggests he was entitled to special education services. However, at the time, officials from the Watson Chapel School District had a bias.

---

[25]    Ms. Willis filed several different complaints. All of the complaints alleged discrimination based upon her gender. At least one complaint alleged racial discrimination. A true and correct copy of this complaint is attached to petitioner's original pleading and is incorporated herein by reference. (*See* Attachment F to petitioner's original pleading).

[26]    A true and correct Order entered in Ms. Willis' suit is attached to petitioner's original pleading and is incorporated herein by reference. (*See* Attachment "G" to petitioner's original pleading).

[27]    In his statement attached to petitioner's original pleading, and incorporated herein, trial counsel Larry Moore indicated that the trial judge threatened to instruct the jury to disregard the testimony of the Government's expert, Dr. George Parker.(*See* "Attachment H" to petitioner's original pleading).

*U.S.A. v. Bruce Carneil Webster*
*Amended* Motion filed under 28 U.S.C. § 2255                                      Page 33

Many minorities were denied such services and, considering the racial desegregation orders in place, school officials could hardly admit they denied petitioner needed services and that later petitioner was "put out" of school in ninth grade. Thus, the evidence available to counsel would have questioned the credibility of the only witnesses presented to demonstrate petitioner was not mentally retarded

Not only has error been shown in counsel's failure to investigate and present such evidence, but harm is shown as well. Petitioner is on death row. Due to a failure to investigate evidence similar to that alleged herein, petitioner's counsel were denied the ability to demonstrate to the jury a reasonable explanation for the testimony of school officials, and the potential bias underlying their testimony.

Petitioner would show that he has sought to discover additional evidence of the racial discriminatory environment in which he was raised. Although, in its order denying discovery in this case, the Court appears to have held that such racial discrimination has been established, petitioner would respectfully show a reasonable belief that the current evidence of discrimination, and its negative effects on petitioner's childhood and development, is but the "tip of the iceberg." Petitioner is prevented from discovering and presented additional evidence.

**GROUND FOR REVIEW FIVE:   PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO OBJECT TO THE TRIAL JUDGE'S DETERMINATION THAT HE WOULD MAKE THE REQUISITE FINDINGS CONCERNING MENTAL RETARDATION**

Petitioner demonstrated *supra* that the determination whether petitioner was mentally retarded was an issue for the jury's consideration. This was a matter presented to the appellate

court in petitioner's brief on direct appeal. However, the Court of Appeals held that petitioner's claimed error was not preserved because trial counsel failed to object to trial judge's written determination that petitioner was not mentally retarded. *U.S. v. Webster*, 162 F.3d 308, 351 (5th Cir. 1998).

The failure to object to the trial judge's action was not strategical or even intentional. In his written statement, trial counsel stated,

> ... Although I knew that Judge Means had discussed with Allan Butcher (on the night of the punishment verdict) the possibility of his making a finding on the issue of the Defendant's mental retardation as a matter of fact, I was surprised when I received a copy of the Judge's Finding Concerning Mental Retardation after the conclusion of the trial, finding that Bruce Webster was not mentally retarded as a matter of fact, considering the Judge's remarks at the bench conference concerning Dr. Parker's testimony, and the overwhelming expert testimony to the contrary that had been offered by the defense.

*See*, Larry Moore, written statement attached to petitioner's original pleading (and incorporated by reference). Moreover, petitioner was represented on appeal by the same attorneys, and these attorneys challenged the trial judge's authority to make such a determination.

Petitioner contends that the failure to object to the trial judge's determination of mental retardation in this case satisfies the first prong of *Strickland*. As is argued herein, the determination of mental retardation is a matter for the jury's determination. And, in viewing the jury's verdict at the punishment stage, at least four members of the jury were convinced of petitioner's mental retardation. This was without the additional evidence which is alleged *supra*, and the additional evidence which petitioner has been prevented from discovering and presenting to this Court. Considering this additional evidence, along with the evidence presented at trial, it is probable that the jury would have entered a finding that petitioner was mentally retarded.

Petitioner would further show that, because harm is evident, the second prong of *Strickland* is satisfied as well. As is argued *supra*, this case should not be distinguished from the recent Supreme Court opinion in *Ring, supra,* and its previous opinion in *Apprendi, supra.* The trial judge's actions herein deprived petitioner of his right to have a jury determination of an issue which weighed the evidence and elevated his sentence to include the death penalty. Had a factual finding of mental retardation been entered, petitioner would be ineligible for execution. There could be no death sentence. Clearly, petitioner's trial attorneys' failure to object to the trial judge's action, thereby preserving the issue for appellate consideration, deprived petitioner of a substantial defense to execution.

**GROUND FOR REVIEW SIX: PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN ALLOWING A BREAKDOWN IN COMMUNICATION WITH THEIR MITIGATION SPECIALIST TO AFFECT THE DISCOVERY, INVESTIGATION AND PRESENTATION OF EVIDENCE AT TRIAL.**

**GROUND FOR REVIEW SEVEN: PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT THE JURY AN ACCURATE ASSESSMENT OF THE EXTREME ABUSE SUFFERED BY PETITIONER AS MITIGATING EVIDENCE.**

Trial counsel retained the services of Annette Lamoreaux as a mitigation specialist to assist in the preparation of petitioner's case for trial. Lamoreaux is an attorney with specialized training in mitigation investigations in death penalty cases.[28] Lamoreaux was previously employed by the Texas Resource Center, a federally funded entity charged with representing

---

[28] Lamoreaux executed a written statement which is attached to petitioner's original pleading and is incorporated by reference herein as if fully copied and set forth at length.(*See* Attachment "I" to petitioner's original pleading).

*U.S.A. v. Bruce Carnell Webster*
*Amended* Motion filed under 28 U.S.C. § 2255                                                    Page 36

capital defendants and providing resources to private attorneys who represented capital

defendants. Lamoreax expended a great deal of effort on petitioner's behalf. As the written

statements by trial counsel and Lamoreaux demonstrate, Lamoreaux had unique talents which

were not duplicated on the defense team.

Moore indicates that there existed a disagreement between counsel and Lamoreaux which

carried forth into the representation.[29]  Moore and Lamoreaux disagreed over her billing. In

Moore's written statement he indicates:

> As I recall, the Court initially approved $15,000 as a fee for Ms.
> Lammoreaux's services. When we received Ms. Lammoreaux's initial interim
> bill, Allan and I had some problems with her bill and indicated that we needed to
> discuss it with her before we would submit it to the Court. I remember at least
> one meal receipt from a casino in Louisiana that I did not feel was appropriate. I
> also recall that she traveled out of state to a cemetery to document grave sites on
> Mr. Webster's family, and I felt like that particular trip was unnecessary. Further,
> the amount of her initial bill was in excess of the entire budget originally
> approved by the Judge for her services, and there was a significant amount of
> work yet to be done.

---

[29]    According to Lamoreaux, her disagreement with counsel Moore began as early as their first
meeting. She states "[i]t was my impression , that Mr. Moore, who was a former prosecutor, was not particularly
experienced in, nor sympathetic to, mental health and abuse issues being presented at trial. However, I believed that
as the investigation went on, he could be won over to the standard of practice to which I was accustomed."

Lamoreaux further states:

> During the time that I was undertaking this investigation, I attempted to report my
> findings as regularly as possible to Moore. While I was accustomed to a "team" approach on a
> case, I found that Moore was not. He was not interested in discussing case strategy or possible
> additional lines of investigation, so much as repeatedly commenting that someone must have
> thought Bruce was retarded. He discouraged my investigation on family abuse and violence,
> specifically telling me not to pursue the family history in this regard, even though I told him I
> believed that because the facts of the murder were so gruesome, we needed to address how
> someone could come to commit such a violent crime. I was of the opinion that the jury could have
> been presented with a story of Bruce's life which might have been mitigating, which
> complemented the retardation defense. Moore dismissed this approach.

See, Lamoreaux's written statement, attached to petitioner's original pleading and incorporated herein.

