# 09-11039

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH JUDICIAL CIRCUIT

**In re: BRUCE CARNEIL WEBSTER,**

Movant.

On Appeal from the United States District Court
for the Northern District of Texas
Fort Worth Division
District Court Number 4-94-CR-0121-Y

**GOVERNMENT'S OPPOSITION TO MOVANT'S REQUEST
FOR PERMISSION TO FILE A SUCCESSIVE
28 U.S.C. § 2255 MOTION**

U.S. COURT OF APPEALS
**FILED**
NOV 3 0 2009
CHARLES R. FULBRUGE III
CLERK

JAMES T. JACKS
United States Attorney
Northern District of Texas

DELONIA A. WATSON
Assistant United States Attorney
Burnett Plaza, Suite 1700
801 Cherry Street, Unit #4
Fort Worth, Texas 76102-6882
817.252.5200 OFFICE
817.978.3094 FAX

ATTORNEYS FOR APPELLEE

## RECOMMENDATION ON ORAL ARGUMENT

The government recommends against oral argument because it would not materially aid the Court in the disposition of this matter.

09-11039

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH JUDICIAL CIRCUIT

**In re: BRUCE CARNEIL WEBSTER,**
Movant.

On Appeal from the United States District Court
for the Northern District of Texas
Fort Worth Division
District Court Number 4-94-CR-0121-Y

**GOVERNMENT'S OPPOSITION TO MOVANT'S REQUEST
FOR PERMISSION TO FILE A SUCCESSIVE 28 U.S.C. § 2255 MOTION**

## STATEMENT OF JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 2255(h) over Webster's

request for certification of his successive motion under 28 U.S.C. § 2255.

## STATEMENT OF THE ISSUE

Whether Webster satisfied his burden under section 2255(h) with Social

Security records and declarations from his childhood friends, relatives, and

acquaintances that are neither newly discovered nor substantive?

## STATEMENT OF THE CASE

Lisa Rene was a sixteen-year-old girl kidnapped from her home in

Arlington, Texas, on September 24, 1994, and taken to Pine Bluff, Arkansas,

1

where she was ultimately struck several times with a shovel and buried – possibly while still alive. Bruce Carneil Webster, also known as "B-Love," and four co-defendants, were charged in the United States District Court for the Northern District of Texas with various offenses relating to the kidnapping and murder.

Webster was convicted of kidnapping resulting in the death of Lisa Rene, conspiring to commit kidnapping (count two); and using and carrying a firearm during a crime of violence (count six). The jury also returned a recommendation for a sentence of death. On September 30, 1996, Webster was sentenced to death on count one; life imprisonment on count two; and 60 months imprisonment on count six, with the latter two ordered to run consecutively.[1]

The district court, in response to defense counsel and in recognition of 18 U.S.C. § 3596(c)'s flat prohibition against the execution of a mentally retarded person, filed a "Factual Finding Regarding Mental Retardation, on June 21, 1996, in which the court stated, "Webster is not mentally retarded and ... he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him. As a result, defendant Webster is not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty."

---

[1] Orlando Hall was also sentenced to death. Steven Beckley, Demetrius Hall, and Marvin Holloway were not charged with offenses for which death was a possible penalty. Each pled guilty and received a substantial sentence.

Webster's convictions and sentence were affirmed by this Court on December 3, 1998. *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998). In addition to other issues on appeal, Webster challenged the district court's mental retardation finding on several grounds: (1) it was made in contravention of the Federal Death Penalty Act; (2) it was made in derogation of Webster's rights to due process and effective assistance of counsel; (3) it was contrary to the greater weight of the credible evidence; and (4) it was inconsistent with the verdict. *See Webster*, 162 F.3d at 351. This Court concluded that the district court's actions were proper, and the finding was supported by the evidence. Webster's petition for writ of certiorari was denied. *Webster v. United States*, 528 U.S. 829 (1999).

Webster filed a timely initial motion for relief pursuant to 28 U.S.C. § 2255 on September 29, 2000, and an amended motion on August 16, 2002. He raised multiple issues involving the determination of whether he is mentally retarded: (1) his due process rights were violated by the district court's alleged usurpation of the jury's right to determine whether he is mentally retarded; (2) he is ineligible for execution because he is mentally retarded; (3) the evidence presented at trial was insufficient to support the district court's determination that he is not mentally retarded; (4) 18 U.S.C. § 3596 is unconstitutionally vague; and (5) binding international law forbids his execution because he is mentally retarded. The

3

district court denied the motion, authoring a substantial order explaining why,

even in the face of *Atkins v. Virginia*, 536 U.S. 304 (2002), the evidence supported

a finding that Webster, who admittedly has a low IQ, is not mentally retarded

where he does not have a deficit in adaptive skills.[2] *Webster v. United States*, No.

4:00-CV-1646-Y, 2003 WL 23109787 (N.D. Tex. Sept. 30, 2003) (attached).

The district court subsequently denied a certificate of appealability (COA)

on most of the claims raised by Webster in his amended section 2255 motion, but

granted a certificate on two issues: (1) the evidence presented at trial was

insufficient to warrant the district court's finding that Webster is not mentally

retarded; and (2) his alleged retardation renders him ineligible for a death

sentence. *United States v. Webster*, 421 F.3d 308, 310 (5th Cir. 2005). This Court

again rejected Webster's contentions, explaining that

> Webster claims he is mentally retarded and thus ineligible for his
> death sentence, but given our rejection of his claim regarding the
> standard of proof and sufficiency of the evidence supporting the
> contrary finding at trial, this claim is reduced, in essence, to nothing
> more than an attempt to re-litigate the question. Indeed, Webster's
> brief does not point to any new evidence bearing directly on his

---

[2] Mental retardation refers to substantial limitations in present functioning, which manifests itself before the age of 18. Mental retardation is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000); *Atkins*, 536 U.S. at 308 n.3.

4

mental capacity; instead, it summarizes the evidence presented at trial concerning his cognitive abilities and childhood experiences

*Webster*, 421 F.3d at 313-314. Webster's petition for writ of certiorari was

denied. *Webster v. United States*, 549 U.S. 828 (2006).[3]

## **STATEMENT OF FACTS**[4]

Whether Webster is mentally retarded was hotly contested at trial. Given

that a finding of mental retardation requires the manifestation of significantly

subaverage intellectual functioning and related limitations in two or more of

adaptive skill areas before the age of 18, both the government and the defense

offered expert testimony as to Webster's IQ and his adaptive skills

(communication, self-care, home living, social skills, community use, leisure,

work, self-direction, health and safety, and functional academics).[5] *See* Diagnostic

and Statistical Manual of Mental Disorders 41 (4th ed.2000); *Atkins*, 536 U.S. at

308 n.3. The government presented testimony from two experts. Defense counsel

presented testimony from four medical experts regarding Webster's mental

---

[3] In late 2006/early 2007, Webster applied for commutation of his death sentence. His request is being held in abeyance, where his sentence has been stayed in collateral litigation challenging the constitutionality of the federal method for execution. *See* Webster's Exhibit A.

[4] The gruesome details surrounding the kidnapping and murder of Lisa Rene are set out in both this Court's opinion on direct appeal. *See Webster*, 162 F.3d at 318-320.

[5] Both sides also introduced lay testimony regarding Webster's intellectual functioning and his adaptive skills.

capacity and a fifth medical expert on surrebuttal to critique the methodology used by one of the government experts to score Webster's IQ test.

All of the experts who testified at Webster's trial, including those who testified for the government, agree that Webster's IQ test scores are low. When tested by his experts, Webster had composite scores ranging between 51 and 65, while the government expert's test, which admittedly was flawed, resulted in a score of 72. That the experts disagreed on Webster's true IQ was largely irrelevant because an IQ score of 72 falls within the range where one can be diagnosed as mentally retarded, if that person also has a deficit in adaptive skills. All four defense experts concluded that Webster was mentally retarded; two found him to be mildly retarded. Only one of the defense experts, Dr. Denis Keyes, conducted an adaptive skills test on Webster. It was on the issue of Webster's adaptive skills that the experts sharply diverged.

Dr. Keyes, a certified school psychologist, a Ph.D in special education, and a professor of special education at the College of Charleston, testified on Webster's behalf. Dr. Keyes set out about the requirements for a diagnosis of mental retardation (low IQ combined with deficits in adaptive skills), acknowledging that the definition for mental retardation has changed over the years. At the time of trial, an IQ of between 75 and 50 would be considered

6

mildly mentally retarded or what is now referred to as a person needing intermittent support levels, according to the American Association on Mental Retardation.

Regarding adaptive skills, Dr. Keyes used what is called a "Vineland" adaptive skills scale that uses a scoring system for determining adaptive skills. Dr. Keyes interviewed family members, family friends, school counselors, teachers and principals. Using these interviews, Dr. Keyes came up with two "composite scores" on the Vineland scale. He admitted that he used a technique called "convergent validation," that is, when interviewing these various people, "You find the information that people give you that is most consistent. If the information is inconsistent, you drop those people." Dr. Keyes also admitted that he did not interview the jailors in completing the Vineland based upon the reasoning that because the onset of mental retardation must occur before age 18, and Webster was older than 18 at the time he was incarcerated awaiting the trial of this case, Webster's conduct in jail would not have made any difference in the adaptive skills analysis. Based upon Webster's IQ scores and his adaptive skills scores, Dr. Keyes was of the opinion that Webster was mentally retarded.

