No. 09-11039

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States of America,

Plaintiff/Respondent,

v.

Bruce Carneil Webster,

Defendant/Petitioner.

**REPLY BRIEF IN SUPPORT OF MOTION FOR AUTHORIZATION TO
FILE SUCCESSIVE MOTION TO VACATE SENTENCE**

**THIS IS A DEATH PENALTY CASE.**

*Oral Argument Requested*

Dorsey & Whitney LLP
Steven J. Wells
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600

Counsel for Petitioner
Bruce Carneil Webster

## **INTRODUCTION**

Mr. Webster has made a prima facie showing of mental retardation such that it warrants a fuller exploration by the district court; that is his only burden on this motion (as even the government agrees, *see* Gov't Br. at 13), and that burden has been satisfied.  In his opening brief, Mr. Webster presented the Court with powerful new evidence of his mental retardation, including:  two new IQ tests that were administered before the commission of the crime and place him squarely within the range of mental retardation (with scores of 59 and 69); two independent diagnoses of mental retardation – which necessarily took into account Mr. Webster's adaptive deficits – made by unbiased government doctors before the commission of the crime; and numerous declarations from individuals who knew Mr. Webster before age 18 and who attest to a variety of Mr. Webster's adaptive deficits, including his inability to tie his shoes and dress himself.  This evidence, when viewed in light of the evidence as a whole, which includes six other scores from individually administered IQ examinations all within the range associated with mental retardation (scores of 48, 51, 55, 59, 65, and 72), the testimony of Mr. Webster's childhood friends and acquaintances, and four expert witnesses diagnosing Mr. Webster with mental retardation, demonstrate by clear and convincing evidence that Mr. Webster is mentally retarded and therefore innocent of the death penalty.  This new evidence directly undercuts the government's

1

arguments at trial and in opposition to Mr. Webster's initial habeas petition.

Further, contrary to the government's arguments, Mr. Webster has met the

procedural requirements necessary for filing a successive motion under 28 U.S.C.

§ 2255(h)(1).[1]

## **ARGUMENT**

**I.    THE NEWLY DISCOVERED EVIDENCE PRESENTED BY MR. WEBSTER DEMONSTRATES THAT HE IS MENTALLY RETARDED**

> **A.    The Newly Discovered Evidence Demonstrates That Mr. Webster Is Mentally Retarded**

This Court's only task is to decide whether Mr. Webster has made a "prima

facie showing" that he is mentally retarded.  As the government recognizes, to

satisfy this requirement, Mr. Webster need do no more than make "a sufficient

showing of possible merit to warrant a fuller exploration by the district court."

*Reyes-Requena v. United States*, 243 F.3d 893, 899 (5th Cir. 2005).[2]  As discussed

at length in Mr. Webster's opening brief, he has made the necessary showing.

---

[1]  Mr. Webster's death sentence is currently stayed in collateral litigation; therefore, by granting this motion, the Court would not prolong these proceedings.

[2]  While agreeing that Mr. Webster need only make a prima facie showing for this motion, *see* Gov't Br. at 14, the government also seems to contend that Mr. Webster must show "substantial" evidence of mental retardation, *see id.* at 16. The government, however, fails to cite any authority for this heightened standard, and it does not appear to be supported by the statute or case law. Nevertheless, Mr. Webster meets this standard as well.

First, Mr. Webster has shown that his IQ is well within the range of mental retardation. The newly discovered IQ tests, resulting in scores of 59 and 69, were individually administered before the commission of the crime by two separate medical professionals, chosen by the government, in connection with Mr. Webster's application for Social Security benefits for a sinus condition at the age of 20. These scores, like those resulting from the other six individually administered tests offered at trial, are well within the range of mental retardation. Indeed, Mr. Webster's lowest score, 48, puts him at least three and one-third standard deviations below the mean, with a higher IQ than less than 0.1 percent of the population. *See* David Wechsler, *WAIS-III Administration and Scoring Manual* 24 (3d ed. 2003) (Second Wells Decl. Ex. 1). Furthermore, Mr. Webster's IQ scores are significantly lower than the scores of prisoners recently found to be mentally retarded by this Court. *See, e.g.*, *Rivera v. Quarterman*, 505 F.3d 349, 362 (5th Cir. 2007) (IQ scores up to 92). The government has not identified, and counsel has not been able to find, any case since *Atkins* holding that a person with such consistently low IQ scores is *not* mentally retarded.

