# EXHIBIT 3

# PSYCHOLOGY IN MENTAL RETARDATION AND DEVELOPMENTAL DISABILITIES

## OFFICIAL PUBLICATION OF DIVISION 33

### AMERICAN PSYCHOLOGICAL ASSOCIATION

Volume 33, Number 1        Summer 2007

## Message from the President

Johannes Rojahn, George Mason University



The Annual APA Conference in San Francisco is fast approaching and our division's program is chock full of exciting symposia and poster presentations. Let me congratulate this year's Program Chair and President-Elect Steven Warren and the Co-Chair Maria Valdovios for their outstanding effort. I look forward to meeting many of you in August in the City by the Bay during our program sessions and social events.

The past year has brought some important changes for the Division, not the least of which was the name change. We collectively decided to shed the increasingly unpopular term "Mental Retardation" and replaced it with "Intellectual and Developmental Disabilities". As far back as 2001, Bill MacLean, Div. 33 President at the time, kept the division members informed about the ongoing controversy surrounding the use of the term 'mental retardation' (MacLean, 2001). Well, at long last, that discussion should be at an end, at least as far as it concerns the name of our Division. At last year's Executive Council meeting in New Orleans the terminology and division name issue resurfaced and a name change was unanimously approved in principle by those present. The time was ripe to make a move. In the next step, the Executive Council members received three options to choose from in an email poll: 1. Intellectual and Developmental Disabilities (27 points), 2. Intellectual and other Developmental Disabilities (11 points), and 3. Developmental Disabilities (9 points). The numbers in parentheses were calculated on the basis of the following ratings: three points for first, two points for second, and one point for third place choices respectively. The first name option prevailed albeit not unanimously. In opposition it was argued, for instance, that intellectual and developmental disabilities was logically inconsistent. The strongest argument in favor of name option one was its uniformity with the international consensus on nomenclature. That first round winning name was then presented to the Division 33 membership for approval, introduced by a spirited and eloquent request for ratification by Steve Warren in the 2006 Fall Newsletter (Warren, 2006). It was approved by our membership. The name change finally took effect on May 15, 2007 after the deadline for other APA divisions and members of the APA Council of Representatives to comment had passed without objections. It is important to add that, in keeping with APA Rule 100-3, our name change does not extend the scope of the scientific and/or professional field for which our division was recognized at the time it was established by the Council of Representatives.

But other matters are waiting to be addressed. In the Executive Council meeting in San Francisco we will address several new and continuing business items and discuss the Division's response to several announcements. Here are some highlights:

- Student memberships and recruitment of new members.
- Governance – in the process of developing a *Division Handbook*, an extremely important exercise which was initiated by Sara Sparrow which will be of great assistance to future Division officers, several problems became apparent which we will try to fix. For instance, the role of past-presidents must be specified more clearly and the future of currently inactive committees needs to be discussed (e.g., Professional Standards Committee, the Quality of Care Committee, and the Ethics Committee.)
- Division Website: Given that the current website provided by APA is very limited and that we are running into space problems if we want to continue posting the Division Newsletter, our web master Matthew Hile suggested that the Division purchase its own domain name and obtain a web host.
- The Committee on International Relations in Psychology (CIRP) wants to establish a psychology speaker's bureau for the United Nations. They would like names of members of our division who would be good contacts for such a UN

### Division 33 Election Results:
**President-Elect: J. Gregory Olley, PhD**
**Member-at-Large: Erica Kovacs, PhD**
**Congratulations to Greg and Erica!**



In This Issue...

Message From the President
by Johannes Rojahn ........... 1

The Assessment of Adaptive Behavior in Adult Forensic Cases: Part 3, The Importance of Adaptive Behavior
by J. Gregory Olley ........... 3

Division Announcements and News
Division 33 and Psychology In the World
by Laraine M. Glidden ........... 6

Our Readers Write
Are We Seeing More Children With Autism? Part 2 by Allan S. Bloom ........... 7

