# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **BRUCE CARNEIL WEBSTER,**<br>Petitioner, | §<br>§<br>§ | |
| v. | §<br>§<br>§ | Criminal No. 4-94-CR-0121-Y<br>(Civil No. 4-00-CV-1646-Y) |
| **UNITED STATES OF AMERICA,**<br>Respondent. | §<br>§<br>§ | |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO "AMENDED MOTION OF BRUCE CARNEIL WEBSTER TO VACATE CONVICTION AND SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE"

The United States of America, by and through the United States Attorney for the

Northern District of Texas, files this response in opposition to the "Amended Motion of Bruce

Carneil Webster to Vacate Conviction and Sentence and for New Trial Pursuant to 28 U.S.C. §

2255 and Rule 33 of the Federal Rules of Criminal Procedure," filed on August 16, 2002.

I.

**Procedural Background Prior to the Filing of the Motion for Relief Pursuant to**

**Section 2255.** On November 22, 1994, a superseding indictment in cause number 4:94-CR-

0121-Y in the Northern District of Texas was returned against Bruce Carneil Webster, also known

as "B-Love," and four co-defendants, charging various offenses relating to the kidnapping and

murder of Lisa Rene. Webster was charged in count one with kidnapping resulting in the death

of Lisa Rene, in violation of 18 U.S.C. § 1201(a). He was also charged with conspiring to

commit the kidnapping (count 2); traveling in interstate commerce to promote the unlawful

EXHIBIT

4

lectured Barber that Webster should not be executed. When Barber told Dr. Keyes that Webster had never acted retarded, Dr. Keyes told Barber that he would not be able to help him and left.

Pat Drewett was Webster's ninth-grade civics teacher at Watson Chapel Junior High School. Her class was not a special education class. Webster slept a lot in her class. In her opinion, Webster was not mentally retarded. Had she thought that he was, she would have recommended him for special education classes.

Linda Monk was Webster's ninth-grade basic English teacher at Watson Chapel Junior High School. She testified, "For a student in a basic class, he seemed like one of the brighter ones, although his grade did not reflect that." Webster slept a lot the first nine weeks of class but seemed to pay more attention the second nine weeks when the class concentrated on literature. Webster did not have any problems communicating and seemed mature for his age. Ms. Monk testified that she had had contact with many mildly mentally retarded or borderline retarded students, and that several of her students each year were classified as mildly or borderline retarded. In her opinion, Webster was not borderline or mildly mentally retarded. She felt he did not excel because he just did not try. In her opinion, Webster was quite a bit brighter than his brother Tony, whom she also taught.

E.C. Turner testified that he had been a school counselor for 23 years, 13 at Watson Chapel Junior High School. As a part of his duties, he administered achievement tests called M.A.T. 6 Surveys on a regular basis to seventh graders. Based upon these test scores, a determination can be made whether a student should be enrolled in special education classes. During his career, Turner diagnosed or came into contact on many occasions with mildly or moderately mentally retarded students. He had no indication that Webster was suffering from

mental retardation. Webster's M.A.T. 6 Survey was in the 43rd percentile, placing Webster in the low average at Watson Chapel. Based on his score, Webster definitely would not have qualified for special education classes.

Marcus Hollien testified that, in June 1992, he was a supervisor in a work program for teenagers in which Webster was a participant. Hollien testified that he saw nothing that would indicate that Webster was retarded, and Webster was the individual that others followed. Hollien's evaluation of Webster stated that, "Bruce is a very intelligent individual with good characteristics but needs to get self discipline."

The government introduced a letter written by Webster to fellow inmate John Clay on April 14, 1996, and a letter written by Webster to Marvin Holloway just a few weeks before Webster's trial. In the letter written to John Clay, Webster asked for Clay's assistance in a plan to have sex with female jail inmates during visiting hours. In the letter, Webster described to Clay a plan whereby Clay would give Webster the names of some of the women Clay knew who were in custody and the names of some people not in custody that Webster could put on his visitation list. The plan was for visitors to come into the jail and ask to visit Webster, Clay and some women inmates at the same time. Webster told Clay in the letter that he could keep a watch for Clay, and then Clay could keep a watch for Webster while they had sexual relations with the women. In the letter to Holloway, Webster talked in slang about how everyone knew that he would "put in work" on someone, that is, he was not afraid to shoot someone.

B.J. Valdez, the same jailer who had testified about Webster escaping into the women's area of the jail, testified that he had seen Webster reading newspapers and postcards while Webster was incarcerated, and that on one occasion, Webster read a newspaper story out loud to

As the original fact-finder, the Court is in the unusual position of weighing whether its decision would have been different given this new "evidence" offered by Webster, rather than considering whether the jury's determination would have been different. The government submits that the Court's determination should remain unchanged. First, although Webster contends that Mr. Turner and Ms. Gray will offer certain testimony, he offers no affidavit from either substantiating his claim. Notwithstanding, the testimony he claims they would offer is insufficient to change the outcome rendered at trial by this Court – that Webster is not mentally retarded. Much of it has nothing to do with Webster himself and is not probative on the issue of whether he is mentally retarded. At trial, this Court heard considerable evidence on the question of whether Webster is mentally retarded. Although the evidence may have been equivocal on whether Webster possesses a low I.Q. and exactly what his I.Q. is, there is no question the evidence demonstrated that Webster's adaptive skills are intact. Many witnesses other than teachers and school counselors testified to their observations of Webster; these observations proved that Webster's adaptive skills are not deficient. See Punishment Phase, pp. 14-29.

**c. Trial counsel were not ineffective in failing to object to the trial court's determination that it would make the requisite findings concerning mental retardation where the law was unsettled at the time of trial (pp. 34-36)**

Webster contends that his defense counsel were ineffective where they failed to object to the trial judge's decision to make the requisite findings regarding mental retardation. The Fifth Circuit in its opinion in this case determined that the FDPA failed to provide guidance on how or who was to make the determination on mental retardation. Webster, 162 F.3d at 351. "Because the statute fails to provide guidance and no case has addressed this issue, the law is not pellucid." Id.