*U.S.A. v. Bruce Carneil Webster*
*Amended* Motion filed under 28 U.S.C. § 2255                                                      Page 37

*See*, Moore's written statement, attached to petitioner's original pleading and incorporated herein. Lamoreaux responded:

> It was my understanding that a request for my appointment would submitted immediately and I would then file vouchers for interim fees and expenses. I later learned that I was not appointed on the case until September, 1995, although I began working in June–both reviewing the evidence collected by the FBI and traveling to Pine Bluff to do family interviews.

*See*, Lamoreaux's written statement, attached to petitioner's original pleading and incorporated herein.

The disagreement between Moore and Lamoreaux festered and grew. Shortly before trial, counsel were unable to locate Lamoreax or her materials. Counsel ordered their factual investigators to interview possible mitigation witnesses and sought to prepare for trial without Lamoreaux. In short, petitioner was sent to trial without the benefit of the mitigation specialist retained/appointed by the Court.

It was unfortunate that Lamoreax and the results of her investigation were unavailable to trial counsel. Lamoreax's investigation documented a cycle of abuse within petitioner's family which existed for several generations, at least through petitioner's grandfather and great-grandfather. Indeed, the information available through Lamoreaux indicated that petitioner was the descendant of a slave named "Sam" Webster. Within the memory of different family members it can be established that Sam Webster and his descendants were abusive within the family.

Petitioner's father was one of the worst abusers in this lineage. Various family members informed Lamoreaux that petitioner's father was easily provoked and very violent. He was known to beat the children and his wife with a water hose or extension cords and he always

continued until they were bleeding.[30] He hit petitioner's sister, Dorothy, in the head with a hoe and once tied her hands to a stick, strung her up in a tree and beat her. Petitioner's father made petitioner's brother, David, drink urine. Lamoreaux's investigation demonstrated that petitioner's mother was very afraid of her husband, but planned to testify.

Lamoreax further documented some of the racial prejudices which are alleged and argued elsewhere in this petition. The investigative information which Lamoreax shared with the undersigned counsel revealed the racial segregation policies of the Watson Chapel School District, their reporting requirements, and the possible discipline for assigning too many blacks to special education. All this was information which could have been presented and used in petitioner's behalf at his trial.

Lamoreaux's halted investigation also raised additional issues which could have been explored by trial counsel. Lamoreax determined that petitioner's mother was exposed to pesticides as a child in the cotton fields where she and her family worked.

Lamoreaux attributes her unavailability just prior to and during trial to another factor—money. She states that if "even a portion of my fees and/or expenses been paid, I would have been able to be present both before and during the trial, as I had always anticipated I would be." She claims to have expended several thousand dollars in expenses, depleted her savings, and filed for bankruptcy while never receiving payment from the Court for her services or

---

[30] Lamoreaux's investigation indicated that petitioner and his siblings often fled their father by going to the home of their maternal aunt, Ruby Harris Binns. However, once, when petitioner's father found out, he shot out the window of her car and threatened to burn down her home. Ms. Binn's thereafter told the children not to run to her home.

expenses. Though her statement contradicts that by Moore, Lamoreaux states that she "re-did and resubmitted" her voucher.

Petitioner would respectfully show this Court that the determining factor in this issue is that all three participants—counsel Moore, counsel Butcher and mitigation specialist Lamoreaux—were attorneys. Each owed a duty to petitioner. Indeed, under the Sixth Amendment, petitioner was entitled to the effective assistance of each one of these participants. Money issues aside, petitioner was on trial for his life. Lamoreaux was in possession of information which could have been presented to the jury in mitigation of the death penalty and in support of his claim of mental retardation. She was further in possession of additional information which, if investigated, might have led to other persuasive mitigating evidence. But, because of the "breakdown" in communication between Lamoreaux and the trial attorneys, the jury was denied this information. Petitioner would respectfully contend that the allegations herein are sufficient to demonstrate that the performance by Moore, Butcher and Lamoreaux, with respect to their deteriorating relationship, fell below that to be expected of attorneys representing a capital defendant.[31]

Petitioner would further show this Court that the second prong of *Strickland* is met herein. Petitioner's burden is only to demonstrate an adverse effect on the trial and verdict. The evidence which Lamoreaux developed, and could have continued to develop, demonstrated the

---

[31] Petitioner is aware of an additional statement by Moore concerning his relationship with Lamareaux. The questions of fault in the deterioration of the relationship in the defense team are not relevant to the inquiry before the Court. Based upon the conflicting views, no such determination can be made and none has been offered herein. Petitioner contends that the focus must be on whether an appropriate investigation was accomplished and whether evidence which was discovered in this investigation was presented to the jury in mitigation of the death penalty. Whether counsel's failure to accomplish these professional duties was the result of interference by co-counsel, an investigator, prosecutor or the trial judge, petitioner's jury was still denied relevant mitigating evidence which may have persuaded the jury to impose a life sentence or unanimously find mental retardation.

abusive family relationship in a much more detailed and graphic way than that evidence presented in petitioner's trial. *See, Williams v. Taylor, supra*. Moreover, Lamoreaux's historical evidence of abuse lends more credibility to these mitigating claims. This would have been especially so had counsel been able to discuss such evidence with the mental health experts already available to explain such evidence to the jury. Petitioner contends he is entitled to relief.

### GROUND FOR REVIEW EIGHT:  PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO PRESENT EVIDENCE OF PETITIONER'S SPECIAL TALENTS, MUSICAL ABILITIES, AND RELIGIOUS DEVOTION IN MITIGATION OF THE DEATH PENALTY.

Petitioner comes from a large family with extensive musical talents. Petitioner's father had several talents, including being a musician and singer. He played in many of the clubs throughout Arkansas. Petitioner and his brothers shared their father's musical talent. They performed with their father throughout their childhood, appearing in many different clubs in the Pine Bluff Area. The family also performed in many of the area churches, singing gospel music. The family's talents in this area were well known.

Additionally, petitioner had a devotion to Christianity and his religious training. He attended church regularly, even during his pre-trial incarceration, and read the bible daily. Petitioner met with different persons who assisted him as "spiritual advisors."

The jury was entitled to hear all evidence in mitigation of the death penalty. Indeed, under federal law, the jury did not have to be in unanimous agreement as to which factors were mitigating. Therefore, petitioner's burden was only to establish, by a preponderance of the evidence, a mitigating factor to persuade one juror that life was a better alternative. In such a

situation it cannot be reasonable strategy to fail to introduce to the jury any and all available evidence calling for a sentence less than death.

Petitioner would respectfully show that his trial attorneys' failure to present evidence of his special talents, his musical ability and his religious devotion falls short of that representation to be expected of counsel in a federal death penalty case. There was no rational or reasonable reason to withhold such information from the jury. And, petitioner would respectfully show that this failure had some conceivable effect on the outcome of his trial. Petitioner is sentenced to death. Such evidence could easily have convinced one juror by a preponderance of the evidence that petitioner's life should be spared.

## Additional Argument on

## Ineffective Assistance of Counsel

As is argued *supra*, it is improper for the Court to consider the errors, or specific instances, alleged herein in isolation. It is entirely proper, appropriate and mandated that this Court consider the cumulative effect of all of these errors in determining a constitutional violation herein. Petitioner would contend that such errors are sufficient alone to sustain a grant of relief herein, but that the cumulative effect of such errors is constitutionally devastating. These errors clearly demonstrate that the representation afforded petitioner in these instances did not meet the standards of an attorney defending an individual in a capital murder trial. Moreover, harm is evident. The evidentiary matters alleged herein would persuade a jury to impose a lesser sentence or, in the case of mental retardation, preclude an execution at all. Thus, petitioner is entitled to relief herein.

*U.S.A. v. Bruce Carneil Webster*
*Amended* Motion filed under 28 U.S.C. § 2255                                                    Page 42

**GROUND FOR REVIEW NINE:  PETITIONER'S RIGHTS TO DUE PROCESS AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BECAUSE THE GOVERNMENT WAS IN POSSESSION OF THE INFORMATION WHICH SUGGESTS PETITIONER WAS NOT PROVIDED SPECIAL EDUCATION SERVICES DUE TO RACIAL DISCRIMINATION.**

This ground for review is made in conjunction with grounds for review three and four which discuss the petitioner's mental retardation. Petitioner would specifically incorporate herein the factual allegations made within grounds for review three and four as if such were fully copied and set forth at length. Within these grounds petitioner contended the education witnesses who testified at his trial were biased and the racial discrimination provided a reasonable explanation why petitioner was not provided special education services by the Watson Chapel School District.