During cross-examination, Dr. Keyes admitted that he marked some questions "DK," standing for "don't know" for activities such as addressing

7

envelopes.  He gave Webster scores of "0" for such activities as setting the table, preparing food and making his bed.  Dr. Keyes also gave Webster a score of "DK" for keeping secrets or confidences for more than one day despite knowing that Webster had lied to the police about his involvement.

On redirect examination, Dr. Keyes testified that Webster would be able to function normally in an institutional setting like a prison or a mental institution.  During examination by the district court, Dr. Keyes testified that he did not think it was likely that Webster made the decision to grab Lisa Rene.  He testified he did not think Webster could carry on a high-level conversation or read a text and understand everything he had read.  Dr. Keyes testified that, while he believed Webster has some organic retardation, he believed Webster's formal diagnosis would be primary non-organic retardation.

Dr. George Parker, a psychologist and government witness, concluded that Webster is not mentally retarded.  Consistent with the relevant standard, Dr. Parker testified that usually the adoptive skills evaluation is done with an instrument that involves behavior ratings, such as a Vineland adaptive skills scale.  However, a Vineland scale in a situation such as Webster's was inappropriate and would lead to data that was possibly somewhere between misleading and false.

Dr. Parker observed inconsistencies between Webster's behavior and what Dr. Keyes reported on his Vineland. Dr. Keyes marked the Vineland scale "don't know" for the category "speaks in complete sentences." Dr. Parker observed that Webster spoke in full sentences. Dr. Keyes scored a "1" for the category "reads simple stories," and a "0" for the category "reads on own initiative." Dr. Parker observed that Webster could read simple stories and did, in fact, read on his own initiative. Dr. Keyes also marked "don't know" for the category "addresses envelope," whereas Dr. Parker observed envelopes that were addressed by Webster. Dr. Keyes scored "0" for the categories, "puts clean clothes away" and "makes own bed," whereas Dr. Parker observed that Webster kept his cell neat and his bed was neatly made. Dr. Parker testified that teachers were probably in the best position to determine how a student is functioning and whether the student needs special education help. He testified that the letters written by Webster were certainly not indicative of someone who was mentally retarded. Parker testified that what he observed of Webster was not consistent with Dr. Fulbright's results. Webster's statements to the law enforcement officers were not consistent with mental retardation.

The government also presented the testimony of Dr. Richard Coons, a forensic psychiatrist of 22 years. Dr. Coons was familiar with the criteria set forth

9

in the DSM-IV for mental retardation, and his assessment in criminal cases had from time to time included a determination of whether someone is retarded. In March, 1996, Dr. Coons examined Webster along with Dr. Parker. He testified that Webster was good at recalling sequential history. Webster's cell was neat and tidy, and well organized. Dr. Coons saw books, mail and newspapers in the cell. Webster told Dr. Coons that he had escaped into the women's area four or five times before he was caught. Dr. Coons also interviewed Gary Cardinale, B.J. Valdez, and Debra Harrison. Dr. Coons testified that he saw no deficiencies in Webster's adaptive skills, and that adaptive skills is the more important of the two criteria for mental retardation. In his opinion, Webster is not mentally retarded.

From this evidence, and testimony from others who had interacted with Webster, the district court concluded in post-conviction proceedings that "Webster has adapted to the criminal life that he chose and has illustrated the ability to communicate with others, care for himself, have social interaction with others, live within the confines of the "home" he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math." *Webster*, 2003 WL 23109787, *14.

10

## SUMMARY OF THE ARGUMENT

Webster's evidence of Social Security records and declarations from his childhood friends, relatives, and acquaintances are neither newly discovered nor substantive. Such evidence was known or available to Webster at the time of trial and when he filed his initial section 2255 motion. He should not be allowed to thwart the intent of 18 U.S.C. § 2255(f) by being permitted to file a successive motion based on evidence that he could have included in his first section 2255 motion with the exercise of due diligence. The Social Security records add little in the way of probative value, given questions of methodology and expertise. Because Webster was seen by the doctors reflected in the reports in an effort to secure Social Security benefits, he had motive to present himself as mentally deficit as he could. The declarations from his family, friends, and acquaintances likewise lack probative value, given their reason for providing the declarations.

## ARGUMENT AND AUTHORITIES

### WEBSTER DID NOT SATISFY HIS BURDEN
### UNDER 28 U.S.C. § 2255(h)

Webster, whose first motion for post-conviction relief under 28 U.S.C. § 2255(a) was denied, requests that this Court certify his successive motion for post-

11

conviction relief, as provided for in 28 U.S.C. § 2255(h), so that he can pursue his claim that

> Newly discovered contemporaneous Social Security records along with declarations of childhood friends, relative, and acquaintances of Mr. Webster, viewed in light of the evidence as a whole, establish by clear and convincing evidence that Mr. Webster is not eligible for the death penalty.

(Webster's motion, p. 3.) His request should be denied, where his newly discovered evidence is wholly insufficient to satisfy his burden under section 2255(h).

Under section 2255(a), a defendant has a permissive statutory right to collaterally attack his sentence within certain time limitations. *See* 28 U.S.C. §§ 2255(a) and (f). Before a defendant may mount a successive collateral attack on his sentence, however, a "panel of the appropriate court of appeals" must certify, as provided in 28 U.S.C. § 2244, that the motion contains

> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or
>
> (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2255(h); *see In re Tatum*, 233 F.3d 857 (5th Cir. 2000).

12

Section 2244(b)(3)(C), which has been incorporated into section 2255, provides that "[t]he court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection." 28 U.S.C. § 2244(b)(3)(C); *see also Reyes-Requena v. United States*, 243 F.3d 893, 898 (5th Cir. 2001) ("We agree with our sister circuits and find that § 2244(b)(3)((C) has been incorporated into § 2255."); *In re Elwood*, 408 F.3d 211, 212 (5th Cir. 2005) (same). A "prima facie showing" is "simply a sufficient showing of possible merit to warrant a fuller exploration by the district court." *Reyes-Requena*, 243 F.3d at 899, quoting *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997).

To satisfy the requirement of subsection 2255(h)(1), Webster offers Social Security records that he claims contain "three separate contemporaneous diagnoses of mental retardation (none of which could be subject to a claim of 'manipulation' as they were all prepared prior to [his] arrest in this matter." (Webster Motion, p. 15.) He also offers information concerning his participation in special education classes in the Watson Chapel Schools, forms he completed for government benefits, and declarations from childhood friends, relatives, and acquaintances which discuss the manifestation of his mental retardation prior to the age of 18.

13

(Webster Motion, pp. 15-16.) This evidence is insufficient to meet his prima facie burden where it is neither newly discovered, nor substantial enough to warrant a fuller exploration by the district court of his claim of mental retardation.

First, Webster fails to meet the requirement that such evidence be "newly discovered," as required under section 2255(h)(1). All the evidence he claims satisfies his burden was known to Webster at the time of trial, and, certainly was known to him at the time he filed his initial section 2255 motion. Webster was aware that he had applied for Social Security benefits and had been examined by several doctors in that process. He admits that he had requested his Social Security Administration records prior to trial, which demonstrates his knowledge of them. (Webster motion, p. 21.) Moreover, Webster could have presented the declarations from his relatives, friends, and acquaintances that he now claims support a finding that he is mentally retarded with his first 2255 motion. Contrary to his assertion, Webster is required under section 2255 to exercise due diligence in the timely securing of evidence to support his claim. Otherwise, the one-year limitation under 28 U.S.C. § 2255(f) would have no bite. *See* 28 U.S.C. § 2255(f). The need for a defendant under section 2255 to exercise due diligence in securing facts supporting his claim is reflected in subsection 2255(f)(4), which provides that the one-year limitation period runs, *inter alia*, from "the date on which the

14

facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4).

In fact, it is for this reason that Webster's request should be summarily dismissed.[6] Webster raised the issue of his alleged mental retardation in his first section 2255 motion. He should not be permitted to file a successive motion by simply "adding" on "new" evidence to support claims that have already been decided adversely to him, when that evidence could have been part of the first motion if he had acted with due diligence. If a defendant is permitted to piece out evidence bit by bit – adding more and more to each successive motion, then the time limitations in section 2255 would be largely ineffective. Moreover, permitting a successive motion here would fly in the face of the statute's intent. As this Court has explained, the Anti-terrorism and Effective Death Penalty Act (AEDPA) was designed to make it significantly harder for prisoners filing second or successive federal habeas corpus motions to obtain hearings on the merits of their claims. *United States v. Orozco-Ramirez*, 211 F.3d 862, 864 (5th Cir. 2000).

---

[6] The government disagrees with Webster's contention that the same claim successor bar found in 28 U.S.C. § 2244(b)(1) does not apply to applications brought by federal prisoners under 28 U.S.C. § 2255. (Webster motion, pp. 17-18.) In any event, his position is meritless because, as discussed, section 2255 has its own built-in requirement mandating the dismissal of repetitive claims.