Second, Mr. Webster has shown that he has significant adaptive deficits. The newly discovered Social Security records contain two separate diagnoses of mental retardation, again by doctors chosen by the government to evaluate his eligibility for Social Security benefits relating to a sinus condition. These

diagnoses of mental retardation by the Social Security Administration provide substantial evidence of adaptive deficits because a diagnosis of mental retardation necessarily encompasses a finding of adaptive deficits. *See Mental Retardation: Determining Eligibility for Social Security Benefits* 189 (Daniel J. Reschly et al. eds., 2002) (noting that "adaptive behavior is an essential component of the mental retardation diagnostic construct, and all agencies contemplating mental retardation diagnoses should give consideration to adaptive behavior" because "[a]daptive behavior has been fundamental to conceptions of mental retardation at least since the early 19th century") (citing E.A. Doll, *Historical Review of Mental Retardation 1800-1965: A Symposium*, 72 Am. J. Mental Deficiency 165 (1967), and E.A. Doll, *Current Thoughts on Mental Deficiency*, 41 Proc. Am. Ass'n on Mental Deficiency 33 (1936)) (Second Wells Decl. Ex. 2). Notably, none of the doctors, who are tasked with weeding out fake disability claims, concluded Mr. Webster was faking mental retardation, and one doctor specifically ruled out that Mr. Webster was malingering.

Finally, Mr. Webster's adaptive deficits in home living and communication are illustrated by new declarations from his sisters, neighbors, and girlfriends: He could not tie his shoes or make meals without the help of others. His attention span was similar to that of a young child. He could not tell time. He did not understand that the word quarter could refer to twenty-five cents and fifteen

4

minutes.  The newly discovered Social Security records also establish that Mr. Webster received special education and thus had an adaptive deficit in functional academics.  Such a "documented pattern of deficits in adaptive behavior from childhood until the time of the crime is a strong indicator that the defendant is not malingering or 'faking' mental retardation . . . a history of impaired adaptive behavior is a strong argument against the existence of malingering."  J. Gregory Olley, *The Assessment of Adaptive Behavior in Adult Forensic Cases:  Part 3. Sources of Adaptive Behavior Information*, Psychol. Retardation & Developmental Disabilities, Summer 2007, at 3 (hereinafter "Olley") (Second Wells Decl. Ex. 3).

**B.    The Newly Discovered Evidence Directly Contradicts The Government's Previous Arguments And The Factual Bases For The District Court's Finding On Mental Retardation**

While the newly discovered evidence independently proves that Mr. Webster is mentally retarded, it also directly refutes the government's previous arguments and the district court's finding against mental retardation.

Though the government appears in its opposition to this motion to concede that "Mr. Webster's IQ test scores are low," Gov't Br. at 6, the government has never conceded that Mr. Webster's prior IQ test scores were accurate or that they place him in the range of mental retardation.  *See, e.g.*, Gov't Opp. to Amended 2255 Motion, Docket No. 1083, at 69 (arguing the evidence is "equivocal" on what Mr. Webster's IQ is and whether it is low) (Second Wells Decl. Ex. 4); Trial Tr.,

Vol. 26, at 50:1-53:23 (suggesting Mr. Webster was faking later IQ tests in order to secure a mental retardation defense); *id.* at 224:21-225:4 (suggesting third parties encouraged Mr. Webster to invent new defenses) (Second Wells Decl. Ex. 5).

The district court similarly questioned the accuracy of the prior IQ test scores, and likely based its determination that Mr. Webster was not mentally retarded on a suspicion that Mr. Webster was faking his IQ scores. *See Webster v. United States*, No. 4:00-CV-1646-Y, 2003 WL 23109787, at *12 (N.D. Tex. Sept. 30, 2003) (noting the government's experts "believed that Webster was not motivated to do well on I.Q. tests administered after he was charged in this case, and pointed as evidence of this to prior tests where he scored higher, such as tests given to him when he was in junior high, when he was in prison previously, and when he was in the Job Corps"); *id.*, at *14 (noting that Mr. Webster's low I.Q. scores were "attributable to 'nonorganic' factors, which this Court understands to mean his lack of a quality formal education and any positive or productive home life"). As the government *now* concedes, the newly discovered scores of 59 and 69 are certainly "within the range where one might be diagnosed as mentally retarded." Gov't Br. at 6 (noting that an IQ score of 72 may be indicative of mental retardation).