EXHIBIT
3

# The Assessment of Adaptive Behavior in Adult Forensic Cases: Part 3: Sources of Adaptive Behvior Information

**J. Gregory Olley[1]**, University of North Carolina at Chapel Hill

The previous two articles in this series reviewed the controversial issues in the assessment of adaptive behavior in *Atkins* cases and discussed the critical importance of this information in the diagnosis of mental retardation or intellectual disabilities. As a timely aside, the American Association on Mental Retardation has recently changed its name and the names of its journals, and Division 33 is considering following suit to adapt the term intellectual disabilities to replace mental retardation. In contrast, state laws and court decisions contain countless references to mental retardation. The period of transition to a new term is likely to be a slow one in the legal area. Thus, in reference to the work of psychologists in forensic settings related to disabilities, it may be necessary to use both terms in order to be clear. The term "mental retardation" is not likely to go away in the courts for quite some time. My use of this term is not intended to offend or to disregard the importance of this change in language.

As noted in the two earlier articles in this series (Olley, 2006a, 2006b), hearings to determine mental retardation in death penalty cases have come to be called *Atkins* hearings after the United States Supreme Court's 2002 decision in *Atkins v. Virginia* in which they ruled that people with mental retardation may not be given the death penalty. The Supreme Court left many of the details of implementation of this decision to the states, and the result has been much disagreement among attorneys, psychologists, and other experts with regard to the proper procedures for diagnosing mental retardation in these circumstances. Division 33's *ad hoc* Committee on Mental Retardation and the Death Penalty will continue to examine these controversial issues and write position papers on this topic in future issues of this publication.

In the previous article in this series, I emphasized the importance of adaptive behavior information in *Atkins* hearings but acknowledged that there is no single source of information that is sufficient to support a definitive conclusion regarding possible deficits in adaptive behavior. To overcome this limitation, it is essential to seek information from as many sources as possible. In this third and concluding article on the assessment of adaptive behavior, I would like to discuss the range of possible sources of information related to adaptive behavior and the relative strengths and weaknesses of each source.

In the first article in this series (Olley, 2006a), I mentioned several controversies regarding the nature of adaptive behavior and the measurement of adaptive behavior that are commonly raised in *Atkins* hearings. These included the following.

- Is adaptive behavior based on functioning only, or can one consider the individual's potential? ("He could have done better under other circumstances.")
- Should motivation be taken into consideration? ("He could have done better if he had tried harder.")
- Are tests of knowledge accurate measures of adaptive behavior? ("He knew the right answer.")
- How can scores on an adaptive behavior scale be interpreted when the informant must rely on his or her memory of the earlier adaptive behavior of an individual who has been in prison for a long time?
- Is adaptive behavior in prison an adequate indicator of adaptive behavior in one's community?

In his excellent summary of the implications of the *Atkins* decision, Ellis (2003) pointed out another reason why adaptive behavior is important. A documented pattern of deficits in adaptive behavior from childhood until the time of the crime is a strong indicator that the defendant is not malingering or "faking" mental retardation. In Justice Scalia's dissent to the *Atkins* decision (*Atkins*, 2002), he indicated his belief that mental retardation is "readily feigned." Justice Scalia's belief has yet to be tested empirically, but his statement has alerted psychologists to address the issue of malingering whenever they conduct an

evaluation for mental retardation. As Ellis (2003) pointed out, no one would have a reason to "feign" mental retardation throughout life, and a history of impaired adaptive behavior is a strong argument against the existence of malingering.

**Additional Controversies Regarding Adaptive Behavior**

In addition to the controversies about adaptive behavior mentioned earlier (Olley, 2006a), psychologists and attorneys have disagreed over the following.

*Are the deficits due to mental retardation or something else?*

When documentation of adaptive behavior deficits is presented in court, it can be interpreted in various ways. If the evidence is poor academic performance, for instance, the problem may be attributable to illness, truancy, lack of encouragement at home, or alleged personality traits, such as laziness. If the deficits are social or emotional, they may be seen as indicators of a mental disorder, such as conduct disorder or anti-social personality disorder. In such circumstances, the prosecution is likely to argue that the observed deficits are due to one of these alternative causes and not caused by mental retardation. The defense psychologist is likely to point to the last two AAMR manuals (AAMR, 1992; 2002), which distinguish between adaptive behavior deficits and maladaptive behavior and note that the two are not significantly correlated. They may further point to the literature on the dual diagnosis of mental retardation and mental illness (e.g., Matson & Barrett, 1993; Reiss, 1994; Ryan, 1996) and emphasize that having a mental disorder (e.g., conduct disorder) does not rule out mental retardation.