Petitioner would show this Court that all of the evidence, information and factual allegations made within grounds for review three and four (as well as ground for review one) were previously known to the Government. Indeed it was the United States Justice Department who prosecuted the desegregation law suit which began in 1970 and was not resolved until 1991. Additionally, Ms. Willis, through her many complaints to governmental agencies such as the EEOC, informed the Justice Department further of the continued discrimination in the Watson Chapel School District.

A prosecutor has a constitutional duty under the Due Process Clause to disclose, upon request, to the defendant any evidence which is favorable and material to the issue of the defendant's guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1196 (1962). In *Brady*, the Court held the prosecutor's failure to disclose favorable evidence violated the Due

Process Clause, regardless whether the prosecutor acts in good faith or bad faith. *Id.*, 373 U.S. at 87, 83 S.Ct. at 1196-1197.

To be entitled to relief the evidence suppressed must be "material"-- that is, there must be a reasonable probability the result of a proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375 (1985). However, this does not mean the defendant must prove the jury's verdict would have been different. Instead, the defendant is charged with proving the evidence withheld *questions the ultimate fairness of the proceedings*. As the Supreme Court stated in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555 (1995), "[a] reasonable probability of a different result is ... shown when the Government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.*, 514 U.S. at 434, 115 S.Ct. at 1566. And, if the prosecutor has *exculpatory* evidence, such evidence must be disclosed even in the absence of a request. *Bagley*, 473 U.S. at    *and, United States v. Agurs*, 427 U.S. 97 (1976).

In *Kyles*, the Court explained that the rule in *Brady* justifies society's trust in the prosecution as the representative of all people and not simply a litigant striving to win a case.[32] *Id.,* 514 U.S. at 439-440,115 S.Ct. at 1568-1569. Indeed, "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Brady*, 373 U.S. at 87, 83 S.Ct. at 1197. Therefore, in the determination whether favorable evidence should have been disclosed, the prosecutor's "good faith" is irrelevant. The Supreme Court maintains, "... whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith

---

[32]    Under *Bagley*, there can be no distinction between impeachment evidence and exculpatory evidence where *Brady* was concerned. *Id.*, 473 U.S. at 682, 105 S.Ct. at 3383.

or bad faith ...) The prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." *Id.*, 514 U.S. at 437-438, 115 S.Ct. at 1567-1568.

Petitioner would contend that the Government, by virtue of previous prosecution of the Watson Chapel School District, was in possession of evidence which questioned the credibility of their witnesses. It matters not whether the prosecutors in the instant case actually knew of all of the information complained of herein. It is sufficient if the Government knew, or should have known, of the evidence which questioned their witnesses' credibility. *Chambers v. Johnson*, 218 F.3d 360 (5th Cir. 2000). These witnesses were paramount in the Government's quest to defeat petitioner's claims of mental retardation. Therefore, any information which would reflect on the credibility of these witnesses, obviously questions the ultimate fairness of the proceedings.

Moreover, petitioner would respectfully show that a death penalty imposed based upon such impeachable and false evidence is constitutionally infirm. There can be no confidence in a verdict which is based upon information which is later proven false or questionable. *Johnson v. Mississippi*, 486 U.S. 578 (1988). Petitioner is entitled to relief.

**GROUND FOR REVIEW TEN:  PETITIONER'S RIGHTS TO DUE PROCESS AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BY THE PRESENTATION OF UNTRUE AND DAMAGING TESTIMONY BY PETITIONER'S CO-DEFENDANT, STEVE BECKLEY.**

**GROUND FOR REVIEW ELEVEN:  PETITIONER'S RIGHTS TO DUE PROCESS AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BY THE PRESENTATION OF UNTRUE AND DAMAGING TESTIMONY BY PETITIONER'S CO-DEFENDANT, MARVIN HOLLOWAY.**

### EVIDENCE AT TRIAL-BECKLEY

Co-defendant Steven Beckley testified at petitioner's trial pursuant to an agreement with the government.  Beckley's testimony was directly related to petitioner's alleged involvement in the kidnaping and subsequent murder of the victim.  Among other things, Beckley's testimony relevant to petitioner's involvement was that:

■    Petitioner could be heard in the 911 tape yelling "this is the FBI."

■    Petitioner was the one who actually abducted the victim and was the one who dragged the victim from her brother's apartment after the break-in.

■    Petitioner raped the victim at least twice on the way to Pine Bluff, Arkansas.

■    Petitioner tells Beckley that he knows a place where they can take the victim and burn her and "nobody will ever find her."

■    Petitioner returns to the motel where the victim is being held and tells Beckley "the hole is dug."

■    Petitioner and Orlando Hall led Beckley and the victim to a burial site where a grave had been dug.

■    At the grave site, petitioner struck the victim in the head with a shovel multiple times.

- Petitioner placed the victim in the grave.

- Petitioner removed the clothes of the victim.

- Petitioner pours gasoline on the victim after she is placed in the grave.

- Petitioner and Orlando Hall are "talking and laughing" when Beckley returns to the grave site.

## EVIDENCE AT TRIAL-HOLLOWAY

Co-defendant Marvin Holloway testified at petitioner's trial pursuant to an agreement with the government. Although Holloway was not present during the kidnapping or murder of the victim, his testimony was directly related to petitioner's alleged involvement in the kidnaping and subsequent murder of the victim. Among other things, Holloway's testimony relevant to petitioner's involvement was that:

- When Orlando Hall was asked why he wanted Bruce Webster, he responded that he figured Bruce could "kill someone if it came down to it."

- When Bruce Webster was apprized of the situation in Arlington, Texas, he told Holloway "we can handle these punk mother-fuckers."

- Beckley told Holloway that Bruce had been messing with [the victim] all night."

- Petitioner told Orlando Hall that he didn't have to worry about having a place to kill the victim "because he know plenty of places to go to do this."

- Petitioner and Orlando Hall talked about how they were going to kill the victim. They could "either beat her to death, choke her or shoot her."

## NON-RECORD EVIDENCE-BECKLEY

After petitioner's trial, Beckley was being held in the Federal Correctional Institute in Ft. Worth, Texas. In the presence of Correctional Officer Ward and inmate Albert Williams, Beckley made comments to Ward and Williams that Beckley had lied under oath in the trial of petitioner in order to garner favor with the government, avoid the death penalty, and procure a favorable sentence. Beckley had an incentive to place blame on petitioner thereby minimizing his own blameworthiness. He too, could be facing a sentence of death if he failed to cooperate with the government.

## NON RECORD EVIDENCE-HOLLOWAY

In the early months on 2000, Orlando Hall received a letter from Marvin Holloway. A copy of the letter and envelope is attached to petitioner's original pleading as Attachment "A" and incorporated herein by reference as if copied herein verbatim. In his letter to Hall, Holloway states "Tell B-Love what's up if he is still by you, and I think I owe him a big apology, so if he wants to hear it then, he will half to give me his number." Holloway's desire to apologize is a result of his untruthful testimony concerning petitioner's role in the offense.

## THE RELEVANCE OF BECKLEY AND HOLLOWAY'S TESTIMONY

At the close of the punishment phase of trial, the trial judge submitted the following Statutory and Non-Statutory Mitigating Factors to the jury:

II(A).  The defendant, Bruce Carneil Webster, caused the death of Lisa Rene, or injury resulting in the death of Lisa Rene, which occurred during the offense of kidnapping.

II(B).  The defendant, Bruce Carneil Webster, committed the offense in a especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse of Lisa Rene.

II(C). The defendant, Bruce Carneil Webster, after substantial planning and premeditation, committed the offense of kidnapping in which the death of Lisa Rene resulted.

II(D). The victim, Lisa Rene, was particularly vulnerable due to her age.

III(A). The defendant, Bruce Carneil Webster, constitutes a future danger to the lives and safety of other persons.

III(B). The effect of the instant offense on Lisa Rene's family.

The jury found all of the aggravating factors had been proved beyond a reasonable doubt with the exception of II(A). Holloway and Beckley's testimony was significant for a finding on several of the issues but was especially damning on the issues concerning the cruel, heinous nature of the crime and the planning and premeditation.