15

Second, Webster's evidence is not substantial. Dr. C. M. Rittlemeyer, who conducted a general physical examination on Webster, included in his diagnosis: "Mental retardation. Flat feet. Chronic sinus problems and allergies." (G/21.) There is no indication of what Dr. Rittlemeyer used in making that "diagnosis." The records do not reflect any IQ or adaptive skills testing. In fact, the records do not demonstrate that Dr. Rittlemeyer even knew the components for a finding of mental retardation, or that he was qualified to make such an assessment. In fact, given that Dr. Rittlemeyer was conducting a physical examination, it appears that Webster may have self-reported mental retardation to Dr. Rittlemeyer, rather than the doctor making any independent assessment of Webster's mental acumen.

Dr. Charles Spellman, who conducted a psychological evaluation of Webster in order to better ascertain Webster's eligibility for Social Security benefits, "estimated" an IQ of 69, and listed a current level of functioning based on Webster's self-reporting. (G/11-14.) He diagnosed Webster as mentally retarded solely on that IQ estimation, Webster's self-reporting, and his observations of Webster, who was motivated to exaggerate a mental deficiency because of his desire to gain Social Security benefits. *Id.*

From the records, it appears that Dr. Edward Hackett, a psychologist, administered a Wechsler Adult Intelligence Scale - Revised to Webster. (G/15.)

16

He diagnosed Webster with mild mental retardation based on a Verbal IQ of 71, a Performance IQ of 49, and a Full Scale IQ of 59. *Id.* The record does not reflect that Dr. Hackett did any testing of Webster's adaptive skills. The report does note, however, that "The claimant was quite verbal. There may have been some malingering, however, Dr. Hackett could not be sure. The IQ scores are not normal considering history. The claimant was views as a somewhat retarded con man, but very street wise." (G/14.)

At best, these records offer minimal support of Webster's claim, given the questions about methodology and expertise. More importantly, Webster was seeking Social Security benefits and had every reason to present himself as mentally deficit as he could in hopes of securing them.

As for the declarations from Webster's family, friends and acquaintances, they are cumulative of other such evidence offered at trial and in conjunction with his first section 2255 motion. Moreover, since each of them have incentive to exaggerate because of their desire to preclude Webster's execution, these declarations have little probative value. The fact that Webster has uncovered a letter from the Watson Chapel School District indicating that his special education records were destroyed in 1988 is likewise not probative of much. (G/17.) The government agrees that Webster has a low IQ. Whether or not Webster attended

17

any special education classes adds little to the relevant question – does he suffer from sufficient deficits in his adaptive skills to render him mentally retarded?

Webster makes much of the fact that, at the time of his trial, a defendant's mental retardation did not serve as a constitutional bar to execution as it does now under *Atkins*. (Webster Motion, p. 4.) At the time of Webster's trial, there was, and continues to be, however, a statutory bar against the execution of a mentally retarded person. *See* 18 U.S.C. § 3596(c). The Supreme Court's opinion in *Atkins* did nothing more than declare unconstitutional what is already statutorily banned by section 3596(c). *Webster*, 421 F.3d at 311 ("Yet, even before *Atkins*, at the time of Webster's trial, 18 U.S.C. § 3596(c) prohibited the execution of mentally retarded offenders in federal prosecutions. The only substantive change ... ushered in by *Atkins* with respect to federal capital defendants, then, is the recognition of a new source of federal law (*i.e.*, constitutional) that bars their execution.").

Although noting that the American Association of Mental Retardation (AAMR) and the American Psychiatric Associations define mental retardation similarly, *Atkins*, 536 U.S. at 308 n.3, 122 S. Ct. at 2245 n.3, the *Atkins* decision mandates neither a definition nor a standard for the determination of mental retardation. The Supreme Court explained that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally

18

retarded offenders about whom there is a national consensus." *Atkins*, 536 U.S. at 317, 122 S. Ct. at 2250. The *Atkins* Court made clear that each state would have to determine for itself the protocol for such a determination. *Atkins*, 536 U.S. at 317, 122 S. Ct. at 2250.

Because of the statutory bar, the issue of his alleged mental retardation has been front and center, with both the defense and the government marshaling considerable efforts toward it. Unlike many cases, where the issue is joined late in the process, whether Webster is mentally retarded has been litigated. Moreover, the standard that even he claims is the proper one was the one used by the parties in its presentation of evidence and the district court in its determinations.

Webster has not been "denied an opportunity for collateral review of the evidence of his mental retardation under *Atkins* or to develop new evidence under the *Atkins* framework." (Webster motion, p. 15.) In the section 2255 proceedings, although agreeing that both Webster's claims had been raised and rejected on direct appeal, the district court considered both because of the Supreme Court's intervening decision in *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002).

## CONCLUSION

Webster's "newly discovered evidence" is insufficient to meet his prima facie burden. His request to file a successive motion should be denied.

19

Respectfully submitted,

JAMES T. JACKS
United States Attorney
Northern District of Texas


DELONIA A. WATSON
Assistant United States Attorney
State of Texas Bar Number 20937500
Burnett Plaza, Suite 1700
801 Cherry Street, Unit #4
Fort Worth, Texas 76102-6882
817.252.5200 OFFICE
817.978.3094 FAX

## CERTIFICATE OF SERVICE

I certify that, on the 28th day of November, 2009, the original and six

copies of the foregoing response, and a computer diskette containing same, were

sent via Federal Express to the Clerk of the U. S. Court of Appeals for the Fifth

Circuit, and two copies of the response and one computer diskette containing the

brief were served on Mr. Oliver J. McKinstry, counsel for Webster, Dorsey &

Whitney LLP, Suite 1500, 50 South Sixth Street, Minneapolis, MN 55402-1498,

via United States mail.


DELONIA A. WATSON
Assistant United States Attorney

\briefs2009\webstersucc. wpd

20

# Unpublished Order

Westlaw.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
(Cite as: 2003 WL 23109787 (N.D.Tex.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas, Fort Worth Division.
Bruce Carneil WEBSTER, Petitioner,
v.
UNITED STATES OF AMERICA, Respondent.
No. Civ.A. 4:00-CV-1646-.

Sept. 30, 2003.

MEMORANDUM OPINION AND ORDER
DENYING AMENDED MOTION TO VACATE
CONVICTION AND SENTENCE

MEANS, J.

*1 Petitioner Bruce Carneil Webster (Webster) is a federal prisoner under a death sentence who, having been being convicted of capital murder in this Court, has filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255. The government filed a brief opposing the motion and Webster replied. The Court denies Webster's motion.

I

*History of the Case*

On June 7, 1996, a jury convicted Webster of kidnaping in which a death occurred, conspiracy to commit kidnaping, and carrying a firearm during a crime of violence because of Webster's involvement in the kidnaping of Lisa Rene. After a subsequent punishment hearing the jury, after finding certain aggravating and mitigating factors to be present, recommended on June 20, 1996, that Webster receive the death penalty. This Court assessed the death penalty on September 30, 1996. The case was appealed to the Fifth Circuit Court of Appeals, which affirmed Webster's conviction and sentence.

*United States v. Webster*, 162 F.3d 308 (5th Cir.1998).

Webster filed an initial motion to vacate on September 29, 2000. On April 4, 2001, this Court granted Webster's request to file a discovery motion, which he did on April 30, 2001. On June 18, 2002, this Court denied his motion for discovery, and Webster filed an amended motion to vacate on August 16, 2002. The government filed its response on November 14, 2002, and Webster filed a reply on March 13, 2003.

The Fifth Circuit Court of Appeals recited the following factual background in its opinion on direct appeal:

Webster, [Orlando] Hall and Marvin Holloway ran a marijuana trafficking enterprise in Pine Bluff, Arkansas. They purchased marijuana in varying amounts in the Dallas/Fort Worth area with the assistance of Steven Beckley, who lived in Irving, Texas. The marijuana was transported, typically by Beckley, to Arkansas and stored in Holloway's house.

On September 21, 1994, Holloway drove Hall from Pine Bluff to the airport in Little Rock, and Hall took a flight to Dallas to engage in a drug transaction. Beckley and Hall's brother, Demetrius Hall (D.Hall), picked up Hall at the airport. Later that day, Hall and Beckley met two local drug dealers, Stanfield Vitalis and Neil Rene (N. Rene), at a car wash and gave them $4700 for the purchase of marijuana. Later that day, Beckley and D. Hall returned to the car wash to pick up the marijuana, but Vitalis and N. Rene never appeared.

When Hall got in touch with Vitalis and N. Rene by telephone, they claimed they had been robbed of the $4700. Using the telephone number that Beckley had dialed to contact Vitalis and N. Rene, Hall procured an address at the Polo Run Apartments in Arlington, Texas, from a friend who

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
(Cite as: 2003 WL 23109787 (N.D.Tex.))

worked for the telephone company. Hall, D. Hall, and Beckley began conducting surveillance at the address and saw Vitalis and N. Rene exit an apartment and approach the same car they had driven to the car wash, which they claimed was stolen from them along with the $4700. Hall therefore deduced that Vitalis and N. Rene had lied to him about having been robbed.