Similarly, the newly discovered evidence directly contradicts the government's argument and the district court's finding that Mr. Webster did not

6

have adaptive deficits. *See, e.g.*, *Webster*, 2003 WL 23109787, at *14 ("Webster has adapted to the criminal life that he chosen and has illustrated the ability to communicate with others, care for himself, have social interaction with others, live within the confines of the 'home' he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math."). As noted above, the mental retardation diagnoses in the Social Security records, which necessarily rely on a finding of adaptive deficits, directly contradict the district court's finding.

In addition, although the government dismisses the newly discovered evidence that Mr. Webster was enrolled in special education classes because "[t]he government agrees that [Mr.] Webster has a low IQ," Gov't Br. at 17, the government previously relied on the fact that Mr. Webster was *not* enrolled in special education classes to prove to the judge and the jury that he had adaptive strengths.[3] *See, e.g.*, Gov't Opp. to Amended 2255 Motion, Docket No. 1083, at

---

[3] It should also be noted that the AAMR is clear that people with mental retardation may very well have certain adaptive *strengths*. *See* American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 41 (10th ed. 2002) ("Adaptive skill limitations often coexist with strengths in other adaptive skill areas . . . .") (Second Wells Decl. Ex. 6). It is not the case that people with mental retardation are incapable of doing anything to help themselves. For this reason, the AAMR defines as mentally retarded someone who exhibits *deficits* in one of the following three adaptive behaviors: conceptual (including functional academics and communication), social (including social skills), or practical (including home living). *Id.* at 82, 91.

7

24-25 (describing testimony of Mr. Webster's counselor and two of his teachers who believed Mr. Webster was not in special education because of his scores on achievement tests, not I.Q. exams, and because he was mature, but lazy and unmotivated). The district court also relied on the purported absence of special education placement in its discussion of adaptive deficits. *See Webster*, 2003 WL 23109787, at *13 (considering that Mr. Webster was in basic classes, but not special education, in its discussion of adaptive deficits).

Finally, the newly discovered declarations of Mr. Webster's friends, relatives, and acquaintances provide evidence of Mr. Webster's failure to adapt to life in an unstructured environment before the age of 18 and thus directly contradict the government's evidence on adaptive deficits at trial, which focused primarily on Mr. Webster's behavior in *prison*. Such evidence was not only evidence of Mr. Webster's behavior *after* age 18, but also in a highly regimented and rigidly controlled environment. As noted in Mr. Webster's opening brief, such evidence is not considered probative of adaptive deficits. *See* Olley at 5 ("The restricted and highly structured prison setting provides no realistic opportunities to test for community functioning. It may, in fact, be argued that the routine and structure of prison life leads to better adaptive behavior for a person with mental retardation.").

**C.      The Government's Speculation Is Not At Issue On This Motion**

For purposes of determining whether a prima facie case exists, uncontroverted facts must be taken as true, and conflicts between the facts must be resolved in the movant's favor. *See Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990) (discussing requirements for making a prima facie case for personal jurisdiction). As a result, this Court must take as true Mr. Webster's new evidence and disregard the government's speculation to the contrary. *See, e.g.*, Gov't Br. at 16 (government's theory that Mr. Webster "was motivated to exaggerate a mental deficiency because of his desire to gain Social Security benefits").

By arguing over the credibility, accuracy, and reliability of Mr. Webster's newly discovered evidence, the government effectively concedes that a fuller exploration by the district court is necessary to resolve its objections. This Court simply does not have the ability to evaluate the factual disputes raised by the government, and should therefore allow Mr. Webster to present his evidence to the district court for a fuller examination. Further, the government gives no basis for its speculation. The Social Security records indicate that Mr. Webster was seeking benefits resulting from *a sinus condition*, not mental retardation; the government fails to provide any explanation as to why Mr. Webster would have (or could have) feigned mental retardation in order to get benefits for a physical condition.