Many arguments in court appear to be based on the assumption that diagnostic categories are explanatory concepts or causal factors. The discussion is sometimes framed as, "Was the observed adaptive behavior deficit caused by mental retardation or by something else?" The reply is that mental retardation is not a cause at all, but a

[1] Correspondence concerning this article should be addressed to J. Gregory Olley, Center for Development and Learning, University of North Carolina, Chapel Hill, North Carolina 27599-7255. E-mail: greg.olley@cdl.unc.edu

result. Mental retardation is a label given to a constellation of observed behaviors. It doesn't cause anything, but any one of several hundreds of known factors (genetic, environmental, infection, trauma, etc.) can cause the condition that we call mental retardation. Although the cause of mental retardation is often not known, it is clear that mental retardation is a term for the result; it is not a cause. To reason otherwise would be to argue that mental retardation causes mental retardation.

### Is There a "Smoking Gun?"

Perhaps the Perry Mason television shows of the past caused the expectation that there will be a dramatic courtroom moment when the definitive evidence will be produced. As if following this script, sometimes a piece of evidence is presented that is claimed to show conclusively that the defendant has mental retardation or could not possibly have mental retardation. The examples are many and varied, but consider a few.

Mental retardation is a disorder of impaired intelligence, so it is pretty clear that some intellectual accomplishments definitely rule out mental retardation. If the defendant graduated from Harvard, we can safely rule out mental retardation. How about more everyday examples? Prosecutors have argued that the defendant does not have mental retardation, because he had a driver's license, was employed, babysat for his nephews, dressed neatly, got married, had children, knew his way around town, etc. These arguments are based on two premises. The first has to do with the cutoff for "significant impairment" in adaptive behavior. The second has to do with typical performance vs. isolated examples of adequate functioning.

To consider the first premise, one must have an established standard of what is "significant impairment?" In the measurement of intelligence, "significant impairment" is statistically defined as two standard deviations below the mean. The same concept applies to the measurement of adaptive behavior, but what is two standard deviations below the mean in employment or leisure? The ambiguity of the cutoff leads to endless debate with much heat and little light.

A rule of thumb about the cutoff for significant impairment in adaptive behavior is the extent to which the individual has required assistance to carry out age-appropriate activities. If a person were able to live and work without assistance, the individual would not be considered to have mental retardation. If the person has required ongoing assistance to manage money, maintain relationships, make basic decisions, etc., these limitations are indications of significant impairments in adaptive behavior. This emphasis on independence vs. need for assistance is the concept behind the AAMR's classification system based on level of supports needed (American Association on Mental Retardation, 1992; 2002).

The second issue regarding typical behavior vs. isolated behavior is often a focus of courtroom controversy. In order to argue that the defendant does not have mental retardation, the prosecution may point to the crime itself and note that some degree of planning and general intelligence must have been needed to engage in the crime. Other examples include a wide range of successful actions that may be considered incompatible with mental retardation. The defense's counter to this argument often points to the definition of adaptive behavior as typical behavior in community settings (AAMR, 2002) and argues that atypical behavior (e.g., murder) should not be considered evidence of adequate adaptive behavior. The point is further made that human performance, and certainly the performance of people with mental retardation, is variable across time and activities and conditions. Thus, people with mild mental retardation do engage in some activities with reasonable levels of competence.

If there are no, or few, definitive, "smoking gun" types of evidence, perhaps there are some cognitive characteristics that typically influence the adaptive behavior of people with mental retardation. Greenspan, Loughin, and Black (2001) pointed to naiveté or gullibility or credulity as such a characteristic. That is, people with mental retardation are naïve with regard to social interaction and generally have a history of being taken advantage of by other people from an early age. Most scales of adaptive behavior touch lightly, if at all, on this issue, but a thorough evaluation of adaptive behavior should look for evidence that the defendant was tricked, swindled, or otherwise taken advantage of by others. For instance, men with mental retardation may have been tricked out of their money or their labor, and women may be tricked into sexual behavior due to their social naiveté. Of course, all of us have at some time been naïve enough to be convinced by advertising or a good salesman to spend money foolishly. Like most human traits, gullibility exists in degrees, and the cutoff for mental retardation is not at all clear.