The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendants life and liberty may depend. *Napue v. Illinois,* 360 U.S. 64 (1959).

The concept of due process and its application of various constitutional rights is premised on fundamental fairness. *Ake v. Oklahoma,* 470 U.S. 68,76-77, 105 S.Ct. 1087 (1985). *See generally, Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127 (1969); *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735 (1961); *Napue v. Illinois,* 360 U.S. at 269, 79 S.Ct. at 1177; *and, Dispensa v. Lynaugh,* 847 F.2d 211, 218 (5th Cir. 1988). Irrespective of whether the government had knowledge of the untruthful testimony of Holloway or Beckley, petitioner's right to due process under the Fifth and Fourteenth Amendment to the United States Constitution were violated by Holloway and Beckley's untruthful testimony.

Once again petitioner would respectfully show that it matters not whether the prosecutors in this case actually knew of the falsity of the co-defendant's statements. *Chambers, supra*. The prosecutors should have known that the testimony and evidence from Beckley and Holloway was questionable. Moreover, a conviction based upon such false evidence violates the Eighth Amendment. *Johnson, supra*.

Petitioner has unsuccessfully attempted to locate the witnesses to Beckley's statements. Petitioner further has sought use of the discovery process in order to locate those witnesses, but such requests have been denied. Therefore, petitioner would show this Court that he has been denied the ability to present additional evidence relevant to this ground for relief.

Petitioner attempted to interview Holloway through his investigator. Holloway refused the requested interview. Absent petitioner's discovery requests, and/or additional investigation, petitioner is deprived of the ability to present further evidence relevant to this ground for relief.

## GROUND FOR REVIEW TWELVE: PETITIONER IS INELIGIBLE FOR EXECUTION BECAUSE HE IS MENTALLY RETARDED.

For purposes of this Ground for Review, all of the factual allegations contained in paragraph "E" above entitled "Mitigation," as well as the other mental retardation evidence herein, are re-alleged herein and incorporated herein for all purposes as well as the entirety of the record at trial.

18 U.S.C. 3596(c) states in pertinent part: "**Mental capacity.**-A sentence of death shall not be carried out upon a person who is mentally retarded." Moreover, the Supreme Court recently held "[c]onstruing and applying the Eighth Amendment in the light of our evolving

*U.S.A. v. Bruce Carneil Webster*
*Amended* Motion filed under 28 U.S.C. § 2255          Page 50

standards of decency, we therefore conclude that such punishment is excessive and that the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." *Atkins, supra* (citations and quotations omitted). Petitioner is mentally retarded. Years before the instant offense, petitioner was tested and determined to possess an IQ of 48, well within the range for mental retardation. Investigator Joseph Ward, in interviews with siblings determined petitioner attended special education classes while enrolled in Coleman Elementary School. An interview with Ms. Loula Grey, petitioner's former teacher, revealed that she thought petitioner should have and would have been in special education but for the discriminatory practices of the Watson Chapel School District.

Moreover, extensive testing in the months prior to trial provided overwhelming evidence of petitioner's mental retardation. (See factual allegations regarding mental retardation, *supra*).

Mental retardation is not a condition that one overcomes. Once a person is diagnosed as mentally retarded, he or she maintains that condition throughout their lives. The statute does not limit the bar to execution of the mentally retarded to a finding of mental retardation at any particular time in the judicial proceedings. If at any time in the process, petitioner is determined to be mentally retarded, such finding acts as a bar to execution.

Petitioner was mentally retarded in 1992 when his IQ tested at a 48 at an Arkansas Mental Health Facility. Petitioner was mentally retarded in and around the time of trial when his IQ scores tested between 59 and 72. Four Jurors, at the time of trial found that petitioner "is or may be retarded." At the very least, the jury "hung" on the issue of mental retardation. At the most, the jury was improperly instructed, and not provided an adequate vehicle to render a verdict on the issue of mental retardation by the court adding the objected to "is or may be" language.

Petitioner, to this day is mentally retarded and his execution is barred by 18 U.S.C. 3596.

## *IMPLICATIONS OF ATKINS V. VIRGINIA*

On June 20, 2002, The Supreme Court decided *Atkins v. Virginia*, 122 S.Ct. 2242

(2002). In *Atkins*, the Supreme Court held that the Eighth Amendment to the United States

Constitution precluded the execution of a mentally retarded individual. For the first time, the

Court gave a constitutional dimension to the preclusion of the death penalty for the mentally

retarded.

Although at the time of petitioner's trial, there was a statutory provision in the federal

laws that precluded execution of the mentally retarded, petitioner's efforts to avail himself of

those protections were frustrated. As noted previously, although petitioner made clear his wishes

concerning *who* should make the decision on mental retardation, the trial judge, nevertheless

ultimately made the determination, after the jury essentially "hung" on the issue as presented to

them.[33]

The trial judge made written findings that petitioner was not mentally retarded. Trial

counsel failed to object to those findings and "waived" that issue for appellate review according

to the Fifth Circuit Court of Appeals. That issue is raised elsewhere in this petition as an

Ineffective Assistance of Counsel claim for failure to raise a proper, timely objection to the trial

court's written findings.

In a post-*Atkins* world, however, petitioner alleges that the issue of mental retardation

takes on an entirely new and unique importance in death penalty cases. What was once only a

---

[33] Four of the jurors found that the defendant "is or may be mentally retarded".

statutory right, which can be waived by a failure to object, became an affirmative Eighth Amendment protection from execution. *Atkins* essentially elevates mental retardation to the same constitutional level as competency (to stand trial or to be executed). It has long been a part of our jurisprudence that in order for an individual to be competent to stand trial, he must have a rational as well as factual understanding of the proceedings. Likewise, a defendant must have an understanding concerning the reasons for the ultimate punishment. *See, Ford v. Wainwright,* 477 U.S. 399 (1986) ("Today we have explicitly recognized in our law a principle that has long resided there. It is no less abhorrent today than it has been for centuries to exact in penance the life of one whose mental illness prevents him from comprehending the reasons for the penalty or its implications.)    A defendant is either competent or he is not and the issue cannot be waived by a defendant or his counsel. Likewise, a defendant is either mentally retarded or he is not, there is no middle ground, unlike the issue given the jury by the trial court that defendant "is or may be' mentally retarded.

Additionally, any failure to object by trial counsel does not waive the constitutional issue. What was only statutory at the time of petitioner's trial, and, therefore, subject to waiver, is now a constitutional protection that cannot be waived by the negligence of trial counsel. Finally, the issue may be raised at any time, even after the conclusion of trial.

**GROUND FOR REVIEW THIRTEEN:   THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE TRIAL JUDGE'S DETERMINATION THAT PETITIONER IS NOT MENTALLY RETARDED.**

Petitioner re-urges and re-alleges the factual allegations concerning mental retardation, including those within the attachments to the original petition which are incorporated herein, as well as the entirety of the record at trial.

Petitioner further alleges that the only *expert* testimony favorable to the Government's case concerning petitioner's mental retardation was from Dr. George Parker and Dr. Richard Coons. Dr. Parker performed a series of flawed psychological tests while Dr. Coons only performed a forensic interview in the Mansfield Correctional Facility and reviewed various reports and tests of other Doctors (including Dr. Parker's test), school records, as well as statements of co-defendants. Coons performed no testing using standardized psychometric instruments on petitioner to determine his IQ. Neither expert interviewed anyone who knew petitioner outside the correctional setting. The testing by Parker (WAIS-R) revealed a full scale IQ of 72, fully within the range for a diagnosis for mental retardation pursuant to the DSM IV and the American Association on Mental retardation Manuel. Even assuming the result was correct, Parker's administration of the WAIS-R was flawed. He only administrated seven of the eleven sub-tests and prorated (essentially estimated) the results of four of the sub-tests that petitioner previously performed poorly. Naturally, Parker's prorated scores were higher than the *actual* scores petitioner obtained on previous tests in which he was actually administered *all* of the sub-tests. Additionally, Parker admitted on cross-examination that he was not certified by the Texas Department of Mental Health and Mental Retardation to make a diagnosis of mental retardation.[34]

---

[34]    The Texas Health and Safety Code, Section 591.003 defines a "Person with mental retardation" to be a "person determined by a physician or psychologist licenced in this state or certified by the department to have subaverage intellectual functioning with deficits in adaptive behavior." Neither of the governments experts

The Government also presented testimony of school personnel from the Watson Chapel School District who testified that petitioner was not placed in any special education classes and from their records and recollection, did not appear to fit the criteria of a mentally retarded individual. The government also called various jail personnel and a jail inmate who testified that while in jail, petitioner read books, quoted scripture, filled out forms, kept a neat cell and generally did not exhibit any deficiencies in adaptive behaviors.