*2 On September 24, Hall contacted Holloway and had him drive Webster to the Little Rock airport. From there, Webster flew to Dallas. That evening, Hall, D. Hall, Beckley, and Webster returned to the Polo Run Apartments in a Cadillac owned by Cassandra Ross, Hall's sister. Hall and Webster were armed with handguns, D. Hall carried a small souvenir baseball bat, and Beckley had duct tape and a jug of gasoline. They approached the apartment from which they had previously seen Vitalis and N. Rene leave.

Webster and D. Hall went to the front door and knocked. The occupant, Lisa Rene, N. Rene's sixteen-year-old sister, refused to let them in and called her sister and the police emergency phone number. After Webster unsuccessfully attempted to kick in the door, he and D. Hall looked through a sliding glass door on the patio and saw that Lisa Rene was on the telephone. D. Hall shattered the door with the bat; Webster entered the apartment, tackled Lisa Rene, and dragged her to the car.

Hall and Beckley had returned to the car when they heard the sound of breaking glass. Webster forced Lisa Rene onto the floorboard of the car, and the group drove to Ross's apartment in Irving. Once there, they exited the Cadillac and forced Lisa Rene into the back seat of Beckley's car; Hall climbed into the back seat as well. With Beckley at the wheel and Webster in the front passenger seat, they drove around looking for a secluded spot. During the drive, Hall raped Lisa Rene and forced her to perform fellatio on him.

Unable to find a spot to their liking, they eventually returned to Ross's apartment. From there, Beckley,

D. Hall, and Webster drove Lisa Rene to Pine Bluff. Hall remained in Irving and flew back to Arkansas the next day. En route to Pine Bluff, Webster and D. Hall took turns raping Lisa Rene. Once Beckley, D. Hall and Webster reached Pine Bluff, they obtained money from Holloway to get a motel room. In the room, they tied Lisa Rene to a chair and raped her repeatedly.

Hall and Holloway arrived at the motel room on the morning of September 25. They went into the bathroom with Lisa Rene for approximately fifteen to twenty minutes. When Hall and Holloway came out of the bathroom, Hall told Beckley, "She know too much." Hall, Holloway, and Webster then left the motel.

Later that afternoon, Webster and Hall went to Byrd Lake Park and dug a grave. That same evening, Webster, Hall, and Beckley took Lisa Rene to the park but could not find the grave site in the dark, so they returned to the motel room. In the early morning of September 26, Beckley and D. Hall moved Lisa Rene to another motel because they believed the security guard at the first motel was growing suspicious.

The same morning, Webster, Hall, and Beckley again drove Lisa Rene to Byrd Lake Park. They covered her eyes with a mask. Hall and Webster led the way to the grave site, with Beckley guiding Lisa Rene by the shoulders. At the grave site, Hall turned Lisa Rene's back toward the grave, placed a sheet over her head, and hit her in the head with a shovel. Lisa Rene screamed and started running. Beckley grabbed her, and they both fell down. Beckley hit her in the head twice with the shovel and handed it to Hall. Webster and Hall began taking turns hitting her with the shovel. Webster then gagged her and dragged her into the grave. He stripped her, covered her with the gasoline, and shoveled dirt back into the grave. When buried, Lisa Rene, although unconscious, likely was still breathing. Hall, Beckley, and Webster then returned to the motel and picked up D. Hall.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

**\*3** Based on information from the victim's brothers, D. Hall was arrested; Hall and Beckley subsequently surrendered to the police. On September 29, just after turning himself in, Beckley gave a confession to a police detective and an FBI agent in which he admitted to the kidnaping of Lisa Rene and implicated himself, Hall, and an individual known as "B-Love." Beckley stated that he had last seen Lisa Rene at the Pine Bluff Motel with B-Love. A security guard at the motel informed the agents and officers that Webster went by the name B-Love, and provided a description of Webster and his vehicle. When Webster pulled into the motel parking lot during the early morning of September 30, he was detained and subsequently arrested.

*Webster,* 162 F.3d at 318-20.

## II.

### Standard of Review

28 U.S.C. § 2255 provides that a federal prisoner may move the convicting court to vacate, set aside, or correct a conviction or sentence on the grounds that it was imposed in violation of the Constitution or the laws of the United States. *See* 28 U.S.C. § 2255. A petition under § 2255 "may not do service for an appeal," and it is presumed that a defendant stands fairly and finally convicted. *United States v. Shaid,* 937 F.2d 228, 231-32 (5th Cir.1991) (en banc), *citing United States v. Frady,* 456 U.S. 152, 164 (1982). Therefore a defendant may not raise even constitutional or jurisdictional issues for the first time on collateral appeal without establishing both cause for failing to raise the issue on direct appeal and actual prejudice resulting from the error. *Id.* A defendant must meet this cause-and-prejudice standard even where he alleges a fundamental constitutional error. *Id., citing Murray v. Carrier,* 477 U.S. 478, 493 (1986). Other types of error may not be raised for the first time under § 2255 unless the defendant establishes that the error could not have been raised on direct appeal *and,* if the error were

condoned, it would result in a complete miscarriage of justice. *United States v.. Pierce,* 959 F.2d 1297, 1301 (5th Cir.1992).

Moreover, claims that were raised but rejected on direct appeal are also barred from federal habeas review. *United States v. Rocha,* 109 F.3d 225, 229 (5th Cir.1997). A federal habeas petitioner cannot, however, be expected to have raised a claim based on a Supreme Court case before that case was handed down. *Id.* Furthermore, ineffective assistance of counsel on appeal does satisfy the cause-and-prejudice standard. *Id.* And, finally, the Supreme Court has recently held that claims that counsel was ineffective at trial can be raised on habeas review under § 2255 regardless of whether the claims were previously raised on direct appeal. *United States v. Massaro,* 538 U.S. 500, 123 S.Ct. 1690, 1693-94, 155 L.Ed.2d 714 (2003).

## III

### Issues Presented

In his motion to vacate his conviction and sentence, Webster raises the following sixteen claims for relief:

**\*4** 1. Webster's rights to due process and equal protection and right to be free from cruel and unusual punishment were violated by the racially discriminatory effects of the federal capital sentencing scheme.

2. Webster's due-process rights were violated because the trial court made a factual finding on the issue of mental retardation that should have been made by the jury.

3. Trial counsel were ineffective in failing to investigate and present additional evidence regarding mental retardation.

4. Trial counsel were ineffective in failing to investigate and present evidence regarding racial bias

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
(Cite as: 2003 WL 23109787 (N.D.Tex.))

in the school system in which Webster attended school as well as the potential biases of certain witnesses for the government.

5. Trial counsel were ineffective in failing to object to the trial court's decision to make the factual finding on the issue of mental retardation.

6. Trial counsel were ineffective in allowing a breakdown in communication with the mitigation specialist to affect the discovery, investigation, and presentation of evidence at trial.

7. Trial counsel were ineffective in failing to investigate and present to the jury an accurate portrait of the extreme abuse suffered by Webster as mitigating evidence.

8. Trial counsel were ineffective in failing to present evidence of Webster's special talents, musical abilities, and religious devotion as mitigating evidence.

9. Webster's due-process rights and right to be free from cruel and unusual punishment were violated because the government withheld information suggesting that Webster did not receive special education services in school because of racial discrimination.

10. Webster's due-process rights and right to be free from cruel and unusual punishment were violated by false testimony given by co-defendant Steven Beckley.

11. Webster's due-process rights and right to be free from cruel and unusual punishment were violated by false testimony given by co-defendant Marvin Holloway.

12. Webster is ineligible to be executed because he is mentally retarded.

13. The evidence presented at trial was insufficient to support the trial court's finding that Webster is not mentally retarded.

14. The trial court erred in dismissing a jury member and replacing him with an alternate juror after deliberations occurred at the guilt phase of the trial.

15. Webster's due-process rights have been violated because 18 U.S.C. § 3596 is unconstitutionally vague.

16. International law prohibits Webster's execution because he is mentally retarded.

Webster also requests an evidentiary hearing before this Court.

IV

*Procedural Bars*

In its response to Webster's petition, the government asserts several procedural bars to this Court's consideration of many of the claims that Webster raises in his petition. The government asserts that Webster is procedurally barred from raising his first, twelfth, thirteenth, and fourteenth claims because they were raised and rejected on direct appeal. The government also asserts that Webster is barred from raising his fifteenth claim for relief because it was not raised on direct appeal and he has failed to allege any cause and prejudice for the procedural default.

*5 In his reply, Webster asserts that he can overcome these procedural defaults, either because he raises claims based on new factual or legal bases or because his appellate counsel was ineffective on direct appeal. With respect to Webster's first, twelfth, and thirteenth grounds, this Court agrees that these previously raised and rejected grounds are based on new facts or law. Specifically, Webster's selective-prosecution claim is based on statistics from the Department of Justice that were not available at the time of his trial or appeal. Likewise, his mental retardation claims, including claims twelve and thirteen, are based, in essence, upon

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
(Cite as: 2003 WL 23109787 (N.D.Tex.))

cases handed down by the Supreme Court since his appeal became final. Accordingly, these claims are not procedurally barred from habeas review. And, in the interest of justice, this Court will address Webster's fifteenth ground although it was not raised on direct appeal, as Webster has alleged, albeit in a perfunctory manner, that his appellate counsel was ineffective.