## II. MR. WEBSTER HAS MET THE PROCEDURAL REQUIREMENTS FOR FILING A SUCCESSIVE MOTION UNDER 28 U.S.C. § 2255

### A. Congress Intentionally Imposed Different Requirements On State And Federal Prisoners

The government complains that Mr. Webster failed "to exercise due diligence in the timely securing of evidence to support his claim." *See* Gov't Br. at 14. In so doing, the government improperly suggests that this Court apply the statutory requirements applicable to state prisoners to Mr. Webster, a federal prisoner. Congress intentionally used different language to delineate the procedural requirements applied to state and federal prisoners seeking to file a successive habeas petition. *See* Mot. for Auth. at 17-19. The government ignores this plain language argument and fails to cite any authority for its attempt to impose the same requirements on state and federal prisoners. As Mr. Webster argued in his opening brief, Congress chose to require a state prisoner to make a showing of due diligence in connection with his request for authorization to file a successive motion, while not requiring a federal prisoner to make the same showing in his request for authorization to file a successive motion. *Compare* 28 U.S.C. § 2244(b)(2)(B)(i) (requiring a state prisoner seeking authorization to file a successive habeas corpus application "under section 2254" to show "the factual predicate for the claim could not have been discovered previously through the exercise of *due diligence*") (emphasis added) *with* 28 U.S.C. § 2255(h)(1) (stating

substantive requirements for filing a successive motion under § 2255 for federal prisoners, and not including a showing of due diligence).  Thus, a showing of due diligence is not required on Mr. Webster's motion for authorization to file a successive motion under § 2255.

Instead of requiring a federal prisoner to make a due diligence showing when requesting authorization to file a successive motion, Congress drafted the due diligence requirement into the statute of limitations applicable to motions brought under 28 U.S.C. § 2255 by federal prisoners (*not* to requests for authorization to bring a successive motion).  *See* 28 U.S.C. § 2255(f)(4) (stating that "[a] 1-year period of limitation shall apply to a motion under this section" and that the period shall run from, *inter alia*, "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence").  Courts have long held that failure to meet the statute of limitations is an affirmative defense.  *See Bott v. Am. Hydrocarbon Corp.*, 441 F.2d 896, 901 (5th Cir. 1971) ("The burden was upon [defendant] to establish its affirmative defense of limitations.").  And disproof of an affirmative defense is not part of a prima facie case.  *See, e.g.*, *Siler-Khodr v. Univ. of Tex. Health Sci. Ctr. San Antonio*, 261 F.3d 542, 546 (5th Cir. 2001) (noting that "[o]nce a plaintiff has made her prima facie case" of a violation of the Equal Pay Act, "the burden shifts to the defendant to prove by a preponderance of the evidence that the wage

11

differential is justified under one of the four affirmative defenses set forth" in the statute) (internal quotations omitted).  Thus, by intentionally drafting the due diligence requirement into the statute of limitations, rather than into the procedural requirements for seeking authorization to file a successive motion, Congress shifted the burden of proof to the government to show that Mr. Webster has not complied with the statute of limitations.  To the extent the government seeks to assert any such affirmative defense, it does not affect the fact that Mr. Webster has made a prima facie showing, as required by the statute and this Court's precedent, and that he has therefore met the requirements for authorization to file a successive motion under 28 U.S.C. § 2255.  Any affirmative defenses the government seeks to assert can be presented to the district court.

**B.    Mr. Webster Exercised Due Diligence In Presenting The Newly Discovered Evidence**

Even if this Court were to consider evidence relating to the government's argument that the statute of limitations in § 2255(f) should be invoked in this motion – which would be an improper application of the statute – there is no evidence that Mr. Webster failed to exercise due diligence.

As discussed in the opening brief, Mr. Webster attempted to obtain his Social Security records, which contain evidence of his low IQ and adaptive deficits, both prior to trial and prior to filing his first habeas petition.  Had the Social Security Administration turned over Mr. Webster's records when they were

first requested, they would have been presented at trial.  Similarly, had the district court, in connection with the first habeas petition, ordered the government to produce, as requested, "any reports prepared by a mental health professional in the Government's possession . . . on the issue of petitioner's mental retardation," the records would have been discovered earlier and would have been presented in the habeas proceedings.