The importance of this trait in capital cases is that the defendant may have participated in a crime due to the influence of others and not understood that participation would lead to a crime, much less a murder. A related concern is that a person who is easily influenced by others may confess to a crime that he or she did not commit. Kassin (2005) summarized research on the likelihood that innocent people will confess to serious crimes, including murder. This vulnerability is greater in people of low intelligence. The documentary film, *Inside the Interrogation Room* (Canadian Broadcasting Corporation, 2003) provides dramatic evidence of how police interrogation procedures can convince innocent people to confess to crimes, including murder.

### Sources of Adaptive Behavior Information

As noted earlier, all sources of information about adaptive behavior in *Atkins* cases are imperfect. Our typical procedures for assessing adaptive functioning are compromised when we investigate functioning retrospectively to the time of the crime or to childhood. The typical approach to overcoming this problem is to seek adaptive behavior information from several sources and to look for convergence of findings. In other words, if all sources of information point to the same conclusion, we can have more confidence in the validity of that conclusion. Such clear convergence of findings may be hard to achieve, but the approach is logically sound. With these limitations in mind, consider the sources of information about adaptive behavior that are available.

### 1. Interview the Defendant.

The defendant is the one person who experienced his adaptive functioning throughout his life, but interview presents many problems. There is no convincing evidence that anyone (no matter how expert) can diagnose mild mental retardation through interview. Nevertheless, it is customary to get whatever information one can from the defendant. Finlay and Lyons (2001) summarized the research on interviews and self-report questionnaires used with people with mental retardation.



They noted the many problems with item content, question phrasing, item format, and psychometric properties of scales that make it so difficult to obtain valid information.

Furthermore, information from the defendant may be challenged as an indication of malingering. Defendants on death row do have an obvious motive to downplay their accomplishments in hopes of feigning mental retardation. On the other hand, people with mild mental retardation are known to try to hide their disability in order to avoid the associated stigma. *Atkins* hearings have given new popularity to Robert Edgerton's classic book, *The Cloak of Competence* (1967), and his subsequent research (e.g., Edgerton, 2001), which documented this phenomenon. Thus, the defendant's self report may be exaggerated to avoid stigma, downplayed to feign mental retardation, reported inaccurately due to poor memory, or reported accurately. These uncertainties make self-report a particularly weak source of information.

*2. Test the Defendant's Knowledge.*
Any test of knowledge raises the concern that saying the right answer or being able to point to the right answer or a picture of the right answer is not the same as adaptive functioning. We all preach better than we practice. We cannot be confident that the findings from any test of knowledge administered in prison will generalize to typical performance in a community setting.

*3. Test the Defendant's Performance*
The AAMR (1992, 2002) defines adaptive behavior as functioning in one's community. Can a psychologist infer the defendant's community functioning from performance in prison? The restricted and highly structured prison setting provides no realistic opportunities to test for community functioning. It may, in fact, be argued that the routine and structure of prison life leads to better adaptive behavior for a person with mental retardation.

*4. Interview Family Members, Neighbors, Friends, and Former Employers.*
Affidavits from people who knew the defendant well are typical sources of information, and expert psychologists may also interview these people to get impressions and to confirm information in affidavits. Such information generates many anecdotes and examples that may illustrate good or poor community functioning. Interviews do not lead

to standardized test scores, so the significance of each example is subject to interpretation. Information from family members can be criticized for being biased in either direction. Family members do not want the defendant to be executed, but they also may be reluctant to reveal the potentially embarrassing or stigmatizing limitations of the defendant. Like most other information obtained from individuals, the accuracy of these anecdotes is affected by the reporter's memory.

*5. Administer an Adaptive Behavior Scale.*
Scales such as the Vineland Adaptive Behavior Scales (Sparrow, Ciccetti, & Balla, 2005) and the Scales of Independent Behavior-Revised (Bruininks, Woodcock, Weatherman & Hill, 1996) are the most widely accepted indicators of adaptive behavior. However, they were developed to assess current functioning, and information about past functioning depends on having informants who knew the defendant well at the time under discussion and who have good memories. These problems can be lessened to some degree if there are several informants available, and their reports are in substantial agreement.