## PETITIONER'S EVIDENCE AT TRIAL

In stark contrast, petitioner's experts performed intelligence tests, neurological tests, performed forensic interviews, and compiled a social history of petitioner (the Vineland Assessment) in order to determine what adaptive skills, if any, petitioner lacked.

The government experts testified in rebuttal to petitioner's experts, Dr.'s Finn, Keyes, Fulbright and Cunningham. Dr. Raymond Finn first evaluated petitioner in 1995. His initial evaluation led him to believe that petitioner needed further evaluation. Dr. Finn returned sometime later and administered the WAIS-R and Rorshach tests. On January 30, 1995 petitioner obtained a full scale IQ of 59. Finn tested petitioner again in 1996 where petitioner obtained a full scale IQ of 65. Dr. Finn made no evaluation of petitioner's adaptive skills.

Dr. Denis Keyes, a psychologist specializing in mental retardation testified concerning the full battery of tests he performed on petitioner. Dr. Keyes testified that "Mental retardation refers to significantly sub-average intellectual functioning. It refers to a deficit in adaptive behavior that results in various difficulties in understanding and acknowledging existence, and continuing

---

performed interviews outside the correctional setting to determine whether petitioner possessed a deficit in adaptive behaviors *outside* that setting.

*U.S.A. v. Bruce Carneil Webster*
*Amended* Motion filed under 28 U.S.C. § 2255                                                                    Page 55

through life in a normal pattern." In order to evaluate petitioner, Dr. Keyes administered several tests and testified at trial about their results.

Dr. Keyes administered the Bender-Gestalt test which he described as a visual motor integration test. Dr. Keyes testified the purpose was "to see how well a person can take a picture and copy it on to another picture, on to another page, organize the picture, put it together as well as possible given the person's abilities." He added that "it is a very good indicator of soft signs of neurological damage."

According to Dr. Keyes, "[T]he actual results were slightly below average." He also noted there "were several neurological soft signs", indicating brain damage.

Dr. Keyes then administered the Stanford Binet test, Fourth Edition. Dr. Keyes testified that petitioner performed in the lowest .2 percent of the population with a score of 51. He noted that the score of 51 was essentially the same numbers used in other intelligence tests to define mental retardation. Petitioner fell well below the benchmark of 75.

The next test administered was the Woodcock-Johnson Psycho-Educational Battery, Part 2. The purpose of the test was to test petitioner's literacy. To Dr. Keyes surprise, petitioner performed well for a person with his IQ.

Dr. Keyes returned at a later time to perform another intelligence test on petitioner. He chose the Kaufman Adolescent and Adult Intelligence Test. He did not want to re-administer the Stanford-Binet or the WAIS-R because of the "practice effect" (artificially higher score attributable to experience) that sometimes results from taking an intelligence test numerous times. Dr. Keyes testified concerning the test, "The I.Q. that I achieved in the Kaufman was almost exactly the combination of numbers that I got on the Stanford Binet. In other words, there

was virtually no difference between them." He further testified that he felt, as a result of his testing, petitioner was not malingering.

Following the extensive testing performed on petitioner, Dr. Keyes felt it was necessary to perform an adaptive skills assessment relative to petitioner. He used the Vineland Adaptive Skills Assessment that he described as follows:

> I use the Vineland, which is a social maturity scale and adaptive behavior scale, whereby I sit down with people who know the individual and get as much information as I can from them. I like to find out about the person's background, their childhood, their infancy, their developmental history. I get as much history as I can on the individual. Then I also like to find out about the social skills of the individual, what kind of people they were as far as their work attitude, their work ethic, et cetera, et cetera. I get as much information as I can. And it's typically not, I'm asking you questions, you're giving me answers. It is a discussion that is held in interview format.

As a result of his evaluation,[35] Dr. Keyes determined that petitioner functions somewhere in the range of a seven year old. In summary, Dr. Keyes, as a result of his testing, interviews and evaluations, formed the opinion that petitioner is retarded.

Dr. Robert Fulbright, a neuro-psychologist, performed a battery of tests on petitioner on March 19, 1996. As a result of his testing, Dr. Fulbright determined that petitioner had significant impairment in his attention capacity. He testified that "[h]is ability to pay attention to what he hears for a short periods of time does not appear to be too bad. His ability to pay attention to more than one thing at a time and, at the same time on the flip side of the coin, filter out a distraction appears to be quite poor." Tests of petitioner's reasoning abilities led Dr. Fulbright to conclude "absolutely, he could not get it." Petitioner's psychomotor tests revealed

---

[35] This was the only such evaluation done on petitioner. The government did no such evaluation of petitioner's adaptive skills.

petitioner was unusually unsystematic, and unorganized. He had difficulty with complex communications. Sentences had to broken down and simplified for him to understand. Sensory and motor skills testing indicated to Dr. Fulbright a possible frontal lobe impairment or dysfunction. The only testing that showed anywhere in the average range was verbal fluency. As a result of Dr. Fulbright's testing, he formed an opinion that petitioner suffered from some kind of organic brain damage.

Finally, Dr. Mark Cunningham testified that his examinations of petitioner and interviews with family led him to a diagnosis that petitioner suffered from mental retardation of a mild variety.

The finding by the Court that petitioner is not mentally retarded is without support in the record. Not only is the finding against the great weight and preponderance of the evidence, the evidence is wholly insufficient to support the finding. The standard for sufficiency of the evidence in *habeas corpus* proceedings was announced in *Jackson v. Virginia*, 433 U.S. 307 (1979). In *Jackson*, the Supreme Court held a petitioner entitled to relief if it was found that upon the record evidence adduced at trial, in a light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt in terms of the substantive elements of the criminal offense as defined by state law. The standard, therefore, is not a "no evidence" standard, but rather sufficiency thereof as defined in *Jackson*.

Here, of course, we are not dealing with issues of guilt or innocence. Further, neither the statute, or the Supreme Court in *Atkins*, provide guidance on what burden of proof is used in our inquiry. However, an analysis of whether the elements of mental retardation were established is

still possible. The un-rebutted evidence at trial revealed that a diagnosis of mental retardation

has three main components:

(1). A full scale IQ of 75 or below;

(2). Deficits in adaptive behavior

(3) An onset of the disability prior to age 18.

## 75 IQ

Even considering the evidence presented by the government, through Dr. Parker,

petitioner fell well within the range of 75 IQ or below necessary for a diagnosis of mental

retardation. There is no evidence in the record that petitioner ever scored higher than the 72 full

scale IQ as estimated by Dr. Parker.[36]

## ADAPTIVE BEHAVIOR DEFICITS

The only record testimony of anyone making inquiry into the adaptive behaviors of

petitioner outside the structured jail environment was that of Dr. Mark Cunningham, who

interviewed family members over the phone, and Dr. Denis Keyes. Dr. Keyes actually traveled

to Pine Bluff, Arkansas to interview family, friends, school teachers and other collaterals who

could describe petitioner in the "free world." Dr. Keyes used the Vineland Social Maturity and

Adaptive Behavior Scale to examine petitioner's ability to function in the real world. Based on

his assessment, petitioner possessed the requisite deficits in adaptive behavior necessary to a

diagnosis of mental retardation. The government's two witnesses only observed petitioner in a

jail setting and interviewed persons who knew him in that environment. In order to accurately

---

[36] Dr. Parker admitted under cross examination that he was not certified by the Texas Department on Mental Health and Mental Retardation to make a diagnosis of mental retardation.

*U.S.A. v. Bruce Carneil Webster*
*Amended* Motion filed under 28 U.S.C. § 2255                                      Page 59

assess adaptive behaviors, Dr. Keyes testified that it was necessary to interview persons who knew petitioner prior to age 18 in order to obtain the necessary background information for accurate diagnosis. Viewing him in the structure of the jail, without more was insufficient.