Webster's fourteenth ground for relief, however, concerning this Court's decision to excuse one juror and replace him with an alternate juror, was raised and rejected on appeal. Webster does not allege any new factual or legal basis for this claim that would render it necessary for this Court to revisit this issue. Accordingly, the Court agrees that this claim is barred from review.

V

*Discussion of Claims*

A. *Selective-Prosecution claim*

In his first claim for relief, Webster, in essence, makes a selective-prosecution claim. Specifically, Webster contends that the government violated his constitutional rights because it has used ethnicity as a basis for seeking the death penalty against African-Americans like himself. Webster bases his claim on statistics that purport to show that the government has sought the death penalty against African-American defendants with disproportionate frequency as compared to defendants of other races.

*Applicable Law*

In *United States v Armstrong,* 517 U.S. 456 (1996), the Supreme Court addressed the appropriate standard for establishing a selective-prosecution claim. In *Armstrong,* the Court first noted that, absent clear evidence to the contrary, there is a presumption that prosecutors have properly discharged their

duties. The Court then went on to state that, in order to dispel this presumption and establish that he has been selectively prosecuted on the basis of his race, a criminal defendant must show that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose. And, in order to establish a discriminatory effect, the defendant must show that similarly situated individuals of a different race were not prosecuted. *Id.* at 464-65.

*Analysis*

At trial, Webster made a motion to dismiss the government's notice to seek the death penalty based on an affidavit presented to this Court indicating that 66% of federal death-penalty cases involved African-American defendants. This Court denied the motion and Webster's discovery request. Webster then appealed these decisions. On direct appeal, the Fifth Circuit denied this claim, holding that Webster had failed to make a sufficient showing that he was selectively prosecuted because he had not shown that the government had failed or refused to seek the death penalty against other similarly situated individuals, and he had failed to establish a discriminatory purpose on the part of the Department of Justice. The Fifth Circuit further held that Webster's statistical evidence did not rebut the presumption of good faith on the part of the prosecution. *Webster,* 162 F.3d at 334-35.

*6 On habeas review, Webster now points to statistics compiled by the Department of Justice as support for his claim. (Webster's Ex. A). But contrary to his assertion that this statistical evidence is sufficient to establish a *prima-facie* selective prosecution case, the Fifth Circuit in *United States v. Jones,* 287 F.3d 325, 333-35 (5th Cir.), *cert. denied,* 537 U.S. 1018 (2002), ruled that these statistics were not sufficient to establish a *prima-facie* case after being presented with the same Department of Justice Report, titled "Department of Justice, The Federal Death Penalty System: A Statistical Survey (1988-2000)." As Webster presents

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

to this Court the same statistics that the Fifth Circuit has previously held to be insufficient to support a claim of selective prosecution, this Court is not at liberty to rule otherwise, and Webster's first claim for relief is denied.[FN1]

> FN1. Webster further asserts that the fact that this Court denied him the right to conduct discovery on this issue is the reason he cannot establish both prongs of the *Armstrong* standard. But in both his motion for discovery and here, while Webster has arguably presented some statistical evidence to support his claim that there has been a disparate effect on African-Americans, Webster has presented no evidence that there were *similarly situated* white defendants against whom the death penalty was not sought. Furthermore, Webster has failed to present any evidence, inferred or otherwise, that there has been any discriminatory intent when prosecutors have decided to ask for permission to seek the death penalty against African-American individuals or when the Department of Justice has authorized the death penalty in cases against African-American defendants. Accordingly, following the reasoning in *Armstrong,* Webster's statistical evidence is not sufficient to establish either the elements of his claim of selective prosecution or the "some evidence" standard necessary to establish good cause for discovery.

**B.** *Ineffective-assistance claims*

In grounds three through eighth, Webster asserts that his trial counsel were ineffective in several respects. Specifically, Webster contends that his trial counsel were ineffective for: failing to present additional evidence of his mental retardation, evidence of a racial bias in the school system for the area in Arkansas where Webster grew up as additional mitigating and impeachment evidence, accurate evidence regarding the abuse Webster suffered as a child, and evidence of Webster's musical abilities and religious devotion. Webster further asserts that his trial counsel were ineffective for allowing a breakdown in communication with their mitigation specialist to affect the investigation and presentation of evidence and for failing to object to this Court's decision to make the factual finding with regards to mental retardation.

*Standard of Review*

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case reasonably effective assistance of counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 344-45 (1980). In order to obtain federal habeas relief due to ineffective assistance of counsel, a petitioner must satisfy the two-prong test established in *Strickland v. Washington,* 466 U.S. 668 (1984). Under the *Strickland* test, in order to prove that his counsel was ineffective, a defendant must prove by a preponderance of the evidence both that counsel's performance was deficient and that this deficient performance prejudiced his defense. 466 U.S. at 687. Courts, however, should "indulge a strong presumption" that counsel's conduct falls within the range of reasonable assistance, and a defendant must overcome the presumption that an action is sound trial strategy. *Id.* at 689. *See also Lockhart v. Fretwell,* 506 U.S. 364, 372 (1993) (holding habeas petitioner must show that trial result was unreliable or proceeding fundamentally unfair due to deficient performance of counsel).

*Applicable Facts*

At the punishment phase of the trial, defense counsel presented testimony from four experts regarding Webster's mental abilities, including Dr. Raymond Finn (R. 23:172-244), Dr. Denis Keyes (R. 24:2-119), Dr. Robert Fulbright (R. 24:120-172), and Dr. Mark Cunningham (R. 24:183-224). Furthermore, Dr. George Denkowski testified at surre-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
(Cite as: 2003 WL 23109787 (N.D.Tex.))

buttal in order to critique the methodology used by one of the government's experts in testing Webster's I.Q. (R. 26:200-219), and Dr. Cunningham also testified about abuse as a child and its effects on adults.

*7 Moreover, the defense put on testimony from Webster's mother, two of his brothers, two of his sisters, an aunt, a niece, and an ex-girlfriend. All of these witnesses testified, with varying degrees of knowledge, about the severe physical and sexual abuse that Webster's father inflicted on his wife and children, including weekly beatings with hoses and extension cords that left scars; the encouragement of sexual activity between the siblings and, on one instance, between one of Webster's brothers and his mother; and various forms of torture, including forcing the children to eat hog slop or to kiss the anus of a cat, burning one of his sons with an iron, placing hot sauce and pepper in the children's anuses, having the children beat each other, shooting guns at the children when they ran from the house, and killing Webster's dog. (R. 23:8-10, 13-14, 21, 37-40, 42, 55-7, 59, 105, 107-110, 112-13, 122-24, 126-27).

Webster's family members also testified that one of his brothers has been diagnosed as retarded and receives Social Security disability payments, one of his sisters receives disability payments due to a mental disorder, and another sister and his mother have received treatment for mental health problems. (R. 23:19,35-6, 71, 118-19, 136). The defense also presented testimony from an officer of the juvenile court in Arkansas that removed one of Webster's brothers from the home because of the abuse. (R. 24:171-182). Furthermore, Webster's mother testified about the murder of one of her sons and the serious effects that it had on Webster, such that she took him to a mental health clinic for evaluation. (R. 23:146-49). And, several of his family members testified that Webster went to church regularly and was active in church, knew the Bible well, and sang and played the drums in church. (R. 23:43, 48-9, 71-2, 78, 83, 140, 155).

Defense counsel also presented testimony from two defense investigators in an effort to impeach the testimony given by two government witnesses. Investigator Lawrence Connelley testified that he interviewed E.C. Turner, a school counselor who had earlier testified for the government, and Mr. Turner told him that Webster was more of a follower than a leader and was easily influenced. Connelley further testified that he interviewed Pat Drewett, who also told him that Webster was a follower who was easily influenced by others. (R. 26:192-94). Investigator John Strickland testified that he interviewed Greg Barber, Webster's parole officer who had earlier testified for the government. Strickland testified that Barber had told him that Webster was a follower who was easily influenced by other people. (R. 26:196-98).

As support for his ineffective-assistance claims, Webster has submitted written exhibits, including: court documents that indicate that the Watson Chapel School District, the district in which Webster attended school, was under federal-court supervision from 1971 until 1991 because it was deemed a racially segregated district (Webster's Ex. B-E); documents indicating that a school teacher in that district successfully sued the district in the 1980's for racial discrimination in its failure to promote her to a position of assistant principal (Exhibits F & G); and affidavits from defense counsel Larry Moore and mitigation specialist Annette Lamoreaux outlining differences between the two regarding fees claimed by Lamoreaux and their respective theories about the case. (attachments H & I).

*Analysis*

*8 Webster faults his trial counsel primarily for not presenting additional mitigating evidence at the punishment phase of the trial, including additional evidence of mental retardation, additional evidence of abuse from his childhood, and additional evidence of his musical abilities and his religious devotion. Specifically, Webster asserts that his trial counsel should have developed and presented evid-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

ence of the racially discriminatory history of the school district in which he attended school, as well as testimony from certain other witnesses located by habeas counsel, as evidence that Webster was not in special education classes in school because the district was racially biased against African-Americans, not because he was not eligible for these classes. Webster further asserts that his trial counsel should have elicited further testimony from government witness E.C. Turner about his belief that Webster was a "follower;" that counsel should have presented other unspecified evidence about Webster's musical abilities and religious devotion; and that counsel was ineffective for allowing a breakdown in communication with the mitigation specialist, which resulted in counsel using their investigators to investigate possible mitigating evidence rather than Ms. Lamoreaux. Finally, Webster contends that his counsel were ineffective for failing to object to this Court's findings regarding mental retardation, which resulted in the issue's being reviewed only for plain error on direct appeal.