The government's argument simply ignores the prior attempts to obtain the records, and instead argues that Mr. Webster should have known the records contained diagnoses of mental retardation because he knew he applied for benefits related to a sinus condition and because his counsel had previously requested the records.  *See* Gov't Br. at 14.  The government's theory that Mr. Webster knew that the Social Security records contained diagnoses of mental retardation is pure speculation.  There is no evidence that Mr. Webster ever saw or knew the contents of the Social Security records – or could have appreciated their importance to his defense – until his counsel finally obtained them in February 2009.[4]  In any event, the fact is that Mr. Webster attempted to obtain the records, and was thwarted at every turn.

---

[4]  The fact that Mr. Webster attempted to obtain the records in the past similarly does not mean that he knew what they contained.  The purpose of discovery is to obtain any documents that may be relevant to a party's claim or defense.  *See* Fed. R. Civ. P. 26(b); *Hickman v. Taylor*, 329 U.S. 495, 501 (1947) ("the various instruments of discovery . . . serve . . . as a device for ascertaining the facts, or information as to the existence or whereabouts of facts").

13

In addition, on the facts as presented in this motion, the principle of equitable tolling would be applicable to a consideration of whether Mr. Webster's claim is time-barred. *See Rivera*, 505 F.3d at 354 (remanding to district court for consideration of whether equitable tolling applied because state's argument that there was attorney error or lack of diligence was "an assumption not tested in a hearing"). First, Mr. Webster made multiple attempts to obtain the Social Security records, and these government records were never released. Second, Mr. Webster's mental retardation prevented him from effectively participating in the development of his claim. *See Atkins v. Virginia*, 563 U.S. 304, 320 (2002) (recognizing that mentally retarded defendants are less able to give meaningful assistance to their counsel); *Rivera*, 505 F.3d at 355 ("answering whether [defendant] is retarded is logically antecedent – if not a core element itself – to determining whether equitable tolling is available").

Finally, although this circuit has suggested that mental retardation, by itself, does not excuse a petitioner's failure to meet the statute of limitations, *see In re Lewis*, 484 F.3d 793, 798 n.20 (5th Cir. 2007), other circuits have recognized that actual innocence serves as a complete defense to failure to meet the statute of limitations. *Cf. Souter v. Jones*, 395 F.3d 577, 599, 602 (6th Cir. 2005) (holding that "where an otherwise time-barred habeas petitioner can demonstrate that it is more likely than not that no reasonable juror would have found him guilty beyond

14

a reasonable doubt, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying constitutional claims" and noting that "the inclusion of an actual innocence exception to the limitations provisions is consistent with the underlying principles of AEDPA"). Here, Mr. Webster is, as a mentally retarded person, actually innocent of the death penalty.

## III.   THE NEWLY DISCOVERED EVIDENCE SHOULD BE EVALUATED AT A HEARING BEFORE THE DISTRICT COURT

While the government argues that Mr. Webster's claims have already been litigated, and the proper standard applied to them, Gov't Br. at 18-19, this is simply untrue. The government does not, and cannot, claim that any court has considered Mr. Webster's new evidence. Thus, the only evaluation of Mr. Webster's mental retardation claim was based on incomplete evidence and evaluated using an undeveloped standard. *See Webster*, 2003 WL 23109787, at *11-*14. The fact is that the new evidence presented in Mr. Webster's motion has not been evaluated under *any* standard—it simply has not been evaluated. Section 2255(h)(1) mandates that the evidence be considered "as a whole." To deny Mr. Webster the opportunity to present the new evidence of his mental retardation would be contrary to law.

## **CONCLUSION**

THEREFORE, for reasons stated in the opening brief and in this reply, Mr.

Webster respectfully asks this Court to:

       Authorize Bruce Carneil Webster to file a successive
       motion to vacate his sentence under 28 U.S.C. § 2255.

Dated:　December 8, 2009

                  Respectfully submitted,

                  Dorsey & Whitney LLP

                  By　_s/Steven J. Wells_____
                     Steven J. Wells (MN Atty# 163508)
                  Suite 1500, 50 South Sixth Street
                  Minneapolis, MN 55402-1498
                  Telephone: (612) 340-2600
                  Facsimile:  (612) 340-2868
                  E-mail:  wells.steve@dorsey.com

                  Counsel for Petitioner
                  Bruce Carneil Webster