*6. Administer an Adaptive Behavior Scale to the Defendant.*
The Adaptive Behavior Assessment System (Harrison & Oakland, 2003) is the only current adaptive behavior measure that offers the option of administering the scale to the defendant. The problems of interviewing people with mental retardation (Finlay & Lyons, 2001) apply to this approach, and problems of potential bias are also likely to be raised.

*7. Objective Archival Information.*
The results of an objective evaluation of the defendant during childhood are likely to be unbiased and address the issue of adaptive functioning before age 18. School records (grades, test scores) are the most available examples, although school records are often partially or completely missing after several years, and the help of a person from the local school system may be needed to interpret the meaning of certain records. Tests for eligibility for Social Security disability benefits or the records of any agency from which the defendant received services may be sources of information.

*8. Subjective Archival Information.*
Information from childhood or from

before the time of the crime is unlikely to be biased in a way that is relevant to the diagnosis of mental retardation. However, the subjective comments of teachers in school records are, by definition, subjective, and many school systems purge their records of such comments. Comments by coaches, scout leaders, camp counselors, or others who might have known the defendant in childhood are seldom written and preserved. If the defendant was in a residential treatment program or in a juvenile correctional facility, records containing subjective evaluations may be available. However, such comments may be limited to behavior in the residential setting, rather than typical community performance.

*9. Clinical Judgment.*
The testimony of experts is often offered as "clinical judgment," and some controversy exists about the validity of such conclusions. Although the so-called *Daubert* standard (*Daubert v. Merrell Dow Pharmaceuticals*, 1993) requires that expert testimony be based on some objective research or science, clinical judgments or impressions are often accepted from experts. Schalock and Luckasson's (2005) book on clinical judgment in mental retardation is an excellent guide to the proper use of clinical judgment that is based on objective information, rather than simply seat-of-the-pants impressions.

**Conclusions**
The measurement of adaptive behavior is a critical part of *Atkins* hearings, but the limitations to precise and valid measurement make it a lightning rod for controversy. Information about a defendant's adaptive functioning can come from varied sources, although the validity of each source may not be clear, and not all sources of information may be available for a given defendant.

This series of articles is intended to identify critical issues that affect the professional role of psychologists in capital cases. At this time, the controversies can best be addressed by identifying areas of agreement or consensus, but a long-term resolution will require substantial research on measurement of adaptive behavior and the variety of other challenging issues that are commonly raised in *Atkins* hearings.

## References

American Association on Mental Retardation. (1992). *Mental retardation: Definition, classification, and systems of supports* (9th ed.). Washington, DC: Author.

American Association on Mental Retardation. (2002). *Mental retardation: Definition, classification, and systems of support* (10th ed.). Washington, DC: Author.

*Atkins v. Virginia* 536 U.S. 304 (2002).

Bruininks, R. H., Woodcock, R. W., Weatherman, R. F., & Hill, B. K. (1996). *Scales of Independent Behavior-Revised.* Chicago: Riverside.

Canadian Broadcasting Corporation (Producer) (2003). *Inside the interrogation room* [Motion picture]. (Available from Films Media Group, P.O. Box 2053, Princeton, NJ 08543-2053)

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

Edgerton, R. B. (1967). *The cloak of competence: Stigma in the lives of the mentally retarded.* Berkeley: University of California Press.

Edgerton, R. B. (2001). The hidden majority of individuals with mental retardation and developmental disabilities. In A. J. Tymchuck, K. C. Lakin, & R. Luckasson (Eds.), *The forgotten generation: The status and challenges of adults with mild cognitive limitations* (pp. 3-19). Baltimore: Paul H. Brookes.

Ellis, J. W. (2003). Mental retardation and the death penalty: A guide to legislative issues. *Mental and Physical Disability Law Reporter, 27*(1), 11-24.

Finlay, W. M., & Lyons, E. (2001). Methodological issues in interviewing and using self-report questionnaires with people with mental retardation. *Psychological Assessment, 13,* 319-335.

Greenspan, S., Loughin, G., & Black, R. S. (2001). Credulity and gullibility in people with developmental disorders: A framework for future research. In L. Masters (Ed.). *International review of research in mental retardation.* (Vol. 24, pp. 101-135). San Diego: Academic Press.