The record is void of any credible evidence from the government that petitioner possessed that necessary adaptive functioning to avoid a diagnosis of mental retardation.

### ONSET PRIOR TO AGE 18

The final component of mental retardation is the requirement that the disability manifest itself prior to age 18. A determination of this component can only be made by interviewing individuals who knew and dealt with petitioner in those developmental years. The only testimony to this component that included such an evaluation was that of Drs. Keyes and Cunningham.

Applied to the case at bar, no rational trier of fact could find that petitioner *was not* retarded. At least four rational jurors found the evidence sufficient to make an affirmative finding that "defendant is or may be retarded." A view of the extensive evidence at trial, concerning the mental retardation of petitioner, viewed in a light most favorable to the government, reveals evidence wholly insufficient to support the finding of the Court that petitioner was not retarded. To the contrary, the evidence is overwhelming that petitioner is retarded.

**GROUND FOR REVIEW FOURTEEN: THE TRIAL JUDGE ERRED IN DISMISSING JURY MEMBER ALFRED FOX AND REPLACING HIM WITH AN ALTERNATIVE JUROR WHO DID NOT PARTICIPATE IN THE JURY'S DELIBERATION DURING THE GUILT/INNOCENCE STAGE.**

After the jury retired to deliberate at the guilt/innocence phase of the trial, the court discharged three of the five alternate jurors. The two remaining jurors were told to remain but to not discuss the case. During the punishment phase of trial, prior to deliberations, juror number 12, Alfred Fox, informed the judge that he had been injured in an automobile accident and was suffering pain from his injuries. He was also taking nitroglycerine tablets. Mr. Fox was distraught and concerned about his health when he informed the Court that he could no longer serve as a juror.

After questioning Mr. Fox, the Court dismissed him without consulting the attorneys and later requested the attorneys to give input on how to proceed. Petitioner questioned the propriety of allowing a juror who did not participate in the deliberations at the guilt/innocence phase of trial to now participate in the punishment phase without benefit of having been involved in all of the deliberations. Petitioner requested a mistrial as a remedy voicing concerns that the new juror "would not be on equal footing with the other 11 jurors."

18 U.S.C. 3593(b)(3) requires that a jury impaneled to consider a death penalty case "shall consist of 12 members, unless, and any time before the conclusion of the hearing, the parties stipulate with the approval of the Court, that it shall consist of a lesser number." No such stipulation was entered into on behalf of petitioner, therefore, the statute requires the Court proceed with 12 jurors. However, the Court, did not proceed with the 12 who deliberated petitioner's guilt/ innocence. Instead, an alternate, without benefit of the prior deliberations on guilt/innocence, was forced to "take up the baton" and consider the punishment evidence.

The Court instructed the jury:

*U.S.A. v. Bruce Carneil Webster*
*Amended* Motion filed under 28 U.S.C. § 2255                                                    Page 61

In deciding whether aggravating or mitigating factors exist, you may consider any evidence that was presented during the guilt phase of the trial and any information that was presented during the penalty phase of the trial, including any matters to which the parties have stipulated. You may also make deductions and reach conclusions that reason and common sense lead you to draw from facts which have been established from the testimony and other evidence and information in the case.

The is no doubt, the alternate juror had the benefit of hearing all the evidence in the case. However, the alternate juror had none of the benefit of discussing that evidence with his fellow jurors. The result was an 11 person jury with an additional party placed in its midst to meet the requirement of 12 jurors. The 5th Circuit Court of Appeals has voiced concerns over the practice of replacing a juror with an alternate after deliberations have begun.

An alternate juror replacing a regular juror after the jury has commenced its deliberations may not be unable to participate equally with the other jurors, because he will lack the benefit of the prior deliberations. There is a danger that the other juror will have "already formulated positions or viewpoints or opinions" in the absence of the alternate juror and then pressure the newcomer into passively ratifying this predetermined verdict, thus denying the defendant the right to consideration of the case the 12 jurors.

U.S. v. Quiroz-Cortez, 960 F.2d 418 (5th Cir. 1992). In petitioner's case, deliberations had already begun, in fact, deliberations on guilt/innocence were complete. The Court, therefore, violated the requirement of 18 U.S.C. 3593 by replacing a juror after guilt/innocense deliberations but before punishment deliberations were complete.

**GROUND FOR REVIEW FIFTEEN: 18 U.S.C. Sec. 3596 IS UNCONSTITUTIONALLY VAGUE AND VIOLATES PETITIONER'S RIGHTS TO DUE PROCESS.**

18 U.S.C. 3596(c)states in pertinent part: "**Mental capacity.**-A sentence of death shall not be carried out upon a person who is mentally retarded." The Supreme Court's

pronouncement in Atkins clearly holds that an execution of a mentally retarded person violates the Eighth Amendment. *Atkins, supra.* These statements of the law, although succinct, provide no insight into how the statute is to be implemented. Neither the Supreme Court, 18 U.S.C. 3596 nor any of the ancillary death penalty statutes in Title 18 concerning the death penalty provide any guidance for the courts or counsel concerning (1) who is to be the fact-finder in an issue on mental retardation, (2) the burden of proof when dealing with such an issue (whether the issue is to be resolved by clear and convincing evidence, by a preponderance, or beyond a reasonable doubt) (3) nor what standards are to be utilized in defining mental retardation.[37] 21 U.S.C. 848, the statute providing for the death penalty for "drug kingpins," is written in similar fashion to the statute in question, but provides no guidance for the litigants. The silence of both statutes leaves all parties uncertain of their intent when mental retardation actually becomes an issue.

A statute fails to meet the requirements of the due process clause if it is so vague and standard less that it leaves Judges, attorneys, juries or the public uncertain as to the conduct that is prohibited, or in the case of petitioner, what the legal standards are for a particular procedure in a particular case. The intended result is outlined, that mentally retarded persons may not to be executed, but the road to that result has not begun to be outlined. The result in the case of 18

---

[37] The legislative history indicates that Senator Biden, the proponent of the amendment precluding execution of the mentally retarded, understood the definition of mental retardation to be "a person with the IQ of 70 or less, or put another way, with a mental capacity, with a mental age of 12 or less." (Congressional Record - Senate S6875, May 24, 1990) The House debates on the 1988 Drug Control Bill, 21 U.S.C. 848, which reinstated the death penalty for the Federal Government, included debate on the exemption of persons with mental retardation from execution. Representative Levin of Michigan apparently felt the definition of mental retardation, for purposes of that debate, was the definition promulgated by the American Association on Mental Retardation. (144 Congressional Record H7283, September 8, 1988) The provisions precluding the execution of the mentally retarded in 18 U.S.C. 3596 and 21 U.S.C. 848 are identical.

U.S.C. 3596 is a statute that is so vague, indefinite and standard less as to be unconstitutional. Nor can one rely upon the Supreme Court jurisprudence for such a determination. Our Federal capital sentencing jurisprudence wholly fails to provide any safety procedures or guidelines for implementation of 18 U.S.C. 3596.

## GROUND FOR REVIEW SIXTEEN: BINDING INTERNATIONAL LAW FORBIDS PETITIONER'S EXECUTION BECAUSE PETITIONER IS MENTALLY RETARDED.

Petitioner respectfully contends that his execution would violate International Law. Petitioner would incorporate by reference all the factual allegations and evidence heretofore plead concerning petitioner's mental retardation. Petitioner would show that he is a mentally retarded person and that all credible evidence and witnesses support such a determination.

Petitioner would further show that International Law is binding upon this Court:

> International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination. For this purpose, where there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.

*The Paquete Habana*, 175 U.S. 677, 700 (1900) (citations omitted).