With regard to Webster's assertion that his trial counsel was ineffective for failing to present *additional* evidence of his mental retardation, the abuse in his family, and his religious devotion and musical abilities, as outlined earlier, defense counsel put substantial amounts of this evidence into trial. Thus, Webster is contending that his counsel were ineffective for failing to put *enough* of this type of information into evidence. The Fifth Circuit, however, has cautioned that a reviewing court should be wary of claims that an attorney did not investigate enough or failed to present enough evidence. *Smith v. Cockrell*, 311 F.3d 661, 669 (5th Cir.2002), *citing Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir.2000). And although more of the same or similar evidence could have possibly been presented by defense counsel, defense counsel did place a great deal of this type of evidence about Webster's past before the jury, and counsel were not ineffective for failing to present more of the same. *Prejean v. State*, 889 F.2d 1391, 1898-9 (5th Cir.), *cert. denied*, 494 U.S. 1090 (1990).

Likewise, counsel were not ineffective for failing to discover and present evidence about the racial discriminatory past of the school district. Webster contends that it was vitally important that his trial counsel establish that he was prevented from attending special education classes because of his race, not because he did not qualify. Webster contends that, had defense counsel placed this type of information into evidence, it would have effectively countered the government's contention that Webster is not mentally retarded. This Court, however, disagrees with Webster about the importance of this information. The government disputed Webster's allegations of mental retardation primarily through its own experts and the testimony of people other than his family who have known him both in and out of the prison system, not primarily by arguing that he is not mentally retarded because he was not in special education classes in school. Moreover, Webster's brother Mark testified that most of his brothers were in special education classes, and Tony Webster acknowledged that he was in "resource" classes in school. (R. 23:19, 31, 36). Therefore, any assertion that Webster was not placed in special education classes because the school district ignored the problems of its black students is countered by the fact that members of Webster's own family were in such classes. The Supreme Court noted in *Strickland* that a fair assessment of an attorney's performance requires one "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 2065. Given the fact that evidence was presented at trial that other members of Webster's family were in special education classes at school, counsel cannot be faulted for not pursuing evidence of the school district's troubled past. Webster has failed to establish either prong of the *Strickland* standard with respect to this claim.

\*9 With respect to Webster's claim that his attorneys were ineffective for failing to question E.C. Turner directly about his previous statements about Webster and his claim that they were ineffective in

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

their relationship with the mitigation specialist, Webster has failed to prove any prejudice. Defense counsel put an investigator on the stand to impeach Turner's testimony at trial that Webster was not, in his opinion, retarded with other statements made by him. And, regardless of the type of relationship defense counsel had with the mitigation specialist, the defense called numerous witnesses to the stand to testify regarding several different mitigation issues. In fact, all twelve of the jurors found as a mitigating factor the fact that Webster suffered from abuse and neglect at home, four found as a mitigating factor that he either is or may be mentally retarded, six found it mitigating that he grew up in an atmosphere of violence and fear which misshaped his perception of violence, four found as a mitigating factor that his participation in the crime was, at least in part, attributable to the influence of another, and eleven jurors found as a mitigating factor the fact that he has the love and support of other members of his family. *Webster,* 162 F.3d at 319, n. 2. These findings indicate that defense counsel were successful in presenting convincing mitigating evidence. Webster has not shown that cross-examining Mr. Turner, rather than having an investigator testify, or that a better relationship between the attorneys and the mitigation specialist would have resulted in any substantially different information being placed before the jury or, more importantly, that the result of the trial would have been different.

Finally, with regards to Webster's claim that his attorneys were ineffective for failing to object to the factual finding on mental retardation by this Court, as the Fifth Circuit noted on direct appeal, the law on this issue is far from settled or clear. *Webster,* 162 F.3d at 351.[FN2] Counsel cannot be deemed ineffective for failing to object when the law is not clear that a potential error has occurred. *See Clark v. Collins,* 19 F.3d 959 (5th Cir.1994) (holding that counsel was not deficient in failing to object to racially-motivated peremptory strikes before *Batson* was handed down by the Supreme Court). Webster has not established either prong of the *Strickland*

standard with respect to this claim. Webster's ineffective-assistance claims are without merit and are denied.

> FN2. Indeed, as of the date of this opinion, a search on Westlaw reveals that only two published federal cases even mention 18 U.S.C. § 3596(c), the statute concerning the federal statutory prohibition on executing the mentally retarded. One was the instant case on direct appeal before the Fifth Circuit and the other is *Atkins v. Virginia,* 536 U.S. 304 (2002), the recent Supreme Court case that held that executing the mentally retarded violates the Constitution. *Atkins* only mentions this statute in passing in a footnote. *Id.* At 314, n. 10.

## C. *Mental-Retardation claims*

In his second, twelfth, thirteenth, fifteenth, and sixteenth grounds for relief, Webster asserts various claims that he is ineligible for the death penalty because he is mentally retarded. In his second claim, Webster asserts that this Court usurped the jury's role by making a factual finding that Webster is not mentally retarded. Instead, Webster asserts that he had a due process right to have the jury make that finding. In ground twelve, Webster asserts that he is ineligible for execution because he is mentally retarded. In ground thirteen, Webster contends that the evidence was insufficient to support this Court's finding that he was not mentally retarded. In ground fifteen, Webster argues that the federal statute that exempts mentally retarded defendants from execution is unconstitutionally vague, and in ground sixteen Webster argues that international law prohibits his execution because he is mentally retarded.

### 1. *Claims concerning 18 U.S.C. § 3596*

**\*10** In his second claim for relief, Webster asserts that he had a due-process right to have the jury make the factual determination under 18 U.S.C. § 3596(c) regarding whether he is ineligible for exe-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

cution because is mentally retarded, and in his fifteenth ground, Webster contends that § 3596(c) is unconstitutionally vague.

18 U.S.C. § 3596 concerns the implementation of a sentence of death, and 18 U.S.C. § 3596 states, in relevant part, that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." *See* 18 U.S.C. § 3596(c). This subsection does not, however, give any guidance as to who is to make this determination. At trial, this Court chose to make the factual determination that, based upon the evidence presented at trial, Webster is not, as a matter of law, mentally retarded. (R. 26:227-28).

On appeal, using the clear-error standard because Webster did not object at trial, the Fifth Circuit held that this Court had not erred in opting to make the factual finding itself. *Webster,* 162 F.3d at 351. In his habeas petition, however, Webster cites *Apprendi v. New Jersey,* 530 U.S. 466 (2000), and *Ring v. Arizona,* 536 U.S. 584 (2002), handed down after the opinion in this case on direct appeal, as support for his assertion that he had a due-process right to have the jury make this determination. In *Apprendi,* the Supreme Court held that a jury, rather than a judge, must find beyond a reasonable doubt any fact that exposes a criminal defendant to a penalty greater than the statutory maximum. *Id.* at 482-83. In *Ring,* the Supreme Court extended the rule announced in *Apprendi,* holding that capital-murder defendants are entitled to a jury determination on any fact that increases their maximum punishment, such as aggravating circumstances that make a capital defendant eligible for the death penalty. *Ring,* 536 U.S. at 588.

The Fifth Circuit, however, has specifically held that the rule announced in *Apprendi* is a new criminal procedural rule that is not retroactively applicable under the exceptions set forth in *Teague v. Lane,* 489 U.S. 288 (1989). *United States v. Brown,* 305 F.3d 304, 309-10 (2002). Accordingly, *Apprendi* is not applicable to initial petitions under § 2255. *Id.* While the Fifth Circuit has not ruled

whether the rule in *Ring* should be applied retroactively, a case issued by the Fifth Circuit last year strongly suggests that it should not. *See In re Johnson,* 334 F.3d 403, 405 n. 1 (5th Cir.2003) (noting that, as *Ring* is essentially an application of *Apprendi,* logic would suggest that the rule announced in *Ring* is not retroactively available). Moreover, even if *Ring* is retroactively applicable, the Fifth Circuit has recently observed, albeit in the context of a state defendant seeking permission to file a second habeas petition, that neither *Ring* nor *Apprendi* renders the absence of mental retardation an element of capital murder which must be proven beyond a reasonable doubt. *Johnson,* 334 F.3d at 405. That is, the status of *not* being mentally retarded does not raise the sentence for the capital crime for which Webster was convicted to one where the death penalty is available. Rather, the status of being mentally retarded prevents the death penalty from being carried out with regards to a federal defendant. Because neither *Ring* nor *Apprendi* is applicable to § 3596(c), Webster has not shown any reason for this Court to re-examine the Fifth Circuit's determination that it was not error for this Court to make the factual determination under § 3596(c).