Harrison, P. L., & Oakland, T. (2003). *Adaptive Behavior Assessment System* (2nd ed.). San Antonio: Harcourt Assessment.

Kassin, S. M. (2005). On the psychology of confessions: Does innocence put innocents at risk? *American Psychologist, 60, 215-228.*

Olley, J. G. (2006a). The assessment of adaptive behavior in adult forensic cases: Part 1. *Psychology in Mental Retardation and Developmental Disabilities, 32*(1), 2-4.

Olley, J. G. (2006b). The assessment of adaptive behavior in adult forensic cases: Part 2. The importance of adaptive behavior. *Psychology in Mental Retardation and Developmental Disabilities, 32*(3), 7-8.

Matson, J. L., & Barrett, R. P. (Eds.). (1993). *Psychopathology in the mentally retarded* (2nd ed.). Boston: Allyn and Bacon.

Reiss, S. (1994). *Handbook of challenging behavior: Mental health aspects of mental retardation.* Worthington, OH: IDS.

Ryan, R. M. (1996). *Handbook of mental health care for persons with developmental disabilities.* Evergreen, CO: S&B.

Schalock, R. L., & Luckasson, R. (2005). *Clinical judgment.* Washington, DC: American Association on Mental Retardation.

Sparrow, S. S., Cicchetti, D. V., & Balla, D. A., (2005). *Vineland Adaptive Behavior Scales* (2nd ed.). Circle Pines, MN: AGS.

# Psychology and the World

**Laraine M. Glidden**, Division Liaison to APA Committee on International Relations in Psychology

As some of you have undoubtedly experienced, renewing your passport or getting a new one has become more difficult. Simultaneously, the global nature of psychology generally and activities of particular interest to members of Division 33, have made attention to the international nature of our discipline more essential. The APA Committee on International Relations in Psychology (CIRP) has met twice since our last convention in New Orleans, once in September 2006, and most recently in March 2007. The minutes from the September meeting are at www.apa.org/international/2006-CIRP-fall-draft.pdf.

As of this writing the March minutes had not yet been posted. Highlights from that meeting include funding for a psychologists' map of the world—a web page in which details of psychology in different countries would be available at the roll of a mouse over the selected region. Another initiative involved the formation of a coalition of psychologists who have been Fulbright scholars who could serve as advisors to other psychologists who are planning international activities, either short- or long-term. Finally, Florence Denmark, an APA representative to the United Nations,

provided updated information on the October 11, 2007 Psychology Day at the UN. For additional APA international news go to www.apa.org/international/pi.

From April 23-25, 2007, the Shafallah Center for Children with Special Needs hosted its 2nd International Forum, focusing during these three days on disability and the media. Several documentaries were shown and discussed, including the award-winning *Collector of Bedford Street*, featuring Larry Selman, a man with mild intellectual disability who has lived most of his adult life on Greenwich Village's Bedford Street where his neighbors have become his family. Larry was in attendance as was Alice Elliott, the film's director. As with the 1st International Forum, approximately 200 delegates from six continents shared stories with each other and with the staff and families and children and youth from the Shafallah Center. It was invigorating, and the relationships that were forged or renewed should effectively serve the global community. Go to www.shafallah.org.qa for more information.

Looking ahead to international meetings, members of Division 33 should add the 13th World Congress of the

International Association for the Scientific Study of Intellectual Disability (IASSID) to their calendar: August 25-30, 2008 in Capetown, South Africa. This meeting has been in the planning stages since 2004, and IASSID is focused on including a record number of African speakers and attendees. You can obtain more information from www.iassid.org.

Finally, as you prepare for the APA Convention in San Francisco, be aware of the programming that is focused on international issues and development. Given that the theme of the convention is "building bridges" it was particularly apt that APA President Sharon Brehm invited the presidents of all the national and regional psychology associations around the world to attend at her expense. More than 20 accepted the invitation and will speak in a symposium on international perspectives. For other international programming, see www.apa.org/onternational/convention which will be uploaded approximately three weeks before the convention. Print copies will also be available at the international booth at the San Francisco convention Center. I hope to see you there.