International Law clearly frowns upon the use of the death penalty. However, when the death penalty is imposed upon mentally ill and mentally retarded persons, the condemnation is

certain. In 1988, the United Nations recommended that every member take steps to eliminate the death penalty for all persons suffering from mental retardation or mental illness, whether existing at the time of sentence or execution. *See, (Safeguards Guaranteeing Protection of Rights of Those Facing the Death Penalty*, ECOSCO Res. 1989/64, U.N. ESCOR Supp. No. 1, at 51, U.N. Doc. E/1989/91 (1989); U.N. ESCOR 1988); *and, (Report of the Committee on Crime Prevention and Control on its Tenth Session*, U.N. ESCOR, Supp. No. 10, at 28-29, U.N. Doc. E/1988/20 (1988).   In 1996, the United Nations adopted a similar resolution recommending protection for persons suffering from mental retardation. *(Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty*, ECOSCO Res. 1996/19, U.N> Doc. E/CN 15/1996/19 (1996)). Indeed, throughout that year the United States received many appeals concerning the execution of mentally retarded persons.

In 1997, the Commission on Human rights called on all countries to abolish the death penalty or at least limit its application to only the most serious crimes and exempting mentally retarded defendants. (Question of the Death Penalty, U.N. Hum. Rts. Comm. Res. 1997/12 adopted Apr. 3, 1997).   In 1998, the Commission called on all countries to comply with the *International Covenant on Civil and Political Rights*, GA Res. 2200 A (XXI), U.N. GAOR, 21st Sess. Supp. No. 16, at 52, Article 6 and 7, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171).[38] *See, Question of the Death Penalty*, U.N. Hum. Rts. Comm. Res. 1998/8). In the opinion of the

---

[38]   In April of 2000 the Commission on Human Rights released another request that all countries not "impose the death penalty on a person suffering from any form of mental disorder or to execute any such person ... ." (Question of the Death Penalty, U.N. Hum. Rts. Comm. Res. 2000/65; 3(e)), (*See* Attachment "J" to petitioner's original pleading).

The United States has been the subject of international criticism with regard to its continued execution of mentally retarded persons. *See,* (United Nations, *Report of the Special Rapporteur, On Extrajudicial Summary or Arbitrary Executions*, E/CN.4/1998/68 ADD.3 (1998)).

Commission, the execution of mentally retarded persons arbitrarily deprives individuals of life by subjecting them to cruel and inhuman punishment. *See Id., supra.*

Petitioner understands that the Senate sought to invoke a "reservation" concerning Article 6 and Article 7 of the *International Covenant on Civil and Political Rights.*[39] However, International Law will not recognize any attempted reservation which is incompatible with the object and purpose of the treaty. In 1995, the Human Rights Committee disapproved of the attempted reservation by the United States. *(Consideration of Reports Submitted by States under Article 40 of the Covenant,* Comments of the Human Rights Committee, 53rd Session, 1413, mtg., Par. 14 at p. 4, par. 16, at 4, U.N. Doc. CCPR/C/79/Add.50 (1995)). The attempted reservation of Articles Six and Seven by he U.S. Senate are invalid. Schabas. W., *The Abolition of the Death Penalty in International Law,* 2nd edition, Cambridge University Press (1977); Schabas, W., *The International Source book on Capital Punishment,* Center for Capital Punishment Studies, London, Northeastern University Press, Boston (1997).

The International Community has recognized additional rights for the mentally retarded as well. *Declaration on the Rights of Mentally Retarded Persons,* G.A. res. 2856 (XXVI), 26 U.N. GAOR Supp. (No. 29) at 93, U.N. Doc. Doc. A/8429 (1971)(*See* Attachment "M" to petitioner's original pleading which is incorporated herein). The General Assembly noted that "[t]he mentally retarded person has a right to proper medical care and physical therapy and to such education, training, rehabilitation and guidance as will enable him to develop his ability and

---

[39]     Article 6 of the Covenant provides in part, "Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life." Article 7 provides: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, no one shall be subjected without his free consent to medical or scientific experimentation."

maximum potential." *See, id.* at (2). Moreover, "[t]he mentally retarded person has a right to protection from exploitation, abuse and degrading treatment. If prosecuted for any offence, he shall have a right to due process of law with full recognition being given to his degree of mental responsibility." *Id.*, at (6).

Petitioner would respectfully show this Court that each of these actions are "conventional norms," as that term is understood in International law. No other country in our world, save Japan, has executed mentally retarded persons. Additionally, the American Bar Association has twice adopted policies which oppose the execution of the mentally retarded.[40] (ABA 1989 & 1997). The ABA published *Criminal Justice Mental Health Standards* which oppose the execution of the mentally retarded. (ABA 1987). Therefore a norm has evolved which forbids the execution of mentally retarded persons and this norm is binding on the Courts of this country.

### STATEMENT REGARDING AMENDMENTS AND INVESTIGATION

Petitioner continues his request that the Court allow continued investigation, full discovery and liberal amendments to this pleading, in accordance with the dictates of justice.

---

[40] In addition to the American Bar Association, the American Association on Mental Retardation (AAMR) opposes the execution of mentally retarded persons. (AAMR, 1988). As does the Association of Retarded Citizens. (ARC, 1992).

# CONCLUSION and PRAYER FOR RELIEF

Wherefore, petitioner BRUCE CARNEIL WEBSTER respectfully prays that this Court:

1. Vacate his unlawfully obtained death sentence;

2. Order that Mr. Webster be relieved from the illegal restraint of his liberty, such restraint being founded upon an unlawful and unconstitutional conviction and sentence;

3. Allow Mr. Webster's previous discovery requests and allow him to file such amendments to this Motion as might be necessary to bring all proper matters before the Court;

4. Grant Mr. Webster an evidentiary hearing on all claims raised herein;

5. Pursuant to Rule 6 of the Rules Governing Section 2255 Cases in the United States District Courts, grant Mr. Webster leave to pursue such discovery as would be available under the Federal Rules of Civil Procedure, pending a hearing on his claims; and

6. Grant such other relief as law and justice require.

Respectfully Submitted,

**PHILIP WISCHKAEMPER**
SNUGGS & WISCHKAEMPER
State Bar No. 21802750
915 Texas Avenue
Lubbock, TX 79401
(806) 763-9900

GARY TAYLOR
State Bar No. 19691650
P.O. Box 90212
Austin, Texas 78709-0212
(512) 301-5100
(512) 301-5329 (fax)

# LeRoux Declaration

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Bruce Carneil Webster

v.

United States of America

## DECLARATION OF KRISTEN K. LEROUX IN SUPPORT OF MOTION FOR AUTHORIZATION TO FILE SUCCESSIVE MOTION TO VACATE SENTENCE

I, **Kristen K. LeRoux**, declare as follows:

1.      I am an employee of Dorsey & Whitney LLP ("Dorsey") and a paralegal on the Bruce Webster case team. I have worked at Dorsey since 1993.

2.      In September 2008, my colleagues and I reviewed and indexed Bruce Webster's trial and appellate case file sent by Mr. Webster's appellate attorneys to Dorsey.

3.      In October 2008, Dorsey attorneys asked me and my colleagues to collect Arkansas Department of Human Services, Division of Children and Family Services records for Bruce Webster and his immediate family members, including Tony Webster, Dassie Mae Harris Frazier, and Dorothy Harris McKelvey Wallace. In late October 2008, Dorsey attorneys asked me and my colleagues to collect Social Security Administration records for Bruce Webster and his immediate

family members, including Willie Webster, Tony Webster, Dassie Mae Harris Frazier, and Dorothy Harris McKelvey Wallace.

4. On October 7, 2008, Dorsey sent a request to Arkansas Department of Human Services, Division of Children and Family Services, Central Registry Unit, P.O. Box 1437 (Slot S566), Little Rock, AR 72203-1437, to release records for Bruce Webster. On October 23, 2008, Dorsey sent requests to release the same for Tony Webster, Dassie Mae Harris Frazier, and Dorothy Harris McKelvey Wallace. On October 27, 2008, Dorsey called the Central Registry with the same request.

5. On October 31, 2008 Dorsey received a fax from Central Registry attaching the Maltreatment Summary Report and Narrative for the Webster family, which included entries for Bruce Webster and Tony Webster. The cover letter stated, however, that the Jefferson County office of the Division of Children and Family Services could not locate the investigative file, and therefore Central Registry was unable to provide the complete investigative file as requested.

6. On the same date, one of my colleagues spoke with Vellor Williams, following up on the request for the investigative file. Although Dorsey offered to send someone to Pine Bluff to collect the investigative file, Ms. Williams insisted that it had been either lost or destroyed.