**\*11** Webster further contends that § 3596(c) is unconstitutionally vague because it does not provide any guidance on who is to be the fact-finder, does not outline a burden of proof, and does not set forth any standards for defining mental retardation. He offers no case law as support for this claim. Moreover, as noted by the government in its response, even were this portion of the statute determined to be unconstitutionally vague, this would have no effect on Webster's conviction, as this statutory prohibition on execution has no bearing on his underlying conviction. Moreover, regardless of the failings of 18 U.S.C. § 3596(c), Webster's execution would be prohibited by Supreme Court case law were it determined that Webster is mentally retarded, *Atkins v. Virgina,* 536 U.S 304 (2002), and *Atkins* provides its own guidance for making this determination. Webster is therefore not entitled to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

relief on either of these claims.

*2. Sufficiency of evidence regarding mental retardation*

In his twelfth ground for relief, Webster asserts that he is ineligible for the death penalty because he is mentally retarded, and in his thirteenth ground he contends that the evidence is insufficient to support this Court's factual finding that Webster is not mentally retarded. As support for these grounds, Webster relies on *Atkins v. Virginia,* 536 U.S. 304 (2002), and *Jackson v. Virginia,* 443 U.S. 307 (1979). In *Atkins,* the Supreme Court held that the Eighth Amendment's ban on cruel and unusual punishment prohibits the execution of a mentally retarded person, while in *Jackson v. Virginia,* the Supreme Court held that a state inmate is entitled to federal habeas relief if a review of the record in the light most favorable to the prosecution established that no rational trier of fact could have found the proof of guilt beyond a reasonable doubt. *Id.* at 324, 326.

On direct appeal, the Fifth Circuit, using the "clearly erroneous" standard for review of a factual finding, held that the evidence presented at trial was sufficient to support this Court's finding that Webster is not mentally retarded. *Webster,* 162 F.3d at 352-53. Specifically, the Fifth Circuit noted that, not only had the government presented "substantial" evidence to support the finding, but only four of the twelve jurors found that Webster either is or may be retarded. Accordingly, the Fifth Circuit held that it could not be said that this Court clearly erred in making this finding. *Id.*

Webster, however, contends that the Fifth Circuit erred in this decision. While recognizing that neither § 3596(c) nor *Atkins* delineates a particular standard of review that should be used when assessing whether a finding regarding mental retardation is supported by the evidence, Webster argues that the *Jackson v. Virginia* standard should be utilized in determining on collateral review whether or not

he is mentally retarded (Motion at 58).

It is highly unlikely that the "beyond a reasonable doubt" standard would be applicable to a factual finding on mental retardation, as this standard would imply that the government bore the burden of doubt of establishing "beyond a reasonable doubt" that a federal defendant is *not* retarded, which the opinion in *Atkins* does not even suggest. However, even were *Atkins* to require some greater standard of review than the "clear error" standard already used by the Fifth Circuit, such as the *Jackson* standard, viewed in the light most favorable to the prosecution, a rational fact-finder could have found that Webster is not mentally retarded based upon the evidence presented at trial.

*12 In that regard, this issue was a highly contested one at trial. Webster called four expert witnesses who testified about his mental capacity, including Dr. Raymond Finn, Dr. Denis Keyes, Dr. Robert Fulbright, and Dr. Mark Cunningham. Webster was given different I.Q. tests by some of these experts, and he scored between a composite score of between a 51 and a 65. (R. 23:184-94; R. 24:20). Webster's experts agreed that an I.Q. score of around 70 or lower, along with a lack of adaptive skills and the onset of these deficits before the age of 18, are the criteria for a diagnosis of mental retardation. (R. 23:183, 229-30).[FN3] In order to assess Webster's adaptive skills, Dr. Keyes used the Vineland test, which involved asking numerous questions of people who knew Webster before he was eighteen, including family members, teachers, and friends, but dropping those answers that are inconsistent with the answers of most of the interviewees. (R. 24:36-42). From this, Keyes determined that Webster lived at home, did not have a bank account or a charge card, and was never observed setting the dinner table, assisting in the preparation of meals, or making his bed. He also determined that no one had known Webster to keep secrets or confidences or address envelopes on his own. (R. 24:44-5, 73-6). Dr. Keyes testified that he did not speak to Webster's fellow gang members or

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

police officers who had dealt with him before he was eighteen-years-old in reaching his results on the Vineland test. (R. 24:82-4). Based on this test, Dr. Keyes opined that Webster did have a lack of adaptive skills. Based on the I.Q. scores, along with this adaptive skills test and evidence from family members that Webster had been "slow" as a child, all of Webster's experts diagnosed him as being mentally retarded. (R. 24:43, 47, 144, 189).

> FN3. This definition is the same as that outlined by the Supreme Court in *Atkins*, 536 U.S. at 308, n. 3, 318.

Both Dr. Finn and Dr. Keyes acknowledged that cultural factors can have an effect on I.Q. scores (R 23:212; R. 24:59), and Dr. Keyes testified that the I.Q. tests required Webster to define words and recognize faces, and he did not know the definition of "inflation," nor did he recognize pictures of Shakespeare, Mark Twain, or Einstein, but he did recognize Elvis Presley and Stevie Wonder. (R. 24:60-2). Dr. Keyes also testified that Webster had reading and writing abilities that were unusual in a person with his alleged level of retardation and that Keyes attributes this to his belief that Webster probably suffers from "inorganic," as opposed to "organic" retardation. (R. 24:48, 111). Dr. Keyes also acknowledged, upon being questioned by this Court, that evidence that Webster was a leader in the kidnaping plot would be inconsistent with a diagnosis of mental retardation and that, in his opinion, it would have been "unlikely" that Webster was the one who physically took the victim. (R. 24:102).

The government, on the other hand, offered testimony from two experts, Dr. George Parker and Dr. Richard Coons. Dr. Parker testified that he administered an I.Q. test to Webster and his composite score was a 72. (R. 26:49). Dr. Parker and Dr. Coons testified that they did not believe that Webster is mentally retarded. (R. 26:143). Both Parker and Coons believed that Webster was not motivated to do well on I.Q. tests administered after he was charged in this case, and pointed as evidence of this

to prior tests where he scored higher, such as tests given to him when he was in junior high, when he was in prison previously, and when he was in the Job Corps. (R. 26:51-3, 60-1, 63, 67, 126, 142). Parker also observed that the fact that someone like Webster lived in a sub-culture in which he was not exposed to a lot of vocabulary could cause his I.Q. scores to be lower. (R. 26:50-51).

*13 Primarily, however, Parker and Coons questioned the results obtained by the defense when the test was administered to determine Webster's adaptive skills. Parker testified that he did not believe that the Vineland test was appropriate in Webster's case because of Webster's lifestyle, namely that of a drug dealer. Because of choices that Webster had made in his life, and because Webster had been in prison most of the time since he was fifteen years old, Parker and Coons believed that he would rate deceptively poor on the Vineland test. Dr. Parker and Dr. Coons also disputed some of the results Dr. Keyes did obtain with the Vineland test. Specifically, Dr. Keyes had indicated on the test that Webster's family members stated that Webster did not speak in complete sentences, did not read simple stories aloud, and did not read on his own initiative, when both the two experts and officers at the prison where he was housed after being charged in the instant case had observed that Webster did all of these things. Moreover, his family had stated that they did not know whether Webster addressed envelopes, put his clothes away, or made his own bed, whereas Parker had in his possession an envelope Webster had addressed and had observed that Webster put his clothes away and made his bed in his jail cell. (R. 26: 58-9, 136-39). Parker and Coons also noted that Webster had shown cleverness when he sneaked into the women's part of the jail at one point, and he had shown the ability to adapt to the life he had chosen, as well as life in prison. (R. 26:143-44). Furthermore, Webster had shown adaptability by being deceitful to the police by way of cover stories and excuses when he was arrested with a motel key in his pocket, and had the adaptive ability to destroy evidence when he burned his

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

clothes after Lisa Rene's murder. (R. 26:65-6).

Moreover, the government placed into evidence the testimony of Greg Barber, Webster's former parole officer, Gene Stewart, who was the principal at the junior high that Webster attended, and Rick McLaughlin, the vice-principal at that same school. They all testified that they did not believe that Webster was mentally retarded and that, when they were visited by Dr. Keyes earlier and told him their opinions, he told them that they could not help him because he was trying to keep Webster from being executed, a charge he disputed in his testimony. (R. 25:26-8, 238, 239-40, 247-48, 249). Moreover, E.C. Turner, Pat Drowett, and Linda Monk, a counselor and two teachers from the junior high Webster attended, testified that in their opinion, while Webster was in "basic" classes at school rather than advanced classes and dropped out in the ninth grade, he is not retarded. (R. 25:34-70). Finally, two fellow inmates and several officers from the federal prison where Webster had been housed for some time testified that Webster wrote letters to other inmates, albeit in almost indecipherable slang, received letters and newspapers, read aloud from the newspapers, wrote request slips for various services, wrote written grievances, submitted names and addresses of people for his visitation list, appeared to be reading from law books in the law library and taking notes, and on one occasion complained because the change he had received after purchasing materials from the commissary was incorrect. (R. 25:86-103, 111-18, 122-25, 128-30, 136-38, 141-46; R. 26:24-35).