7. On November 4, 2008, Dorsey received a letter from Central Registry regarding our request for records for Dassie Mae Harris Frazier and Dorothy Harris

2

McKelvey Wallace. The letter stated that after a search of their files, they were unable to locate any reports in the Child Maltreatment Central Registry under those names.

8.     On November 3, 2008, November 5, 2008, and November 18, 2008, one of my colleagues spoke with Vellor Williams regarding the term "legacy file" in the Webster family's Maltreatment Summary Report and Narrative. No further detail was provided.

9.     On October 27, 2008, Dorsey sent a request to Social Security Administration at 3511 Market Street, Pine Bluff, Arkansas 71601, to release records for Bruce Webster, Willie Webster, Tony Webster, Dassie Mae Harris Frazier, and Dorothy Harris McKelvey Wallace.

10.     On December 4, 2008, one of my colleagues called Logan Hamilton, Assistant District Manager of the Social Security Administration at Pine Bluff, who stated that a completed and signed Social Security Administration Form 3288 is necessary to release a copy of their records. Dorsey sent Bruce Webster's signed form to Social Security Administration on December 15, 2008. Dorsey sent signed forms from Willie Webster, Tony Webster, Dassie Mae Harris Frazier, and Dorothy Harris McKelvey Wallace to Social Security Administration on January 15, 2009.

11.     Dorsey received Social Security Administration records for Dassie

Mae Harris Frazier on February 2, 2009.

12.    Dorsey received Social Security Administration records for Bruce Webster and for Willie Webster on February 9, 2009.

13.    Dorsey did not receive Social Security Administration records for Tony Webster or Dorothy Harris McKelvey Wallace.


I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Kristen K. LeRoux

4

# Moore Declaration

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Bruce Carneil Webster

v.

United States of America

## DECLARATION OF LARRY M. MOORE IN SUPPORT OF MOTION FOR AUTHORIZATION TO FILE SUCCESSIVE MOTION TO VACATE SENTENCE

I, **Larry M. Moore**, declare under penalty of perjury, as follows:

1.    I am an attorney duly licensed to practice law in the State of Texas, and have been so licensed since November of 1977. I am also licensed to practice before the United States District Court for the Northern District of Texas; the United States Court of Appeals for the Fifth Circuit; and the United States Supreme Court. I am Board Certified in Criminal Law by the Texas Board of Legal Specialization, and I have been so certified since 1982. I am a sole practitioner; however, I am associated and share offices with another sole practitioner, and we practice under the firm name of the Law Offices of Moore and Cummings (not a partnership).

2.    I was appointed in the United States District Court for the Northern District of Texas as one of the attorneys representing Bruce Carneil Webster in his case, both at trial and upon his direct appeal to the United States Court of Appeals for the Fifth Circuit. I served as Mr. Webster's "lead counsel" at trial, and as "second chair counsel" on appeal. I

was originally appointed to represent Mr. Webster at the end of October in 1994, and his case was ultimately tried during the summer of 1996. His direct appeal ended approximately October of 1999, and we subsequently obtained the appointment of alternative counsel to pursue Mr. Webster's Section 2255 Application.

3.     While representing Mr. Webster, I employed one paralegal/legal assistant, Ms. Kimberly J. Whitehead (Moore), but had no other full-time employees. For purposes of Mr. Webster's trial, I secured the appointment of co-counsel to participate in the case (Dr. Allan K. Butcher), as well as a defense investigator (L. Michael Connelly and Associates), and a Mitigation Specialist (Ms. Annette Lamoreaux). Additionally, we had a number of experts appointed to assist in Mr. Webster's defense, including three mental health experts. Dr. Butcher and I also retained additional experts to assist us with various aspects of Mr. Webster's defense (including an additional mental health expert), whom we paid with our own funds. We also consulted with a number of other experts who advised and/or assisted us without compensation; however, Dr. Butcher and I were also required to pay with our own funds for some additional expenses which were incurred by some of these individuals.

4.     During our representation of Mr. Webster, we came to believe that the issue regarding Mr. Webster's mental retardation was going to be a critical issue in Mr. Webster's defense. For that reason, we made every effort which we were able to make, in an attempt to secure any and all evidence which might relate to the issue of Mr. Webster's mental retardation. In that regard, we were apprised at some point by Mr. Webster's family that an application had been made for social security disability benefits on Mr.

Webster's behalf; and we were further advised that some testing may have been done of Mr. Webster attendant to that application. We contacted the Social Security Administration District Office in Pine Bluff, Arkansas, and requested that we be provided with copies of any and all records that might exist pertaining to Mr. Webster, pursuant to a written release which I had obtained from Mr. Webster for that purpose. We also arranged for our defense investigator to retrieve any records which the Social Security Administration might locate during a trip to Pine Bluff, Arkansas, during March of 1996. I have reviewed the copies of the Social Security Administration records pertaining to Mr. Webster's application for benefits that have been provided to me by Mr. Oliver McKinstry of the Dorsey Whitney Law Firm. I do not recall ever having seen these records before, and to the best of my recollection, they were never provided to us by the Social Security Administration pursuant to the request we made during our preparation for trial. I have not had access to my case file regarding Mr. Webster's case since I originally provided it several years ago to the attorneys representing Mr. Webster in his original Section 2255 application. For that reason, I have been unable to review any notes which I may have made, or which may have been provided to me by our investigator, regarding the result of our investigator's trip in Arkansas in March of 1996; particularly in regard to any response that might have been made to our request for the production of any Social Security Administration records that might exist regarding Mr. Webster. While I do not currently have any direct recollection of the response which we received, it is my good faith belief that we must have been told that no records regarding Mr. Webster existed, otherwise we would have continued to pursue them by every means available to us.

5.    In my opinion, the Social Security Administration records which I have reviewed could have been important during the trial on the issue of Mr. Webster's mental retardation, as the testing conducted attendant to Mr. Webster's claim for benefits predates the offense for which he was convicted.  Additionally, the anecdotal information provided in the records regarding Mr. Webster's adaptive functioning would have provided support for our experts' determinations of the deficits in those areas of adaptive functioning they found to exist relative to Mr. Webster.

6.    During my representation of Mr. Webster, I also attempted to obtain any and all records which might exist regarding Mr. Webster's abuse or mistreatment as a child. To that end, I requested that I be provided with copies of any and all such records that might be in the possession of the Arkansas Department of Human Services.  I was ultimately advised by the Arkansas Department of Human Services Division of Children and Family Services that they were unable to locate any such information pertaining to Mr. Webster within the Child Maltreatment Central Registry of the Department, and we never received any such records from them.

7.    Although I have heretofore neither been provided with, nor had the opportunity to review the <u>Motion for Authorization to File Successive Motion to Vacate Sentence</u> which I understand is to be filed on Mr. Webster's behalf, I have nonetheless provided this Declaration in support of such an application.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct to the best of my knowledge

Dated: _10-20-09_

Larry M. Moore
Attorney at Law
Texas State Bar No. 14357800
Law Offices of Moore and Cummings
4210 West Vickery Blvd.
Fort Worth, Texas 76107
Telephone Number: 817-338-4800
Fax: 817-989-2442

## CERTIFICATE OF SERVICE

I, Oliver J. McKinstry, certify that today, October 21, 2009, a copy of the Motion for Authorization to file Successive Motion to Vacate Sentence, Proposed Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255, Declaration of Steven J. Wells in Support of Motion for Authorization to File Successive Motion to Vacate Sentence, Declaration of Kristen LeRoux in Support of Motion for Authorization to File Successive Motion to Vacate Sentence, Declaration of Larry M. Moore in Support of Motion for Authorization to File Successive Motion to Vacate Sentence, and Certificate of Compliance With Rule 32(a) were served upon James T. Jacks, Esq. by Federal Express, at the following address:

> James T. Jacks
> U.S. Attorney for the Northern
>   District of Texas
> Burnett Plaza Suite 1700
> 801 Cherry Street, Unit #4
> Fort Worth, Texas 76102-6882

Dorsey & Whitney LLP

Dated:  October 21, 2009

By _____
    Oliver J. McKinstry (MN # 388109)
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile:  (612) 340-2868
E-mail:  mckinstry.oliver@dorsey.com

Counsel for Petitioner
Bruce Carneil Webster