*14 In summary, all of the experts who testified at Webster's trial, including those who testified for the government, acknowledged that Webster has a low IQ. The experts disagreed about how low, but even a 72 I.Q. falls into the range where one can be diagnosed as mentally retarded, if one also has a deficit in adaptive skills. (R. 26:85-6). And the issue of adaptive skills or the lack thereof is where the parties converged at Webster's trial. While the defense did place into evidence the results of the Vineland test, government witnesses effectively reputed some of those findings with direct evidence that Webster has adapted to his environment and does possess skills that his family stated that he did not. Looking at all of the evidence presented by both sides at trial, while it is undisputed that Webster has had low scores on almost every I.Q. test that has been administered to him, these scores are, according to even defense witness Dr. Keyes, attributable to "nonorganic" factors, which this Court understands to mean his lack of a quality formal education and any positive or productive home life. Nevertheless, the evidence presented at trial does reflect that Webster has adapted to the criminal life that he chose and has illustrated the ability to communicate with others, care for himself, have social interaction with others, live within the confines of the "home" he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math. This evidence therefore supports a finding that Webster does not have a deficit in adaptive skills. *See Atkins,* 536 U.S. at 308, n. 3. The evidence at trial therefore supports a finding that Webster is not mentally retarded and therefore is not rendered ineligible for the death penalty under either *Atkins* or 18 U.S.C. § 3596(c).

### 3. International Law claim

In his final claim on the issue of mental retardation, Webster asserts that binding international law prohibits his execution because he is mentally retarded. As support for this claim, Webster points to resolutions from the United Nations and the International Commission on Human Rights. (Motion at 65). Aside from whether these resolutions are, in fact, binding on the United States, as the government notes, because the Supreme Court has recently held that the United States Constitution prohibits the execution of the mentally retarded, international law provides no greater relief to him than domestic law. Webster's second, twelfth, thirteenth, fifteenth, and sixteenth grounds for relief are without merit and are denied.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

D. *Brady claim*

In his ninth ground for relief, Webster contends that the government violated its duty under *Brady v. Maryland*, 373 U.S. 83 (1963), because the government was in possession of mitigating and impeachment evidence but did not provide it to Webster. Specifically, Webster asserts that the government knew that the reason he was not placed in special education classes when he was in school was because of racial discrimination and knew that certain of the government's witnesses who testified at punishment about his educational background were biased against Webster.

*15 Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the suppression of evidence favorable to the accused and material to either guilt or punishment by the State violates a defendant's due-process rights under the federal constitutional. And under *Brady*, the prosecution has the duty to turn over to the defense both exculpatory and impeachment evidence, whether or not it was requested by the defense. *United States v. Bagley*, 473 U.S. 667, 682, 685 (1985). Such evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. A reasonable probability of a different result is shown when the suppression of evidence undermines confidence in the verdict. *Bagley*, 473 U.S. at 678.

Webster asserts that the government was aware that the Watson Chapel School District in Arkansas, where Webster attended school, had had a history of discriminating against African-Americans. Webster further asserts that part of this discrimination was the failure to place African-American students in special education classes when needed. Therefore, Webster asserts, had this information been provided to the defense, the defense could have impeached certain government witnesses, such as E.C. Turner, Linda Monk, and Pat Drewett, who testified that they did not believe that Webster was retarded and noted that he was not in special education classes in school. (R. 25:34-56).

Putting aside the issue of whether knowledge of the history of the Watson Chapel school district can be imputed to the prosecutors who prosecuted Webster's case, Webster has not established that, even if the evidence was withheld and could have been effectively used to impeach allegedly "biased" witnesses, it is material. In that regard, the Fifth Circuit has recognized that the materiality prong of the *Brady* standard is identical to the prejudice prong of the *Strickland* standard. *Martin v. Cain*, 246 F.3d 471 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001); *Johnson v. Scott*, 68 F.3d 106, 109-10 (5th Cir.1995). That is, in both instances, a habeas petitioner must establish a reasonable probability of a different verdict had the alleged error not occurred. In the instant case, this Court has already determined that Webster has failed to establish any prejudice because his trial counsel did not discover and present this purported evidence of the school system's history of racial discrimination. Accordingly, Webster has failed to establish that this evidence was material to the punishment he received as he has not shown a reasonable probability that he would not have received the death penalty had defense counsel known about this information. These claims are denied.

E. *False-testimony claims*

In his tenth and eleventh grounds for relief, Webster argues that his due-process rights were violated when the government presented the "untrue and damaging" testimony of two of his co-defendants, Steve Beckley and Marvin Holloway. Specifically, Webster contends that, after his trial, Beckley told a correctional officer and a fellow inmate that he had lied at Webster's trial in order to improve his own situation. Webster further contends that, after Webster's trial, his co-defendant Orlando Hall received a letter from Holloway indicating that Holloway owed Webster an apology, a statement that Webster alleges indicates that Holloway lied at trial. Webster further argues that his due-process rights were violated even if the government did not know about any untruthful testimony.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

\*16 Beckley and Holloway were co-defendants who testified at Webster's trial regarding both their own and Webster's involvement in the crime. Both testified about their motives for testifying against Webster, namely that both had pled guilty to various offenses and were hoping that the government would recommend to this Court that their sentences be lowered in recognition of their cooperation. (R. 19:4-7; R. 20:94-9). Nevertheless, Webster contends that he has evidence that both Beckley and Holloway lied when they testified about Webster's involvement in the crime.

It should be noted that Webster has not presented any actual evidence to this Court that either Beckley or Holloway have ever stated that they lied at Webster's trial. In that regard, the statements allegedly made by Beckley and Holloway could very easily be read to mean that both men were apologetic for testifying at Webster's trial in order to improve their own situations. But even if Webster's allegations are taken as true, and all of Beckley's and Holloway's testimony about Webster's involvement in the crime is suspect, Webster has shown no due-process violation. In that regard, the Supreme Court has held that the presentation and admission of false evidence at trial violates a criminal defendant's due-process rights if the reliability of a given witness may be determinative of guilt or innocence. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Mooney v. Holohan*, 294 U.S. 103 (1935). And this is true whether the presentation was intentional or through negligence. *Giglio v. United States*, 405 U.S. 150, 154 (1972). Predictably, then, none of the cases cited by Webster supports his contention that it is a due-process violation for false testimony to be presented at trial without the knowledge of the prosecution.[FN4] In fact, contrary to this assertion, in order to prevail on a claim that his constitutional rights were violated by the presentation of false testimony, Webster must establish not only that the testimony was actually false, but also that it was material and that the prosecution knew it was false. *Napue v. Illinois*, 360 U.S. at 271. Webster has failed even to allege that the government knew that

any testimony given by Holloway or Beckley was false. Accordingly, this Court denies relief with respect to these claims.

> FN4. Webster does not contend that the evidence is insufficient to support his conviction or sentence without the alleged false testimony. Indeed, after he was arrested, Webster gave a written confession that was admitted into evidence at trial in which he acknowledged that he participated in the kidnaping of Lisa Rene, although, not surprisingly, by his accounting his participation in the crime was less than his co-defendants. (R. 20:40-55). Furthermore, Holloway's and Beckley's testimony was corroborated by the testimony of Demetrius Hall, another co-defendant (R. 18:98-152); the testimony of a woman who saw Webster at a 7-Eleven near the victim's apartment (R. 18:280); testimony from a security guard at the motel where the victim was kept that the room was rented in Webster's name and he saw Webster on the premises (R. 19:176-92); testimony that Webster had the key to the motel room in his pocket when he was arrested (R. 19:247-54); testimony that Webster helped police officers locate the grave (R. 20:32-4); testimony that Webster had the victim's gold bracelet and necklace on him when he was arrested (R. 20:217, 219, 222); and testimony about Webster's own statements to the police that the killing was "strictly business." (R. 21A:72).

VI

*Request for Evidentiary Hearing*

Webster also requests that this Court conduct an evidentiary hearing on the claims he raised in his motion. Section 2255 does not require that a hearing be held to dispose of every motion made under

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

its authority. *Coco v. United States,* 569 F.2d 367, 369 (5th Cir.1976). But § 2255 does require a hearing unless the motion, files, and record of the case conclusively show that no relief is appropriate. *United States v. Bartholomew,* 974 F.2d 39, 41 (5th Cir.1992). However, conclusive, rather than direct evidence, is required in order to deny relief without a hearing. *United States v. Drummond,* 910 F.2d 284, 285 (5th Cir.1990). Bona fide or contested fact issues must be resolved on the basis of an evidentiary hearing. *Booth v. United States,* 507 U.S. 243 (5th Cir.1975); *Reagor v. United States,* 488 F.2d 515 (5th Cir.1973).

*17 The record before this Court, including the exhibits submitted by Webster with his motion, do not create any contested fact issues that must be resolved in order to decide Webster's claims. To the contrary, most of Webster's claims are based on the record from the trial. And, with regard to the claims for which Webster has submitted additional evidence, the Court has decided these claims either by assuming that everything Webster alleges is true or based on legal, not factual, bases. Accordingly, because the record before this Court shows conclusively that Webster is not entitled to relief, his request for an evidentiary hearing is denied.

It is therefore ORDERED that Petitioner's motion to vacate his conviction and sentence under 28 U.S.C. § 2255 be, and is hereby, DENIED.

It is further ORDERED that the clerk of the Court shall transmit a copy of this order to Petitioner by certified mail, return receipt requested.

N.D.Tex.,2003.
Webster v. U.S.
Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.